IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JOAO MONTEIRO, | |
| Plaintiff, | |
| | |
| v. | No. 21-cv-00046-MSM-LDA |
| | |
| SUSAN CORMIER, TREVOR LEFEBVRE, DANIEL MULLEN, TINA GONCALVES, CITY OF PAWTUCKET, and TAMARA WONG, | |
| Defendants | |

**<u>DEFENDANT TAMARA WONG'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT</u>**

INTRODUCTION..................................................................................................1

I. FACTS AND POSTURE ...................................................................................2

A.    SCIENTISTS IDENTIFIED 14 DNA SEQUENCES IN A DNA SAMPLE OBTAINED FROM A DECEASED CHILD'S PANTS; PLAINTIFF MONTEIRO'S DNA SAMPLE REVEALED THE EXACT SAME SEQUENCES. ............................................................................... 2

    1.    Analyst Wong Identifies and Tests DNA Specific to the Y Chromosome........ 2

    2.    Analyst Wong Reports The Findings of Her Y-STR DNA Comparison............ 6

    3.    In Her Probable Cause Affidavit, Detective Cormier Reports That the Two Y-STR DNA Profiles Are "Consistent" With Each Other.................................. 10

B.    PLAINTIFF MONTEIRO IS ARRESTED, BRIEFLY DETAINED AND RELEASED ON BOND..... 11

C.    PLAINTIFF BRINGS SUIT AGAINST ANALYST WONG. ................................................... 11

D.    PLAINTIFF BELATEDLY ADMITS THAT ANALYST WONG DID NOT COMMIT THE MISCONDUCT ALLEGED IN HIS COMPLAINT. ............................................................... 13

II. LEGAL STANDARD ...................................................................................15

III. ARGUMENT ...............................................................................................16

A.    PLAINTIFF CANNOT SUCCEED ON ANY OF HIS SEVEN CLAIMS AGAINST ANALYST WONG BECAUSE HE WAS ARRESTED WITH PROBABLE CAUSE. ............................................... 18

    1.    The Purported Absence of Probable Cause is the Sine Qua Non of Plaintiff's Seven Claims; The Actual Presence of Probable Cause Requires Dismissal of All Counts. ...................................................................................................... 18

    2.    Plaintiff Presents No Evidence to Rebut the Legal Presumption of Probable Cause for Plaintiff's Arrest. ............................................................................ 21

    3.    Even if Probable Cause For Plaintiff's Arrest Was Absent, Plaintiff's Claims Against Analyst Wong Must Still Be Dismissed.............................................. 26

B.    THE ABSENCE OF ANY CAUSAL LINK BETWEEN ANALYST WONG'S TEXT MESSAGE, AND PLAINTIFF'S ALLEGED INJURIES, DOOMS PLAINTIFF'S CLAIMS AGAINST WONG. ............................................................................................................................ 29

    1.    Analyst Wong's text message communication –"It's a match. Finalizing the report right now." – is a true and correct statement. ......................................... 30

    2.    The Text Message Was Not Presented in Evidence to the Magistrate, And Thus Could Not Have "Caused" The Magistrate to Find Probable Cause. ............... 35

    3.    The Magistrate's Determination of Probable Cause Extinguishes Any Causal Link Between Analyst Wong's Conduct, and Plaintiff Monteiro's Arrest....... 36

C.    PLAINTIFF MONTEIRO FAILS TO ADDUCE EVIDENCE SUFFICIENT TO SUPPORT REQUIRED ELEMENTS OF HIS CLAIMS AGAINST ANALYST WONG. ................................................. 37

    1.    Plaintiff Fails To Adduce Evidence to Support Critical Elements of Counts I and II, for Malicious Prosecution and False Arrest ................................................. 37

2. Plaintiff Produces No Evidence In Support Of a Purported Conspiracy to Deprive Plaintiff of Constitutional Rights (Count IV). ................................... 41

3. Plaintiff Fails to Adduce Evidence To Satisfy His Claim That Analyst Wong Failed to Intervene in Purported Constitutional Violations (Count V). ............ 42

4. Plaintiff Fails to Adduce Evidence Necessary to Prove That Analyst Wong is Liable to Plaintiff on Plaintiff's State Law Claims (Counts VI, VII and VIII). 44

D. ANALYST WONG VIOLATED NO "CLEARLY ESTABLISHED" CONSTITUTIONAL RIGHT AND IS ENTITLED TO SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY. .................... 46

E. ANALYST WONG IS STATUTORILY PROTECTED FROM LIABILITY ON PLAINTIFF'S STATE LAW CLAIMS BY RHODE ISLAND GENERAL LAWS SECTION 23-1-32. .......................... 49

**CONCLUSION** ................................................................................................................**50**

## INTRODUCTION

Two years ago, Plaintiff Joao Monteiro sensationally alleged that Forensic Science Analyst Tamara Wong, of the Rhode Island Department of Health, "intentionally fabricated" "DNA evidence" against the Plaintiff "to frame [him] for murder." Compl. ¶¶ 17, 100. In essence, he claimed that this fabricated evidence supplied artificial probable cause for Plaintiff's arrest. *Id*.

Plaintiff retained a respected forensic DNA scientist to scrutinize Analyst Wong's work. That expert found no mistake or inaccuracy in Analyst Wong's DNA analyses or reports. To support his career-crippling charges against Analyst Wong, Plaintiff has quietly *revised* the factual allegations which purportedly underpin each of his claims against her. Plaintiff now avers that the "DNA evidence" "fabricated" by Analyst Wong is a *text message* Wong sent to a detective, briefly summarizing her analysis: "It's a match. Finalizing the report right now."

Today, Plaintiff admits the accuracy of Wong's DNA analysis. He also admits the accuracy of Wong's Final Report of that analysis, which Wong furnished to the requesting detective promptly after transmitting her texted summary. The only purportedly culpable conduct Plaintiff now alleges against Wong is her statement, "it's a match," in that interim text update. The samples in question *do* match. Plaintiff offers word games, but no evidence, to prove otherwise.

Significantly, the fact of the "match" ultimately proves immaterial to the adjudication of Plaintiff's claims against Wong. The record conclusively establishes that Wong's disputed characterization of two DNA samples as a "match," was not presented in evidence to the Magistrate Judge who actually found probable for Plaintiff's arrest. That undisputed fact entirely disproves Plaintiff's theory that Wong's text communication *caused* the determination of probable cause for Plaintiff's arrest. On that basis alone, Plaintiff should have withdrawn all seven of his causes of action against Wong. Analyst Wong requests this Court to dismiss Plaintiff's claims.

**I.**
**FACTS AND POSTURE**

A.    **Scientists Identified 14 DNA Sequences In a DNA Sample Obtained From A Deceased Child's Pants; Plaintiff Monteiro's DNA Sample Revealed the Exact Same Sequences.**

1.    Analyst Wong Identifies and Tests DNA Specific to the Y Chromosome

Human DNA is stored in 23 pairs of chromosomes (or 46 individual chromosomes), which comprise our human genome. Those 23 pairs of chromosomes, and the DNA encoded therein, are found in each of our cells.  Wong Statement of Undisputed Facts (Wong SUF) Wong SUF ¶¶ 17-18.  Twenty two  (22) of the pairs are categorized as "autosomes"; these are not specific to gender. One of each pair of autosomes is inherited from one's biological mother; the other of the pair of autosomes is inherited from one's biological father.  Wong SUF ¶¶ 19-20.

The particular combination of *all* the DNA sequences encoded in our twenty two (22) pairs of autosomes is unique to a single individual (other than an identical twin).  Wong SUF ¶ 21. While any one particular DNA sequence ("allele") identified at a specific location ("locus"), on *one* of a person's 44 autosomes is not likely to be unique to that individual, the *combination* of *all* of that person's DNA sequences (alleles), across *all* locations (loci), on *all* 44 autosomes, is so variable as to be entirely unique to an individual other than an identical twin.

The twenty third (23) pair of chromosomes is comprised of the "sex" (or "sex-determining) chromosomes: either two "X" chromosomes (in a biological woman), or an "X" chromosome and a "Y" chromosome (in a biological male).  Wong SUF ¶¶ 23.  DNA in the Y chromosome is *not* unique to an individual.  Wong SUF ¶ 24.  The Y chromosome is passed down from father to son, entirely unchanged, resulting in the son's inheritance of a Y chromosome that is identical to his father's and to all males in his paternal lineage, *i.e.* to his biological brothers', paternal uncles', and paternal male cousins' Y chromosome. Wong SUF ¶ 25.  In other words, the alleles identified

at particular loci on a male's Y chromosome are expected to match the alleles identified at the same loci, on the Y chromosome belonging to the male's father and his paternally related grandfather, brothers, uncles, great uncles, male cousins and sons. Wong SUF ¶ 26.

Christine Cole disappeared in January of 1988. Wong SUF ¶ 28. Her body was discovered fifty four days later on the shore of Conimicut Point, in Warwick. Wong SUF ¶¶ 29-30. Detectives from the Pawtucket Police Department periodically re-visited the case to identify and chase down leads. Wong SUF ¶ 31.

In 2008, the Pawtucket Police Department requested that scientists at the Department of Health re-analyze the pair of pants worn by Cole at the time her body was discovered. Wong SUF ¶ 32. A Department of Health scientist (not Analyst Wong) detected an apparent stain on the inside crotch of those pants. Wong SUF ¶ 33. Scientists at the Rhode Island Department of Health, Forensics Science Laboratory (the "DOH Lab") made a cutting of the stained area of the pants. DNA was detected in the cutting. Wong SUF ¶ 34. Scientists at the DOH Lab scientifically extracted the DNA from the cutting, for testing purposes. Wong SUF ¶¶ 35-36. Scientists analyzed the DNA extracted from the pants cutting (hereinafter, the "Pants DNA Sample"). Wong SUF ¶¶ 37-39.

Scientists at the DOH Lab attempted to identify an autosomal DNA profile from the Pants DNA Sample. Wong SUF ¶ 37. An autosomal DNA profile (also called an "STR DNA profile") is drawn from the DNA stored in the 22 pairs of "autosome" or (non-sex-determining) chromosomes. Wong SUF ¶ 22. An autosomal DNA profile is unique to an individual (except an identical twin) (Wong SUF ¶ 21) and therefore is useful to forensic investigators who seek to connect an evidentiary DNA sample to the particular individual who is the sole source of that DNA sample.

DOH scientists were unable to identify an autosomal ("STR") DNA profile in the Pants DNA Sample. Wong SUF ¶ 38. However, DOH scientists recognized the presence of a Y allele in the DNA extract, indicating the presence of a Y chromosome. Wong SUF ¶ 39. In 2008, the DOH Lab did not have the technology to sequence DNA exclusively from the Y chromosome. Wong SUF ¶ 42.

A DNA profile drawn exclusively from the Y chromosome is called a "Y-STR" DNA profile. Wong SUF ¶ 24. Y-STR DNA is <u>not</u> unique to an individual; it is shared among all male members of a paternal lineage. Wong SUF ¶¶ 24-25. Therefore, forensic investigators can only use a Y-STR DNA profile to connect a DNA sample to *all* of the males in a paternal lineage. Wong SUF ¶ 26.

In 2010, the Department of Health reported that it sent the Pants DNA Sample to an external laboratory, which identified a *partial* Y-STR DNA profile from the Sample. Wong SUF ¶¶ 43, 46. That laboratory, called Fairfax Identity Laboratories, identified alleles at six of the 17 loci on the Y chromosome for which the external lab could test at the time. Wong SUF ¶ 47. Today, Plaintiff Monteiro admits the accuracy of that lab's partial Y-STR DNA profile. Wong SUF ¶ 49.

In 2018, Detective Cormier re-opened the Christine Cole Death Investigation. Wong SUF ¶ 52. In late 2018 or early 2019, a DOH supervisor assigned Wong to re-analyze the Pants DNA Sample from the Cole evidence, using more advanced Y-STR technology since acquired by the Department of Health. Wong SUF ¶¶ 54-57. In early 2019, Wong developed a more complete – but still partial – Y-STR DNA profile from Pants DNA Sample. Wong SUF ¶ 58. In 2019, a *complete* Y-STR DNA profile would reflect alleles identified at 23 loci (or locations) on the Y

chromosome. Wong SUF ¶ 57. Wong's further testing identified alleles at 12 loci, four of which were also identified in the earlier analysis, and eight of which were "new." Wong SUF ¶ 60.

Today, Plaintiff Monteiro admits the accuracy of Analyst Wong's Y-STR DNA analysis and the partial Y-STR DNA profile she obtained from the Pants DNA Sample. Wong SUF ¶ 61.

Between the testing initially conducted in 2010 (which identified alleles at six loci), and Wong's further testing in 2019 (which identified alleles at eight *additional* loci), the Department of Health compiled a newer and more complete "composite" partial Y-STR DNA profile for the Pants DNA Sample, comprised of alleles at 14 loci, of the 23 loci for which testing was available in 2019. Wong SUF ¶ 64.

Today, Plaintiff Monteiro does not claim any inaccuracy in the partial Y-STR DNA profile comprised of a total of 14 identified alleles, which were identified in the 2010 and/or 2019 analyses. Wong SUF ¶ 66.

On July 17, 2019, Analyst Wong received a buccal swab sample taken by the Pawtucket Police Department, from Plaintiff Monteiro's inner cheek. Wong SUF ¶ 67. Analyst Wong followed stringent testing and control protocols to correctly identify Plaintiff Monteiro's autosomal (or "STR") DNA profile, <u>and</u> his Y-STR DNA profile. Wong SUF ¶ 68.

Today, Plaintiff admits that Analyst Wong correctly identified his *autosomal* (or "STR") DNA profile. Wong SUF ¶ 69. Plaintiff's STR DNA profile was drawn from the DNA stored in the 22 pairs of "autosome" or (non-sex-determining) chromosomes. Wong SUF ¶ 22. That profile is unique to an individual other than an identical twin, and therefore is a valuable forensic tool for differentiating between possible sources of DNA evidence. Wong SUF ¶ 21.

Today, Plaintiff admits that Analyst Wong accurately identified his *Y-STR* DNA profile (a DNA profile drawn exclusively from Plaintiff's Y chromosome). Wong SUF ¶70. Plaintiff's Y-STR DNA is <u>not</u> unique to him; it is shared among all male members of his paternal lineage. Wong SUF ¶ 72-73. Forensic investigators can only use a Y-STR DNA profile to connect a DNA sample to *all* males in a paternal lineage. Wong SUF ¶ 73.

    2. <u>Analyst Wong Reports The Findings of Her Y-STR DNA Comparison.</u>

     (i) The Y-STR DNA From the Cole Pants, and From Plaintiff Monteiro, Reveal Identical Alleles at All 14 Loci Available for Comparison.

On July 17, 2019, Analyst Wong compared Plaintiff Monteiro's Y-STR DNA profile to the partial Y-STR DNA profile from the Cole Pants DNA Sample. Wong SUF ¶ 74. The Y-STR DNA profile from the Cole Pants DNA Sample revealed identifiable alleles at 14 loci. Wong SUF ¶ 75. Wong observed that Plaintiff Monteiro's Y-STR profile revealed the exact same alleles, at the exact same loci. Wong SUF ¶ 76.

In advance of the final and official Department of Health report she would provide to Detective Cormier just sixty-nine (69) minutes later, Analyst Wong briefly summarized the findings of her comparison of the two samples in a text message to Detective Cormier at 5:53 pm: "It's a match. Finalizing the report now." Wong SUF ¶ 77.

     (ii) Analyst Wong Furnishes the Department of Health's Official Report to Detective Cormier; It States the Samples Are Consistent With Each Other.

After texting Detective Cormier at 5:53 pm, Analyst Wong prepared, received supervisory approval for, and transmitted to Detective Cormier the final Report of the Department of Health (denoted "Supplemental Report II"), at 7:02 pm the same evening. Wong SUF ¶ 78. Supplemental Report II set forth Analyst Wong's official findings, on behalf of the Department of Health. Wong SUF ¶ 79.

Supplemental Report II identified the Y-STR DNA profiles Analyst Wong obtained for all samples submitted to her, including the partial Y-STR DNA profile from the Cole Pants DNA Sample, and Plaintiff Monteiro's Y-STR DNA sample. Wong SUF ¶ 76 (excerpted here). Notably, the same 14 alleles appear at the same loci in the profiles obtained for both samples.

| Locus on Y Chromosome | Alleles Identified on Y Chromosome<br><br>Pants DNA Sample[1] | Alleles Identified on Y Chromosome<br><br>Plaintiff's Buccal Sample[2] |
|---|---|---|
| DYS576 | 18 | 18 |
| DYS389I | 13 | 13 |
| DYS448 | 20 | 20 |
| DYS38911 | [No Reportable Result] | 30 |
| DYS19 | [No Reportable Result] | 13 |
| DYS391 | 11 | 11 |
| DYS481 | 22 | 22 |
| DYS549 | 13 | 13 |
| DYS533 | 12 | 12 |
| DYS438 | [No Reportable Result] | 10 |
| DYS437 | [No Reportable Result] | 14 |
| DYS570 | 18 | 18 |
| DYS635 | 21 | 21 |
| DYS390 | 24 | 24 |
| DYS439 | [No Reportable Result] | 12 |
| DYS392 | [No Reportable Result] | 11 |
| DYS643 | [No Reportable Result] | 12 |
| DYS393 | 13 | 13 |
| DYS458 | 15 | 15 |
| DYS385(a/b) | [No Reportable Result] | 17, 18 |
| DYS456 | 18 | 18 |
| YGATAH4 | 11 | 11 |

*See* Wong SUF ¶ 76 (Excerpted from Supplemental Report II).

---

[1] Plaintiff admits the accuracy of all 14 alleles identified in this Partial Y-STR DNA profile from the Cole Pants DNA Sample. Wong SUF ¶ 66.

[2] Plaintiff admits the accuracy of all of the alleles identified in this Y-STR DNA profile from Plaintiff Monteiro's buccal swab. Wong SUF ¶ 70.

Analyst Wong observed that Plaintiff Monteiro's Y chromosome revealed the exact same alleles, at the exact same locations, as were identified in the Y chromosome from the Pants DNA Sample. Wong SUF ¶ 76. In other words, the two profiles *match* each other. In her official report, Supplemental Report II, Wong reverted to the more general language utilized by the Department of Health to report the Department's official findings: she related that the two profiles are "consistent with" each other. Wong SUF ¶ 80(d). Today, Plaintiff Monteiro concedes the truth of that statement: he agrees the profiles are consistent with each other. Wong SUF ¶ 82.

> (iii)  Supplemental Report II Explains That Paternal Male Relatives Have "the Same Y-STR DNA Profiles."

Supplemental Report II also provided explanatory information (which had already been provided to the Pawtucket Police Department, in March of 2019, in Wong's Supplemental Report I). Wong SUF ¶¶ 63 & 80. The explanatory information described that Y-STR DNA is not unique to an individual but instead is shared among all members of a person's male lineage. Supplemental Report II emphasized that "Y-STR loci are located on the male specific Y chromosome *and are maintained throughout the paternal lineage*." Supplemental Report II (Ex. 27) at p. 5 (PD 1st RFP 000998) (emphasis added); Wong SUF ¶ 80. The Report accurately stated that "[m]ale relatives in the same paternal line will demonstrate *the same Y-STR DNA profiles*." Supplemental Report II (Ex. 27) at p. 5 (PD 1st RFP 000998) (emphasis added); *see also* Wong SUF ¶ 80. This information had *also* been provided to Detective Cormier several months earlier, in Analyst Wong's Supplemental Report I, dated March 19, 2019. *See* Supplemental Report I (Ex. 26) at p. 2 (PD 1st RFP 000992); Wong SUF ¶ 63.

Supplemental Report II informed Detective Cormier of the *statistical significance* of Wong's findings. Wong SUF ¶ 84. Supplemental Report II related that "approximately 1 in every 1,909 individuals" is expected to have the same partial Y-STR DNA profile as that obtained from

the Cole Pants DNA Sample. Wong SUF ¶ 84. Plaintiff admits the accuracy of that statistical analysis. Wong SUF ¶ 85. Specifically, Supplemental Report II stated:

> Statistics were developed using all suitable loci tested and the haplotype from the stain on the victim's purple pants (Item# 1.8) is found in. 0 of 5,717 total individuals within the combined U.S. Y-HRD database. Applying the 95% upper confidence interval results in a frequency of approximately 1 in every 1,909 individuals.

Supplemental Report II (Ex. 27) at p. 5 (PD 1st RFP 000998); Wong SUF ¶ 84.

Within ten minutes of receipt of Wong's Supplemental Report II (at 7:02pm), Detective Cormier admits that she read it. Wong SUF ¶ 86, 89. Detective Cormier asked Analyst Wong (by text message) about the absence of the more compelling sort of statistics which are often provided for *autosomal* DNA matches. Wong SUF ¶ 87-88. Cormier texted Wong at 7:10 pm: "So there is no '1 in 10 billion' match type of stats… Just 95% confident?" Wong SUF ¶ 87-88. Detective Cormier confirmed in her testimony that the 7:10 pm text message referred to the statistical significance of a 1 in 1,909 match probability. Wong SUF ¶ 89. In deposition testimony, Detective Cormier admitted that she hoped to obtain a statistic closer to 1 in 10 billion, than 1 in 1,909, from Analyst Wong's DNA analysis. Wong SUF ¶ 94. In response to Detective Cormier's question, Wong again emphasized to Detective Cormier, at 7:12pm (by return text message), that Y-STRs "are shared with family members," and therefore "the stats are always low." Wong SUF ¶ 91. This exchange was followed by a brief telephone call at 7:13pm between Tamara Wong and Detective Cormier. Wong SUF ¶ 93.

Detective Cormier gathered and conferred with a number of personnel from the Attorney General's Office, and drafted a probable cause Affidavit in support of an application for a warrant to arrest Plaintiff Monteiro. Wong SUF ¶ 95.

3.     <u>In Her Probable Cause Affidavit, Detective Cormier Reports That the Two Y-STR DNA Profiles Are "Consistent" With Each Other.</u>

In her probable cause Affidavit, Detective Cormier described the relationship between Plaintiff Monteiro's Y-STR DNA sample, and the partial Y-STR DNA profile obtained from Cole's pants, exactly as Analyst Wong described it in her official report: the Affidavit reported that the samples were "consistent with" each other. Wong SUF ¶ 97. Specifically, Detective Cormier's probable cause Affidavit stated that Analyst Wong contacted Detective Cormier on July 17, 2019:

> to notify [Detective Cormier] that the DNA reference was compared to the partial Y-STR profile obtained from the blood located on the inside crotch of the victim's pants and **confirmed that it was consistent with the known reference DNA profile for Joao Monteiro**. Tamara Wong provided a Summary of Analytical Facts Supplemental Report [II], which detailed her findings. Please see the attached report for further details.

Probable Cause Affidavit (Ex. 24) at p. 5 of 6 (PD 1st RFP 844); SUF ¶ 97.

Neither the probable cause Affidavit drafted by Detective Cormier, nor the Supplemental Report II which Detective Cormier attached to her Affidavit, used the term "match" to describe the relationship between the samples. Wong SUF ¶ 98. Nor did the probable cause Affidavit reference the "it's a match" text message, nor describe the two samples in question as "match[ing]." Wong SUF ¶ 98. Rather, as noted *supra*, the probable cause Affidavit attached the statistical analysis report found in Supplemental Report II, indicating a statistical significance of a 1 in 1,909 random match probability, which Plaintiff admits to be accurate. Wong SUF ¶ 84, 100.

After Detective Cormier's Probable Cause Affidavit was reviewed by prosecutors from the Attorney General's Office (Wong SUF ¶ 99) the Probable Cause Affidavit and an attached copy of Supplemental Report II were presented by Detective Cormier to Magistrate Judge Patrick O'Neill for a probable cause determination, on the night of July 17, 2019 (Wong SUF ¶ 101).

Magistrate Judge O'Neill found probable cause and issued a warrant for Plaintiff Monteiro's arrest at 10:30 that night. Wong SUF ¶ 101.

**B.      Plaintiff Monteiro Is Arrested, Briefly Detained and Released on Bond.**

Plaintiff Joao Monteiro was arrested late in the night on July 17, 2019, by Pawtucket Police, on a magistrate-issued arrest warrant.   Wong SUF ¶ 104.   Plaintiff Monteiro was ultimately detained for just under 48 hours – first at the Pawtucket Police Department, and then, following his arraignment on July 18, 2019, at the Rhode Island Adult Correctional Institution where he was committed for a single night. Wong SUF ¶ 104-107.

On July 19, 2019, the Court set bail for Mr. Monteiro.  Wong SUF ¶ 107.  On January 31, 2020, the Office of the Attorney General declined to charge Plaintiff Monteiro with any crime. Wong SUF ¶ 111.  Plaintiff Monteiro's bond payment and passport were returned, and all travel restrictions lifted.

**C.      Plaintiff Brings Suit Against Analyst Wong.**

Plaintiff brought suit against the City of Pawtucket,  four Pawtucket Police officers,[3]  and Analyst Wong (in her individual capacity only) seeking relief for "42 U.S.C. § 1983 – Federal Malicious Prosecution" (Count  I); "42 U.S.C. § 1983 – Arrest without Probable Cause" (Count II); "42 U.S.C. § 1983 – Equal Protection" (Count III)[4]; "42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights"(Count IV); "42 U.S.C. § 1983 – Failure to Intervene" (Count V); "State

---

[3] Pawtucket Police Defendants, Detective Susan Cormier, Detective Trevor LeFebvre, Major Daniel Mullens and Chief Tina Gonsalves, of the Pawtucket Police Department, together with Defendant the City of Pawtucket, are the "Pawtucket Defendants."

[4] In February of 2023, Plaintiff informed Analyst Wong that he would voluntarily withdraw this single count (Count III) against her. Wong SUF ¶ 113.

Law – False Arrest/Imprisonment" (Count VI); "State Law – Malicious Prosecution" (Count VII); "State Law - Intentional Infliction of Emotional Distress" (Count VIII).[5]  Wong SUF ¶ 113.

Most of Plaintiff's allegations are made against all Defendants, without differentiation. He claims that *all* Defendants, including Analyst Wong: "bypassed prosecutors" to seek a "false arrest" of Plaintiff (Ex. 1, Compl. ¶ 52); "arrested Plaintiff" (Ex. 1, Compl. ¶ 89); "commenced a criminal case against Plaintiff" (Ex. 1, Compl. ¶ 119); "initiated the prosecution of Plaintiff," "with malice," (Ex. 1, Compl. ¶ 125) and "detained" Plaintiff "without legal justification" (Ex. 1, Compl. ¶ 117).  Wong SUF ¶ 114.

The *only* factual allegations Plaintiff levels against Analyst Wong in particular are:

(a)    Analyst Wong was employed by the Department of Health. Ex. 1, Compl. ¶ 17.

(b)    Analyst Wong "supplied DNA evidence related to this case that was either manipulated by the Pawtucket Defendants to pursue the wrongful arrest of Plaintiff or that was intentionally fabricated to falsely implicate Plaintiff." Ex. 1, Compl. ¶ 17.

(c)    The Pawtucket Defendants "utilized Defendant Wong to accomplish the falsification of [DNA] evidence." Ex. 1, Compl. ¶¶ 43-44.

(d)    The Pawtucket Defendants either misrepresented the findings of Defendant Wong's analysis and/or Defendant Wong participated in the misrepresentation. Ex. 1, Compl. ¶ 45

(e)    Defendant Wong never truly concluded that the DNA found in the girl's pants was a match with Plaintiff's DNA sample. Ex. 1, Compl. ¶ 46.

(f)     The "Pawtucket Defendants and/or Defendant Wong falsely asserted that the DNA evidence was a match to Plaintiff's DNA." Ex. 1, Compl. ¶ 48.

Wong SUF ¶ 115.

---

[5] Plaintiff brought a further claim (Count IX) against Detective Cormier and Chief Gonsalves, and a claim for indemnification (Count X) that is presumably brought against the City of Pawtucket.

Following nearly two years of discovery, Plaintiff has adduced evidence adequate to support only one of these allegations: (a) that Analyst Wong was employed by the Department of Health.

**D.      Plaintiff Belatedly Admits that Analyst Wong Did Not Commit The Misconduct Alleged In His Complaint.**

Plaintiff Monteiro retained DNA scientist Meghan Clement, of Clement Consulting LLC, as a testifying expert in this case. Wong SUF ¶ 116.   Ms. Clement has identified no mistake, no misstep and no inaccuracy in Analyst Wong's tests, analyses or reporting.   Wong SUF ¶ 117.

Additionally, Plaintiff Monteiro admits that Analyst Wong did <u>not</u> tamper with any DNA evidence. Wong SUF ¶ 123.   Indeed, his own expert contradicted that averment.   Wong SUF ¶ 118.   Plaintiff admits that all proper procedures were followed by Analyst Wong in the physical handling of the DNA evidence in this case.   Wong SUF ¶ 120.   He also concedes that the processes Analyst Wong utilized to obtain the partial Y-STR DNA profile from the evidentiary sample were proper.   Wong SUF ¶¶ 122.   Further, he concedes that the processes Analyst Wong utilized to obtain the partial Y-STR DNA profile from Plaintiff Monteiro's reference sample were proper. Wong SUF ¶¶ 121.   Plaintiff's expert opined that all of Analyst Wong's processes and protocols appeared to adhere to the relevant standards in the profession at the time.   Wong SUF ¶¶ 118

Moreover, Plaintiff now admits that the profiles in question – the partial Y-STR DNA profile obtained from the evidentiary sample, and the complete Y-STR DNA profile obtained from Plaintiff Monteiro's reference sample – are true and accurate.   Wong SUF ¶¶ 124 & 125.   Plaintiff Monteiro further agrees that both such profiles were accurately expressed by Analyst Wong in her "Supplemental Report II," issued July 17, 2019.   Wong SUF ¶¶ 124 & 125.   Supplemental Report II clearly describes that the 14 alleles identified in the Cole Pants DNA Sample appeared, in identical form, at the same 14 loci in Plaintiff Monteiro's reference sample. See Wong SUF ¶ 76.

13

Plaintiff Monteiro *no longer contests* that his Y-STR DNA profile is consistent with the partial Y-STR DNA profile obtained from Cole's pants, exactly as Wong concluded in Supplemental Report II. Wong SUF ¶ 126.

Notwithstanding that Plaintiff Monteiro's bald allegations have collapsed under the undisputed facts adduced to date, Plaintiff Monteiro did <u>not</u> drop his causes of action against Analyst Wong. Plaintiff has inventively reformed and reconstituted his allegations. He still maintains that Analyst Wong "fabricated" "false" "DNA evidence." Wong SUF ¶ 132. He accomplishes this sleight in two steps:

First, Plaintiff avers that the "DNA evidence" which Analyst Wong "fabricated" is the interim *text message* she sent to Detective Cormier: "It's a match." Wong SUF ¶ 129. The transmission of those three words is, by Plaintiff's own admission, the only culpable conduct he now alleges against Analyst Wong. Wong SUF ¶ 129 & 130.

Next, to transform the plain and true statement, "It's a match," into "false DNA evidence," Plaintiff handily re-defines the term "match," assigning it to mean something akin to an exclusive identity statement. In so doing, he disingenuously ascribes a foreign meaning to Analyst Wong's plain and true statement.

It is on these fictions that Plaintiff seeks to haul Analyst Wong before a jury, and raise the alarm that "false" "DNA evidence" has been "fabricated" by a State scientist for the purpose of framing an innocent man for murder.

Most notably, Plaintiff's revised allegations *still* fail to connect Analyst Wong to Plaintiff's alleged injury. Wong SUF ¶¶ 129-133. Plaintiff insists that Wong supplied false DNA evidence, by text message, to Detective Cormier. Wong SUF ¶ 133. But he does not claim that Detective

Cormier or anybody else relied on that purportedly false DNA evidence to make the probable cause determination which caused Plaintiff to be arrested. Indeed, that determination was rendered by Magistrate Judge Patrick O'Neill, on the basis of the evidence submitted to him by Detective Cormier (Wong SUF ¶ 103), which merely described that Plaintiff Monteiro's Y-STR DNA profile is "consistent with" the partial Y-STR DNA profile from the Cole Pants DNA Sample (Wong SUF ¶ 100). Plaintiff *himself* now admits that his Y-STR DNA profile is "consistent with" the partial Y-STR DNA profile from the Cole Pants. Wong SUF ¶ 82. The record proves that Analyst Wong's "match" communication to Detective Cormier was not among the evidence submitted to Magistrate Judge O'Neill for his probable cause determination (*see* Wong SUF ¶ 101); the statement could not and did not cause Magistrate Judge O'Neill to find probable cause for Plaintiff's arrest.

## II.

## <u>LEGAL STANDARD</u>

Plaintiff spent nearly two years endeavoring to develop evidence to support his dramatic claim that Analyst Wong – and/or the City of Pawtucket, and/or any of four police officers – manipulated, fabricated or misrepresented DNA evidence to frame Plaintiff Monteiro for murder. Now Plaintiff is required to marshal and present it.[6]

When "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment is

---

[6] *Harvey v. Town of Merrillville*, 649 F.3d 526, 532 (7th Cir. 2011) ("Plaintiff[] cannot idly rest on the conclusory allegations of [his] complaint at this stage of the game.") (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505 (1986)).

appropriate.[7]  "A fact is 'material' if it potentially could affect the suit's outcome."[8]  "An issue concerning such a fact is 'genuine' if a reasonable fact finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor."[9]

## III.
## ARGUMENT

Plaintiff alleges that Analyst Wong's interim text message summary to Detective Cormier supplied artificial probable cause for his arrest, and thereby caused him to suffer numerous constitutional deprivations, including false arrest, false imprisonment and malicious prosecution. *See gen*. Compl.  The evidence in the record directly refutes Plaintiff's theory that the text message is false.  Significantly, the evidence in the record also refutes Plaintiff's theory that Analyst Wong's text message could have *caused* the determination that there was probable cause for Plaintiff's arrest.  Consequently, Plaintiff Monteiro has not adduced "specific facts showing that there is a genuine issue for trial" – that is, facts, on which a jury can return a verdict against Analyst Wong.[10]  Summary judgment should enter for Analyst Wong.

Each of Plaintiff's claims against Wong are premised on the theory that he was arrested for a crime even though there was no probable cause to support his arrest.  But Plaintiff fails to produce evidence adequate to rebut the presumption that probable cause for his arrest *was* present.  Since Plaintiff Monteiro has no right to be free from arrest *with* probable cause, Plaintiff has suffered no

---

[7] *Morrissey v. Boston Five Cents Sav. Bank, F.S.B.*, 54 F.3d 27, 31 (1st Cir. 1995).

[8] *Cortes-Iriszarry v. Corporacion Insular DeSeguros*, 111 F.3d 184, 187 (1st Cir. 1997) (citations omitted).

[9] *Id.* (citations omitted).

[10] A*nderson*, 477 U.S. at 249 (1986) (citing *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)).

injury for which recovery is available, and each of his claims should be dismissed.  *See* Section III. A., *infra*.

Significantly, a Magistrate Judge's probable cause determination is rendered on the basis of facts in the record presented to him by sworn affidavit, and *only* on those facts.[11]  Here, Magistrate Judge Patrick O'Neill made his probable cause determination after Detective Cormier provided Magistrate O'Neill with (a) her sworn Affidavit, which accurately relayed Analyst Wong's conclusion that the samples in question were "consistent with" each other, *and* (b) the full and official report of Wong's DNA analysis (the Department of Health's "Supplemental Report II") which detailed the same conclusion that the samples were "consistent," and expressed the random match probability (or statistical significance) of the match between the samples as 1 in 1,909. Wong SUF ¶¶ 80, 84, 100-101.  Plaintiff does <u>not</u> dispute the accuracy of Analyst Wong's findings as expressed in that Supplemental Report II, nor the accuracy of the statement in the Affidavit that the two DNA profiles are "consistent."  Wong SUF ¶¶  124-126.

These undisputed facts negate Plaintiff's theory that Analyst Wong's accurate text message ("It's a match.") to Detective Cormier *caused* an independent Magistrate Judge – to whom it was not furnished in evidence – to find probable cause on the basis of that text message or its content. *See* Section III. B. 2.-4., *infra*.  Moreover, common sense, usage of the term generally, and usage of the term in the forensics field (including by Plaintiff's own DNA expert) each prevent Plaintiff from genuinely disputing that Analyst Wong's texted statement to Detective Cormier, "[i]t's a match," was a true and correct statement.  *See* Section III. B. 1, *infra*.

_____

[11] *State v. Byrne*, 972 A.2d 633, 638 (R.I. 2009) ("Probable cause must be ascertained within the four corners of the affidavit prepared in support of the warrant.") (citing *State v. Joseph*, 114 R.I. 596, 603, 337 A.2d 523, 527 (1975)).

The absence of evidence in the record adequate to satisfy essential elements of Plaintiff's claims against Analyst Wong also bars Plaintiff's claims from advancing to trial. *See* Section III. C., *infra*. Finally, Analyst Wong is protected from suit on all of Plaintiff's claims under the Doctrine of Qualified Immunity, and on the basis of statutory immunity as to Plaintiff's state claims. *See* Section III. D., *infra*.

A.   **Plaintiff Cannot Succeed on Any of His Seven Claims Against Analyst Wong Because He Was Arrested With Probable Cause.**

   1.   The Purported Absence of Probable Cause is the *Sine Qua Non* of Plaintiff's Seven Claims; The Actual Presence of Probable Cause Requires Dismissal of All Counts.

Plaintiff brings each of his federal claims against Analyst Wong (Counts I, II, IV and V) pursuant to 42 U.S.C. § 1983. "Section 1983 supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law."[12] To succeed on his Section 1983 claims, Plaintiff must demonstrate that he was deprived of a federally secured right (*i.e.* that he suffered some "constitutional injury").[13] Therefore, "'[t]he first inquiry in any § 1983 suit' is 'to isolate the precise constitutional violation with which [the defendant is] charged.'"[14] Each of Plaintiff's four federal causes of action arise from a single purported constitutional violation: arrest (or seizure) of Plaintiff Monteiro without probable cause. Consequently, "[i]f the officers had probable cause to arrest" Plaintiff Monteiro, all claims premised on its absence "necessarily fall flat."[15]

---

[12] *Evans v. Avery*, 100 F.3d 1033, 1036 (1st Cir. 1996).

[13] *Rogan v. City of Bos.*, 267 F.3d 24, 27 (1st Cir. 2001) (To satisfy the "constitutional injury" requirement, the plaintiff must make a showing of a deprivation of a federally-secured right.) (citing *Baker v. McCollan*, 443 U.S. 137, 142, 99 S.Ct. 2689 (1979); *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001)).

[14] *Graham v. Connor*, 490 U.S. 386, 394 (1989) (quoting *Baker,* 443 U.S. at 140).

[15] *Mucci v. Town of N. Providence ex rel. Valle*e, 815 F. Supp. 2d 541, 545 (D.R.I. 2011) (noting that presence of probable cause defeats claims for false arrest and malicious prosecution) (citing *Horton v.*

(i)    Each of Plaintiff's Federal Claims Are Premised on the Purported Absence of Probable Cause for Plaintiff's Seizure.

Plaintiff's claims for "Malicious Prosecution" (Count I) and "Arrest Without Probable Cause" (Count II) are premised on Plaintiff's belief that he was seized pursuant to legal process that was <u>not</u> supported by probable cause. *See* Compl ¶¶ 65 & 91. Plaintiff's claim for malicious prosecution requires Plaintiff to prove that he was seized pursuant to legal process (*i.e.* a warrant) which was unsupported by probable cause.[16] Plaintiff's claim for "Arrest without Probable Cause" requires Plaintiff to prove that, based on the facts available to the officers at the moment of arrest, there was no "reasonable basis" for such officers to believe that Plaintiff Monteiro had committed *any* crime.[17] Therefore, the presence of probable cause for Plaintiff's arrest is a complete bar to Plaintiff's success on either Count I or Count II.

To succeed on Plaintiff's claim for "Conspiracy to Deprive [Plaintiff] of Constitutional Rights" (Count IV) Plaintiff must allege and prove that he suffered an "actual deprivation of a right secured by the Constitution and laws."[18] *See* Section C.2., *infra* (identifying remaining elements of claim). Likewise, to succeed on Plaintiff's claim for "Failure to Intervene" (Count V), Plaintiff must allege and prove that a "constitutional violation [took] place" in the presence of the

---

*Portsmouth Police Dep't*, 22 A.3d 1115, 1123 (R.I. 2011) ("[W]hen probable cause exists to arrest," or "to initiate a proceeding," "a claim of false arrest" or "of malicious prosecution must fail.") (citations omitted)).

[16] *Evans v. Chalmers*, 703 F.3d 636, 647-48 (4th Cir. 2012) (To prove malicious prosecution, Plaintiff must prove that Defendant caused the seizure of Plaintiff pursuant to legal process which is unsupported by probable cause, and that proceedings terminated in plaintiff's favor.) (adopted by First Circuit in *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101 (1st Cir. 2013)). *See also*, *See* Section C.1., *infra* (describing union of Malicious Prosecution and Arrest without Probable Cause claims).

[17] *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) (citing *Beck v. Ohio,* 379 U.S. 89, 96, 85 S.Ct. 223, 228, (1964); *Edwards v. City of Philadelphia,* 860 F.2d 568, 571 n. 2 and 575-76 (3d Cir.1988)).

[18] *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980) (citing S*lavin v. Curry*, 574 F.2d 1256, 1261 (5th Cir. 1978), modified on other grounds, 583 F.2d 779 (1978), overruled on other grounds; *Sparks v. Duval County Ranch Co., Inc*., 604 F.2d 976, 978 (5th Cir. 1979)).

defendant.[19]  *See* Section C.3., *infra* (identifying remaining elements of claim).  The only Constitutional deprivation alleged by Plaintiff – and therefore the purported Constitutional deprivation on which his Counts IV and V must be premised – is the purported absence of probable cause to support his arrest.

In response to Analyst Wong's request that Plaintiff identify each of the Constitutional or federal rights of which he was deprived, Plaintiff responded: "arrest without probable cause," "malicious prosecution"; and/or "false arrest/wrongful imprisonment." Wong SUF ¶ 136.[20]  As noted *supra*, the single alleged Constitutional deprivation associated with "arrest without probable cause" and "malicious prosecution" alike is a purported arrest or seizure without probable cause.[21] And, the Constitutional deprivation associated with a claim for "false arrest/wrongful imprisonment" pursuant to 42 U.S. § 1983, is "unjustified" confinement[22] *i.e.* arrest without probable cause.[23]  Therefore Counts I, II IV and V fail unless Plaintiff can prove that there was no probable cause for his arrest.

---

[19] *Smith v. Mensinger*, 293 F.3d 641, 650–51 (3d Cir. 2002) (citing *Byrd v. Clark,* 783 F.2d 1002, 1007 (11th Cir.1986); *Putman v. Gerloff*, 639 F.2d 415, 423-424 (8th Cir.1981); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir.1972)).

[20] Omitting Plaintiff's response of a violation of Plaintiff's right to equal protection, as Plaintiff dropped that claim against Analyst Wong in February of 2023.

[21] *Bristol v. Schenk*, No. CV146647JFBAKT, 2019 WL 1177857, at *9 (E.D.N.Y. Feb. 15, 2019), *report and recommendation adopted,* No. 14CV6647JFBAKT, 2019 WL 1172555 (E.D.N.Y. Mar. 12, 2019) (citing *Mitchell v. Home*, 377 F. Supp. 2d 361, 371 (S.D.N.Y. 2005)).

[22] *Bristol*, No. CV146647JFBAKT, 2019 WL 1177857, at *9 ("To state a claim for false arrest under § 1983, a plaintiff must plausibly allege that: '(1) the defendant intentionally confined the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise justified.'") *report and recommendation adopted,* No. 14CV6647JFBAKT, 2019 WL 1172555 (citing *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 515 (S.D.N.Y. 2013); *Richardson v. N.Y.C. Health & Hosps. Corp.*, No. 05 Civ. 6278, 2009 WL 804096, at *7 (S.D.N.Y. Mar. 25, 2009)).

[23] *Hershey*, 938 F. Supp. 2d at 515 ("'The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest.'") (quoting *Dotson v. Farrugia, No. 11CIV1126PAE, 2012 WL 996997, *7 (S.D.N.Y. Mar. 26, 2012)* (quoting *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996))). .

(ii)     Each of Plaintiff's State Claims Are Also Premised on the Purported Absence of Probable Cause for Plaintiff's Seizure.

Plaintiff also brings three state law claims against Analyst Wong which are likewise premised on Plaintiff's theory that probable cause for his arrest was absent: False Arrest/Imprisonment (Count VI), Malicious Prosecution (Count VII) and Intentional Infliction of Emotional Distress (Count VIII).[24]   But the presence of probable cause "vitiates" a Plaintiff's "claims for malicious prosecution, false arrest and false imprisonment."[25]   Likewise, no claim for intentional infliction of emotional distress may lie where Plaintiff's arrest is "legally justified,"[26] *i.e.* where it was executed with probable cause.   Consequently, to survive this Motion for Summary Judgment, Plaintiff must adduce evidence adequate to convince a jury that he was arrested with*out* probable cause, notwithstanding the determination of an independent Magistrate Judge to the contrary.

2.     Plaintiff Presents No Evidence to Rebut the Legal Presumption of Probable Cause for Plaintiff's Arrest.

The issuance of a facially valid arrest warrant creates the *presumption* of probable cause.[27]

Plaintiff's only avenue to defeat the presumption of probable cause that attends the issuance by

---

[24] *See* Compl. ¶ 116 (Plaintiff alleges false arrest/imprisonment because Plaintiff's confinement or restriction "was not otherwise privileged," *i.e.* lacked probable cause); Compl. ¶ 120 (Plaintiff alleges malicious prosecution because "Defendants commenced a criminal case," but "lacked probable cause to bring such a proceeding"); Compl. ¶ 126 (Plaintiff claims "extreme and outrageous conduct" by Defendants in "fabricating evidence" to supply artificial probable cause, because genuine article was allegedly absent).

[25] *Beaudoin v. Levesque*, 697 A.2d 1065, 1067 (R.I. 1997); *Horton v. Portsmouth Police Dept.*, 22 A.3d 1115, 1122 (R.I. 2011) ("Just as it is to a claim of malicious prosecution, "[t]he existence of probable cause is a complete defense to a false arrest claim." (quoting *Henshaw v. Doherty,* 881 A.2d 909, 919 (R.I.2005))).

[26] *See e.g.*, *Curtis v. State Dept. for Children and Their Families*, 522 A.2d 203, 206-208 (R.I. 1987) (Hospitalization of child by state officials due to suspected child abuse does not give rise to claim for false arrest nor intentional infliction of emotional distress where actions were "legally justified," notwithstanding that "defendants' fulfillment of their statutory responsibility here was bound to cause plaintiffs emotional stress.").

[27] *Coleman v. New Hampshire*, No. 16-CV-498-LM, 2018 WL 4268914, at *7 (D.N.H. Aug. 16, 2018) R. & R. adopted*, No. 16-CV-498-LM, 2018 WL 4266113 (D.N.H. Sept. 6, 2018), aff'd sub nom. *Coleman v.*

Magistrate Judge O'Neill of a warrant for Plaintiff's arrest, is to demonstrate "that law enforcement secured the warrant with evidence that was not 'believed or appropriately accepted by the [officer] as true.'"[28]  In other words, to succeed on any of his claims, Plaintiff must, as an initial matter, show that evidence in the record supports a genuine conclusion (1) that  a defendant, "'knowingly and deliberately, or with a reckless disregard for the truth, made [] statements or omissions that create a falsehood in applying for a warrant;' and (2) that 'such statements or omissions were material or necessary to the finding of probable cause.'"[29]  Plaintiff fails to meet that threshold because he fails to adduce evidence that any purportedly false statement in the warrant was material or necessary to the probable cause determination.

Plaintiff appears to take aim at two allegedly incomplete or inaccurate statements in Detective Cormier's probable cause Affidavit; importantly for this motion, they are entirely unrelated to Analyst Wong's DNA analyses or communications.  The first is the stated inference in Detective Cormier's Affidavit that: "it appears that Monteiro lives his life in a very covert manner."  Wong SUF ¶ 153.  While Plaintiff Monteiro may disagree with that inference, it is directly supported by, and drawn from, at least five factual statements in the Affidavit which Plaintiff Monteiro has produced no evidence to refute: (i) Plaintiff Monteiro "has moved at least nineteen (19) times in the past thirty [(30)] years"; (ii) "none of the addresses that Plaintiff

_Dronsfield_, No. 18-2108, 2019 WL 10837706 (1st Cir. July 24, 2019). _See also Martinetti v. Town of New Hartford_, 12 F. App'x 29, 32 (2d Cir. 2001) ("an arrest pursuant to a facially valid arrest warrant is presumed to be made with probable cause") (citing _Artis v. Liotard_, 934 F. Supp. 101, 103 (S.D.N.Y. 1996) ("A magistrate's finding of probable cause in issuing a warrant creates a presumption that probable cause existed, and is rebuttable only though proof of fraud, perjury or the misrepresentation or falsification of evidence.")).

[28]  _Hernandez-Cuevas_, 723 F.3d 91, 101 (1st Cir. 2013) (quoting _Franks v. Delaware_, 438 U.S. 154, 165, 98 S. Ct. 2674 (1978)).

[29] _Menebhi v. Mattos_, 183 F. Supp. 2d 490, 502 (D.R.I. 2002) (quoting _Wilson v. Russo,_ 212 F.3d 781, 786–87 (3d Cir. 2000).

Monteiro uses, including the ones on his license and registration[,] are where [Plaintiff Monteiro] actually resides"; (iii) a US Postal Inspector advised the affiant that Plaintiff "Monteiro does not receive any mail at" the address where he actually resides; (iv) at his residence, Plaintiff Monteiro "parks his vehicle behind the building next door to where he lives and not at his actual residence," and (v) at his place of business, Plaintiff "Monteiro parks his vehicle in the rear of the lot between two large delivery trucks, which makes it impossible to see the vehicle from the street," in contrast to "[a]ll other employees" who "appear to park in the front parking lot out in the open." Wong SUF ¶ 154.

A magistrate judge considers only the *facts* in the Affidavit, and the reasonable inferences which may be drawn from those facts.[30] Unless Plaintiff demonstrates with competent evidence that the facts are false, and that they were included knowingly, deliberately, or with reckless disregard,[31] he fails to meet his burden to rebut the presumption of probable cause on the basis of this first alleged incomplete or inaccurate statement in the probable cause Affidavit.

The second statement in the probable cause Affidavit with which Plaintiff Monteiro appears to take issue relates to a statement attributed to him by Detective Cormier. Plaintiff Monteiro disputes the affiant's statement that during Plaintiff's interview by Pawtucket Police, Plaintiff "Monteiro confirmed the fact that he lived at that address [above Saint's Market] during that same time frame" that the victim disappeared. *See* SUF ¶ 156. The Affidavit reports that Christine Cole was reportedly last seen at Saint's Market. SUF ¶ 155.

---

[30] *State v. Byrne*, 972 A.2d 633, 638 (R.I. 2009).

[31] *Menebhi,* 183 F. Supp. 2d at 502 (D.R.I. 2002) (quoting *Wilson,* 212 F.3d at 786–87).

Plaintiff is poised to point to the recording of his interview with Detective Cormier, in which Plaintiff Monteiro confirmed that he lived at the location in question, for a "couple of years," and that he thinks he lived there in 1984 or perhaps 1985. Wong SUF ¶ 160. The recording is difficult to follow. Detective Cormier suggests "sometime in the eighties, the late eighties you were living over there." Monteiro appears to respond in disagreement, based on his facial expression and his tone of voice, stating, perhaps: "over there? I say I go and live in [unintelligible]." *Id*. On the basis of this slice of the recording alone, it would be inaccurate to state that Monteiro confirmed that he lived above the market *at the time* that Christine Cole disappeared – January of 1988. However, Detective Cormier's Affidavit merely described that Plaintiff Monteiro confirmed that he lived there "during that same timeframe."

"To determine the materiality of a misstatement, courts must 'excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause.'" *Menebhi v. Mattos*, 183 F. Supp. 2d 490, 503 (D.R.I. 2002) (quoting *Wilson v. Russo,* 212 F.3d 781, 789 (3d Cir.2000)). Notably, this Court must look to the totality of the circumstances to determine whether an arrest was supported by probable cause.[32] This Court has stated that "probable cause to make an arrest exists where the facts and circumstances of which the arresting officer has knowledge would be sufficient to permit a reasonably prudent person, or one of reasonable caution, to conclude that an offense has been, will be or is being, committed."[33] Criminality need not be established.[34] If there is

---

[32] *United States v. Reyes*, 225 F.3d 71, 75 (1st Cir. 2000) (citing *United States v. Torres–Maldonado,* 14 F.3d 95, 105 (1st Cir.1994)).

[33] *Menebhi,* 183 F. Supp. 2d at 499 (citing *Michigan v. De Fillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627 (1979)).

[34] *Menebhi,* 183 F. Supp. 2d at 499 ("a finding of probable cause does not require an actual showing of criminality") (citing *United States v. Grant*, 218 F.3d 72, 75 (1st Cir.2000)).

merely "a probability or substantial chance of illegal activity," probable cause is established.[35] "The probable cause threshold is so low that the First Circuit has held that '[p]robable cause to arrest may be based on less than a fifty percent likelihood that the suspect is guilty.'"[36]

Here, stripping away the statement that Plaintiff Monteiro confirmed in his interview that the timeframe when he lived above Saints Market was the same timeframe in which the victim disappeared, does not materially affect the probable cause determination. Detective Cormier did not offer that information to establish that Plaintiff Monteiro was present *at the scene* where Christine Cole was last seen on the night she disappeared. Detective Cormier did not purport to have any such "opportunity" evidence. Rather, the information demonstrated Plaintiff Monteiro's familiarity with the market Cole frequented and at which she was last seen, and the possibility that Monteiro's path and Cole's path may have crossed during whatever timeframe Plaintiff Monteiro *did* live at that location. Had Detective Cormier's Affidavit stated that Plaintiff Monteiro confirmed that he lived at the location above the market where Cole was last seen, approximately three years before Cole's disappearance, her Affidavit would have expressed the same essential facts: that Plaintiff Monteiro was familiar with the location and that his path and Cole's may have crossed during the time Monteiro resided above the market that Cole frequented.

"To gauge the sufficiency of the [warrant] [a]pplication, we must determine whether the totality of the revealed circumstances makes out a showing of probable cause, even with false facts stripped away, inaccurate facts corrected, and omitted facts included."[37] Here, replacing the "same

---

35 *Menebhi,* 183 F. Supp. 2d at 500 (citing *Hoffman v. Reali*, 973 F.2d 980 (1st Cir. 1992)).

36 *Menebhi,* 183 F. Supp. 2d at 500 (D.R.I. 2002) (citing *Nowaczyk v. Town of North Hampton,* No. Civ. 97–635–JD, 2001 WL 274775, at *3 (D.N.H. March 15, 2001); citing and referring to *Samos Imex Corp. v. Nextel Commc'ns, Inc.*, 194 F.3d 301, 303 (1st Cir. 1999)).

37 *United States v. Barbosa*, 896 F.3d 60, 69 (1st Cir. 2018).

25

timeframe" statement, the remaining facts are adequate to demonstrate probable cause. Magistrate Judge O'Neill was presented with (a) the five undisputed facts regarding Plaintiff Monteiro's residence, use of different addresses, and parking habits, which reasonably support the inference of a "covert" lifestyle; (b) the true and undisputed statement that Plaintiff's Y-STR DNA profile is consistent with the partial Y-STR DNA profile obtained from Cole's pants; (c) the Supplemental Report II accurately describing the random probability of such a match to be approximately 1 in 1,909 (at a confidence interval of 95%); and (d) Plaintiff Monteiro's confirmation that a few years prior to Cole's disappearance, he lived at a residence located above the market frequented by Cole, and at which she was last seen. That evidence is more than adequate to sustain a probable cause determination.

To withstand this motion for summary judgment, Plaintiff is required to raise a genuine issue pursuant to which a jury could conclude that probable cause was lacking at the time of his arrest. Since Plaintiff's arrest was based on probable cause, and arrest *with* probable cause is not a constitutional violation, Plaintiff fails to allege any constitutional violation or state law tort. Plaintiff's Counts I through VIII should be dismissed.

3.    <u>Even if Probable Cause For Plaintiff's Arrest Was Absent, Plaintiff's Claims Against Analyst Wong Must Still Be Dismissed.</u>

Plaintiff Monteiro alleges that Analyst Wong deprived him of his right to be free from seizure without probable cause because she "fabricated material evidence against Plaintiff in the form of false DNA evidence." The fabricated material and false DNA evidence is, according to Plaintiff, a "false[] represent[ation] to the Pawtucket Defendants that she [Wong] had developed DNA evidence that demonstrated that Plaintiff's DNA "matched" a partial profile of Y-STR DNA that was purportedly obtained from Christine Cole's pants." Wong SUF ¶¶ 138-139.

"The knowing or intentional fabrication of false testimony to obtain an arrest warrant implicates a criminal defendant's Fourth Amendment rights, and will support a § 1983 claim if the false statement was necessary to the finding of probable cause."[38] But to hold Analyst Wong liable for Plaintiff's seizure on the basis that she provided "false" or "fabricated" information to the investigation, Plaintiff must first demonstrate by competent evidence that: (i) Wong's statement was false[39]; (ii) Wong made or communicated the statement intentionally or recklessly[40]; (iii) Wong herself "in fact entertained serious doubts as to the truth" of her statement to Detective Cormier[41]; (iv) Wong's purported false statement was actually represented in the probable cause Affidavit upon which the Magistrate Judge made his probable cause determination[42]; and (v)

---

[38] *Dutton v. Montgomery Cty., Md.*, 94 F. Supp. 2d 663, 665 (D. Md.), aff'd sub nom. *Dutton v. Montgomery Cty. Gov't*, 232 F.3d 887 (4th Cir. 2000) (citing *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674 (1978); and then *Wilkes v. Young*, 28 F.3d 1362, 1365 (4th Cir.1994)).

[39] *See Manifase v. City of Providence*, 569 F. Supp. 3d 98, 107 (D.R.I. 2021) (To determine whether arrest warrant is invalid because it was obtained through material false statement, Court asses facts under *Franks*-inspired framework: (a) the affidavit must contain a falsehood; (b) the falsehood must be such that its deletion would eliminate probable cause, and (c) the falsehood must have been made deliberately, *i.e.* intentionally or recklessly.) (citing *Jordan v. Town of Waldoboro*, 943 F.3d 532, 541 (1st Cir. 2019), abrogated on other grounds by *Thompson v. Clark*, 212 L. Ed. 2d 382, 142 S. Ct. 1332 (2022)).

[40] *Manifase,* 569 F. Supp. 3d at 108 (describing third part of inquiry in *Franks*-inspired framework, regarding deliberateness, as question whether defendant "acted intentionally or with reckless disregard for the truth.")

[41] *Burke v. Town Of Walpole*, 405 F.3d 66, 89 (1st Cir. 2005) (To determine whether evidence permits inference that statement was made with deliberate falsity or reckless disregard for the truth, Plaintiff must show that defendant "'in fact entertained serious doubts as to the truth'" of her opinions, or that "'circumstances evinc[ed] obvious reasons to doubt the veracity" of her results.") (quoting *U.S. v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002)).

[42] *Burke,* 405 F.3d at 91 (Describing that Court only analyzes the allegedly false or misleading statement(s) actually found *in* the probable cause affidavit or submission: "We need not determine whether [odontologist] Dr. Levine's [alternate] terminology or the terminology recommended by the [Board of Odontologists] guidelines is correct," since "[n]either appears in [the Detective's] summary of probable cause in the arrest warrant application; restricting analysis to the statement *actually set forth in that summary* in support of the application for an arrest warrant.)

Wong's purported false statement, if it was in the affidavit, was a *material* factor in the probable cause determination.[43]

Plaintiff has not adduced *any* evidence that the text message was false – he only provides his unsupported opinion that the word "match" has a different meaning than that found in any dictionary or in common or scientific usage. *See* B. 1., *infra*. He produces *no* evidence that Wong entertained serious doubts (or any doubt) as to the truth of her statements to Detective Cormier. He produces *no* evidence that the text message (or "match" language) was presented in evidence to Magistrate Judge O'Neill. *See* B. 2., *infra*. Since it did not appear in "the four corners" of the Affidavit on which Magistrate Judge O'Neill was required to rely in rendering his determination as to probable cause,[44] the "match" statement could not have been a factor, much less a material factor, in the determination of probable cause.

To be clear: only the Affidavit and Supplemental Report II were presented to Magistrate Judge O'Neill. Supplemental Report II accurately advises (as Plaintiff admits) of a statistical significance of a 1 in 1,909 match probability. Significantly, neither the Affidavit nor the Supplemental Report II relayed the "match" language which Plaintiff decries as false and fabricated evidence. Wong SUF ¶ 98. The Affidavit and Supplemental Report II only used the term "consistent with," which Plaintiff agrees to be an accurate description. Wong SUF ¶¶ 96, 82.

---

[43] *Burke*, 405 F.3d at 89 ("To constitute a Fourth Amendment violation, the allegedly fabricated or exaggerated evidence must also be material to the probable cause determination." (citing *Pierce v. Gilchrist,* 359 F.3d 1279, 1287-88 (10th Cir.2004); *Aponte Matos v. Toledo Davila*, 135 F.3d 182, 185 (1st Cir. 1998))); *Manifase*, 569 F. Supp. 3d at 107 (describing second part of inquiry in Franks-inspired framework, as question "whether a more complete and accurate affidavit would have nevertheless supported a finding of probable cause for the ... seizure." (quoting *Jordan,* 943 F.3d 541, abrogated on other grounds by *Thompson v. Clark*, 212 L. Ed. 2d 382, 142 S. Ct. 1332 (2022))).

[44] *State v. Byrne*, 972 A.2d 633, 638 (R.I. 2009) ("Probable cause must be ascertained within the four corners of the affidavit prepared in support of the warrant.") (citing *State v. Joseph,* 114 R.I. 596, 603, 337 A.2d 523, 527 (1975)).

Therefore, the only statement by Wong that could have been a material factor (or any factor at all) in the probable cause determination now challenged by Plaintiff is the statement by Wong that Plaintiff *admits is accurate*: that Plaintiff Monteiro's Y-STR DNA profile is "consistent with" the partial Y-STR DNA profile obtained from the Cole Pants DNA Sample. The statement that Plaintiff challenges (*i.e.* the match language) was not presented to the Magistrate Judge in the probable cause Affidavit, nor in the attached Supplemental Report II. Wong SUF ¶ 98.

**B.** **The Absence of Any Causal Link Between Analyst Wong's Text Message, and Plaintiff's Alleged Injuries, Dooms Plaintiff's Claims Against Analyst Wong.**

To succeed on a Section 1983 claim (alleged by Plaintiff in Counts I, II, IV and V), Plaintiff must satisfy the Court as to the presence of three essential elements: "deprivation of a right, a causal connection between the actor and the deprivation, and state action.'"[45] Likewise to succeed on Plaintiff's state tort claims against Analyst Wong, Plaintiff must demonstrate a causal link.[46]

The text message to which Plaintiff points as Analyst Wong's sole misdeed cannot be a proximate nor legally significant cause of Plaintiff's arrest because the texted language (i) was truthful and accurate, (ii) did not lead Detective Cormier to make any false statement in her probable cause Affidavit, and (iii) in any event, was not among the evidence on which Magistrate Judge O'Neill's probable cause determination was based (because it was not in the probable cause Affidavit, or attached Supplemental Report II). In the absence of this causal link, both Plaintiffs' 1983 claims and state tort claims against Analyst Wong fail. Plaintiff's state tort claims against Analyst Wong fail for the same reason.

---

[45] *Hodge v. Murphy*, 808 F. Supp. 2d 405, 408 (D.R.I. 2011) (emphasis added) (quoting *Sanchez v. Pereira–Castillo*, 590 F.3d 31, 41 (1st Cir. 2009)).

[46] It is axiomatic that "[t]o be held liable in tort, a defendant's actions must have proximately caused the plaintiff's injuries." § 1:11. Proof of causation, 1 American Law of Torts § 1:11.

1. <u>Analyst Wong's text message communication – "It's a match. Finalizing the report right now." – is a true and correct statement.</u>

Tamara Wong's texted statement is a true statement. Therefore, Tamara Wong's text message of a "match" could not have imparted false information that caused Plaintiff's arrest. Plaintiff's unique and entirely unsupported averment is that the term "match" was a false statement, because it implied that Plaintiff Monteiro is the *sole* source of the DNA evidence found on Christine Cole's pants. Wong SUF ¶ 139. Having literally put words in Ms. Wong's mouth, Plaintiff then points to the falsehood he created (as evidence of liability): because other persons are known to *also* carry Y-STR DNA that matches the evidence from the pants, Plaintiff cannot possibly be the only individual whose Y-STR DNA matches the DNA on Cole's pants.

Of course, Analyst Wong has repeatedly agreed with Plaintiff's statement that other persons are known or anticipated to *also* carry Y-STR DNA that matches evidence from the pants. She stated as much time and again in her written reports. *See* Wong SUF ¶¶ 63, 80. And Plaintiff admits that Analyst Wong correctly calculated and reported to Detective Cormier that one in 1,909 male individuals are anticipated to match the Y-STR DNA on Cole's pants (with a 95% confidence interval), and that Wong correctly informed Detective Cormier of that fact. Wong SUF ¶ 85.

Plaintiff's claim is that Wong could not have "developed DNA evidence that demonstrated Plaintiff's DNA 'matched' a partial profile of Y-STR DNA" from Cole's pants, because "the DNA sample from the pants was a Y-STR sample that, at best, can be used to identify male family relatives."

> Analyst Wong falsely represented to the Pawtucket Defendants that she had developed DNA evidence that demonstrated that Plaintiff's DNA "matched" a partial profile of Y-STR DNA that was purportedly obtained from Christine Cole's pants. In fact, the DNA sample from the pants was a Y-STR sample that, at best, can be used to identify male family relatives.

Wong SUF ¶ 139. Plaintiff's conclusion does not logically follow from his premise. That Y-STR DNA can "at best," " be used to identify male family relatives," does not make Wong's statement as to a match between the Y-STR DNA from the two samples, a falsehood. Indeed, Plaintiff's purported explanation clarifies his tactic: he draws a false equivalency between Wong's entirely accurate statement that the Cole pants Y-STR DNA sample matches Plaintiff's Y-STR DNA sample, and the entirely distinct (and never expressed) assertion he ascribes to Wong: that Plaintiff *himself* is "the match" to the Cole pants DNA sample, such that he is the sole and exclusive *source* of that DNA. These linguistic gymnastics are disingenuous at best.

As an initial matter, that *other* Y-STR DNA samples will *also* match the partial profile from the Cole Pants DNA Sample does not render Plaintiff Monteiro's Y-STR DNA sample a "*non*-match" to the Cole Pants DNA Sample. Plaintiff's Y-STR DNA sample is still, of course, a match to the partial profile in evidence from Cole's pants. Consider the case of an individual who is apprehended by police because he matches the appearance of a suspect who is described to be male and wearing white shoes and a red hat. No one would claim on the basis of a matching description that the individual is the only person who can "match" the description of the suspect (*i.e.* an "exclusive match"), nor deduce that the apprehended individual therefore must be the suspect (*i.e.* an identity statement).

Moreover, Wong did not text: "he's a match." Wong texted, "it's a match," referring to the relationship between the two Y-STR DNA samples she was tasked to compare. Wong SUF ¶ 77. As Analyst Wong's reports (including Supplemental Report II) indicate, the match is not exclusive. Wong SUF ¶¶ 63, 80. Nevertheless, Plaintiff purports to redefine the term "match" to mean an "exclusive match" and to imply an identity statement. On that basis he insists that Wong is subject to liability.

(i)     "Match" describes a relationship between two equal or similar things.

In common usage, the noun "match" means "a person or thing that is equal to another person or thing in strength, speed, or quality"[47]; "a person or thing equal or similar to another," or "an exact counterpart."[48]   That is exactly what Tamara Wong described here: the alleles detected in Plaintiff Monteiro's Y-STR DNA sample are identical to the alleles detected in the Cole Pants DNA Sample.  *See* Wong SUF ¶ 76.   There is a one-to-one correspondence between the alleles in one sample, and the alleles in the other.  *Id*.   For example, the DNA analysis on the DNA from the Cole Pants DNA Sample revealed the following alleles at four loci:  11, 22, 13 and 12.[49]   The DNA from Monteiro's reference sample *matched*: his DNA analysis revealed the alleles 11, 22, 13 and 12 at the same four loci.  Wong SUF ¶ 76.

There is no dictionary which defines the term "match" as Plaintiff would have the term understood: a relationship not only equal (or similar), but also *exclusive*.  Likewise, the term does not connote exclusivity or amount to an "identity statement" in forensic science. See Wong SUF ¶¶ 145, 147-149.   It merely refers to a one-to-one correspondence between two samples, as stated by Dr. Schienman Wong SUF ¶ 144, and as reflected by the statements of Plaintiff's own DNA expert Wong SUF ¶ 149-152.

(ii)     Analyst Wong's text message communication is an accurate and scientifically correct statement.

Dr. Scheinman is the only expert witness to provide an opinion as to the accuracy of the term "match" in Tamara Wong's text message communication to Detective Cormier at 5:53 pm.

---

[47]  *See*  "Match"  (noun,  *equal*).  Cambridge  Dictionary,  https://dictionary.cambridge.org/us/dictionary/english/match.  Accessed 6 Feb. 2023.

[48]  *See*  "Match"  (noun 1(a)  &  1(c)).   Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/match. Accessed 6 Feb. 2023.

[49]  The loci referenced are DYS391, DYS481, DYS549, DYS533.  See chart comparing Y-STR DNA profiles of Cole sample and Plaintiff's buccal sample at Wong SUF ¶ 76.

Wong SUF ¶ 140.  Dr. Schienman states: "It is my opinion that the word 'match' is a scientifically accurate and correct description of the Y-STR DNA profile comparisons reported by Ms. Wong." Wong SUF ¶ 141.

Plaintiff suggests that the word "match" can *never* be used to describe Y-STR DNA evidence because Y-STR evidence cannot identify a single individual.  Wong SUF ¶ 144.  But the term "match" is repeatedly used in exactly that manner in the authoritative guidelines on Y-STR DNA testing, published by the chief forensic authority in North America, SWGDAM.[50]  Wong SUF ¶ 145 (emphasis added):

> The most recent SWGDAM guidelines (approved in March 2022) for Y-Chromosome STR Typing (11-28) state: "Subsequent to **a match between two samples using Y-STR testing,** a single source, major, or deduced Y-STR haplotype may be searched against a database of Y-STR haplotypes to obtain the sample frequency of the profile, and, as needed, to calculate profile and/or match probabilities."

This is exactly the context in which Analyst Wong used the term: to describe two Y-STR profiles or samples whose alleles match each other.  Plaintiff's DNA expert provides no rebuttal to this undisputed testimony, and is notably silent as to Plaintiff's theory that Analyst Wong texted a "false" statement to Detective Cormier when Analyst Wong described the Y-STR profiles to "match."  Wong SUF ¶ 149.

(iii)    Forensic Scientists regularly use the term "match" as Wong did here: to describe a *non-exclusive* relationship between identical samples.

Plaintiff's own DNA expert, Meghan Clement, utilizes the term "match" in her own testimony to describe, to a lay audience, the exact same non-exclusive relationship between Y-STR DNA samples, as Tamara Wong described in her text message communication.  For example,

---

[50] SWGDAM (the Scientific Working Group on DNA Analysis Methods) is a group of scientists who advise the FBI director on quality assurance standards for forensic DNA analysis.  Wong SUF ¶¶ 146-147.

in *State of Ohio v. Davis*, No. 04-CR-00464 (Common Pleas, Licking Cty.), Ms. Clement testified at trial as to the relationship between a known Y-STR DNA profile of a suspect, and three items of evidence – labeled 4.4, 4.6 and 4.7 – on which Y-STR DNA was identified. *See* Wong SUF ¶ 151. Ms. Clement stated that she found a "match" between the known profile of the suspect and the Y-STR DNA on the evidence, and confirmed that she did <u>not</u> use the term "match" to indicate exclusivity, or to imply an identity statement as to a single individual:

> 7   **A** The 4.4, 4.6 and 4.7 all revealed the same
> 8   Y chromosome profile, and those three profiles are
> 9   the profile that all **matched** the reference sample
> 10   from Mr. Davis. So, we could not exclude Mr. Davis
> 11   or a paternal relative as being the source of the
> 12   male DNA in 4.4, 4.6 and 4.7.
> 13   **Q** Okay. You said you can't exclude him, so
> 14   it matches him.
> 15   **A** That's correct.

Wong SUF ¶ 151. Ms. Clement described that the term "match" meant that the suspect could not be excluded as the source of the DNA. Ms. Clement did <u>not</u> aver, -- nor did Tamara Wong aver – that "match" means the suspect who cannot be excluded *is the actual and exclusive source* of the DNA found on items of evidence. *See also*, Wong SUF ¶ 152 (testimony by M. Clement in *State of Indiana v. Comm*, No. 22D01-0010-CF-343 (Super. Ct., 2001) describing that "match" means the profiles are "consistent," or "the same," and thus a suspect cannot be excluded).

Dr. Scheinman reports that he routinely describes forensic DNA testing in Court by utilizing the term "match," and that the term is *not* an exclusive identity statement. Wong SUF ¶¶ 142, 148. Plaintiff's expert also uses the term to express the same meaning, in the same context, as Wong. Wong SUF ¶¶ 151-152. Plaintiff has presented no evidence to rebut the dictionary definition of the term match nor to refute the meaning of the term in common usage or forensic analysis. In brief, he offers no evidence on which a jury can conclude that Analyst Wong's

statement of a "match," the only culpable conduct alleged against her, is anything but a true and correct statement.

     2.     <u>The Text Message Was Not Presented in Evidence to the Magistrate, And Thus Could Not Have "Caused" The Magistrate to Find Probable Cause.</u>

Significantly, even if Plaintiff could convince this Court that Analyst Wong misled Detective Cormier by texting a patently true and correct statement summarizing her DNA results, that feat would be immaterial to the Court's analysis of Analyst Wong's liability. Plaintiff does not adduce evidence that Magistrate Judge O'Neill was "misled" about the meaning of Analyst Wong's DNA findings, or more importantly, that the text message was even among the evidence submitted to the Magistrate for consideration on the issuance of a warrant.

A magistrate judge makes a probable cause determination "based on the facts contained [in the affidavit,] together with the reasonable inferences which may be drawn from those facts . . . ."[51] Here, the "match" statement was never set before Magistrate Judge O'Neill for his probable cause determination. Wong SUF ¶ 98. This is not speculation; we know for a fact the scope of information that was set before Magistrate Judge O'Neill in support of Detective Cormier's request for an arrest warrant (Wong SUF ¶ 98): Detective Cormier testified that she presented (only) her sworn probable cause Affidavit, and Tamara Wong's Supplemental Report II, to Magistrate Judge O'Neill at 10:30 pm on July 17, 2019. Wong SUF ¶ 101.

The Probable Cause Affidavit stated that Tamara Wong contacted Detective Cormier:

> to notify her that the DNA reference [sample from Plaintiff Monteiro] was compared to the partial Y-STR profile obtained from . . . the victim's pants and confirmed that **it was consistent with** the known reference DNA profile for Joao Monteiro. Tamara Wong provided a Summary of Analytical Facts

---

[51] *State v. Byrne*, 972 A.2d 633, 638 (R.I. 2009).

Supplemental Report [II], which detailed her findings. Please see the attached report for further details.

Wong SUF ¶ 97 (emphasis added).

Supplemental Report II, attached to the Affidavit, clearly stated the information Tamara Wong supplied to Detective Cormier one hour and nine minutes after Tamara Wong's summary text communication: it reported that the samples were "consistent with" each other; that "Y-STR loci are located on the male specific Y chromosome and are maintained throughout the paternal lineage," and that "**[m]ale relatives in the same paternal line will demonstrate the same Y-STR DNA profiles**." Wong SUF ¶ 80 (emphasis added). The content of the Affidavit and Supplemental Report II directly refute the contention that the facts presented in evidence to Magistrate O'Neill included the term "match." Wong SUF ¶ 98. Therefore, Analyst Wong's texted "match" statement, whether it was true or false, could not have caused the Magistrate to find probable cause.

3.    The Magistrate's Determination of Probable Cause  Extinguishes Any Causal Link Between Analyst Wong's Conduct, and Plaintiff Monteiro's Arrest.

Magistrate Judge O'Neill's probable cause determination, which authorized the arrest that Monteiro claims was unconstitutional, was an *intervening* cause of Plaintiff's arrest, insulating Analyst Wong from liability.[52] "It is well settled that if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating" the arresting officer.[53] Here, Analyst Wong is

---

[52] *See Hernandez-Cuevas v. Taylor, 723 F.3d 91, 100 (1st Cir. 2013)* (neutral magistrate judge's determination that there is probable cause for the individual's arrest is intervening act that, in most cases, would disrupt any argument that a defendant officer had caused the unlawful seizure) (citing *Sanchez v. Pereira–Castillo*, 590 F.3d 31, 50 (1st Cir. 2009).

[53] *Slaughter v. Torres*, 592 F. Supp. 3d 515, 527 (M.D. La. 2022) (quoting *Curtis v. Sowell*, 761 Fed. Appx. 302, 304 (5th Cir. 2019)).

even further removed from the analysis and from the arrest: she is not even an arresting officer and the only issue Plaintiff takes with her actions (the text message) was not among the sworn evidence placed before the Magistrate considering the warrant. Wong SUF ¶¶ 98, 100-101.

In *Hernandez-Cuevas v. Taylor*, the First Circuit contemplated whether a plaintiff may overcome the "causation problem," posed by the intervening act of a neutral magistrate, by demonstrating that an officer is still liable for unlawful pretrial detention. The Court held a plaintiff may do so by producing evidence that the defendant "(1) "lied to or misled the prosecutors"; (2) "failed to disclose exculpatory evidence"; or (3) "unduly pressured the prosecutor to seek the indictment."[54] Here, Plaintiff neglects to produce any such evidence with respect to Analyst Wong.

## C. Plaintiff Monteiro Fails to Adduce Evidence Sufficient to Support Required Elements of His Claims Against Analyst Wong.

Plaintiff's failure to allege facts upon which a jury may conclude that Analyst Wong proximately caused Plaintiff to be arrested is fatal to his claims against Analyst Wong. But his failure to adduce distinct evidence required to satisfy *other* elements of his claims is also fatal, and is an independent basis to dismiss each of Plaintiff Monteiro's claims against Analyst Wong.

### 1. Plaintiff Fails To Adduce Evidence to Support Critical Elements of Counts I and II, for Malicious Prosecution and False Arrest

Plaintiff fails to produce competent evidence in support of the claim that his constitutional rights were violated due to malicious prosecution. Plaintiff's "Malicious Prosecution" claim is premised on a purported violation of the Fourth Amendment. Plaintiff's "Arrest Without Probable

---

[54] *Hernandez-Cuevas,* 723 F.3d at 100 (quoting *Evans v. Chalmers*, 703 F.3d 636, 647–48 (4th Cir. 2012)).

Cause" claim (Count II) merely re-states his Malicious Prosecution claim.[55]  Plaintiff claims arrest pursuant to an *invalid determination* of probable cause (versus its absence) which is, in fact, an element of his malicious prosecution claim.

To succeed on his claim, Plaintiff must prove that 1) the Defendant caused 2) the seizure of Plaintiff pursuant to legal process, which is unsupported by probable cause, where 3) criminal proceedings terminated in plaintiff's favor.[56]  To demonstrate legal process unsupported by probable cause, Plaintiff must show that the evidence presented to the Magistrate was, "constitutionally unacceptable" because it was "formulated" "with a mental state similar to common law malice"; in other words, the evidence "was not 'believed or appropriately accepted by the [officer]'" as true.[57]  Consequently, to hold Wong liable for Plaintiff's seizure, Plaintiff must show that Wong formulated false evidence that was not believed by her, or should not have been accepted by her as true.

In *Burke v Town of Walpole*, the First Circuit considered a plaintiff's claims against two forensic odontologists under 42 U.S.C. § 1983.[58]  The Burke plaintiff claimed that the odontologists "deprived him of his independent constitutional right to be free from arrest on the basis of knowingly or recklessly exaggerated inculpatory bite mark evidence."[59]  The District

---

[55] Plaintiff's claim for unlawful detention due to lack of probable cause re-describes the "tort of malicious prosecution [already alleged in Count I], which remedies detention accompanied . . . by *wrongful institution* of legal process," versus the *absence* of legal process.   See *Wallace v. Kato*, 549 U.S. 384, 390 (2007) (emphasis added).  *See also Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 367 (2017) ("If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment.")

[56] *Evans v. Chalmers*, 703 F.3d 636, 647–48 (4th Cir. 2012) (adopted by First Circuit in *Hernandez-Cuevas*, 723 F.3d at 101).

[57]  *Hernandez-Cuevas*, 723 F.3d at 101) (quoting *Franks v. Delaware,* 438 U.S. 154, 171 (1978)).

[58] *Burke v. Town Of Walpole*, 405 F.3d 66, 88 (1st Cir. 2005).

[59] *Id.*

Court granted summary judgment to all defendants including the odontologists and the plaintiff appealed.[60] The Circuit Court upheld summary judgment in favor of both odontologists. The First Circuit acknowledged that "[t]he intentional or reckless fabrication of inculpatory evidence or omission of material exculpatory evidence by a forensic examiner in support of probable cause may amount to a constitutional violation."[61] The Court's task was to "inquire whether the facts in the record, when viewed in the light most favorable to [plaintiff] Burke, permit the inference that either [odontologist] rendered a bite mark opinion with deliberate falsity or reckless disregard for the truth."[62] To succeed, the plaintiff, Burke, "must show that [either odontologist] 'in fact entertained serious doubts as to the truth' of their bite mark opinions or that 'circumstances evince[ed] obvious reasons to doubt the veracity' of those results".[63]

Plaintiff produced evidence indicating that the first odontologist's statement was made with less scientific certainty than he represented to detectives and was expressed in the probable cause affidavit.[64] Viewing the evidence in the light most favorable to the plaintiff, Burke, the First Circuit concluded that "the record reveals no support for an inference that [the first odontologist's] methodology or judgement were so clearly flawed that he should have harbored serious doubts about the reliability of his resulting opinion."[65] Consequently, the plaintiff "failed to generate a genuine dispute on the threshold question of whether [the first odontologist] violated [Burke's] Fourth Amendment rights by rendering his bite mark opinion with deliberate or reckless disregard

---

[60] *Id.*

[61] *Id.* at 89 (1st Cir. 2005) (citing *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir.2002); (P*ierce v. Gilchrist*, 359 F.3d 1279, 1296 (10th Cir.2004))

[62] *Burke,* 405 F.3d at 89.

[63] *Burke*, 405 F.3d at 90 (citing and quoting *United States v. Ranney*, 298 F.3d 74, 78(1st Cir. 2002)).

[64] *Id.* at 90-91.

[65] *Id.* at 92.

for the truth.[66]  As to the second odontologist, the First Circuit concluded that the record did not support plaintiff's "allegation that [the second odontologist] actually communicated a bite mark opinion to the police investigators for use in [the detective's] arrest warrant application," or that the detective even relied on an opinion by the second odontologist.[67]

Plaintiff's claims against Wong fail for the same reasons that Burke's claims failed against the odontologists in *Burke*[68]:  Plaintiff produces no evidence in the record which demonstrates that Analyst Wong should have entertained "serious doubts" as to any communication she made to Detective Cormier.[69]  In fact, as described *supra*, Plaintiff produces no evidence in the record that any of Analyst Wong's communications or statements to Detective Cormier are anything but accurate and true.  And, the communication that Plaintiff targets as "false" ("it's a match") was not communicated to the police "for use in [the detective's] arrest warrant application,"[70] *i.e.* the Probable Cause Affidavit which Plaintiff is now claiming to be defective.  That is, just like the second odontologist's communication in *Burke,*  Wong's communication with which Plaintiff takes issue is not even expressed in Detective Cormier's Probable Cause Affidavit.  Wong SUF ¶ 98.

Plaintiff fails to produce evidence to demonstrate that Analyst Wong's judgement was "so clearly flawed that [s]he should have harbored serious doubts about the reliability of" her statement to Detective Cormier.[71]  Consequently, Plaintiff fails to satisfy an essential element of his

---

[66] *Id.* at 92.

[67] *Id.* at 93.

[68] *Id.* at 93.

[69] *Id.* at 92.

[70] *Id. at* 93.

[71] *Id*. at 93.

40

Malicious Prosecution claims (Counts I and II): deliberate or reckless disregard for the truth in any of Wong's statements to Detective Cormier that are reflected in the Probable Cause Affidavit (or, indeed, in any of her statements to Detective Cormier).

2.    Plaintiff Produces No Evidence In Support Of a Purported Conspiracy to Deprive Plaintiff of Constitutional Rights (Count IV).

To prevail on a civil conspiracy claim pursuant to § 1983, Plaintiff must establish (a) "an actual deprivation of a right secured by the Constitution and laws"[72]; (b) "the principal element" of "an agreement between the parties to inflict a wrong against or injury upon another"; and (c) an overt act that results in damages."[73]  Plaintiff has neither established a Constitutional deprivation (see A.1.(i) *supra*), an agreement between the parties, nor an overt act.  Moreover, Plaintiff entirely failed to develop any evidence of an agreement or an overt act.  Consequently, Plaintiff's cause of action for conspiracy is no more developed today than it was two years ago, when he first set forth his bald conclusion that: "Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for murder, a crime he did not commit, and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint."  Compl. ¶ 100.  Even though conspiracy is a matter of inference, summary judgment is appropriate "where the nonmoving party rests merely on conclusory allegations."[74]  Since Plaintiff has "presented no evidence, either direct or circumstantial of an agreement among defendants from which a reasonable jury could have inferred a conspiracy

---

[72] *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980) (citing S*lavin v. Curry*, 574 F.2d 1256, 1261 (5th Cir. 1978), modified on other grounds, 583 F.2d 779 (1978), overruled on other grounds; *Sparks v. Duval County Ranch Co., Inc.*, 604 F.2d 976, 978 (5th Cir. 1979)).

[73] *Est. of Bennett v. Wainwright*, 548 F.3d 155 (1st Cir. 2008) (quoting *Earle v. Benoit,* 850 F.2d 836, 844 (1st Cir.1988)).

[74] *Bennett,* 548 F.3d at 178.

among them to inflict harm upon the plaintiffs," summary judgment should enter on Plaintiff's conspiracy claim.[75]

3. Plaintiff Fails to Adduce Evidence To Satisfy His Claim That Analyst Wong Failed to Intervene in Purported Constitutional Violations (Count V).

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."[76] A police officer is directly liable under Section 1983 if the officer "fails or refuses to intervene when a constitutional violation" "takes place in his presence," so long as the officer had "a realistic and reasonable opportunity to intervene."[77] "Liability under section 1983 may be imposed both for action that deprives a plaintiff of a constitutional right and for failure to act, *when there is a duty to a*ct, to prevent such a deprivation."[78] Even if Plaintiff Monteiro did raise a genuine question as to whether one of his constitutional rights was infringed when he was seized for arrest (Wong submits that he does not), Analyst Wong is not a "law enforcement officer"[79];

---

[75] *Est. of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008) (citing *Earle,* 850 F.2d at 845 *; Slotnick v. Staviskey, 560 F.2d 31, 33 (1st Cir.1977))*.

[76] *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994).

[77] *Smith v. Mensinger*, 293 F.3d 641, 650–51 (3d Cir. 2002) (citing *Byrd v. Clark,* 783 F.2d 1002, 1007 (11th Cir.1986); *Putman v. Gerloff*, 639 F.2d 415, 423-424 (8th Cir.1981); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir.1972)).

[78] *Clark v. Taylor*, 710 F.2d 4, 9 (1st Cir. 1983) (emphases added) (citing *DiMarzo v. Cahill,* 575 F.2d 15, 17–18 n. 3 (1st Cir 1978)).

[79] *Terebesi,* 764 F.3d at 243 (quoting *Anderson,* 17 F.3d at 557).

Plaintiff Monteiro was not seized "in [her] presence"[80] and Analyst Wong had no "realistic and reasonable opportunity to intervene" in Plaintiff Monteiro's seizure or detention.[81]

A duty to intervene has been recognized on the part of state actors in a "special relationship" with a citizen, such as a custodial relationship.[82] Therefore, law enforcement officers, prison guards, and even mental health nurses have been held liable for failure to intervene. The *sine qua non* among these liable defendants is their special responsibility *for the care and protection* of a person unable to care for himself, and their physical relationship to such a person which permits them to personally observe a Constitutional deprivation, and intervene at the time the deprivation transpires.[83]

Plaintiff admits that Wong was not present when Detective Cormier drafted her Probable Cause Affidavit, when Detective Cormier presented that Affidavit to Magistrate Judge O'Neill, nor when Plaintiff Monteiro was arrested or detained. Wong SUF ¶ 108-109. Instead, Plaintiff merely avers that Defendant Wong "knew" that her purportedly "false DNA evidence" would be used to cause Plaintiff's arrest. Wong SUF ¶ 132. But even that allegation is unsupported by any evidence. Despite the reams of telephone call transcripts, text message transcripts, and testimony about Analyst Wong's communications with Detective Cormier adduced in discovery, Plaintiff points to no record or testimony which supports his conclusory statement. Thus, in addition to failing to demonstrate that Analyst Wong had a duty to act, or an opportunity to act, Plaintiff also

---

[80] *Id.*

[81] *Smith v. Mensinger*, 293 F.3d 641, 650–51 (3d Cir. 2002) (citing *Byrd v. Clark,* 783 F.2d 1002, 1007 (11th Cir.1986); *Putman v. Gerloff*, 639 F.2d 415, 423-424 (8th Cir.1981); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir.1972)).

[82] *Ali v. Vill. of Tinley Park*, 79 F. Supp. 3d 772, 778 (N.D. Ill. 2015) (citing *Durham v. Nu'Man,* 97 F.3d 862, 868 (6th Cir.1996)); *Davis v. Rennie*, 264 F.3d 86, 114 (1st Cir. 2001);

[83] *See e.g.*, *Davis v. Rennie*, 264 F.3d 86, 114 (1st Cir. 2001) (affirming judgment against staff at state mental hospital for failure to intervene in beating of involuntarily committed patient in their care).

fails to show that Analyst Wong knew that Detective Cormier would be seeking a warrant and executing an arrest on the night of July 17, 2019. Moreover, he fails to demonstrate that Analyst Wong had knowledge of the scope of Detective Cormier's evidence against Monteiro. Therefore, even if Analyst Wong knew of Cormier's timetable, she still would have possessed inadequate information to conclude that Plaintiff Monteiro's seizure pursuant to an arrest warrant could constitute a Constitutional deprivation due to a purported absence of probable cause in the totality of the evidence <u>not</u> available to her.

4.  <u>Plaintiff Fails to Adduce Evidence Necessary to Prove That Analyst Wong is Liable to Plaintiff on Plaintiff's State Law Claims (Counts VI, VII and VIII).</u>

To succeed on Count VI against Analyst Wong, alleging that Wong is liable to the Plaintiff under state law for "False Arrest/Imprisonment," Plaintiff must prove that Analyst Wong *intended* to confine Plaintiff.[84]  To succeed on Count VII against Analyst Wong, alleging that she is liable to the Plaintiff under state law for "Malicious Prosecution," Plaintiff must prove that Wong "initiated a prior criminal proceeding against him," *maliciously* and without probable cause.[85]

Plaintiff can point to no evidence in the record that Analyst Wong ever intended to confine anybody, nor that Analyst Wong ever "initiated" a criminal proceeding, much less that she did so "maliciously."  Plaintiff rests solely on the unsupported allegations of his vague Complaint, wherein he levels the exact same claims against four police officers and the City of Pawtucket, without differentiation.  Wong SOF ¶ 13.  Plaintiff has adduced no evidence on which a jury can

---

[84] *Beaudoin v. Levesque*, 697 A.2d 1065, 1067 (R.I. 1997) (To recover on claims for false imprisonment and false arrest, the Plaintiff must prove that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.") (quoting *Dyson v. City of Pawtucket,* 670 A.2d 233, 239 (R.I.1996)).

[85] *Beaudoin,* 697 A.2d at 1067 (R.I. 1997) (citing *Solitro v. Moffatt,* 523 A.2d 858, 861–62 (R.I.1987)).

reasonably infer that Wong "intended" to confine Plaintiff, that she "initiated" a criminal proceeding, or that her state of mind amounted to "malice."

Finally, Plaintiff's claim for intentional infliction of emotional distress (at Count VIII) "requires proof of the defendant's extreme and outrageous conduct."[86] But when a defendant is merely fulfilling her statutory responsibilities – as Tamara Wong was here – an action for intentional infliction of emotional distress will not lie, notwithstanding that fulfillment of those responsibilities may produce emotional distress in a plaintiff.[87] Here, Analyst Wong was statutorily required to conduct the forensic crime detection responsibilities tasked to her by the Director of the Department of Health. *See* R.I. Gen. Laws § 23-1-8.[88] Analyst Wong was found (by Plaintiff's own expert) to have followed *all* required procedures and protocols to conduct her DNA analysis properly. Wong SUF ¶ 118. Plaintiff admits that Wong did not manipulate or tamper with DNA evidence. Wong SUF ¶ 123. Plaintiff instead claims that Analyst Wong sent a text message, which the record overwhelmingly establishes to be a true and accurate communication (*see* B.1., *supra*) , and which in any event did not *cause* any of Plaintiff's injuries (*see* B.2. & B.3., *supra*). That Plaintiff may suffer emotional distress does not transform Analyst

---

[86] *Reilly v. U.S.*, 547 A.2d 894, 898 (R.I. 1988).

[87] *See e.g.*, *Curtis v. State Dept. for Children and Their Families*, 522 A.2d 203, 206-208 (R.I. 1987) (Hospitalization of child by state officials due to suspected child abuse does not give rise to claim for false arrest nor intentional infliction of emotional distress where actions were "legally justified," notwithstanding that "defendants' fulfillment of their statutory responsibility here was bound to cause plaintiffs emotional stress.").

[88] *See* R.I. Gen. Laws § 23-1-8.

> The director of health shall appoint in accordance with law a suitable and qualified forensic scientist to conduct examinations of evidence in connection with scientific crime detection, and for that purpose the director shall cooperate with the Rhode Island state police, the department of the attorney general, and other law enforcement agencies in the matter of scientific crime detection.

Wong's reasonable and entirely appropriate conduct and communications into "extreme and outrageous conduct," for which she may be subject to liability to the Plaintiff in tort.[89]

## D.    Analyst Wong Violated No "Clearly Established" Constitutional Right And Is Entitled to Summary Judgment Based on Qualified Immunity.

Analyst Wong is entitled to qualified immunity because Plaintiff is utterly incapable of proving, on the basis of evidence in the record, that Analyst Wong violated any clearly established constitutional right.  There is no constitutional right to prevent a DNA analyst from accurately summarizing the results of her DNA analysis and transmitting that information to the requesting officer, by text message, shortly in advance of a full and detailed report describing the same results.

The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

> Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.[90]

Significantly, the Doctrine of Qualified Immunity leaves "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law."[91]

---

[89] *Curtis v. State Dept. for Children and Their Families*, 522 A.2d 203, 206-208 (R.I. 1987) (no claim for intentional infliction of emotional distress where actions legally justified, even if distressing).

[90] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

[91] *Bilida v. McCleod*, 211 F.3d 166, 174 (1st Cir. 2000) (citing *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986)).

The determination whether an official is entitled to qualified immunity requires an assessment as to whether the facts alleged or shown by the plaintiff "make out a violation of a constitutional right" and, if so, "whether the right at issue was clearly established at the time of defendant's alleged misconduct."[92] "[T]he second, 'clearly established,' step of the qualified immunity analysis…in turn has two aspects."[93]

"One aspect of the ['clearly established'] analysis focuses on the clarity of the law at the time of the alleged civil rights violation. To overcome qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[94] The second aspect of the 'clearly established' analysis "focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights."[95] "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[96] "[I]n light of pre-existing law, the unlawfulness [of the action] must be apparent." [97]

Plaintiff, and all citizens, enjoy a constitutional right to be free of arrest without probable cause. That is a clearly established right. A government official's conduct only violates "clearly established law when at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable [official] would have understood that what he is doing violates the

---

[92] *Pearson,* 555 U.S. at 232.

[93] *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009).

[94] *Id.* (citations omitted).

[95] *Id.* (citations omitted).

[96] *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987).

[97] *Id*.

right."[98] Plaintiff's allegations and threadbare evidence (nearly all of which concern the actions of Pawtucket Police Officers) fail to establish that Plaintiff's clearly established constitutional or statutory rights were violated *by Analyst Wong*. The only violative conduct alleged by Plaintiff against Analyst Wong is her plain text message communication ("It's a match. Finalizing the report right now.") which Plaintiff has disingenuously attempted to distort.

The communication to a requesting officer, by a forensic science analyst, of a true summary of the admittedly accurate results of scientific analysis, violates no clearly established constitutional right. Sending an accurate text message that correctly describes the true results of a scientist's accurate and correct analysis is not conduct that anyone in Analyst Wong's position would reasonably believe to be unconstitutional. The communication reveals neither incompetence, nor a knowing violation of the law on the part of Analyst Wong. [99]

Here, an additional factor further removes Analyst Wong's conduct from that realm of behavior which anyone in her position could reasonably believe to be unconstitutional: Analyst Wong did not *only* provide Detective Cormier a texted three-word summary of her findings. She also informed Detective Cormier that she was "[f]inalizing the [final] report right now." Within one hour and nine minutes, Analyst Wong furnished that Final Report (Supplemental Report II) to Detective Cormier – a Report which *even Plaintiff* admits to convey accurate information about the relationship between his Y-STR DNA and the Y-STR DNA sample from Cole's pants: that they are consistent. Wong SUF ¶ 126.

---

[98] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citations and quotations omitted).

[99] *Bilida v. McCleod*, 211 F.3d 166, 174 (1st Cir. 2000) (The Doctrine of Qualified Immunity protects "all but the plainly incompetent or those who knowingly violate the law.") (citing *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986))).

Analyst Wong is protected from liability on Plaintiff Monteiro's state law claims by qualified immunity just as she is protected from liability on Plaintiff Monteiro's federal claims. State law recognizes that qualified immunity is a complete bar to a tort claim against a governmental official exercising discretion.[100] Therefore, the State claims against Analyst Wong should be dismissed on the same basis.

**E.**      **Analyst Wong is Statutorily Protected From Liability on Plaintiff's State Law Claims By Rhode Island General Laws Section 23-1-32.**

Analyst Wong is protected from liability on each of Plaintiff Monteiro's State Claims on a second basis. Rhode Island General Laws § 23-1-32 immunizes Analyst Wong against personal liability for acts undertaken in the performance of her duties, in good faith and without malice. The statute reads in relevant part:

> The director of health and his or her duly authorized agents, individually and severally, and when acting in good faith and without malice, shall not be personally liable for damages because of any act undertaken in the lawful performance of official duties.[101]

Here, Plaintiff does not challenge that Analyst Wong was a duly authorized agent of the Director of the Department of Health, nor that she acted in the lawful performance of her official duties. Analyst Wong's duties as a forensic scientist are set forth by state law:

> The director of health shall appoint in accordance with law a suitable and qualified forensic scientist to conduct examinations of evidence in connection with scientific crime detection, and for that purpose the director shall cooperate with the Rhode Island state police, the department of the

---

[100] *See, e.g., Estrada v. Rhode Island,* 594 F.3d 56, 63 (1st Cir. 2010) ("If an officer is found to be deserving of qualified immunity under federal law, he will also be granted qualified immunity for the same claim under Rhode Island law.") (citing *Hatch v. Town of Middletown*, 311 F.3d 83, 89–90 (1st Cir.2002)); *Ensey v. Culhane*, 727 A.2d 687, 690 (R.I. 1999) (recognizing that as to the appropriate individual tortfeasor, qualified immunity could act as a complete bar and should be determined at the summary judgment stage)).

[101] R.I. Gen. Laws § 23-1-32.

attorney general, and other law enforcement agencies in the matter of scientific crime detection.[102]

The only question as to the applicability of the state immunity statute is whether Plaintiff has adduced evidence that Analyst Wong was acting *other* than in good faith and without malice. In fact, Plaintiff has made no such showing. The entirety of Plaintiff's "case" that Analyst Wong acted in any manner other than professionally, lawfully, and in accordance with her responsibilities, is comprised of Plaintiff's unsupported statements in his Complaint, that Analyst Wong, the police defendants and the City of Pawtucket alike, each acted, *e.g.,* "in total disregard of the truth and plaintiff's clear innocence" (Compl. ¶ 103) and "deliberately and intentionally framed [Plaintiff] for a crime of which he was totally innocent" (Compl. ¶ 69). Plaintiff did not develop evidence to support those allegations (or any evidence of Analyst Wong's state of mind) and therefore is unable to surmount the immunity afforded by R.I. Gen. Laws § 23-1-32 to Analyst Wong.

## **CONCLUSION**

Each of Plaintiff's causes of action fail because Plaintiff suffered no constitutional injury: he was arrested *with* probable cause. His claims also fail because Plaintiff cannot demonstrate that the single act of Analyst Wong which Plaintiff claims as misconduct – her true text communication to Detective Cormier – caused Plaintiff's purported injuries, particularly in light of Magistrate Judge O'Neill's intervening determination of probable cause for arrest. Plaintiff's remaining causes of action against Wong fail for the additional reason that Plaintiff neglects to adduce evidence required to satisfy *other* essential elements of those claims (in addition to causation). Finally, Analyst Wong is protected from liability to Plaintiff Monteiro by the Doctrine of Qualified Immunity, and by statutory immunity under State law with respect to Plaintiff's state law claims.

---

[102] R.I. Gen. Laws § 23-1-8.

Respectfully Submitted,
DEFENDANT,
TAMARA WONG


By her attorney,

PETER F. NERONHA
ATTORNEY GENERAL

*/s/ Beth Landes*
Beth Landes *(10429)*
Special Assistant Attorney General
blandes@riag.ri.gov | Ext. 2296
Rhode Island Office of the Attorney General
150 South Main St. Providence, RI 02903
Tel: (401) 274-4400
Fax: (401) 222-2995


## CERTIFICATE OF SERVICE

I hereby certify that I have caused the within document to be served via ECF to all counsel of record on this 14th day of February , 2023 .

s/ Beth A. Landes