IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

JOAO MONTEIRO,
Plaintiff,

v.                                                    No. 21-cv-00046-MSM-LDA

SUSAN CORMIER, TREVOR LEFEBVRE,
DANIEL MULLEN, TINA GONCALVES,
CITY OF PAWTUCKET, and TAMARA
WONG,
Defendants

### DEFENDANT TAMARA WONG'S STATEMENT OF UNDISPUTED FACTS

**NOW COMES** the Defendant, Forensic Science Analyst Tamara Wong (Analyst Wong) of the Rhode Island Department of Health, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Local Rules for the United States District Court for the District of Rhode Island (LR 56), hereby submits her Statement of Undisputed Facts as follows:

1.  Plaintiff filed a Complaint in January 2021, alleging that Defendant Tamara Wong, a forensic scientist and civil servant employed by the Department of Health, "fabricated" DNA evidence, intentionally, for the purpose of framing the Plaintiff for murder. Complaint, attached hereto as **Exhibit 1,** at ¶ 17; 69 and 89.

2.  In addition to suing Tamara Wong, Plaintiff also sues the City of Pawtucket and four members of the Pawtucket Police Department: Susan Cormier, Trevor LeFebvre, Daniel Mullen and Tina Goncalves. Ex. 1 (Compl.) at ¶ 16.

3.  Susan Cormier is a Major Crimes Detective and, beginning in 2018, was assigned to the Cold Case Unit. Susan Cormier Deposition Transcript, Part I (Sep. 28, 2021) Excerpt 62:18 – 63:03 (attached hereto as **Exhibit 2**).

4.  Plaintiff alleges in his Complaint that Analyst Wong "supplied" DNA evidence to the Pawtucket Police Department (PPD), which the PPD in turn manipulated to frame the Plaintiff for murder. Ex. 1 (Compl.) at ¶ 17.

5.  Plaintiff alleges in his Complaint that Pawtucket Defendants "utilized" Defendant Wong to accomplish falsification of evidence. Ex. 1 (Compl.) at ¶ 44.

6.    Plaintiff alleges in his Complaint that the Pawtucket Defendants either "misrepresented the findings of Defendant Wong's analysis and/or Defendant Wong participated in the misrepresentation." Ex. 1 (Compl.) at ¶ 45.

7.    Plaintiff alleges in his Complaint that "the DNA evidence did not point to Plaintiff's guilt, [but] in an effort to obtain Plaintiff's arrest, the Pawtucket Defendants and/or Defendant Wong falsely asserted that the DNA evidence was a match to Plaintiff's DNA. Ex. 1 (Compl.) at ¶ 48.

8.    Plaintiff alleges in his Complaint that all Defendants, including Analyst Wong, deprived Plaintiff Monteiro of fair state criminal proceedings, including the chance [for Plaintiff Monteiro] to defend himself during those proceedings, resulting in a deprivation of liberty. Ex. 1 (Compl.) at ¶ 68.

9.    Plaintiff alleges in his Complaint that all Defendants, including Analyst Wong, "arrested Plaintiff based on the false evidence that they [the Defendants] fabricated." Ex. 1 (Compl.) at ¶ 89.

10.   Plaintiff alleges in his Complaint that all Defendants, including Analyst Wong, "targeted Plaintiff Monteiro for unlawful arrest, imprisonment, and/or malicious prosecution" because Plaintiff has dark complexion and is of Cape Verdean ancestry. Ex. 1 (Compl.) at ¶ 95.

11.   Plaintiff alleges in his Complaint that all Defendants, including Analyst Wong, conspired "to frame Plaintiff for murder," in total disregard of "Plaintiff's clear innocence." Ex. 1 (Compl.) at ¶¶ 100, 103.

12.   Plaintiff alleges in his Complaint that all Defendants, including Analyst Wong, "stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though [the Defendant[s]] had the opportunity to do so. Ex. 1 (Compl.) at ¶ 107.

13.   Plaintiff alleges in his Complaint that all Defendants, including Analyst Wong, intended to confine Plaintiff and/or restrict his freedom. Ex. 1 (Compl.) at ¶ 113.

14.   Plaintiff alleges in his Complaint that all Defendants, including Analyst Wong, "commenced a criminal case against Plaintiff," and did so maliciously. Ex. 1 (Compl.) at ¶¶ 119, 121.

15.   Plaintiff alleges in his Complaint that all Defendants, including Analyst Wong, "fabricat[ed] evidence in order to arrest an innocent man." Ex. 1 (Compl.) at ¶ 126.

16.   On February 12, 2023, Dr. John E. Schienman, forensic consultant, verified and affirmed the authenticity of his Expert Report dated Sep. 21, 2022, under penalty of perjury. J. E. Schienman, Declaration (Feb 12, 2023), Appending Expert Report of Sep. 21, 2022 (attached hereto as **Exhibit 3**).

17.   Human DNA is stored in 23 pairs of chromosomes (or 46 individual chromosomes), which comprise our human genome. J. E. Schienman, Expert Report (Sep. 21, 2022), prepared on behalf of Defendant Wong at p. 4 (attached hereto as **Exhibit 4**).

18.   Those 23 pairs of chromosomes, and the DNA encoded therein, are found in each of our cells. Ex. 4 (J. E. Schienman Expert Rpt. for Def. Wong) at p. 4.

19.   Twenty two (22) of the pairs are categorized as "autosomes"; these are not specific to gender. Ex. 4 (J. E. Schienman Expert Rpt. for Def. Wong) at p. 4.

20.   One of each pair of autosomes is inherited from one's biological mother; the other of the pair of autosomes is inherited from one's biological father. M. Clement, Expert Report (July 14, 2022), prepared on behalf of Plaintiff Monteiro at ¶ 13 (attached hereto as **Exhibit 5**).

21.   The particular combination of all the DNA sequences encoded in our twenty two (22) pairs of autosomes is unique to a single individual (other than an identical twin). Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro) at ¶ 13.

22.   An autosomal DNA profile (also called an "STR DNA profile") is drawn from the DNA stored among the 22 pairs of "autosome" or (non-sex-determining) chromosomes. *See gen.*, Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro) at ¶ 13.

23.   The twenty third (23) pair of chromosomes is comprised of the "sex" (or "sex-determining") chromosomes: either two "X" chromosomes (in a biological woman), or an "X" chromosome and a "Y" chromosome (in a biological male). Ex. 4 (J. E. Schienman Expert Rpt. for Def. Wong) at p. 4.

24.   The DNA in a Y chromosome is not unique to an individual. A DNA Profile drawn exclusively from the Y chromosome is called a Y-STR DNA profile, Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro) at ¶ 14.

25.   The Y chromosome is passed down from father to son, entirely unchanged, resulting in the son's inheritance of a Y chromosome that is identical to his father's and to all males in his paternal lineage, *i.e.* to his biological brothers', paternal uncles', and paternal male cousins' Y chromosome. Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro) at ¶ 14.

26.   The alleles identified at particular loci on a male's Y chromosome are expected to match the alleles identified at the same loci, on the Y chromosome belonging to the male's father and his paternally related grandfather, brothers, uncles, great uncles, male cousins and sons. *See gen.*, Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro) at ¶ 14.

27.   An allele "is one of two or more versions of [a] DNA sequence . . . at a given genomic location." *Allele*, National Human Genome Research Institute, Glossary of Genomic and Genetic Terms, https://www.genome.gov/genetics-glossary/Allele, (accessed Feb. 13, 2023).

28. Christine Cole, aged 10, disappeared on the evening of January 6, 1988.  PPD Complaint Report (Jan 6, 1988) (PD Supp 1st RFP 2129 to 2130) attached hereto as **Exhibit 6**.

29. A body was discovered fifty four days later on the shore of Conimicut Point, in Warwick. Warwick Police Dept., Statement of Dets. L. Eastman & P. Ainsworth (Feb. 28, 1988) (PD Suppl 1st RFP 002236), attached hereto as **Exhibit 7**.

30. The Rhode Island Department of Health, Office of the Medical Examiner (OME), reported the decedent to be Christine Cole.  OME Cause of Death Report (Mar. 5, 1988) (PD Suppl 1st RFP 2240), attached hereto as **Exhibit 8**; OME Death Certificate (Mar. 4, 1988) (PD Suppl 1st RFP 1631), attached hereto as **Exhibit 9**.

31. Detectives from the Pawtucket Police Department periodically re-visited the case to identify and chase down leads.  *See e.g.,* Correspondence, FBI and PPD (Sep. 5, 1996) (PD Supp 1st RFP 1719 to 1721) attached hereto as **Exhibit 10** (regarding evidence); Correspondence, FBI and PPD (Jan. 2, 1998) (PD Supp 1st RFP 1715), attached hereto as **Exhibit 11** (also regarding evidence); PPD Narrative, Sergeant R. T. Stonely (Undated) (PD 1st RFP 963), attached hereto as **Exhibit 12** (describing investigative starts and stops in 2008 and 2010).

32. In 2008, the Pawtucket Police Department requested that scientists at the Department of Health re-analyze the pair of pants worn by Cole at the time her body was discovered.  *See* PPD Narrative, Detective S. Cormier (Undated) (PD 1st RFP 965 to 970), attached hereto as **Exhibit 13**, at PD_1st_RFP 00966; *see also* Evidence Exam. Request & Receipt (Mar. 11, 2008) (Monteiro 000194), attached hereto as **Exhibit 14**.

33. A Department of Health scientist (not Analyst Wong) detected an apparent stain on the inside crotch of Christine Cole's pants.  *See* General Evidence Exam Worksheet, Cara Lupino (DOH) (June 20, 2008) (Monteiro 000148), attached hereto as **Exhibit 15** (identifying apparent "R/B" stain on inside crotch of victim's purple pants); *see also* Deposition Transcript, Tamara Wong (Nov 4, 2021), Excerpt: 109:09 to 110:06, attached hereto as **Exhibit 16** (explaining the shorthand used in Exhibit 15).

34. Scientists at the Rhode Island Department of Health, Forensics Science Laboratory (the "DOH Lab") made a cutting of the stained area of the pants.  *See* DOH Chain of Custody Report (Monteiro 51 to 58), attached hereto as **Exhibit 17**, at p. 3 of 8 (Monteiro 53); *see also* Deposition Transcript, Tamara Wong (Nov. 4, 2021), Excerpt: 127:19 to 128:01, attached hereto as **Exhibit 18** (identifying cutting of stain from inner crotch on victim's pants).

35. DOH scientists tested the cutting from the victim's pants and detected the presence of DNA on it.  Plaintiff's Admissions by Stipulation of Facts (Dec. 7, 2022), attached hereto as **Exhibit 19**, at ¶¶ 1-2.

36. From the cutting, scientists at the DOH Lab scientifically extracted DNA for testing purposes (this DNA extract is referred to hereinafter as the "Pants DNA Sample").  Ex. 19 (Pl. Admissions by Stip.) at ¶¶ 1-2.

37.   Scientists at the DOH Lab attempted to identify an autosomal DNA profile the Pants DNA Sample.  *See* DOH [Initial] Report: Summary of Analytical Findings (Jun. 22, 2010) (RIDOH 157 to  158), attached hereto as **Exhibit 20**, at RIDOH000157.  *See also*, Allele Summary Worksheets (Jul 7, 2008, Monteiro 133) and (Jun 22, 2010, Monteiro 131) both attached hereto as **Exhibit 21**; Deposition Transcript, Tamara Wong (Nov. 4, 2021), Excerpt: 96:4-12, 97:4-15, attached hereto as **Exhibit 22** (describing Ex. 21); Ex. 19 (Pl. Admissions by Stip.) at ¶ 2.

38.   No reportable DNA profile was obtained from the autosomal DNA testing of the Pants DNA Sample, conducted on July 7, 2008.  *See* Ex. 21 (Allele Summary Worksheets) at Monteiro 131 & 133; Ex. 22 (T. Wong Dep. Tr., Excerpt) at  96:6-12; 97:4-15 (explaining Ex. 21).

39.   However, the autosomal testing *did* identify an allele indicating the presence of a Y chromosome. *See* Ex. 21 (Allele Summary Worksheets) at Monteiro000131 & 133; Ex. 22 (T. Wong Dep. Tr. Excerpt) at 96:4-12, 97:4-15 (explaining Ex. 21).

40.   DOH Initial Report of Jun 22, 2010 [Ex. 20 (DOH Initial Report (Jun. 22, 2010)] describes the detection of a "Y allele," at the Amelogenin locus, and relays that the Pants DNA Sample was sent to Fairfax Identity Laboratories for Y-STR DNA Analysis.Ex. 20 (DOH Initial Report (Jun. 22, 2010) at RIDOH 158; *see also* Ex. 19 (Pl. Admissions by Stip.) at ¶ 4.

41.   The "Amelogenin" locus detects the X and Y alleles. Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro) at ¶ 13.

42.   In 2008, 2009 and 2010, the Rhode Island Department of Health was not equipped with the technology necessary to perform Y-chromosome DNA analysis (or "Y-STR DNA" analysis).  However, Fairfax Identity Laboratories did have the technological capability to perform Y-STR DNA analysis.  Ex. 19 (Pl. Admissions by Stip.) at ¶ 4.

43.   The Department of Health sent the Pants DNA Sample to Fairfax Identity Laboratory, to perform Y-STR DNA analysis.  *See* Forensic DNA Case Report, Fairfax Identity Labs (Jan 13, 2010) (RIDOH 159 to 160), attached hereto as **Exhibit 23**; and Ex. 19 (Pl. Admissions by Stip.) at ¶ 4.

44.   Y-STR DNA testing looks at DNA found only on the male Y chromosome and will ignore all female DNA that may be present in the sample.  Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro) at ¶ 14.

45.   Y-STR DNA is not unique to an individual; it is shared among all male members of a paternal lineage.  Therefore, forensic investigators can only use a Y-STR DNA profile to connect a DNA sample to all of the males in a paternal lineage. Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro) at ¶ 14.

46.   In its January 13, 2010, Report to the Department of Health (Ex. 23), Fairfax Identity Laboratories reported a single-source, partial Y-STR DNA profile for the Pants DNA

Sample.  Ex. 23 (Fairfax Case Report (Jan 13, 2010)) at RIDOH 160; *see also* Ex. 19 (Pl Admissions by Stip.) at Nos. 5-6.

47.    Fairfax obtained reportable data at six of the 17 loci (locations) specific to the Y chromosome for which technology at the time permitted testing.  Ex. 23 (Fairfax Forensic DNA Case Report, Jan 13, 2010) at RIDOH 160; *see also* Ex. 19 (Pl. Admissions by Stip.) at ¶¶ 5-6.

48.    Fairfax Laboratories obtained the following Y-STR DNA partial profile for the DNA extract from the pants cutting:

| Locus on Y Chromosome | Alleles Identified on Y Chromosome (Jan 13, 2010) Pants DNA Sample |
|---|---|
| **DYS456** | 18 |
| **DYS389I** | 13 |
| **DYS390** | No Reported Result |
| **DYS389II** | No Reported Result |
| **DYS458** | 15 |
| **DYS19** | No Reported Result |
| **DYS385a/b** | No Reported Result |
| **DYS393** | 13 |
| **DYS391** | No Reported Result |
| **DYS439** | No Reported Result |
| **DYS635** | 21 |
| **DYS392** | No Reported Result |
| **YGATAH4** | 11 |
| **DYS437** | No Reported Result |
| **DYS438** | No Reported Result |
| **DYS448** | No Reported Result |

Ex. 23 (Fairfax Case Report (Jan 13, 2010)) at RIDOH 160.

49.    Plaintiff admits that the partial Y-STR DNA profile obtained by Fairfax Identity Laboratories in 2010, set forth in Ex. 23, is accurate. Ex. 19 (Pl. Admissions by Stip.) at ¶ 7.

50.    The DOH Initial Report of June 22, 2010 (Ex. 20) described the results of the DOH and Fairfax analyses to date:

   a.   microscopic examination failed to reveal the presence (intact or partial) of spermatozoa on Item 1.8 (the purple pants).

   b.   "[t]he presence of blood was indicated on the pants (Item # 1.8)."

      c.  "STR DNA/PCR typing was performed on the pants, however only Amelogenin alleles were detected."

      d.  a Y allele was detected on the pants, and the Pants DNA Sample was sent to Fairfax Identity Labs for Y-STR DNA testing.

      e.  the Fairfax Identity Laboratories report of January 13, 2010 (Ex. 23) was attached to the DOH Initial Report and identified a partial Y-STR DNA profile for the DNA extract from the pants cutting (finding data at five of 16 tested loci).

Ex. 20 (DOH Initial Report (Jun. 22, 2010)), referencing Ex. 23 (Fairfax Case Report (Jan 13, 2010)).

51.    For several years, the case lay dormant with the Pawtucket Police Department. *See* Affidavit in Support of Probable Cause, Det. Susan Cormier (July 17, 2019) (PD 1st RFP 839 to 846), attached hereto as **Exhibit 24**, at PD 1st RFP 000841.

52.    In 2018, Detective Susan Cormier re-opened the Cole Investigation and learned of the Rhode Island Department of Health's and Fairfax's 2010 testing results for the first time. Ex. 24 (Prob. Cause Aff. (Jul 17, 2019)) at PD 1st RFP 841.

53.    Det. Cormier asserts that she learned from the "Supervisor of Forensic Science" at the Department of Health (not Tamara Wong), that forensic testing had revealed "male blood on the inside crotch of the victims [*sic*.] pants." Ex. 24 (Prob. Cause Aff. (Jul 17, 2019)) at PD 1st RFP 842.

54.    Det. Cormier states that in 2018 she requested "further testing of the extraction from the blood sample in the hopes [*sic*.] that newer advances in technology may reveal more." Ex. 24 (Prob. Cause Aff. (Jul 17, 2019)) at PD 1st RFP 000842.

55.    Thereafter, Analyst Wong was assigned to work on the Cole Investigation in 2018. Deposition Transcript, Tamara Wong (Nov. 4, 2021), Excerpt: 51:9-17, attached hereto as **Exhibit 25**.

56.    The Department of Health conducted additional testing of the Pants DNA Sample and obtained a more complete -but still partial – Y-STR DNA sample. Ex. 19 (Pl. Admissions by Stip.) at ¶ 8.

57.    In 2019, a complete Y-STR DNA profile would reflect alleles identified at 23 loci (or locations) on the Y chromosome. Ex. 4 (J. E. Schienman Expert Rpt. for Def. Wong) at p. p. 6 (describing the PowerPlex Y23, or "PPY23," testing kit, which has 23 testing loci on the Y chromosome).

58.    Using the more advanced PPY23 amplification kit, Analyst Wong developed a more complete – but still partial – Y-STR DNA profile from the Pants DNA Sample in early 2019. Ex. 4 (J. E. Schienman Expert Rpt. for Def. Wong) at p. p. 6 (describing that Wong obtained a partial profile consisting of alleles at 12 of the kit's 23 testing locations).

59. Wong reported her results to Detective Cormier on March 19, 2019, in DOH DOH Supplemental Report I (Mar 19, 2019) (PD 1st RFP 991 to 993), attached hereto as **Exhibit 26**, at p. 2 (PD-1st RFP 992).

60. Tamara Wong obtained the following Y-STR DNA partial profile for the Pants DNA Sample, as reported in DOH Supplemental Report I (Ex. 26).

| Locus on Y Chromosome | Alleles Identified on Y Chromosome (Mar. 19, 2019) Pants DNA Sample |
|---|---|
| DYS576 | 18 |
| DYS389I | 13 |
| DYS448 | 20 |
| DYS38911 | Below Threshold |
| DYS19 | No Type |
| DYS391 | 11 |
| DYS481 | 22 |
| DYS549 | 13 |
| DYS533 | 12 |
| DYS438 | Below Threshold |
| DYS437 | Below Threshold |
| DYS570 | 18 |
| DYS635 | 21 |
| DYS390 | 24 |
| DYS439 | No Type |
| DYS392 | No Type |
| DYS643 | No Type |
| DYS393 | 13 |
| DYS458 | 15 |
| DYS385 | Below Threshold |
| DYS456 | No Type |
| YGATAH4 | No Type |

Ex. 26 (Suppl Report I (Mar. 19, 2019)) at  p. 2 (PD 1st RFP 992).

61. Plaintiff admits that the partial Y-STR DNA profile obtained by Analyst Wong in March of 2019 for the DNA extract (from the pants cutting), and reported in DOH Supplemental Report I (Ex. 26) is accurate.  Ex. 19 (Pl. Admissions by Stip.) at ¶ 9.

62. The DOH Supplemental Report I, dated Mar. 19, 2019 is addressed to Detective Susan Cormier. Ex. 26 (Suppl Report I (Mar. 19, 2019)) at p. 1 (PD 1st RFP 991).

63. The DOH Supplemental Report I, dated Mar. 19, 2019, also states:

      a.      Y-STR loci are located on the male specific Y chromosome

      b.      Y-STR loci . . . are maintained throughout the paternal lineage.

      c.      Male relatives in the same paternal line will demonstrate the same Y-STR DNA profiles.

Ex. 26 (Suppl Report I (Mar. 19, 2019)) at p. 2 (PD 1st RFP 992).

64.    Between the testing initially conducted in 2010 and Wong's further testing in 2019, the Department of Health compiled a composite partial Y-STR DNA profile from the Pants DNA Sample, comprised of alleles at 14 loci, of the 23 loci for which testing was available in 2019.[1]  DOH Supplemental Report II (Jul 17, 2019) (PD 1st RFP 994 to 999) attached hereto as **Exhibit 27,** at p. 4 (PD 1st RFP 997).

65.    The composite partial profile is expressed in "DOH Supplemental Report II," dated July 17, 2019 (PD 1st RFP 994 to 999), attached hereto as Exhibit 27, at p. 4 (PD 1st RFP 997), as follows:

| Locus on Y Chromosome | Alleles Identified on Y Chromosome (Mar. 19, 2019 & Jan 13, 2010*) **Pants DNA Sample** |
|---|---|
| **DYS576** | **18** |
| **DYS389I** | **13** |
| **DYS448** | **20** |
| **DYS38911** | Below Threshold |
| **DYS19** | No Type |
| **DYS391** | **11** |
| **DYS481** | **22** |
| **DYS549** | **13** |
| **DYS533** | **12** |
| **DYS438** | Below Threshold |
| **DYS437** | Below Threshold |
| **DYS570** | **18** |
| **DYS635** | **21** |
| **DYS390** | **24** |
| **DYS439** | No Type |
| **DYS392** | No Type |

---

[1] Twelve of the alleles in that profile were identified by Analyst Wong; two were identified (only) by the earlier Fairfax analysis reported in 2010. *Compare* Ex. 23 (Fairfax Case Report (Jan 13, 2010)) at  p. 2 (RIDOH 160), *to* Ex. 26 (Suppl Report I (Mar. 19, 2019)) at p. 2 (PD 1st RFP 992), as to DYS456 and YGATAH4 loci.  In Ex. 27 Ex. 27 (Suppl Report II (Jul 17, 2019)), the alleles accurately identified by Fairfax are included in the composite partial Y-STR profile for the Pants DNA Sample, on p. 4 (PD 1st RFP 997).

| DYS643 | No Type |
|---|---|
| **DYS393** | **13** |
| **DYS458** | **15** |
| **DYS385** | Below Threshold |
| **DYS456** | *18 |
| **YGATAH4** | *11 |
| * composite profile – alleles previously analyzed and reported [in 2010, by Fairfax]. | |

Ex. 27 (Suppl Report II (Jul 17, 2019)) at p.4 (PD 1st RFP 997).

66. Plaintiff admits the accuracy of the composite partial Y-STR DNA profile for the Pants DNA Sample, set forth in DOH Suppl. Report II. Ex. 19 (Pl. Admissions by Stip.) at ¶ 21.

67. On July 17, 2019, Analyst Wong received a buccal swab sample that had been taken by the Pawtucket Police Department, from Plaintiff Monteiro's inner cheek. Ex. 13 (PPD Narrative Det Cormier) at PD 1st RFP 967.

68. Analyst Wong followed stringent testing and control protocols to correctly identify Plaintiff Monteiro's autosomal (or "STR") DNA profile, and his Y-STR DNA profile. *See* Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro) at ¶ 18.

69. Plaintiff admits the accuracy of Analyst Wong's analysis of his autosomal (or "STR") DNA profile. Ex. 19 (Pl. Admissions by Stip.) at ¶¶ 16-17, 20.

70. Likewise, Plaintiff admits that Analyst Wong accurately identified his Y-STR DNA profile Ex. 19 (Pl. Admissions by Stip.) at ¶ 12.

71. Y-STR DNA is not nearly as discriminating as autosomal STR DNA profiles. Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro) at ¶ 14.

72. Plaintiff's Y-STR DNA is not unique to him; it is shared among all male members of his paternal lineage. Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro) at ¶ 14.

73. Forensic investigators cannot use a Y-STR DNA profile to connect a DNA sample to any one individual; only to the males in a paternal lineage. Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro) at ¶ 14.

74. On July 17, 2019, Analyst Wong compared Plaintiff Monteiro's Y-STR DNA profile to the partial Y-STR DNA profile from the Cole Pants DNA Sample. *See gen.* Ex. 27 (Suppl Report II (Jul 17, 2019)).

75. The partial Y-STR DNA profile from the Cole Pants DNA Sample revealed identifiable alleles at 14 loci. Ex. 27 (Suppl Report II (Jul 17, 2019)) at p. 4 (PD 1st RFP 997).

76.     Wong observed that Plaintiff Monteiro's Y-STR profile revealed the exact same alleles, at the exact same loci, as the partial Y-STR DNA profile from the Cole pants, as expressed in DOH's Supplemental Report II, and reproduced here.

| Locus on Y Chromosome | Alleles Identified on Y Chromosome (Mar. 19, 2019 & Jan 13, 2010*) **Pants DNA Sample** | Alleles Identified on Y Chromosome (July 17, 2019) **Plaintiff's DNA Sample** |
|---|---|---|
| **DYS576** | 18 | 18 |
| **DYS389I** | 13 | 13 |
| **DYS448** | 20 | 20 |
| **DYS38911** | Below Threshold | 30 |
| **DYS19** | No Type | 13 |
| **DYS391** | 11 | 11 |
| **DYS481** | 22 | 22 |
| **DYS549** | 13 | 13 |
| **DYS533** | 12 | 12 |
| **DYS438** | Below Threshold | 10 |
| **DYS437** | Below Threshold | 14 |
| **DYS570** | 18 | 18 |
| **DYS635** | 21 | 21 |
| **DYS390** | 24 | 24 |
| **DYS439** | No Type | 12 |
| **DYS392** | No Type | 11 |
| **DYS643** | No Type | 12 |
| **DYS393** | 13 | 13 |
| **DYS458** | 15 | 15 |
| **DYS385** | Below Threshold | 17, 18 |
| **DYS456** | *18 | 18 |
| **YGATAH4** | *11 | 11 |

Ex. 27 (Suppl Report II (Jul 17, 2019)) at p. 4 (PD 1st RFP 997).

77.     Analyst Wong briefly summarized the findings of her comparison of the two samples in a text message to Detective Cormier at 5:53 pm: "It's a match. Finalizing the report now."

11

Text Comms. Transcript, Wong and Cormier, Excerpt (TWong 04 to 05), attached hereto as **Exhibit 28,** at (TWong 04) (lower left text box).[2]

78.   After texting Detective Cormier at 5:53 pm, Analyst Wong prepared, received supervisory approval for, and transmitted to Detective Cormier the official and final Report of the Department of Health (Ex. 27, DOH Supplemental Report II"), at <u>7:02 pm</u> the same evening.  *See* Deposition Transcript, Tamara Wong (Nov. 4, 2021) Excerpt: 148:10 to 149:2, attached hereto as **Exhibit 29,** (stating Supplemental Report II is formal finalized report); Email Attach DOH Suppl Report II, T. Wong to S. Cormier (Jul. 17, 2019 at 7:02pm) (TWong 023) (transmitting Supplemental Report II to Det. Cormier), attached hereto as **Exhibit 30**; and Ex. 27 (Suppl Report II (Jul 17, 2019)) at p. 6 (PD 1st RFP 999) (showing Supervisor's signature).

79.   DOH Supplemental Report II sets forth Analyst Wong's official findings, on behalf of the Department of Health.  Ex. 29 (T. Wong Dep. Tr. Excerpt) 148:10 to 149:2 (Supplemental Report II is "formal finalized report").

80.   DOH Supplemental Report II (Ex. 27) states:

    a.    "Y-STR loci are located on the male specific Y chromosome";

    b.    "Y-STR loci . . . are maintained throughout the paternal lineage";

    c.    "Male relatives in the same paternal line will demonstrate the same Y-STR DNA profiles"; and

    d.    "The previously reported partial Y-STR DNA profiles obtained from the stain on the victim's purple pants (Item # 1. 8) **is consistent with** the known reference profile from Joao Monteiro (Item# 23 )."

Ex. 27 (Suppl. Report II (Jul 17, 2019)) at p. 5 (PD 1st RFP 998) (emphasis added).

81.   DOH Supplemental Report II states that the partial Y-STR DNA profile obtained from the Cole Pants DNA Sample is **consistent** with Plaintiff Monteiro's Y-STR DNA profile.  Ex. 27 (Suppl. Report II (Jul 17, 2019)) at p. 5 (PD 1st RFP 998) (emphasis added); Ex. 19 (Pl. Admissions by Stip.) at ¶ 13 (emphasis added).

---

[2] For ease of reference, please note that Exhibit 28 shows nine screenshots per page, which are consecutively ordered as follows:

| 1 | 2 | 3 |
|---|---|---|
| 4 | 5 | 6 |
| 7 | 8 | 9 |

82.   Plaintiff Monteiro admits that the partial Y-STR DNA profile obtained from the Cole Pants DNA Sample, and his own Y-STR DNA profile, are in fact consistent.   Ex. 19 (Pl. Admissions by Stip.) at ¶14.

83.   The Report of July 17, 2019 (Supplemental Report II) does <u>not</u> state that the partial Y-STR DNA profile obtained from the Pants DNA Sample  "match" the known reference profile from Joao Monteiro."  *See* Ex. 27 (Suppl. Report II (Jul 17, 2019)) at p. 5 (PD 1st RFP 998).

84.   DOH Supplemental Report II (Ex. 27) provides critical information about the *statistical significance* of the match between Plaintiff Monteiro's Y-STR DNA profile and the partial Y-STR DNA profile obtained from the Pants DNA Sample:

   a.   "Statistics were developed using all suitable loci tested and the haplotype from the stain on the victim's purple pants (Item# 1.8) is found in 0 of 5,717 total individuals within the combined U.S. Y-HRD database."

   b.   "Applying the 95% upper confidence interval results in **a frequency of approximately 1 in every 1,909 individuals**."

   *See* Ex. 27 (Suppl. Report II (Jul 17, 2019)) at p. 5 (PD 1st RFP 998) (emphasis added).

85.   Plaintiff Monteiro *admits* the accuracy of Analyst Wong's statistical analysis in =DOH Supplemental Report II, conceding that "[a]pproximately 1 in every 1,909 male individuals is expected to have the same partial Y-STR DNA profile as that obtained from the [Pants DNA Sample.]"  Ex. 19 (Pl. Admissions by Stip.) at ¶ 15.

86.   Detective Cormier admits that she read DOH Supplemental Report II (Ex. 27) when she received it at approximately 7:02pm on July 17, 2019. Deposition Transcript, Susan Cormier Part II (Oct 12, 2021) Excerpts, attached hereto as **Exhibit 31**, at 123:18-20.

87.   At 7:10pm, Detective Cormier asked Tamara Wong about a specific statement in the DOH Supplemental Report II (Ex. 27), regarding the statistical analysis.   Ex. 28 (Text Tr. Excerpt) at TWong 05 (top left and top center text boxes);  Ex. 31 (S. Cormier Tr. Dep., Part II (Oct 12, 2021)) at 135:18-21.

88.   Detective Cormier texted Tamara Wong at 7:10pm and asked: "So there is no '1 in 10 billion' match type of stats… Just 95% confident?" Ex. 28 (Text Tr. Excerpt) at TWong 05 (top left and top center text boxes).

89.   Detective Cormier admits that her question to Wong, at 7:10pm, refers to the 95 percent confidence interval described in the statistical significance calculation in DOH Supplemental Report II (Ex. 27) at p. 5 (PD-1st RFP-000998).  Ex. 31 (S. Cormier Tr. Dep., Part II (Oct 12, 2021)) at 135:18-21.

90.   Detective Cormier concedes that she read the portion of DOH Supplemental Report II (Ex. 27) describing the statistical significance of Analyst Wong's findings (on page 5 of the

Report, PD-1st RFP-000998), by no later than 7:10pm. Ex. 31 (S. Cormier Tr. Dep., Part II (Oct 12, 2021)) at 135:18-21.

91.     In reply to Detective Cormier's texted question, Wong again emphasized to Detective Cormier, at 7:12pm, that Y-STRS "are shared with family members," and therefore "the stats are always low." Ex. 28 (Text Tr. Excerpt) at TWong_000005 (top left and top center text boxes).

92.     Detective Cormier then asked Tamara Wong (by text message) if she could talk:  At 7:12pm Detective Cormier wrote:  "Can you talk? I need you to translate this into my language.  Dumb it done [sic.] for mw [sic.]." Ex. 28 (Text Tr. Excerpt) at TWong_000005 (top left and top center text boxes).

93.     Tamara Wong's cell phone records for the relevant timeframe identify one call to or from Detective Cormier's phone number, on July 17, 2019.  The call was incoming from Detective Cormier, at 7:13pm.  *See* Verizon Cell Phone Call Records, Tamara Wong, Excerpt (Jul 1 to 19, 2019) (TWong 041), attached hereto as **Exhibit 32**.

94.     Detective Cormier admitted that she had hoped to obtain a statistic closer to 1 in 10 billion, than 1 in 1,909, from Analyst Wong's DNA analysis. Ex. 31 (S. Cormier Tr. Dep., Part II (Oct 12, 2021)) at 127:05-07.

95.     Detective Cormier stated that on the evening of July 17, 2019, she discussed the case with personnel from the Attorney General's office, and set forth all of the information for those personnel, including  DOH Supplemental Report II. Ex. 31 (S. Cormier Tr. Dep., Part II (Oct 12, 2021)) at  140:5-11.

96.     In her Probable Cause Affidavit, Detective Cormier describes the relationship between Plaintiff Monteiro's Y-STR DNA profile, and the partial Y-STR DNA profile obtained from Cole Pants DNA Sample, exactly as Analyst Wong describes it in Wong's Final Report (Suppl. Report II): the Affidavit reported that the profiles are "consistent with" each other.  *See* Ex. 24 (Prob. Cause Aff. (Jul 17, 2019)) at p. 6 (PD 1st RFP 000844).

97.     Specifically, Detective Cormier's probable cause Affidavit stated that Analyst Wong contacted Detective Cormier on July 17, 2019:

> to notify [Detective Cormier] that the DNA reference was compared to the partial Y-STR profile obtained from the blood located on the inside crotch of the victim's pants and **confirmed that it was consistent with the known reference DNA profile for Joao Monteiro**. Tamara Wong provided a Summary of Analytical Facts Supplemental Report [II], which detailed her findings. Please see the attached report for further details.

Ex. 24 (Prob. Cause Aff. (Jul 17, 2019)) at p. 6 (PD 1st RFP 000844) (emphasis added).

98.     Neither the Probable Cause Affidavit drafted by Detective Cormier, nor the Supplemental Report II which Detective Cormier attached to her Affidavit, used the term "match" to describe the relationship between the samples (or the profiles obtained from the samples).

*See* Ex. 24 (Prob. Cause Aff. (Jul 17, 2019)) at p. 6 (PD 1st RFP 844), and Ex. 27 (Suppl. Report II (Jul 17, 2019)) at p. 5 (PD 1st RFP 998).

99.    Detective Cormier's Probable Cause Affidavit was reviewed by prosecutors from the Attorney General's Office. Ex. 31 (S. Cormier Tr. Dep., Part II (Oct 12, 2021)) at 140:5-11.

100.   Susan Cormier's Probable Cause Affidavit attached Tamara Wong's Report (DOH Supplemental Report II); both documents state that the evidentiary partial profile (from the Pants DNA Sample) was "consistent with" Mr. Monteiro's Y-STR DNA profile. *See* Deposition Transcript, Susan Cormier Part III (Jun 21, 2022) Excerpt, attached hereto as **Exhibit 33**, at 72:15-18; Ex. 24 (Prob. Cause Aff. (Jul 17, 2019)) at p. 6 (PD 1st RFP 844); Ex. 27 (Suppl. Report II (Jul 17, 2019)) at p. 5 (PD 1st RFP 998).

101.   On the night of July 17, 2019, the Probable Cause Affidavit (Ex. 24) <u>and</u> an attached copy of DOH Supplemental Report II (Ex 27) were presented by Detective Cormier to Magistrate Judge Patrick O'Neill for a probable cause determination on Detective Cormier's application for an arrest warrant. *See* Ex. 24 (Prob. Cause Aff. (Jul 17, 2019) at pp 6-7 (1st RFP 000844 to 845) (describing attachment of Wong's Report to Affidavit); Ex. 33 (S. Cormier Tr. Dep., Part III (Jun 21, 2022)) at 72:11-18.

102.   Magistrate Judge O'Neill testified that he always reads the information set before him when requested to sign off on a warrant. *See* Deposition Transcript, Magistrate Judge Patrick O'Neill (Sep. 22, 2022) Excerpt, attached hereto as **Exhibit 34**, at 47:06-09.

103.   On the basis of the Probable Cause Affidavit presented to him, and attached DOH Supplemental Report II, Magistrate Judge O'Neill found probable cause for Plaintiff Monteiro's arrest and signed the Warrant for Plaintiff's Arrest at 10:30pm. Ex. 31 (S. Cormier Tr. Dep., Part II (Oct 12, 2021)) at 137:08-14.

104.   On the night of July 17, 2019, Monteiro was taken into custody, and transported to the Pawtucket Police cell block. Ex 13 (Cormier PD Personnel Narrative) at PD_1st_RFP_000969.

105.   Plaintiff Monteiro was arraigned in District Court on July 18, 2019. Ex. 13 (PPD Narrative Det Cormier) at PD 1st RFP 970.

106.   Plaintiff Monteiro was transferred to and held at the Adult Correctional Institutes in Cranston, RI on July 18, 2019, until the following day, July 19, 2019. *See* RAP Sheet, J. Monteiro, Certified (redacted), attached hereto as **Exhibit 35**.[3]

107.   On July 19, 2019, the Court set bail for Mr. Monteiro. *See* Deposition Transcript, Timothy Healy (Dec. 22, 2021) Excerpt, attached hereto as **Exhibit 36**, at 65:24 to 66:03, 66:14-24.

---

[3] Defendant Wong respectfully requests judicial notice of this copy of a public record certified by Captain Paul Rao, of the Records and Identification Unit, Intake Service Center, Department of Corrections. That portion of the document unrelated to the events which are the subject of this suit is redacted to preserve the Plaintiff's privacy.

108.   Plaintiff admits that Tamara Wong was not physically present with Detective Cormier when Detective Cormier drafted her Probable Cause Affidavit seeking a warrant for Mr. Monteiro's arrest.  *See* Plaintiff Monteiro Second Supplemental Response to Defendant Wong Requests for Admissions (Nov. 4, 2022) Excerpt, attached hereto as **Exhibit 37**, No. 255.

109.   Plaintiff admits that Tamara Wong was not physically present when Detective Cormier presented her affidavit to Mag. J. O'Neill on July 17, 2019.  Ex. 37 (Pl 2nd Suppl Resp. to Wong RFAs, Excerpt) at No. 256.

110.   Plaintiff admits that Tamara Wong was not physically present with Plaintiff Monteiro when Plaintiff was detained on July 17, 2019, by the Pawtucket Police.  Ex. 37 (Pl 2nd Suppl Resp. to Wong RFAs, Excerpt) at No. 257.

111.   On January 31, 2020, the Office of the Attorney General declined to prosecute Plaintiff Monteiro for any crime.  *See* Filing, Dist. Ct. Sixth Div., No. 62-2019-07946 (Jan. 31, 2020) Statement of Non Prosecution, (PD 1st RFP 1532), attached hereto as **Exhibit 38**.

112.   In January of 2021, Plaintiff brought suit against four Pawtucket Police officers Detective Susan Cormier, Detective Trevor LeFebvre, Major Daniel Mullens and Chief Tina Goncalves, the City of Pawtucket (together, the Pawtucket Defendants) and Analyst Wong (in her individual capacity only). Ex. 1 (Compl.) at ¶¶ 16-18.

113.   Plaintiff's Complaint seeks relief against Analyst Wong and the Pawtucket Defendants alike for  "42 U.S.C. § 1983 – Federal Malicious Prosecution" (Count  I); "42 U.S.C. § 1983 – Arrest without Probable Cause" (Count II); "42 U.S.C. § 1983 – Equal Protection" (Count III)[4]; "42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights"(Count IV); "42 U.S.C. § 1983 – Failure to Intervene" (Count V); "State Law – False Arrest/Imprisonment" (Count VI); "State Law – Malicious Prosecution" (Count VII); "State Law - Intentional Infliction of Emotional Distress" (Count VIII).[5]  Ex. 1 (Compl.) at ¶¶ 64-139.

114.   Plaintiff's Complaint (Ex. 1) alleges that *all* Defendants, including Analyst Wong: "bypassed prosecutors" to seek a "false arrest" of Plaintiff (¶ 52); "arrested Plaintiff" (¶ 89); "commenced a criminal case against Plaintiff" (¶ 119); "initiated the prosecution of Plaintiff," "with malice," (¶ 125) and "detained" Plaintiff "without legal justification" (¶ 117).  Ex. 1 (Compl).

115.   The *only* factual allegations in Plaintiff's Complaint (Ex. 1) that he levels against Analyst Wong in particular are:

    (a)    Analyst Wong was employed by the Department of Health. Compl. ¶ 17

---

[4] In February of 2023, Plaintiff informed Analyst Wong that he voluntarily withdraws this single count (Count III) against her.
[5] Plaintiff brought a further claim (Count IX) against Detective Cormier and Chief Goncalves, and a claim for indemnification (Count X) (also not brought against Wong).

(b)  Analyst Wong "supplied DNA evidence related to this case that was either manipulated by the Pawtucket Defendants to pursue the wrongful arrest of Plaintiff or that was intentionally fabricated to falsely implicate Plaintiff." Compl. ¶ 17

(c)  The Pawtucket Defendants "utilized Defendant Wong to accomplish the falsification of [DNA] evidence." ¶¶ 43-44.

(d)  The Pawtucket Defendants either misrepresented the findings of Defendant Wong's analysis and/or Defendant Wong participated in the misrepresentation. ¶ 45

(e)  Defendant Wong never truly concluded that the DNA found in the girl's pants was a match with Plaintiff's DNA sample.¶ 46.

(f)   The "Pawtucket Defendants and/or Defendant Wong falsely asserted that the DNA evidence was a match to Plaintiff's DNA." ¶ 48.

Ex. 1 (Compl.).

116.  Plaintiff Monteiro retained DNA scientist Meghan Clement, of Clement Consulting LLC, as a testifying expert in this case.  *See* Plaintiff Monteiro Rule 26(a)(2) Disclosures (Jul. 20, 2022), attached hereto as **Exhibit 39**.

117.  Plaintiff's Forensic Science Expert, Ms. Clement, identified <u>no</u> mistake, <u>no</u> misstep and <u>no</u> inaccuracy in Analyst Wong's tests, analyses or reporting.  *See* Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro) at ¶ 18.

118.  Plaintiff's Forensic Science Expert, Ms. Clement, opined that all of Analyst Wong's "DNA testing appears to have followed standard testing procedures generally used and accepted during their respective time frames." Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro) at ¶ 18.

119.  Plaintiff Monteiro now admits that Tamara Wong "followed appropriate testing procedures in developing the DNA evidence in this case."  Ex. 19 (Pl Admissions by Stip) at No. 16.

120.  Plaintiff Monteiro now admits that Tamara Wong "followed appropriate testing procedures in the physical handling of the DNA evidence in this case."  Ex. 19 (Pl Admissions by Stip) at No. 17.

121.  Plaintiff Monteiro now admits the testing process used by Tamara Wong in developing Plaintiff Monteiro's DNA profile was proper. Ex. 19 (Pl Admissions by Stip) at No. 20.

122.  Plaintiff Monteiro now admits the testing process used by Tamara Wong in developing the partial Y-STR DNA profile from the Cole Pants DNA Sample was proper. Ex. 19 (Pl. Admissions by Stip.) at ¶ 20.

123.  Plaintiff Monteiro now admits that Tamara Wong did not tamper with any item of DNA evidence.  Ex. 19 (Pl. Admissions by Stip.) at ¶ 18.

124.   Plaintiff Monteiro now admits the accuracy of the Y-STR DNA profile obtained from the Cole Pants DNA Sample, as represented in DOH Supplemental Report II (Ex. 27). Ex. 19 (Pl. Admissions by Stip.) at ¶ 22

125.   Plaintiff Monteiro now admits the accuracy of the Y-STR DNA profile obtained from Plaintiff Monteiro's buccal swab, as represented in DOH Supplemental Report II (Ex. 27). Ex. 19 (Pl. Admissions by Stip.) at ¶ 12.

126.   Plaintiff Monteiro no longer contests that his Y-STR DNA profile is consistent with the partial Y-STR DNA profile obtained from Cole's pants.  Ex. 19 (Pl. Admissions by Stip.) at ¶ 14.

127.   On June 23, 2022, Plaintiff Monteiro served Plaintiff Monteiro's Second Supplemental Responses to Defendant Wong First Set of Interrogatories (Interrog Nos. 1-14), attached hereto as **Exhibit 40**.

128.   On the same day, June 23, 2022, Plaintiff Monteiro served Plaintiff Monteiro's Response to Defendant Wong Second Set of Interrogatories (Interrog Nos. 15-22), attached hereto as **Exhibit 41**.

129.   In Response to Analyst Wong's Request in Interrog. No. 1 that Plaintiff identify the "DNA" evidence which Plaintiff alleged in his Complaint was "manipulated" or "fabricated," Plaintiff responded in part:

> Plaintiff states that Defendant Wong supplied false DNA analysis to Defendant Cormier in the form of advising Defendant Cormier that there was a "match" between Plaintiff's DNA and the partial Y-STR profile.

Ex. 40 (Pl 2nd Suppl. Resp to Wong First Set Interrogs), No. 1.

130.   Notably, Plaintiff has identified no record other than the Text Message Communication between Wong and Detective Cormier, in which Wong used the term "match" to describe the relationship between the two Y-STR DNA profiles.

131.   In Plaintiff's Second Supplemental Response to Analyst Wong's Requests for facts that support his averments (*see* Interrog. Nos. 2, 3, 4, 5 and 6), Plaintiff repeats, time and again (in relevant part) that:

> Defendant Wong supplied false DNA analysis to Defendant Cormier in the form of advising Defendant Cormier that three was a "match" between Plaintiff's DNA and the partial Y-STR profile when Defendant Wong knew that it was not true.

Ex. 40 (Pl 2nd Suppl. Resp to Wong First Set Interrogs), Nos. 2, 3, 4, 5 & 6. (emphasis added).

132.   In Plaintiff's Response to Analyst Wong's Second Set of Interrogatories, he avers that Analyst Wong (in relevant part):

> fabricated material evidence against Plaintiff in the form of false DNA evidence that Defendant Wong knew would be used to cause Plaintiff's arrest. Defendant Wong falsely represented to the Pawtucket Defendants that she had developed DNA evidence that demonstrated that Plaintiff's DNA "matched" a partial profile of Y-STR DNA that was purportedly obtained from Christine Cole's pants.

Ex. 41 (Pl Resp to Wong Second Set Interrogs) at No. 15.

133. In Plaintiff's Response to Analyst Wong's Second Set of Interrogatories, he further insists (in relevant part) that:

> Defendant Wong expressly and falsely told Defendant Cormier that the samples were a "match."

Ex. 41 (Pl Resp to Wong Second Set Interrogs) at No. 15.

134. Today, however, Plaintiff **admits** that the samples (profiles) *are* consistent with each other.

> The partial Y-STR DNA profile[] obtained from the extract from the cutting of the deceased's purple pants [is] consistent with the known reference profile from Mr. Monteiro.

Ex. 19 (Pl. Admissions by Stip.) at ¶ 14.

135. Analyst Wong's Interrogatory No. 15 required Plaintiff Monteiro to identify each Constitutional or federal right of which he claims he was deprived. *See* Ex. 41 (Pl Resp to Wong Second Set Interrogs), No. 15.

136. Plaintiff Monteiro responded to Analyst Wong's request that he identify each Constitutional or federal right of which he claims he was deprived by stating (in excerpt):

> Defendant Wong's fabrication of evidence led to the violation of Plaintiff's rights, resulting in: (1) arrest without probable cause; (2) malicious prosecution; (3) a violation of his right to equal protection; and/or (4) false arrest/wrongful imprisonment. Investigation continues.:

Ex. 41 (Pl Resp to Wong Second Set Interrogs), No. 15.

137. Analyst Wong's Interrogatory No. 15 required Plaintiff Monteiro to identify "the specific conduct by Tamara Wong which caused You to be deprived of that Constitutional or federal right." *See* Ex. 41 (Pl Resp to Wong Second Set Interrogs), No. 15.

138. Plaintiff Monteiro responded to Analyst Wong's request that he identify Wong's specific conduct which caused Plaintiff to be deprived of a right as follows (in relevant part):

> Plaintiff states that Defendant Wong fabricated material evidence against Plaintiff in the form of false DNA evidence that Defendant Wong knew would be used to cause Plaintiff's arrest. Defendant Wong falsely

> represented to the Pawtucket Defendants that she had developed DNA evidence that demonstrated that Plaintiff's DNA "matched" a partial profile of Y-STR DNA that was purportedly obtained from Christine Cole's pants.

Ex. 41 (Pl Resp to Wong Second Set Interrogs), No. 15.

139.   The only explanation offered by Plaintiff Monteiro as to why he claims that the use of the term "match" -- to describe the relationship between his Y-STR DNA profile and the partial Y-STR DNA profile from the Pants DNA Sample -- is a false statement, is expressed in his response to Analyst Wong's Interrogatories.  Plaintiff states in relevant part:

> Defendant Wong falsely represented to the Pawtucket Defendants that she had developed DNA evidence that demonstrated that Plaintiff's DNA "matched" a partial profile of Y-STR DNA that was purportedly obtained from Christine Cole's pants.
>
> **In fact, the DNA sample from the pants was a Y-STR sample that, at best, can be used to identify male family relatives.** In this case, the Y-STR sample was a partial sample that could not be used to narrow down the potential source to Plaintiff's family, and could only be used to narrow the potential source to thousands of other individuals in the New England area. Regardless of that limitation, Defendant Wong expressly and falsely told Defendant Cormier that the samples were a "match."

Ex. 41 (Pl Resp to Wong Second Set Interrogs), No. 15 (emphasis added).

140.   John E. Schiemann, PhD, Analyst Wong's retained Forensic Science Expert, is the only forensic scientist to have opined on the meaning of the term "match" in this litigation. *See* Ex. 4 (J. E. Schienman Expert Rpt. for Def. Wong) at p. 10; *compare* Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro) (no reference to term or Wong's use of it).

141.   Dr. Schienman explains that "match" is a scientifically accurate and correct description of the Y-STR DNA profile comparisons reported by Ms. Wong."  Ex. 4 (J. E. Schienman Expert Rpt. for Def. Wong) at p. 10.

142.   Dr. Schienman explains that "match" does not mean "from the same source" nor does it indicate that DNA on an evidentiary sample belongs to any particular person.  Ex. 4 (J. E. Schienman Expert Rpt. for Def. Wong) at p. 10.

143.   Dr. Schienman describes  that: "When the alleles detected from the known reference are identical to the alleles detected from the evidence, there is a one-to-one correspondence, i.e. it is a match." Ex. 4 (J. E. Schienman Expert Rpt. for Def. Wong) at p. 10.

144.   Plaintiff claims that the word "match" can never be used with Y-STR DNA evidence because Y-STR evidence cannot identify a single individual.  *See* Ex. 41 (Pl Resp to Wong Second Set Interrogs), No. 15 (explaining that "match" was a false statement because the DNA sample from the pants was a Y-STR sample that, at best, can be used to identify male family relatives).

145. But the word "match" is repeatedly used to describe the relationship between samples of Y-STR evidence in the very guidelines published by the chief forensic authority in North America. Dr. Schienman explains:

> The latest SWGDAM guidelines (approved in March 2022) for Y-Chromosome STR Typing (11-28) state: "Subsequent to a **match** between two samples using Y-STR testing, a single source, major, or deduced Y-STR haplotype may be searched against a database of Y-STR haplotypes to obtain the sample frequency of the profile, and, as needed, to calculate profile and/or **match** probabilities."

Ex. 4 (J. E. Schienman Expert Rpt. for Def. Wong) at p. 11 (quoting SWGDAM Interpretation Guidelines for Y-Chromosome STR Typing, Approved March 2, 2022).

146. SWGDAM stands for the "Scientific Working Group on DNA Analysis Methods." Ex. 4 (J. E. Schienman Expert Rpt. for Def. Wong) at p 4.

147. SWGDAM is a group of approximately 50 scientists representing federal, state, and local DNA laboratories in the United States and Canada. Among other responsibilities, SWGDAM "provide[s] recommendations to the FBI Director on quality assurance standards for forensic DNA analysis." Ex. 4 (J. E. Schienman Expert Rpt. for Def. Wong) at p. 4.

148. Dr. Scheinman expresses in his report: "I also use the term "match" when I testify in court and explain DNA testing to a lay jury." Ex. 4 (J. E. Schienman Expert Rpt. for Def. Wong) at p. 11.

149. Plaintiff's Forensic Science expert, Meghan Clement, expresses no contrary opinion. *See gen.* Ex. 5 (M. Clement Expert Rpt. for Pl. Monteiro).

150. Plaintiff's Forensic Science expert, Meghan Clement has also utilized the same "match" terminology to describe the relationship between Y-STR DNA profiles, where, as in this case, alleles in one Y-STR DNA profile are identical to those alleles found in a second Y-STR DNA profile.

151. Meghan Clement testified in *State of Ohio v Davis,* as follows, describing three items of evidence – labeled 4.4, 4.6 and 4.7 – on which Y-STR DNA was identified:

```
7     A The 4.4, 4.6 and 4.7 all revealed the same
8     Y chromosome profile, and those three profiles are
9     the profile that all matched the reference sample
10    from Mr. Davis. So, we could not exclude Mr. Davis
11    or a paternal relative as being the source of the
12    male DNA in 4.4, 4.6 and 4.7.
13    Q Okay. You said you can't exclude him, so
14    it matches him.
15    A That's correct.
```

Expert Testimony, Meghan Clement, State of Ohio v. Davis, No. 04-CR-00464 (Common Pleas, Licking Cty., Jul 6, 2005) Excerpt at p. 1686, attached hereto as **Exhibit 42**, at p. 1686.

152. In addition, Plaintiff's Forensic Science expert, Meghan Clement has specifically defined the term "match" to mean "cannot exclude."

> **Q** Now, when you use the language "cannot exclude" what do you mean?
> **A** What we mean is that there is a match between the profile on the [garment in evidence] and the reference sample from [the suspect], therefore, it could have originated from her, or is consistent, both profiles are the same.

*See* Expert Testimony, Meghan Clement, State of Indiana v Comm, No. 22D01-0010-CF-343, 2001 WL 34886304 (Super. Ct. 2001), Excerpt, attached hereto as **Exhibit 43**, at p. 8.

153. Detective Cormier's Probable Cause Affidavit states: "It appears that Monteiro lives his life in a very covert manner." Ex. 24 (Prob. Cause Aff. (Jul 17, 2019)) p. 5  (PD 1st RFP 843).

154. Detective Cormier's Probable Cause Affidavit also describes that:

    i.    Plaintiff Monteiro "has moved at least nineteen (19) times in the past thirty [(30)] years";

    ii.    "none of the addresses that Plaintiff Monteiro uses, including the ones on his license and registration[,] are where [Plaintiff Monteiro] actually resides";

    iii.    a US Postal Inspector advised the affiant that Plaintiff "Monteiro does not receive any mail at" the address where he actually resides;

    iv.    at his residence, Plaintiff Monteiro "parks his vehicle behind the building next door to where he lives and not at his actual residence," and

    v.    at his place of business, Plaintiff "Monteiro parks his vehicle in the rear of the lot between two large delivery trucks, which makes it impossible to see the vehicle from the street," in contrast to "[a]ll other employees" who "appear to park in the front parking lot out in the open."

    Ex. 24 (Prob. Cause Aff. (Jul 17, 2019)) p. 4-5 (PD 1st RFP  842 to  843).

155. Detective Cormier's Probable Cause Affidavit states: "The victim's last own location was Saint's Market located at 76 Slater Street at approximately 7:00 PM." Ex. 24 (Prob. Cause Aff. (Jul 17, 2019)) p. 3 (PD 1st RFP 841).

22

156.   Detective Cormier's Probable Cause Affidavit reports that Plaintiff "Monteiro confirmed the fact that he lived at that address [above Saint's Market] during that same time frame" that the victim disappeared.  Ex. 24 (Prob. Cause Aff. (Jul 17, 2019)) p. 6 (PD 1st RFP 844).

157.   Plaintiff Monteiro was interviewed by Detective Cormier and Detective LeFebvre on July 17, 2019.  Ex. 24 (Prob. Cause Aff. (Jul 17, 2019)) p. 6 (PD 1st RFP 844).

158.   Detective Cormier reports in her Affidavit that:

> The entire interview was recorded and burned to a DVD.  Monteiro was confronted with . . . the fact that he lived at the same address, 76 / 78 Slater Street, where the victim was last seen. Monteiro confirmed the fact that he lived at that address during that same time frame.

Ex. 24 (Prob. Cause Aff. (Jul 17, 2019)) p. 6 (PD 1st RFP 844).

159.   The Pawtucket Police Defendants produced a record of the recorded interview of Plaintiff Monteiro from July 17, 2019, labeled Joao Monteiro #1-88-00837, for which no transcript is available.

160.   The recording appears to relate an exchange relevant to Plaintiff Monteiro's alleged statement, as expressed in Detective Cormier's Probable Cause Affidavit:

(a)   Detectives inquire about Plaintiff's residence above Saint's Market (approx. 1h:27m:20s );

(b)   Plaintiff Monteiro confirms that he lived at the location in question, for a "couple of years" (approx. 1:27:30) ;

(c)   Plaintiff Monteiro indicates that he thinks he lived there in 1984 or perhaps 1985 (approx. 1:31:50 - 1:32:13);

(d)   Detective Cormier suggests "sometime in the eighties, the late eighties you were living over there "(approx.. 1:32:13- 1:32:18).

(e)   Plaintiff Monteiro appears to disagree (approx.. 1:32:18 - 1:32:25);

(f)   Plaintiff Monteiro's states, in apparent disagreement with Detective Cormier's suggestion, something not fully intelligible in the recording, potentially language to the effect of: "over there? I say I go and live in [unintelligible]" (approx. 1:32:18 - 1:32:25).

(g)   Plaintiff Monteiro goes on to offer additional information to Detectives about the sequence of his moves to and from that residence, appearing to put the timing of his residence at the referenced location in context *vis a vis* the date of his marriage (1:32:25 - 1:33:08).

Respectfully Submitted,
DEFENDANT,
TAMARA WONG


By her attorney,

PETER F. NERONHA
ATTORNEY GENERAL

 */s/ Beth Landes*                           .
Beth Landes *(10429)*
Special Assistant Attorney General
blandes@riag.ri.gov | Ext. 2296
Rhode Island Office of the Attorney General
150 South Main St. Providence, RI 02903
Tel: (401) 274-4400
Fax: (401) 222-2995


## CERTIFICATE OF SERVICE

I hereby certify that I have caused the within document to be served via ECF to all counsel of record, this 14th day of 2023.

s/ Beth A. Landes

INDEX OF EXHIBITS
TO DEFENANT WONG'S STATEMENT OF UNDISPUTED FACTS

**Exhibit 1**      Complaint

**Exhibit 2**      Susan Cormier Deposition Transcript, Part I (Sep. 28, 2021) Excerpt 62:18 – 63:03

**Exhibit 3**      J. E. Schienman, Declaration (Feb 12, 2023), Appending Expert Report of Sep. 21, 2022

**Exhibit 4**      J. E. Schienman, Expert Report (Sep. 21, 2022), prepared on behalf of Defendant Wong.

**Exhibit 5**      M. Clement, Expert Report (July 14, 2022), prepared on behalf of Plaintiff Monteiro

**Exhibit 6**      PPD Complaint Report (Jan 6, 1988) (PD Supp 1st RFP 2129 to 2130)

**Exhibit 7**      Warwick Police Dept., Statement of Dets. L. Eastman & P. Ainsworth (Feb. 28, 1988) (PD Suppl 1st RFP 002236)

**Exhibit 8**      OME Cause of Death Report (Mar. 5, 1988) (PD Suppl 1st RFP 2240)

**Exhibit 9**      OME Death Certificate (Mar. 4, 1988) (PD Suppl 1st RFP 1631)

**Exhibit 10**    Correspondence, FBI and PPD (Sep. 5, 1996) (PD Supp 1st RFP 1719 to 1721)

**Exhibit 11**    Correspondence, FBI and PPD (Jan. 2, 1998) (PD Supp 1st RFP 1715)

**Exhibit 12**    PPD Narrative, Sergeant R. T. Stonely (Undated) (PD 1st RFP 963)

**Exhibit 13**    PPD Narrative, Detective S. Cormier (Undated) (PD 1st RFP 965 to 970)

**Exhibit 14**    Evidence Exam. Request & Receipt (Mar. 11, 2008) (Monteiro 000194)

**Exhibit 15**    General Evidence Exam Worksheet, Cara Lupino (DOH) (June 20, 2008) (Monteiro 000148)

**Exhibit 16**    Deposition Transcript, Tamara Wong (Nov 4, 2021), Excerpt: 109:09 to 110:06

**Exhibit 17**    DOH Chain of Custody Report (Monteiro 51 to 58)

**Exhibit 18**    Deposition Transcript, Tamara Wong (Nov. 4, 2021), Excerpt: 127:19 to 128:01

**Exhibit 19**    Plaintiff's Admissions by Stipulation of Facts (Dec. 7, 2022)

**Exhibit 20**    DOH [Initial] Report: Summary of Analytical Findings (Jun. 22, 2010) (RIDOH000157 to 000158)

**Exhibit 21**    Allele Summary Worksheets (Jul 7, 2008, Monteiro 133) and (Jun 22, 2010, Monteiro 131)

1

**Exhibit 22**   Deposition Transcript, Tamara Wong (Nov. 4, 2021), Excerpt: 96:4-12, 97:4-15

**Exhibit 23**   Forensic DNA Case Report, Fairfax Identity Labs (Jan 13, 2010) (RIDOH 159 to 160)

**Exhibit 24**   Affidavit in Support of Probable Cause, Det. Susan Cormier (July 17, 2019)  (PD 1st RFP 839 to 846)

**Exhibit 25**   Deposition Transcript, Tamara Wong (Nov. 4, 2021), Excerpt: 51:9-17.

**Exhibit 26**   DOH Supplemental Report I (Mar 19, 2019) (PD 1st RFP 991 to 993)

**Exhibit 27**   DOH Supplemental Report II (Jul 17, 2019) (PD 1st RFP 994 to 999)

**Exhibit 28**   Text Comms Transcript, Wong and Cormier, Excerpt (TWong 04 to 05)

**Exhibit 29**   Deposition Transcript, Tamara Wong (Nov. 4, 2021) Excerpt: 148:10 to 149:2

**Exhibit 30**   Email Attach DOH Suppl Report II, T. Wong to S. Cormier(Jul. 17, 2019at 7:02pm) (TWong 023).

**Exhibit 31**   Deposition Transcript, Susan Cormier Part II (Oct 12, 2021) Excerpts

**Exhibit 32**   Verizon Cell Phone Call Records, Tamara Wong, Excerpt (Jul 1 to 19, 2019) (TWong 041)

**Exhibit 33**   Deposition Transcript, Susan Cormier Part III (Jun 21, 2022) Excerpt

**Exhibit 34**   Deposition Transcript, Magistrate Judge Patrick O'Neill (Sep. 22, 2022) Excerpt

**Exhibit 35**   RAP Sheet, J. Monteiro, Certified (redacted)

**Exhibit 36**   Deposition Transcript, Timothy Healy (Dec. 22, 2021) Excerpt

**Exhibit 37**   Plaintiff Monteiro Second Supplemental Response to Defendant Wong Requests for Admissions (Nov. 4, 2022) Excerpt

**Exhibit 38**   Filing, Dist. Ct. Sixth Div., No. 62-2019-07946 (Jan. 31, 2020) Statement of Non Prosecution, (PD 1st RFP 1532)

**Exhibit 39**   Plaintiff Monteiro Rule 26(a)(2) Disclosures (Jul. 20, 2022)

**Exhibit 40**   Plaintiff Monteiro's Second Supplemental Responses to Defendant Wong First Set of Interrogatories (Interrog Nos. 1-14)

**Exhibit 41**   Plaintiff Monteiro's Response to Defendant Wong Second Set of Interrogatories (Interrog Nos. 15-22)

**Exhibit 42**   Expert Testimony, Meghan Clement, *State of Ohio v. Davis*, No. 04-CR-00464 (Common Pleas, Licking Cty., Jul 6, 2005) Excerpt at p. 1686

**Exhibit 43**   Expert Testimony, Meghan Clement, *State of Indiana v Comm*, No. 22D01-0010-CF-343, 2001 WL 34886304 (Super. Ct. 2001), Excerpt

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOAO MONTEIRO, | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SUSAN CORMIER, TREVOR | ) | |
| LEFEBVRE, DANIEL MULLEN, TINA | ) | |
| GONCALVES, CITY OF PAWTUCKET, | ) | |
| and TAMARA WONG, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiff, JOAO MONTEIRO, by his attorney WILLIAM DEVINE[1], complains

of SUSAN CORMIER, TREVOR LEFEBVRE, DANIEL MULLEN, TINA

GONCALVES, CITY OF PAWTUCKET, and TAMARA WONG as follows:

### INTRODUCTION

1.     Plaintiff, Joao Monteiro, is a legal immigrant from Cape Verde. He has

lived in the United States for decades and worked hard all of his life.

2.     In 2020, Plaintiff was wrongly accused, framed, and arrested for

murder related to the death of a 10 year-old girl in 1988.

3.     Plaintiff had absolutely nothing to do with the murder and had never

known or interacted with the girl.

---

[1] Plaintiff intends to file along with his Complaint, motions for admission *pro hac vice* for the appearance of attorneys from Loevy & Loevy.

4.      There was no legitimate evidence connecting Plaintiff to the girl's death.

5.      Instead, Defendants fabricated evidence in order to "solve" the 32 years-old "cold case" in order to gain notoriety.

6.      In particular, Defendants fabricated false statements from Plaintiff that relied on taking advantage of an obvious language barrier to make it falsely seem as if Plaintiff lived near the victim around the time that she died. Defendants further fabricated purported DNA evidence, and misrepresented it in order to obtain an arrest warrant.

7.      To get away with this misconduct, Defendants bypassed standard procedures by excluding representatives of the Rhode Island Attorney General's Office ("AGO") from the arrest process and by not seeking a grand jury indictment as the basis for an arrest.

8.      When members of the AGO did finally have access to the "evidence" developed by Defendants, they dismissed the charges against Plaintiff by refusing to take the case before a grand jury.

9.      The AGO's dismissal did not happen until after Plaintiff's life was forever damaged.

10.     Defendants sought publicity for arresting Plaintiff, which caused Plaintiff to lose his job that he held for 15 years and to become homeless. It also caused Plaintiff's reputation to be forever tarnished and left Plaintiff forever fearful that his life and liberty could, at any moment, be wrongly taken from him by police.

11.     Plaintiff seeks justice through this action to hold those responsible accountable for their misconduct.

## JURISDICTION AND VENUE

12.     This action is brought under 42 U.S.C. § 1983 and Rhode Island law to redress Defendants' misconduct and deprivation of Plaintiff's rights secured by the United States Constitution.

13.     This Court has jurisdiction of Plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims under 28 U.S.C. § 1367.

14.     Venue is proper under 28 U.S.C. § 1391(b). The events and omissions giving rise to Plaintiff's claims occurred within this judicial district. Moreover, on information and belief, Defendants reside in Rhode Island and are subject to the personal jurisdiction of the courts in this judicial district.

## PARTIES

15.     Plaintiff Joao Monteiro was a hard-working man who has four children. Mr. Monteiro worked loading trucks at Cintas from 2004 until he was wrongly arrested by Defendants. Since the wrongful arrest, Plaintiff has been unable to work because of the trauma from the wrongful arrest—his life was upended by the wrongful arrest.

16.     Defendants Susan Cormier, Trevor Lefebvre, Daniel Mullen, and Tina Goncalves, (collectively "Pawtucket Defendants") were Pawtucket police officers at the time of the events giving rise to this matter. All of these Defendants were responsible for investigating crimes, including the possible crime at issue in this

case, and/or for supervising other police officer Defendants. They committed, facilitated, and approved the constitutional violations at issue in this case.

17.     Defendant Tamara Wong was employed by the Rhode Island Department of Health. She supplied DNA evidence related to this case that was either manipulated by the Pawtucket Defendants to pursue the wrongful arrest of Plaintiff or that was intentionally fabricated to falsely implicate Plaintiff.

18.     Defendant City of Pawtucket, Rhode Island is a municipality of the State of Rhode Island, which oversees the Pawtucket Police Department. The Pawtucket Defendants referenced above were employed by the City of Pawtucket or were acting as agents of the City of Pawtucket, and/or the Pawtucket Police Department while conducting the investigation described in this Complaint. Defendant City of Pawtucket is responsible for the policies and practices of the Pawtucket Police Department that were implemented by Defendants in this case. Finally, Defendant City of Pawtucket is responsible under Rhode Island law for any judgment entered against Defendants.

19.     At all times relevant to the events described in this Complaint, each of the Defendants identified above acted under color of law, within the scope of his employment, and as an investigator.

20.     Each of the Defendants is sued in his/her individual capacity, unless otherwise noted.

## FACTS

### The Unsolved Murder

21.     A ten year-old girl disappeared near her home on January 6, 1988. Her body was found washed up on a beach approximately 54 days later.

22.     Local police and the FBI have never solved how or why the girl died.

23.     When the girl's body was recovered, there were purportedly traces of blood found on her pants.

24.     On or before 1996, unknown DNA analysis had been conducted on that blood.

25.     Plaintiff had absolutely nothing to do with the girl's death.

### Defendants' "Cold Case" "Investigation"

26.     In August 2018 the Pawtucket Defendants reopened the investigation.

27.     The Pawtucket Defendants obtained additional DNA analysis of the blood from the girl's pants.

28.     The DNA analysis did not produce sufficient DNA to provide a match to any DNA profile from a known person.

29.     Regardless, the Pawtucket Defendants used the DNA to chart a convoluted path to frame Plaintiff.

30.     The only person that the DNA sample indicated a potential connection to was Plaintiff's son. The DNA sample did not directly implicate anyone, and Plaintiff's son was not born until five years after the girl died.

31.     The DNA profile that the Pawtucket Defendants developed could have been used to indicate a potential connection with any relative of Plaintiff's son through his paternal line, including cousins and an uncle. This DNA profile potentially pointed to any number of men who may have had some connection to the area.

32.     For some unknown reason, the Pawtucket Defendants decided to target Plaintiff, an innocent man.

33.     Plaintiff was a hard-working man who had held his job for 15 years, and lived a quiet life.

34.     The Pawtucket Defendants started following Plaintiff around and manufacturing evidence that falsely made Plaintiff appear to be acting suspiciously. None of this evidence was true, and it was used to justify Plaintiff's wrongful arrest.

35.     To be clear, Plaintiff was just living his life as any other working person.

36.     Moreover, the Pawtucket Defendants required Plaintiff to submit to DNA analysis and an interrogation.

37.     Because he was completely innocent, Plaintiff cooperated at every step of the way.

38.     A DNA buccal swab was taken from Plaintiff.

39.     Defendants Cormier and Lefebvre interrogated Plaintiff even though it was obvious that Plaintiff could not speak English well enough to understand the interrogation. Plaintiff speaks Cape Verdean Creole as his native language.

Defendants were well aware of Plaintiff's language barrier and could have easily involved an interpreter in their communications with him, but deliberately denied Plaintiff access to a person who could translate or communicate with him in a language he understood.

40.     Instead, Defendants Cormier and Lefebvre either used the obvious language barrier to fabricate incriminating "admissions" from Plaintiff and/or they fabricated his "admissions" directly. These false "admissions" included purported, and false, statements that Plaintiff lived near the girl when she died.

41.     The Pawtucket Defendants used this fabricated evidence to wrongly arrest and seek the prosecution of Plaintiff.

42.     Despite the Pawtucket Defendants' efforts to falsify evidence and exploit the language barrier, Plaintiff honestly denied any knowledge about what happened to the girl.

43.     The Pawtucket Defendants then set about fabricating misleading DNA evidence.

44.     They utilized Defendant Wong to accomplish the falsification of this evidence.

45.     The Pawtucket Defendants either misrepresented the findings of Defendant Wong's analysis and/or Defendant Wong participated in the misrepresentation.

46.     Defendant Wong never truly concluded that the DNA found in the girl's pants was a match with Plaintiff's DNA sample.

47.     Rather, the DNA evidence supported only that any of Plaintiff's son's relatives through his paternal genetic line could have been a match.

48.     Despite the fact that the DNA evidence did not point to Plaintiff's guilt, in an effort to obtain Plaintiff's arrest, the Pawtucket Defendants and/or Defendant Wong falsely asserted that the DNA evidence was a match to Plaintiff's DNA.

**Defendants Bypassed Prosecutors to Secure Plaintiff's Wrongful Arrest**

49.     The typical procedure for proceeding in a murder case in Rhode Island is for prosecutors from the AGO to be included in the investigation decisions and/or the decisions about whether to proceed to a grand jury to obtain a murder indictment.

50.     Because the Pawtucket Defendants knew that any objective review of their work would reveal their misconduct and fabrication of evidence, they intentionally bypassed prosecutors and sought Plaintiff's arrest on their own.

51.     In fact, when AGO prosecutors finally saw the "evidence" that Defendants developed, about a half-year after Plaintiff's arrest, prosecutors promptly dismissed all charges against Plaintiff and refused to take the case to a grand jury.

52.     Defendants bypassed prosecutors to seek Plaintiff's wrongful arrest, in part, because Defendant Cormier wanted publicity for solving "cold cases."

53.     Defendant Cormier was a media hound who frequently issued press releases in order to be in the limelight (as she did in this case).

54.     For instance, Defendant Cormier and other Pawtucket Defendants created a playing-card deck of 52 cold cases that she proclaimed to the media that she was personally going to solve.

55.     In this case, Defendant Cormier held a press conference to publicly announce Plaintiff's wrongful arrest—warning other, potentially innocent, people that "we are coming for you."

56.     Defendants Cormier and Goncalves also publicly and falsely proclaimed that there was a DNA match between the blood found in the girl's pants and Plaintiff.

57.     In addition, Defendant Cormier conducted a weekly media spotlight about her "cold cases," highlighting one case a week for a year.

## Plaintiff's Damages

58.     After Plaintiff's wrongful arrest, Plaintiff's life fell apart.

59.     As a result of Defendants' misconduct, Plaintiff lost his job that he had held for fifteen years.

60.     As a result of Defendants' misconduct, Plaintiff lost his residence.

61.     As a result of Defendants' misconduct, Plaintiff suffered irreversible loses of his reputation.

62.     As a result of Defendants' misconduct, Plaintiff suffered severe emotional distress and substantial pain and suffering, which ultimately led to his inability to work and function.  Since then, Plaintiff has been unable to resume a normal life because of the trauma he suffered.

63.    Plaintiff spent every day for six months, and since then, fearing police and being aware that at a police officer's whim he could be wrongly arrested and possibly imprisoned for the rest of his life for something that he did not do.

## COUNT I
### 42 U.S.C. § 1983 – Federal Malicious Prosecution

64.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

65.    In the manner described above, Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, and/or in spite of the fact that they knew Plaintiff was innocent.

66.    In doing so, Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

67.    The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury.

68.    Defendants deprived Plaintiff of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of his liberty. Rhode Island law does not provide an adequate state-law tort remedy to redress that harm.

69.     In addition, Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through Defendants' fabrication and suppression of evidence.

70.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

71.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

72.     The judicial proceedings against Plaintiff were terminated in his favor, in a manner indicative of his innocence.

73.     The Pawtucket Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Pawtucket, and by Defendants who were final policymakers for Defendant City of Pawtucket, in the manner more fully described above.

74.     Plaintiff's wrongful conviction further resulted from the failure to supervise and train Pawtucket police officers regarding the proper investigation of alleged crimes. The City's failure to supervise and train its officers showed deliberate indifference to the risk that an innocent person like Plaintiff would be arrested without probable cause.

75.    In addition, the Pawtucket Police Department encouraged its employees to lead investigations without oversight from supervisors and/or prosecutors who would otherwise ensure that wrongful arrests would not occur.

76.    At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Pawtucket promulgated rules, regulations, policies, and procedures governing the development of evidence, witness interviews, questioning of criminal suspects, in-court testimony, preparation and presentation of witness testimony, and training, supervision, and discipline of employees and agents of the City of Pawtucket, including employees and agents of the Pawtucket Police Department.

77.    These rules, regulations, policies, and procedures were implemented by employees and agents of Defendant City of Pawtucket, including the Defendants, who were responsible for conducting investigations of crimes in and around Pawtucket, Rhode Island.

78.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Pawtucket had notice of a widespread practice by its officers and agents under which individuals suspected of criminal activity, such as Plaintiff, were routinely were subjected to criminal proceedings based on false evidence, and were deprived of their liberty without probable cause, such that individuals, in particular people of color, were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved. For instance, Pawtucket

police officers were sued: (1) for unlawfully handcuffing, arresting, and detaining a 13 year-old Black girl, Tre'sur Johnson, an honors middle school student in June 2019; (2) for false arrest by Carlton Vose in 2019; (3) for illegal arrest and imprisonment by John Miner in 2015; (4) for unlawful detention in 2014 of Eldominic Ramsey, a Black man; (5) for false arrest and imprisonment in *Sirois v. Heureux*, No. 14-472 S (D. R.I.) stemming from an incident in 2011. In addition, Defendant City of Pawtucket had notice of the widespread practice of its officers to deprive citizens of their rights, including: (1) a Pawtucket police officer was charged with assaulting an elderly person in 2020; (2) Pawtucket police officer Boudreault used excessive force on a 14 year-old student in 2015; (3) the City of Pawtucket settled a lawsuit based on the use of excessive deadly force against a mentally ill man, Jason Swift, in 2008.  Finally, the City of Pawtucket, knowing of its serious police misconduct problem has repeatedly violated, and been sued for violating, Rhode Island's public records law in order to shield its woeful police misconduct issues.

79.    These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendant City of Pawtucket directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and discipline their officers, agents, and employees who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful arrests and prosecutions.

80.     The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the City of Pawtucket, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

81.     The misconduct described in this Count was undertaken under the policy and practices of Defendant City of Pawtucket in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Pawtucket and the Pawtucket Police Department, or were actually committed by persons with such final policymaking authority.

82.     Defendant Goncalves was chief of the Pawtucket Police Department in 2019 and the final policymaker for the Pawtucket Police Department as authorized by the City of Pawtucket.

83.     As police chief, Defendant Goncalves was responsible for all the policies, practices, and customs of the department.

84.     At the time of the investigation at issue here, Defendant Goncalves and/or Defendant Mullens failed to supervise offices in the Pawtucket Police Department.

85.     Had Pawtucket police officers been properly supervised, Defendants would not have fabricated evidence to falsely claim probable cause.

86.     The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and

proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

87.     Plaintiff's injuries were caused by Defendants, many of whom were officers, agents, and employees of the City of Pawtucket, and the Pawtucket Police Department including but not limited to the individually named Pawtucket Police Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT II
### 42 U.S.C. § 1983 – Arrest without Probable Cause

88.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

89.     Defendants arrested Plaintiff based on the false evidence that they fabricated.

90.     Defendants did not have probable cause to perform the arrest on Plaintiff.

91.     Plaintiff was harmed by Defendant's arrest without probable cause.

92.     The Pawtucket Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Pawtucket, and by Defendants who were final policymakers for Defendant City of Pawtucket, in the manner more fully described above.

## COUNT III
### 42 U.S.C. § 1983 – Equal Protection

93.     Each of the Paragraphs of this Complaint is incorporated as if fully

stated herein.

94.     In the manner described in this Complaint, Defendants violated Plaintiff's constitutional rights intentionally subjecting him to unlawful, unequal treatment on the basis of his race and/or ethnicity in violation of the Fourteenth Amendment of the United States Constitution.

95.     Defendants' misconduct created discriminatory effect by targeting Plaintiff for police action based on his race, ethnicity and/or national origin.

96.     Plaintiff has dark complexion and is of Cape Verdean ancestry, and but for his race, ethnicity, and/or national origin, Defendants would not have targeted him for unlawful arrest, imprisonment, and/or malicious prosecution based on the flimsy evidence it had.

97.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

98.     The Pawtucket Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Pawtucket, and by Defendants who were final policymakers for Defendant City of Pawtucket, in the manner more fully described above.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights**

99.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

100.    Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for murder, a crime he did not commit, and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

101.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

102.    In furthering this conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

103.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

104.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

105.    The Pawtucket Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Pawtucket, and by Defendants who were final policymakers for Defendant City of Pawtucket, in the manner more fully described above.

## COUNT V
### 42 U.S.C. § 1983 – Failure to Intervene

106.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

107.   In the manner described above, during the constitutional violations described herein, one or more Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

108.   As a result of Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress and permanent physical damage. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

109.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

110.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

111.   The Pawtucket Defendants' misconduct described in this Count was undertaken under the policies, practices, and customs of Defendant City of Pawtucket, and by Defendants who were final policymakers for Defendant City of Pawtucket, in the manner more fully described above.

## COUNT VI
### State Law – False Arrest/Imprisonment

112.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

113.   Defendants intended to confine Plaintiff and/or restrict his freedom from restraint of movement.

114.   Plaintiff was conscious of the confinement and/or restrict his freedom from restraint of movement.

115.   Plaintiff did not consent to the confinement and/or restrict his freedom from restraint of movement.

116.   Plaintiff's confinement and/or restriction on his freedom from restraint of movement was not otherwise privileged.

117.   Plaintiff was detained and/or his freedom from restraint of movement was restricted without legal justification.

## COUNT VII
### State Law – Malicious Prosecution

118.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

119.   Defendants commenced a criminal case against Plaintiff.

120.   This criminal case lacked probable cause to bring such a proceeding.

121.   Defendants maliciously commenced the criminal case against Plaintiff.

122.   The criminal case against Plaintiff closed in Plaintiff's favor.

### COUNT VIII
### State Law - Intentional Infliction of Emotional Distress

123.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

124.    As a proximate result of the initiation of the prosecution of Plaintiff for the murder without probable cause and with malice by defendants, Plaintiff suffered severe emotional distress.

125.    The acts and omissions of defendants in initiating the prosecution of Plaintiff was made without probable cause that was intentional or in reckless disregard of causing emotional distress.

126.    Fabricating evidence in order to arrest an innocent man is extreme and outrageous conduct, beyond all possible bounds of decency and utterly intolerable in a civilized community.

127.    The defendants' acts and omissions caused Plaintiff to suffer severe emotional distress of a nature that no reasonable person could be expected to endure as described above.

128.    These actions constitute the tort of intentional infliction of emotional distress under Rhode Island law.

129.    As a result of the Defendants' intentional infliction of emotional distress, Plaintiff has suffered damages as described above.

130.    Defendants are liable to the Plaintiff for injuries and damages resulting from the fact that by their acts and omissions alleged herein, they intentionally inflicted emotional distress upon the Plaintiff.

## COUNT IX
## State-Law Claim – Slander

131.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

132.   Defendants Cormier and Goncalves made false and defamatory statements concerning Plaintiff.

133.   These defamatory statements were unprivileged communications to a third party.

134.   Defendants Cormier and Goncalves were at least negligent in making the false and defamatory statements.

135.   The false and defamatory statements caused Plaintiff damages.

136.   Defendants Cormier and Goncalves are liable to the Plaintiff for injuries and damages resulting from the fact that by their acts and omissions alleged herein, committed slander upon the Plaintiff.

## COUNT X
## State-Law Claim – Indemnification

137.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

138.   Rhode Island law provides that public entities are to pay tort judgments for which employees are liable within the scope of their employment activities.

139.    The Pawtucket Defendants were employees, members, and agents of the City of Pawtucket, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, JOAO MONTEIRO, respectfully requests that this Court enter a judgment in his favor and against Defendants SUSAN CORMIER, TREVOR LEFEBVRE, DANIEL MULLEN, TINA GONCALVES, CITY OF PAWTUCKET, and TAMARA WONG, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, JOAO MONTEIRO, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

JOAO MONTEIRO

BY:    /s/ William Devine
       *One of Plaintiff's Attorneys*

William Devine
D'AMICO BURCHFIELD, LLP
536 Atwells Avenue
Providence, RI 02909
(401) 490-4803
WVD@dblawri.com

# EXHIBIT 2

# In The Matter Of:

*Monteiro vs Cormier*

*CONFIDENTIAL - Detective Susan Cormier*

*September 29, 2021*



Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF RHODE ISLAND
 2

 3

 4  Joao Monteiro        :

 5       VS.        :C. A. NO:  21-cv-00046-MSM-LDA

 6  Susan Cormier, Trevor:
    Lefebvre, Daniel
 7  Mullen, Tina         :
    Goncalves, City of    :
 8  Pawtucket, and Tamara :
    Wong
 9

10

11           DEPOSITION OF DETECTIVE SUSAN CORMIER,
    a Defendant in the above-entitled cause, taken on
12  behalf of the Plaintiff, before Elizabeth Greeley,
    Notary Public, in and for the State of Rhode Island,
13  at the offices of D'Amico Burchfield, LLP, 536 Atwells
    Avenue, Providence, Rhode Island, on September 29,
14  2021, at 10:00 a.m.

15

16

17  PRESENT:

18  FOR THE PLAINTIFF.......LOEVY & LOEVY
                       BY:   MARK LOEVY-REYES, ESQUIRE
19                           311 N. ABERDEEN STREET
                             CHICAGO, IL  60607
20                             -AND-
                             D'AMICO BURCHFIELD, LLP
21                       BY:  WILLIAM DEVINE, ESQUIRE

22  FOR THE DEFENDANT.......DESISTO LAW
    (CORMIER)         BY:  CAROLINE MURPHY, ESQUIRE
23
    FOR THE DEFENDANT.......STATE OF RHODE ISLAND
24  (WONG)                  DEPT. OF ATTORNEY GENERAL
                       BY:  BETH LANDES, ESQUIRE
25
```

Page 2

```
 1                I N D E X

 2  WITNESS                                    PAGE

 3  DETECTIVE SUSAN CORMIER

 4  EXAMINATION BY MR. LOEVY-REYES.............. 3

 5

 6

 7

 8

 9              EXHIBITS FOR I.D.

10  EXHIBIT       DESCRIPTION               PAGE
    PLAINTIFF'S
11  EXHIBIT 26    POLICE ACADEMY RECRUIT INFO
                  (1 PG)........................ 3
12  EXHIBIT 20    COURSE COMPLETION (10 PGS)....... 3

13
    EXHIBIT 41    MONTEIRO BACKGROUND INVESTIGATION
14                (329 PGS)..................... 3

15  EXHIBIT 48    IA SHEET (1 PG)................ 3

16  EXHIBIT 2     ORGANIZATIONAL CHART (3 PGS)..... 3

17  EXHIBIT 42    AUTOPSY REPORT (28 PGS).......... 3

18  EXHIBIT 14    SEARCH WARRANT (5 PGS).......... 3

19  EXHIBIT 4     AFFIDAVIT (7 PGS)............... 3

20

21

22

23

24

25
```

Page 3

```
 1         (DEPOSITION COMMENCED AT 10:00 A.M.)

 2     (EXHIBITS 1 - 93 PLAINTIFF'S PREVIOUSLY MARKED)

 3              DETECTIVE SUSAN CORMIER

 4      Being duly sworn, deposes and testifies as

 5  follows:

 6          THE REPORTER:  Would you state your name

 7  for the record, please?

 8          THE WITNESS:  Susan Cormier, S-U-S-A-N,

 9  C-O-R-M-I-E-R.

10          EXAMINATION BY MR. LOEVY-REYES

11  Q.  Ms. Cormier, you're on duty today?

12      A.  Yes.

13  Q.  What are your hours today?

14      A.  8 a.m. to 4 p.m.

15  Q.  I see that you've worn a weapon into the

16  deposition today; is that right?

17      A.  Yes, sir.

18  Q.  Is there a reason why?

19      A.  I'm working.

20  Q.  What are your job responsibilities today?

21      A.  Today, I'm here for this deposition.

22  Normally I just work as a detective in the major

23  crimes unit, cold case unit.

24  Q.  When you testify in court, do you wear your

25  weapon then?
```

Page 4

```
 1      A.  We wear it to the courthouse, but we secure

 2  it at the court, on the first floor of the courthouse.

 3  Q.  Did you wear your weapon today to try to be

 4  intimidating?

 5      A.  No.

 6  Q.  You have a magazine with your duty belt; is that

 7  right?

 8      A.  Yes.

 9  Q.  Your badge is on the your duty belt; is that

10  right?

11      A.  Yes.

12  Q.  Tell me, how many rounds do you have in your

13  magazine?

14      A.  There are thirteen, and one in the chamber of

15  the weapon.

16  Q.  You have an extra magazine; is that right?

17      A.  Correct.

18  Q.  How many rounds do you have in that?

19      A.  Thirteen.

20  Q.  So how many total rounds do you have?

21      A.  Twenty-seven, perhaps, if my math is right.

22  Q.  Have you ever been in a deposition before?

23      A.  No.

24  Q.  Have you ever been sued before?

25      A.  No.
```

Page 61

1  was following through, our current day investigation.

2  Q.    Do you recall anything else that you might have

3  told Mr. Lefebvre before you went to see Mr. Soares?

4      A.   No.

5  Q.    Did you have any communication with Mr. Lefebvre

6  on the drive back from Fort Devens about what you had

7  learned from Mr. Soares?

8      A.   We really didn't learn anything from

9  Mr. Soares, so there really wasn't a lot of

10 conversation about what took place there.

11 Q.  Can you take a look at Exhibit 48, please?

12     A.   What number?

13 Q.   48.  I just have a couple of quick questions on

14 Exhibit 48.  Taking a look at Exhibit 48, I'm going to

15 represent to you that this was identified as an IA

16 sheet related to you.  I'm going to ask you to look at

17 that and tell me if that refreshes your memory in

18 regard to any internal investigations that might have

19 occurred regarding your work as a Pawtucket police

20 officer?

21     A.   I've never seen this document, so I don't

22 know what this, what this is.

23 Q.   I understand.  I'm going to ask you to take a

24 look at it, though, and tell me if any of that

25 refreshes any memory of any investigation that might

Page 62

1  have occurred.

2      A.   No.

3  Q.   Okay.  You picked up the Christine Cole

4  investigation based upon your work with the cold case

5  unit, correct?

6      A.   Yes.

7  Q.  What is the cold case unit?

8      A.   That is to take a look at any of the unsolved

9  homicide cases from the Pawtucket Police Department.

10 Q.  How long has the cold case unit been in existence

11 in the Pawtucket Police Department?

12     A.   I believe it was formed in March of 2018.

13 Q.  When did you join the cold case unit?

14     A.   Then, March 2018.

15 Q.  What officers were assigned to the cold case unit

16 in March of 2018?

17     A.   Just me.

18 Q.   How is it that you came to be the officer who

19 would run the cold case unit?

20     A.   I had previous conversations with my

21 supervisors.  We had talked on and off over the years

22 about paying some attention to the unsolved cases in

23 our department.  I had requested to look at some of

24 those cases.

25     The command staff had a conversation, to my

Page 63

1  knowledge, about that.  I was not present.  And they

2  thought that it was a good idea to do, and assigned me

3  to that.

4  Q.   Who did you speak to at the command staff about

5  having a cold case unit?

6      A.   I spoke with retired, now retired Detective

7  Captain Kevin Santori and with Major Dan Mullen.

8  Q.   During any of those discussions, was there any

9  mention about how the cold case unit would be

10 supervised?

11     A.   I don't believe there was anything specific,

12 but it would fall under same as the major crimes unit.

13 I have supervisors that I answer to.

14 Q.  Could you pull out Exhibit 2?  You have in front

15 of you what's been marked as Exhibit 2 for your

16 deposition.  I'm going to ask you to look through

17 those three documents and tell me if you recognize

18 what they represent.

19     A.   It appears that it is the organization table

20 for the Pawtucket Police, and what falls under each

21 division.

22 Q.  Going to Page 1 of Exhibit 2, if we follow the,

23 I'm just going to call it the flow chart, for lack of

24 a better word, the head of the department is the chief

25 of police, correct?

Page 64

1      A.   Correct.

2  Q.   Is it your understanding that the chief of police

3  is the chief policy maker of the department?

4      A.   Yes.

5  Q.   Then off to the left there is a section called

6  Investigative Service; do you see that?

7      A.   Yes.

8  Q.   It looks like there is a major to head up the

9  investigative services section; is that right?

10     A.   Yes.

11 Q.  Below the investigative services section there

12 are three different units, one of those units is the

13 major crimes unit; do you see that?

14     A.   Yes.

15 Q.  That includes, within the major crimes unit,

16 various detectives and supervisors, correct?

17     A.   Yes.

18 Q.  Would the cold case unit be part of that major

19 crimes unit?

20     A.   Yes.

21 Q.  Okay.  That's what I'm trying to figure out, like

22 where it falls within this organizational structure.

23 Would it be fair to say the supervisors in the major

24 crimes unit would also be your supervisors?

25     A.   Yes.

Page 217

1 them to come up with the number 19; isn't that right?

2     A.   That showed that he had moved at least that

3 many times, yes.

4 Q.   Would it be fair to say that you use the reports

5 to support your allegation of probable cause,

6 regardless of the accuracy, which we'll say you're not

7 going to include information that does not support

8 probable cause because you don't think the reports are

9 entirely, accurate?

10        MS. MURPHY:   Objection.

11     A.   No.   I am indicating things that I learned on

12 the report.   I saw that there were 19 different

13 addresses in one way or another with all of these

14 files, and one of those addresses was above Saints

15 Market.

16 Q.   The next sentence reads, Several of the other

17 addresses he had were also in the immediate

18 neighborhood of where the victim lived; which

19 addresses were those?

20     A.   23 Quincy.   Initially one of the addresses

21 was the address on Mineral Spring Avenue.   There were

22 other addresses, the South Union Street address, that

23 we didn't learn until later that wasn't him.   The

24 other addresses were, the Sisson Street is not far

25 from there.   I can't think of the rest of them.   I'm

Page 218

1 not sure.

2 Q.   How far away is 23 Quincy Street from Saints

3 Market?

4     A.   About one block.

5 Q.   How far is the Mineral Spring Avenue address from

6 Saints Market?

7     A.   I think it's two blocks.

8 Q.   When was it that Mr. Monteiro allegedly lived at

9 23 Quincy?

10     A.   I don't remember what year it was.

11 Q.   When was it that he allegedly lived at Mineral

12 Spring Avenue?

13     A.   That's the address that we learned later on

14 was a different Joao B. Monteiro.

15 Q.   The South Union address was also a different Joao

16 B. Monteiro, too, correct?

17     A.   Yes.   We could not figure out who owned that

18 one.

19 Q.   When did you figure out that those were different

20 Joao B. Monteiros?

21     A.   I'm not sure when that was.

22 Q.   Is it possible it was before you signed this

23 affidavit?

24     A.   I don't believe so.

25 Q.   Do you have a police report that would be able to

Page 219

1 demonstrate when that was?

2     A.   I don't know.

3 Q.   The Sisson Street address that you mentioned,

4 when was it that Mr. Monteiro allegedly lived there?

5     A.   I don't know the exact time frame.

6 Q.   Would it be based upon the reports that you had

7 printed out?

8     A.   That's in those reports.   That's where his

9 sister lived.   That's where his car was registered to,

10 getting his mail.

11        (OFF THE RECORD)

12        MS. LANDES:   The entire transcript should

13 be designated as confidential.

14        (DEPOSITION SUSPENDED AT 5:00 P.M.)

15

16

17

18

19

20

21

22

23

24

25

Page 220

1

2

3             C-E-R-T-I-F-I-C-A-T-E

4 I, ELIZABETH GREELEY, a Notary Public, in and for the

5 State of Rhode Island, duly commissioned and qualified

to administer oaths, do hereby certify that the

6 foregoing Deposition of Detective Susan Cormier, a

Defendant in the above-entitled cause, was taken

7 before me on behalf of the Plaintiff, at the offices

of D'Amica & Burchfield, LLP, 536 Atwells Avenue,

8 Providence, Rhode Island on September 29, 2021 at

10:00 A.M.; that previous to examination of said

9 witness, who was of lawful age, she was first sworn by

me and duly cautioned to testify to the truth, the

10 whole truth, and nothing but the truth, and that she

thereupon testified in the foregoing manner as set out

11 in the aforesaid transcript.

12 I further certify that the foregoing Deposition was

taken down by me in machine shorthand and was later

13 transcribed by computer, and that the foregoing

Deposition is a true and accurate record of the

14 testimony of said witness.

15 Pursuant to Rules 5(d) and 30(f) of the Federal Rules

of Civil Procedure, original transcripts shall not be

16 filed in Court; therefore, the original is delivered

to and retained by Plaintiff's Attorney, Mark

17 Loevy-Reyes.

18 Reading and signing of the Deposition was waived by

the Witness.

19 IN WITNESS WHEREOF, I have hereunto set my hand this

8th day of October, 2021.

20

21              *Elizabeth Greeley*

22

23 _____

ELIZABETH GREELEY, CERTIFIED COURT REPORTER

24 CERTIFIED COURT REPORTER

MY COMMISSION EXPIRES:   04/07/2022

25

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JOAO MONTEIRO,

    Plaintiff,

    v.

SUSAN CORMIER, TREVOR LEFEBVRE,
DANIEL MULLEN, TINA GONCALVES,
CITY OF PAWTUCKET, and TAMARA
WONG,

    Defendants

No. 21-cv-00046-MSM-LDA

## DECLARATION OF DR. JOHN E. SCHIENMAN

1.    My name is John E. Schienman.

2.    I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration.

3.    I am a Forensic Science Examiner and Forensic Consultant, retained by Defendant Tamara Wong in connection with the litigation captioned *Monteiro v. Cormier et al*, No. 21-CV-0046 (D.R.I.).

4.    I make this declaration based on my personal knowledge.

5.    I provide this declaration in support of Defendant Wong's Motion for Summary Judgment.

6.    At the request of Beth Landes of the Rhode Island Attorney General's Office, counsel to Defendant Wong, I previously prepared an Expert Report, dated September 21, 2022.

7.    A true and correct copy of the Expert Report that I prepared and signed on September 21, 2022, with its Appendices, is attached hereto as Exhibit A.

8.    I incorporate my Expert Report of September 21, 2022, including its Appendices, into this Declaration.

1 of 2

9.      I affirm and verify, under penalty of perjury, that the Expert Report (and Appendices), dated September 21, 2022, and attached hereto as Exhibit A, accurately and truthfully expresses my qualifications, knowledge, opinions, the bases for my opinions, and the terms of my retention by counsel for Defendant Wong.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

By:     _____

Executed on February 12, 2023.          John E. Schienman, PhD

2 of 2

# EXHIBIT A
# [To Exhibit 3]

# EXPERT REPORT
## John E. Schienman, Ph.D.
### 9/21/2022

## I. Qualifications, Publications, Prior Testimony, Statement of Compensation

I work as a forensic consultant in the area of forensic DNA testing.  My consulting routinely includes observation of DNA testing, reviewing case-related documents, laboratory protocols, testing worksheets, DNA profile data, and reports, generating opinions on the quality of the testing and the meaning of the results, and court testimony when needed.  I have also been employed for the last 17 years by the Connecticut Division of Scientific Services as a Forensic Science Examiner in the DNA Section of the Laboratory.  As a Forensic Science Examiner 1 from August 2005 to December 2010, I was responsible for criminal DNA casework consisting of examining evidentiary and known biological samples, performing analyses and developing DNA profiles if possible, and making comparisons between the known and evidentiary DNA profiles to draw conclusions as to whether the known individual could or could not be the source or component of the evidentiary DNA profile.  A summary of the testing and the conclusions drawn would be presented in a report to the agency that submitted the evidence and testimony in court would be provided on those findings as necessary.  As a Forensic Science Examiner 2 from January 2011 to the present, I have had the additional responsibilities of being a lead to several individuals in the Forensic Science Examiner 1 position and of being the Validation Coordinator for the DNA section.  As a lead Examiner, I approve time worked and leave requests and provide guidance with respect to DNA testing, report writing, and court testimony.  As the Validation Coordinator, I produce written experimental plans to evaluate new DNA testing methodologies or techniques, perform experiments, and write summaries of the results.

My education and training in the science of DNA began as a teaching and research assistant that culminated in obtaining a Ph.D. in Genetics from the University of Connecticut at Storrs.  I then continued my research in Genetics as a Postdoctoral researcher at the State University of New York at Albany, followed by a position as an Assistant Professor at the Center for Applied Genomics and Technology at the University of Connecticut at Storrs.  Lastly, I performed a 6-month training in forensic science laboratory specific protocols at the Connecticut

Division of Scientific Services which provides forensic testing services to the law enforcement agencies of Connecticut. My Curriculum Vitae, which includes a list of my publications, is attached as Appendix A.

Over the last 15 years, I have been recognized as a DNA expert for testimony in over 40 criminal cases in the State of Connecticut as well as 2 cases in the State of Massachusetts. I have never been disqualified as an expert. I testified as an expert in four proceedings in and after 2018:

     i. On July 27, 2018, I testified for the State of Connecticut, in New Britain Superior Court in *State of Connecticut v. Azia Jenkins*.

     ii. On February 19, 2019, I testified for the State of Connecticut, in New Haven Superior Court in *State of Connecticut v. Shane Dunkley-Roundtree.*

     iii. On February 12, 2020, I testified for Defendant Pedro Vasquez, in Hampden Superior Court, in *Commonwealth of Massachusetts v. Pedro Vasquez*.

     iv. On April 5, 2022, I testified for the State of Connecticut, in New Haven Superior Court in *State of Connecticut v. Anthony Smith.*

I was retained by the State of Rhode Island on behalf of Defendant Tamara Wong to provide an independent analysis and opinion regarding the statements in Plaintiff's Expert Report by Meghan Clement at Paragraphs 19, 20, and 22 and in Plaintiff's Expert Report by Susan Peters at Opinion No. 4. This Report represents my opinions based upon my knowledge, training, education, and experience as a researcher in Genetics and DNA science, a forensic consultant on DNA testing, and as a forensic DNA analyst, lead analyst, and Validation Coordinator over the preceding 31 years. The facts and data that I have considered in forming my expert opinions are identified below in Section II. Relevant background information regarding forensic DNA testing that support my opinions are listed in Section III. Facts derived from the records are summarized in Section IV. My opinions and their bases are explained below in Section V.

The State of Rhode Island is paying me my standard rate for consultant services, which is $250 per hour. My opinions are my own and the State is required to pay me for my services no matter the content of my opinions. I reserve the right to change or revise my opinions in the event that information not presently known to me is made available to me in the future.

**II. Facts and Data Considered**

      Appendix B lists the complete set of case-specific records made available to me.  I relied

upon a subset of these records to form my opinions:

1. ECF No. 01 - Complaint
2. Pl 2nd 26a2 Disclosures
3. Pl Expert Report, DNA, Clement 2022-07-14
4. Pl Expert Report, Policing, Peters 2022-07-11
5. Pl Monteiro Response to Wong Second Interrogs (2022.06.23)
6. Cormier, Susan (PPD Det.) - Depo Tr Part 2
7. Cormier, Susan (PPD Det.) - Depo Tr Part 3
8. Wong, Tamara (Dept Health) - Depo Tr (with errata)
9. Ex 004. Arrest Warrant and Affidavit
10. Ex 010. FBI Lab Reports Trace, STR and mtDNA, 2019-2020
11. Ex 011. FBI Lab Report STRs, 2019
12. Ex 015 and 057. DNA Analytical Finds Suppl. Report I 2019-03-19
13. Ex 015 and 059. DNA Analytical Finds Suppl. Report II 2019-07-17
14. Ex 016. T Wong texts w S Cormier (Cormier version)
15. Ex 035. T Wong texts w S Cormier (Wong version)
16. Ex 068. DNA Analytical Finds 2001-03-06
17. Lab Casefile pgs 001-025 (Monteiro-000101 -000125)
18. Lab Casefile pgs 026-056 (Monteiro-000173-000203)
19. Lab Casefile pgs 057-080 (Monteiro-000149-000172)
20. Lab Casefile pgs 081-103 (Monteiro-000126-000148)
21. Lab Casefile pgs 168-169 (RIDOH-000164 -000165)
22. Lab Casefile pgs 208-213 (RIDOH-000166 -000171)
23. Lab Casefile pgs 214-231 (RIDOH-000146 -000163)
24. RIDOH 000001-000163
25. RIDOH 000164-000171

Other documents relied upon for this report:

26. Committee on DNA Technology in Forensic Science Board on Biology, Commission on Life Sciences National Research Council, 1992 (NRC I)

27. The Evaluation of Forensic DNA Evidence.  Committee on DNA Forensic Science: An Update, National Research Council, 1996 (NRC II)

      The National Research Council was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of further knowledge and advising the federal government of the United States. The Council has become the principle operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities.  In 1992 they created a document with recommendations for forensic DNA testing and an updated document in 1996, NRC I and NRC II, respectively (see II-26 & II-27).

28. SWGDAM Interpretation Guidelines for Y-Chromosome STR Typing, Approved March 2, 2022

29. Supplemental Information for the SWGDAM Interpretation Guidelines for Y-Chromosome STR Typing by Forensic DNA Laboratories

> The Scientific Working Group on DNA Analysis Methods (SWGDAM) is a group of approximately 50 scientists representing federal, state, and local DNA laboratories in the United States and Canada.  These scientists meet to discuss, share, and evaluate forensic biology methods, protocols, training, and research to enhance forensic biology services as well as provide recommendations to the FBI Director on quality assurance standards for forensic DNA analysis (see SWGDAM guidelines II-28 & II-29).

30. The Quality Assurance Standards for Forensic DNA Testing Laboratories, Effective July 1, 2020

> The Quality Assurance Standards for Forensic DNA Testing Laboratories is an auditing document produced by the FBI that is specific to the DNA section of a forensic laboratory.  The DNA section's testing and reporting protocols must fulfill all the applicable requirements in this document if they wish to use the Combined DNA Index System (CODIS) for searching unknown DNA profiles and to receive federal grants.  These grants are heavily relied upon to purchase testing equipment and reagents and provide funds for overtime hours worked by laboratory staff to decrease case backlogs and are often a significant portion of the DNA section's budget (see FBI-QAS at II-30).

## III.  Relevant Background Information Regarding Forensic DNA Testing

1.  Every human cell (with a few exceptions) contains a complete set of the individual's DNA known as the human genome.  The DNA is packaged in structures known as chromosomes and humans have 23 pairs of these chromosomes.  Twenty-two of the pairs are further categorized as autosomes which are not specific to gender.   The remaining pair is categorized as the sex chromosomes and are comprised of the X and Y chromosomes.  Females have two copies of the X chromosome while males have one copy of the X and one copy of the Y chromosome. The Y chromosome is generally passed from father to son unchanged, *i.e.* in identical form.

2. Today's forensic DNA profiling (or "typing") techniques are more sensitive than the analytical techniques utilized in 1996, *i.e.* at the time the NRC II was published.  Forensic DNA typing methodology in 1996 was anywhere from ~20 to 1,000 fold less sensitive than the current STR

typing methodology of the last 20 years.  In 1996, the target amount of DNA needed to obtain complete DNA profile results ranged from ~750 to 75,000 human cells worth of DNA depending on which of the two available DNA typing technologies was utilized.  The target amount of DNA for the current STR and Y-STR typing technology is ~50 human cells worth of DNA with complete DNA profiles developed from as few as 10.

3. A DNA profile result does not generally provide information as to the human cell type from which it is was derived.  Developing a DNA profile requires extracting the DNA from the cell.  This process of extraction frees and isolates the DNA from most other components of the cell.  The resulting DNA profile —  developed after stripping away the majority of the other cellular components — contains inadequate information to identify the type of cell from which the DNA derived.  Therefore, obtaining a DNA profile for a biological sample does not generally reveal whether the DNA came from, *e.g.* skin, blood or saliva.  There has been research into this area for the last decade or so evaluating other molecules contained in human cells that are specific to certain cell types, but none of this research has resulted in, as yet, a commercially available kit for forensic laboratories to validate and use in their testing process to identify the human cell type from which the DNA profile is derived.

4. A positive serological test result for a human body fluid does not necessarily translate into detectable human DNA from that fluid.  The DNA could be degraded such that it is not amplifiable and will not produce a profile while the molecules detected by the serology test are still intact.  Additionally, if the serological test is only presumptive, the stain may not be a human body fluid at all.  Lastly, there is no serological test, either presumptive or confirmatory, for human epithelial (skin) cells.

5. DNA extracted and profiled from a stain that tests presumptively positive for blood could be derived from the white blood cells of a blood stain, from human skin cells deposited through touch, or both.  Today's technology does not enable us to determine what proportion of recovered DNA may have been deposited by blood versus by touch (*i.e.* skin cells).  Any human skin cells present on a substrate (or item of evidence) could be spread throughout that substrate - either under, on top of, mixed in with or next to blood cells appearing on the substrate.  In that event, it

would not be unusual for DNA detected in the location of a presumptive blood stain to also be detected in an area adjacent to the stain.

## IV. Summary of Testing by Wong

My review of the records reveals the following facts.  Ms. Wong was assigned the task of re-amplifying a DNA extract from the Christine Cole case that was first isolated in 2008 from a cutting from the stain on the victim's purple pants (Item # 1.8).  In 2010, Fairfax Identity Laboratories reported the results of amplifying this extract with a Y-STR DNA amplification kit known as Yfiler and produced a partial single source male Y-STR profile at 6 of the 17 loci tested.  Ms. Wong re-amplified using a more modern Y-STR DNA amplification kit known as PowerPlex Y23 (PPY23).  The PPY23 kit has more testing locations on the Y chromosome (23) than the Yfiler kit (17) and also allows for 75% more volume of the DNA extract to be added to the reaction providing the potential for a Y-STR DNA profile with results at a greater number of testing locations than that produced in 2010.  Indeed, the PPY23 amplification produced a partial Y-STR DNA profile consisting of 12 of this kit's 23 testing locations.  These results were reported to Detective Susan Cormier by the Rhode Island Department of Health, Division of Laboratories, Forensic Biology Unit, Supplemental Report dated March 19, 2019 signed by Tamara Wong.  The Conclusions section of this report state that a partial Y-STR DNA profile was obtained from the stain on the pants that is consistent with an unidentified male donor. The report also states male relatives in the same paternal line will demonstrate the same Y-STR DNA profiles and directs Detective Cormier to submit any available suspect and/or elimination reference samples for comparative DNA analysis.  The partial Y-STR DNA profile obtained from the stain on the pants was searched against a RIDOH Lab internal database of known reference Y-STR DNA profiles and revealed a match to the known Y-STR DNA profile of Jerson Semedo.  Based in part on this information, Mr. Semedo's father, Joao Monteiro, became a subject of Detective Cormier's investigation.

Detective Cormier submitted evidence to the RIDOH Lab in April 2019 with 12 of the items presumably being trash that may have been discarded by Joao Monteiro.  Most of these items had no or insufficient human DNA for testing, but Ms. Wong developed autosomal and Y-STR DNA profiles from three of these items along with a water bottle submitted by Detective Joel Saccoccio in May of 2019.  The four Y-STR DNA profiles generated from these trash items

were all excluded as possible sources of the partial Y-STR DNA profile detected on the victim's pants. The RIDOH Lab Supplemental Report II dated July 17, 2019 signed by Ms. Wong contained the results and comparisons of the four items from the trash pull.

A known biological reference sample from Joao Monteiro was submitted on July 17, 2019. The RIDOH Lab Supplemental Report II dated July 17, 2019 identified Mr. Monteiro's STR and Y-STR DNA profiles developed from his reference sample. At 5:53 PM on July 17th, Ms. Wong sent a phone text communication to Detective Cormier regarding Mr. Monteiro's Y-STR DNA profile comparison to the partial Y-STR DNA profile detected on the victim's pants stating "It's a match. Finalizing the report right now." That report was transmitted to Detective Cormier at 7:02 PM on July 17th. In this report, Mr. Monteiro's DNA profiles were compared to the partial Y-STR profile from the pants and the report stated that the DNA profiles were consistent.

In this finalized report, Mr. Monteiro's autosomal and Y-STR DNA profiles were excluded from the profiles of the four trash items, but his Y-STR DNA profile was consistent with the partial Y-STR DNA profile detected from the stain from the victim's purple pants. The finalized report also contained a statistic that was developed using the combined partial Yfiler and PPY23 Y-STR profiles from the victim's pants. This statistic signifies the weight of this match, i.e. the expected frequency of unrelated male individuals in the general population that would match this partial Y-STR DNA profile. Searching the combined partial Y-STR DNA profile against the U.S. Y-HRD database produced a statistic with the 95% upper confidence interval applied of approximately 1 in every 1,909 individuals. This report also includes the statements that male relatives in the same paternal line will demonstrate the same Y-STR DNA profiles and to submit any available suspect and/or elimination reference samples for comparative DNA analysis.

**V. Opinions on Plaintiff's Experts' Statements**

My opinions are expressed to a reasonable degree of scientific certainty. In forming my opinions, I have relied upon my education, training, experience and expertise accumulated over the course of my 31 year career, including more than 17 years as a forensic DNA analyst, lead analyst, validation coordinator, and as a forensic DNA consultant.

### 1. Response to Opinion 19 by Meghan Clement

Ms. Clement is concerned that there appears to be no testing of male individuals/family members living in or routinely frequenting the home of the deceased girl.  Clement is concerned due to the possibility of DNA of the co-habitants transferring to clothing articles either from direct contact or during the washing process and the fact that not only is a Y-STR DNA profile not unique to an individual, but separate unrelated male lineages can also share the same Y-STR DNA profile.  Clement continues that it would be important to rule out males that lived with the victim or frequently visited the house.  I agree with this opinion and based on Tamara Wong's requests to law enforcement she appears to as well.  Clement states that Wong testifies in her deposition (page 86) that Wong did request reference samples from the deceased girl's stepfather or any of his paternal relatives in a text to Detective Cormier.   Additionally, both the Supplemental Report dated March 19, 2019 and the Supplemental Report II dated July 17, 2019 state in the Conclusions Section "Please submit any available suspect and/or elimination reference samples for comparative DNA analysis."  Based on the results of the initial DNA testing and the case scenario, it is routine for DNA analysts to make written requests for elimination known reference samples in the DNA Report or in emails to the investigating officer of the submitting agency.  It is my opinion, based on my education, knowledge, training, and experience as a forensic science DNA analyst, validation coordinator, and lead analyst of 17 years, that it is not one of the job duties of forensic science laboratory analysts to interact with the general public or any civilians involved in the criminal case at hand and make direct requests for, or to write search warrants to obtain, known reference samples from such individuals.  The analyst can make the request to the law enforcement agency that submitted the evidence, but the burden is on the investigating detective to legally obtain such samples for the laboratory to process.  Tamara Wong made several such requests in this case.

### 2. Response to Opinion 20 by Meghan Clement

Ms. Clement states in opinion 20 that testing a substrate control sample from the pants for Y-STR DNA would have determined if there was background DNA on the material.  However, due to the sensitivity of today's DNA typing technologies, the testing of a substrate control is no longer sufficient to determine whether a stain is or is not the source of the detected DNA profile.  Both the NRC I document of 1992 (II-26) and the update NRC II document of 1996 (II-27) made

recommendations that it was important to test unstained regions in the proximity of the stained region as a substrate control to rule out contamination from sample handling or from the background environment.   However, this recommendation was made at a time when samples tested for DNA consisted predominantly of serologically identified biological stains such as human blood, semen, or saliva.   These human body fluids typically contain large numbers of human cells containing DNA. The predominance of testing only these identifiable fluids was due to the sensitivity of DNA testing at that time.   The current STR and Y-STR typing technology has increased the sensitivity of DNA testing to such an extent that with the current amplification kits and detection instruments, as few as 10 human cells worth of DNA can routinely result in a complete DNA profile with partial DNA profiles detected with less.   This makes possible the detection of human skin cells sloughed off from a person making casual contact with an object or substrate (often referred to as "touch" DNA).   This was true in 2008 when the cutting from the crotch of the victim's pants was first extracted for DNA and tested and was even more so in 2019 with the latest generations of STR testing kits available.

As described earlier, a DNA profile does not provide information from which human cell type it was derived (refer to III-3), and a positive serology result does not necessarily translate into detectable human DNA (refer to III-4).   In my opinion, these facts and the sensitivity of STR typing to detect a DNA profile from "touch DNA," render the results of substrate control testing inconclusive at best.   Finally, testing substrate controls is not a requirement nor recommendation, nor is it even discussed in the FBI's Quality Assurance Standards for Forensic DNA Testing Laboratories (II-30).   It is my opinion, based on my education, knowledge, training, and experience as a forensic science DNA analyst, validation coordinator, and lead analyst of 17 years and as a consultant having reviewed the procedures of other laboratories, that substrate controls are rarely processed and profiled in forensic science laboratories performing DNA testing.

### 3. Response to Opinion 22 by Meghan Clement

Megan Clement states in her final opinion that anyone with the education, training, experience, and knowledge of Ms. Wong would know that the testing of the purple pants did not identify the presence of DNA from Mr. Monteiro, but rather that he, all his paternal relatives, and male individuals in approximately 1 in every 1,909 other paternal lineages could be included as a

possible source of the male DNA on the purple pants.  In my opinion, based on my education, knowledge, training, and experience as a forensic science DNA analyst, validation coordinator, and lead analyst of 17 years and on my review of the case records, that Tamara Wong did, in fact, demonstrate this education, training, experience, and knowledge.  As part of the normal course of business of a forensic science examiner at the RIDOH Laboratory, Ms. Wong conducted sophisticated forensic DNA testing that culminated in two formal reports that encompassed all that is stated by Ms. Clement above.  Please refer to the summary (IV) of Ms. Wong's work for this case.

### 4. Response to Opinion No. 4 by Susan Peters

It is Susan Peters' opinion that Tamara Wong communicated misleading information to Detective Cormier regarding the comparison of the known Y-STR DNA profile of Joao Montiero to the partial Y-STR DNA profile detected from the victim's pants by stating in a text message "It's a match.  Finalizing the report right now."  It is my opinion that the word "match" is a scientifically accurate and correct description of the Y-STR DNA profile comparisons reported by Ms. Wong.

The word "match" when comparing DNA profiles from known individuals to evidentiary profiles is absolutely an appropriate and correct term.  When the alleles detected from the known reference are identical to the alleles detected from the evidence, there is a one-to-one correspondence, *i.e.* it is a match.  Match does not mean two things are from the same source, but rather they appear or measure the same.  In forensic DNA testing, finding "a match" between a person's known DNA profile, and a profile from an evidentiary sample, does not necessarily indicate that it is *that* person's DNA on the evidence.  Rather, the finding of "a match" is consistent with that conclusion.  An identity statement  — that it is in fact the DNA of the individual who matches the evidence — is **not** the normal procedure for reporting forensic DNA comparison results/conclusions.  This is due to the fact that a match can result from several possibilities.  First, the DNA on the evidentiary sample is indeed this individual's DNA.  Second, the DNA on the evidentiary sample belongs to the individual's identical twin, or in the case of Y-STRs, a male in the same paternal lineage.  The last possibility is that the DNA on the evidentiary sample is from an unrelated individual who happens to have the same DNA profile as that detected on the evidence.  The probability of this last possibility is referred to as the

"random match probability."  The statistical expectation of this last possibility occurring in the general, unrelated human population is required for presentation of probative DNA evidence in court.  The statistic goes towards the weight of this match.

The word "match" is used in SWGDAM's published DNA testing guidelines.  The latest SWGDAM guidelines (approved in March 2022) for Y-Chromosome STR Typing (II-28) state: "Subsequent to a **match** between two samples using Y-STR testing, a single source, major, or deduced Y-STR haplotype may be searched against a database of Y-STR haplotypes to obtain the sample frequency of the profile, and, as needed, to calculate profile and/or **match** probabilities."  I also use the term "match" when I testify in court and explain DNA testing to a lay jury.  As a qualified expert in DNA testing testifying in Connecticut Superior courts, I routinely describe forensic DNA testing as the following:  "we develop DNA profiles from evidentiary and known samples and then compare the known DNA profile to that of the DNA profile detected from the evidence to see if they **match** or not."

 In prior communications between Ms. Wong and Detective Cormier, Ms. Wong clearly communicated that male individuals in the same paternal lineage will share identical Y-STR DNA profiles.  This is true barring a mutation occurring in the Y-STR haplotype during transmission from one generation to the next.  The expectation of  identical Y chromosomes in a paternal lineage was, in fact, the basis for the investigative lead communicated to Detective Cormier by Ms. Wong regarding Jerson Semedo.  Ms. Wong informed Detective Cormier that male relatives of Jerson Semedo, such as his biological father or any paternal uncles, would also match this partial Y-STR DNA profile from the pants by default (barring a mutation).  Therefore, it is not logical that the statement, "it's a match," could be misleading when it is the expected result.

Regardless of the less formal language of the word "match" used in a text to Detective Cormier, the Supplementary Report II, dated July 17, 2019, produced by analyst Tamara Wong to Detective Cormier contains the final, formally reported conclusions.  The Y-STR conclusions on page 5 of the report clearly state that "[m]ale relatives in the same paternal line will demonstrate the same Y-STR DNA profiles," and that the "partial Y-STR DNA profiles obtained from the stain on the victim's purple pants (Item #1.8) is consistent with the known reference profile from Joao Monteiro (Item #23)."  The word "match" has been rephrased as "consistent with."  Detective Cormier's Arrest Warrant and Affidavit for Joao Monteiro (II-9, Ex 004) uses

this phrasing "consistent with."  This language used by Detective Cormier in the warrant would suggest she was not ultimately confused by the use of the word "match."

Finally, in my experience as a Forensic Science Examiner at the Connecticut Division of Scientific Services, I have been contacted many times over the 17 years by police officers and detectives regarding the meaning of the conclusions contained in DNA Reports produced as part of my normal course of business at the laboratory.  Not uncommonly, the officer or detective is trying to clarify for the purposes of writing a search or arrest warrant and I do my best to explain the conclusions in lay person language.  If asked, I will also give advice regarding any wording they have chosen for their warrant.  But, in my opinion, this burden of asking clarifying questions is on the officer or detective.

Respectfully submitted,

John E. Schienman, Ph.D.

# APPENDIX A

# [To Exhibit 3]

## CURRICULUM VITAE

**John E. Schienman, Ph.D.**
**Forensic Consultant**
31 Shanti Place, Tolland, CT 06084
Telephone: (860) 874-3098
Email: jjschien@gmail.com

<u>**Education:**</u>

| | | |
|---|---|---|
| Ph.D. | Genetics | University of Connecticut, 1999 |
| B.A. | Physics | Case Western Reserve University, 1986 |

<u>**Research and Professional Experience:**</u>

***Forensic Science Examiner 2, DNA Section***   (January 2011-Present)
    Criminal DNA Casework, Supervisor, and Validation Coordinator
***Forensic Science Examiner 1, DNA Section***   (August 2005-December 2010)
    Criminal DNA Casework
State of Connecticut Division of Scientific Services, Meriden, CT

***Assistant Professor in Residence***   (January 2003-August 2005)
    Development and Improvement of DNA applications for Forensic Science
Dept. of Molecular and Cell Biology, Center for Applied Genomics and Technology, Forensic
Research Laboratory, University of Connecticut at Storrs

***National Science Foundation Postdoctoral Research Fellow***   (August 2000-January 2003)
    The Role of Alu Elements in Regulatory Evolution of Primates:  Bioinformatic and
    Experimental Studies.
***Postdoctoral Research Fellow***   (April 1999-July 2000)
    Analysis of the molecular evolution and gene expression of ribonuclease genes in primate
    lineages.
Dept. of Biological Sciences, State University of New York at Albany
Dr. Caro Beth Stewart, sponsor.

***Ph.D. Dissertation Research***   (January 1993-April 1999)
    Analysis of genomic organization, molecular basis of variation, and gene expression in the
    *Drosophila virilis* repetitive histone gene family.
***Supervisor Undergraduate Research Projects***   (January 1993-May 1998)
Dept. of Molecular and Cell Biology, University of Connecticut at Storrs
Dr. Linda Strausbaugh, major advisor

***Research Assistant***   (January 1992-December 1992)
    Mutagenesis of recombinant plasmid DNA with a mini-transposon for facilitation of sequencing
    of large cloned DNA molecules.
Dept. of Molecular and Cell Biology, University of Connecticut at Storrs
Dr. Linda Strausbaugh and Dr. Claire Berg, advisors

***Research Assistant***   (September 1991-January 1992)
    Analysis of DNA polymorphisms with denaturing gradient acrylamide electrophoresis.
    Characterization of potential transgenic animals through DNA isolation and Dot Blot analysis.
Dept. of Animal Science, University of Connecticut at Storrs
Dr. Sandra Velleman and Marina Julian, supervisors

**Teaching Experience:**

| | |
|---|---|
| Instructor | Real-Time PCR Module (Sum/Fall 2005, Spr/Sum/Fall 2004, Fall 2003, UCONN), Experiments in DNA Identification (Summer 1997, UCONN) |
| Teaching Associate | Human Genetics (Spring 2003, UCONN), Forensic Applications of DNA Science (Fall 1998, UCONN), Experiments in DNA Identification (1998, 1997, UCONN) |
| Teaching Assistant | Human Genetics (1997, 1996, 1995, UCONN), Genetics (1995, 1994, 1993, UCONN), Recombinant DNA Techniques Laboratory (1992, UCONN) |
| Guest Lecturer | Forensic Applications of DNA Science (2008-2010, UCONN) |

**Academic Awards and Honors:**

NSF Postdoctoral Fellowship in Biological Informatics (Aug. 2000-July 2002)
Department awarded Demi-Fellowship (Fall 1996-Fall 1998)
Phi Kappa Phi Honor Society (Inducted 1995)

**Publications:**

Quintin DM, **Schienman JE**, Adamowicz MS, and San Pietro D.  (2020) Assessment of PowerPlex® Fusion 5C's ability to type degraded DNA.  Science & Justice Volume 60, Issue 5, 423-431.

Ensenberger MG, Lenz KA, Matthies LK, Hadinoto GM, **Schienman JE**, Przech AJ, Morganti MW, Renstrom DT, Baker VM, Gawrys KM, Hoogendoorn M, Steffen CR, Martin P, Alonso A, Olson HR, Sprecher CJ, and Storts DR.  (2016) Developmental Validation of the PowerPlex® Fusion 6C System.  Forensic Science International: Genetics 21, 134-144.

Adamowicz MS, LaBonte RD, and **Schienman JE**.  (2015) The Potential of Cosmetic Applicators as a Source of DNA for Forensic Analysis.  Journal of Forensic Science, July 60 (4), 1001-1011.

**Schienman JE.**  Techniques of DNA Fingerprinting (Chapter 3, pages 23-44).  In: HM Coyle, ed. Non-Human DNA Typing: Theory and Casework Applications.  CRC Press, August 2007.

**Schienman JE**, Holt RA, Auerbach MR, and Stewart CB.  (2006)  Duplication and divergence of two distinct pancreatic ribonuclease genes in leaf-eating African and Asian colobine monkeys. Molecular Biology and Evolution 23(8), 1465-1479.

Weber DS, Stewart BS, **Schienman JE**, and Lehman N.  (2004)  Major histocompatibility complex variation at three class II loci in the northern elephant seal.  Molecular Ecology Mar; 13(3), 711-8.

Xing J, Salem AH, Hedges DJ, Kilroy GE, Watkins WS, **Schienman JE**, Stewart CB, Jurka J, Jorde LB, Batzer MA.  (2003) Comprehensive analysis fo two Alu Yd subfamilies.  Journal of Molecular Evolution 57 Suppl 1, S76-89.

**Schienman JE**, Lozovskaya ER, and Strausbaugh LD.  (1998) *Drosophila virilis* has atypical kinds and arrangements of histone repeats.  Chromosoma 107, 529-39.

# APPENDIX B

# [To Exhibit 3]

| | RECORD | BATES |
|---|---|---|
| 1 | ECF No. 01 - Complaint | |
| 2 | ECF No. 17 - PPD and City Answer to Complaint | |
| 3 | ECF No. 19 - T Wong Answer to Complaint | |
| 4 | ECF No. 25 - Stipulated Protective Order | |
| 5 | Pl 2nd 26a2 Disclosures | |
| 6 | Pl Expert Report, DNA, Clement 2022-07-14 | |
| 7 | Pl Expert Report, Policing, Peters 2022-07-11 | |
| 8 | Pl Monteiro Req Admissions to Wong (2021-11-19) | |
| 9 | Wong Response to Pl Monteiro Req Admisions (2021-12-01) | |
| 10 | Wong Req Admissions to Pl Monteiro (2022.05.20) | |
| 11 | Pl Monteiro Response to Wong Req Admissions (2022.06.20) | |
| 12 | Pl Monteiro First Interrogs (Corrected) to all Individual Defs (2021.05.24) | |
| 13 | Wong First Interrogs to Pl Monteiro (2021.08.11) | |
| 14 | Wong Response to Pl Monteiro First Interrogatories (2021.08.20) | |
| 15 | Pl Monteiro Initial Response to Wong First Interrogs (2021.09.16) | |
| 16 | Pl Monteiro First Suppl Response to Wong First Interrogs (2021.10.11) | |
| 17 | Wong Second Interrogs to Monteiro (2022.05.24) | |
| 18 | Wong Third Interrogs to Monteiro (2022.06.17) | |
| 19 | Pl Monteiro Second Suppl Response to Wong First Interrogs (2022.06.22) | |
| 20 | Pl Monteiro Response to Wong Second Interrogs (2022.06.23) | |
| 21 | Pl Monteiro Response to Wong Third Interrogs (2022.07.19) | |
| 22 | Cormier, Susan (PPD Det.) - Depo Tr Part 1 | |
| 23 | Cormier, Susan (PPD Det.) - Depo Tr Part 2 | |
| 24 | Cormier, Susan (PPD Det.) - Depo Tr Part 3 | |

|    | **RECORD** | **BATES** |
|----|-----------|-----------|
| 25 | DuBois, Jillian (RIAG Prosecutor) - Depo Tr (with errata) | |
| 26 | Healy, Timothy (RIAG Prosecutor) - Depo Tr (with errata) | |
| 27 | Monteiro, Joao (Plaintiff) - Depo Tr (with exhibits) | |
| 28 | Mullen, Daniel (PPD Major) - Depo Tr | |
| 29 | Wong, Tamara (Dept Health) - Depo Tr (with errata) | |
| 30 | Ex 002. PPD Org Chart | PD-000883 -000835 |
| 31 | Ex 004. Arrest Warrant and Affidavit | PD-000839 -000845 |
| 32 | Ex 005. Arrest Report and Narrative | PD-000846 -000865 |
| 33 | Ex 010. FBI Lab Reports Trace, STR and mtDNA, 2019-2020 | PD-000932 -000941 |
| 34 | Ex 011. FBI Lab Report STRs, 2019 | PD-000947 -000948 |
| 35 | Ex 012 PPD Incident Report and Narrative | PD-000954 -000973 |
| 36 | Ex 014. Search Warrant and Affidavit | PD-000986 -000990 |
| 37 | Ex 015 and 057. DNA Analytical Finds Suppl. Report I 2019-03-19 | PD-000991 -000993 |
| 38 | Ex 015 and 059. DNA Analytical Finds Suppl. Report II 2019-07-17 | PD-000994 -000999 |
| 39 | Ex 016. T Wong texts w S Cormier (Cormier version) | PD-001001 -001016 |
| 40 | Ex 020. PPD Officers Training Records | PD-001025 -001034 |
| 41 | Ex 026. S Cormier Recruit Info Sheet 1993 | PD-001282 |
| 42 | Ex 035. T Wong texts w S Cormier (Wong version) | TWong-000001 -000006 |
| 43 | Ex 036. S Cormier emails to T Wong | Monteiro-000059 -000085 |
| 44 | Ex 037. T Wong emails to S Cormier | Monteiro-000086 -000100 |
| 45 | Ex 038. DOH Chain Custody Rpt | Monteiro- 000051-058 |
| 46 | Ex 041. PPD Background Investigation | PD-Suppl-002793 -003121 |
| 47 | Ex 042. Autopsy Report | PD-Suppl-001604 -001631 |
| 48 | Ex 053. S Cormier, L Iannelli, T Wong email re DNA GED Match, 2019-01-25 | PD-Suppl-001803 |
| 49 | Ex 064. S Cormier, S Medeiros FBI email re Pedigree Info, 2019-07-29 | PD-Suppl-001907 |

| | RECORD | BATES |
|---|---|---|
| 50 | Ex 065. S Cormier, E Small email re Christine Cole, 2019-08-12 | PD-Suppl 001909 -001911 |
| 51 | Ex 066. S Cormier, call notes, 2019-01-16 | PD-Suppl-001924 -001927 |
| 52 | Ex 078. PPD Report, purple corduroy slacks, 1988-01-08 | PD-Suppl-002135 |
| 53 | Ex 097. DOH Gen Evidence Exam Worksheet Pants, 2008-06-20 | Monteiro-000148 |
| 54 | Ex 098. DOH Chain Custody Report | Monteiro-000053, 000056 -000058 |
| 55 | Ex 099. DOH Chain Custody Report | Monteiro-000101 -000104 |
| 56 | Ex 100. (Cormier Marked Only) Transcript Jan 2019 Wong Calls | Twong-000007 -000012 |
| 57 | Ex 100. DOH Lab Records, Worksheets etc | Monteiro-000126 -000148 |
| 58 | Ex 101. (Cormier Marked Only) Email T. Wong to S. Cormier, 2019-07-17 | TWong-00023 |
| 59 | Ex 101. DOH Lab Records, Worksheets etc | Monteiro-000149-000172 |
| 60 | Ex 105. DOH Ethics and Inegrity Policy | Monteiro-000204 |
| 61 | Ex 106. DOH Lab Service Manual | Monteiro-000205 -000231 |
| 62 | Ex 107. ANAB Guiding Principles | Monteiro 000232 -000234 |
| 63 | Ex 109. DOH Case Records Policy | Monteiro 000266 -000268 |
| 64 | Ex 110. DOH Chain of Custody Policy | Monteiro-000269 -000270 |
| 65 | Ex 111. DOH Dissemination of Info | Monteiro-000271 -000273 |
| 66 | Ex 112. DOH Evidence Policy | Monteiro-0000274 -275 |
| 67 | Ex 113. DOH Training and Development Policy | Monteiro-000276 -000279 |
| 68 | Ex 114. DOH  Wong Annual Reviews | Monteiro-000280 -000288 |
| 69 | Ex 115. DOH Wong Training Records | Monteiro 000289 -000292 |
| 70 | Ex 116. DOH Wong Forensic Science Assoc. Cert | Monteiro-000293 -000294 |
| 71 | Ex 117. DOH Wong Competency in Serology | Monteiro-000295 -000299 |
| 72 | Ex 068. DNA Analytical Finds 2001-03-06 | PD-Suppl-001993-1998 |
| 73 | Lab Casefile pgs 001-025 (Monteiro-000101 -000125) | Monteiro-000101-000125 |
| 74 | Lab Casefile pgs 026-056 (Monteiro-000173-000203) | Monteiro-000173-000203 |
| 75 | Lab Casefile pgs 057-080 (Monteiro-000149-000172) | Monteiro-000149-000172 |

B - 3

| | RECORD | BATES |
|---|---|---|
| 76 | Lab Casefile pgs 081-103 (Monteiro-000126-000148) | Monteiro-000126-000148 |
| 77 | Lab Casefile pgs 168-169 (RIDOH-000164 -000165) | RIDOH-000164 -000165 |
| 78 | Lab Casefile pgs 208-213 (RIDOH-000166 -000171) | RIDOH-000166 -000171 |
| 79 | Lab Casefile pgs 214-231 (RIDOH-000146 -000163) | RIDOH-000146 -000163 |
| 80 | RIDOH 000001-000163 | RIDOH 000001-000163 |
| 81 | RIDOH 000164-000171 | RIDOH 000164-000171 |

# EXHIBIT 4

**EXPERT REPORT**

**John E. Schienman, Ph.D.**

**9/21/2022**

**I. Qualifications, Publications, Prior Testimony, Statement of Compensation**

I work as a forensic consultant in the area of forensic DNA testing. My consulting routinely includes observation of DNA testing, reviewing case-related documents, laboratory protocols, testing worksheets, DNA profile data, and reports, generating opinions on the quality of the testing and the meaning of the results, and court testimony when needed. I have also been employed for the last 17 years by the Connecticut Division of Scientific Services as a Forensic Science Examiner in the DNA Section of the Laboratory. As a Forensic Science Examiner 1 from August 2005 to December 2010, I was responsible for criminal DNA casework consisting of examining evidentiary and known biological samples, performing analyses and developing DNA profiles if possible, and making comparisons between the known and evidentiary DNA profiles to draw conclusions as to whether the known individual could or could not be the source or component of the evidentiary DNA profile. A summary of the testing and the conclusions drawn would be presented in a report to the agency that submitted the evidence and testimony in court would be provided on those findings as necessary. As a Forensic Science Examiner 2 from January 2011 to the present, I have had the additional responsibilities of being a lead to several individuals in the Forensic Science Examiner 1 position and of being the Validation Coordinator for the DNA section. As a lead Examiner, I approve time worked and leave requests and provide guidance with respect to DNA testing, report writing, and court testimony. As the Validation Coordinator, I produce written experimental plans to evaluate new DNA testing methodologies or techniques, perform experiments, and write summaries of the results.

My education and training in the science of DNA began as a teaching and research assistant that culminated in obtaining a Ph.D. in Genetics from the University of Connecticut at Storrs. I then continued my research in Genetics as a Postdoctoral researcher at the State University of New York at Albany, followed by a position as an Assistant Professor at the Center for Applied Genomics and Technology at the University of Connecticut at Storrs. Lastly, I performed a 6-month training in forensic science laboratory specific protocols at the Connecticut

Division of Scientific Services which provides forensic testing services to the law enforcement agencies of Connecticut. My Curriculum Vitae, which includes a list of my publications, is attached as Appendix A.

Over the last 15 years, I have been recognized as a DNA expert for testimony in over 40 criminal cases in the State of Connecticut as well as 2 cases in the State of Massachusetts. I have never been disqualified as an expert. I testified as an expert in four proceedings in and after 2018:

    i. On July 27, 2018, I testified for the State of Connecticut, in New Britain Superior Court in *State of Connecticut v. Azia Jenkins*.

    ii. On February 19, 2019, I testified for the State of Connecticut, in New Haven Superior Court in *State of Connecticut v. Shane Dunkley-Roundtree.*

    iii. On February 12, 2020, I testified for Defendant Pedro Vasquez, in Hampden Superior Court, in *Commonwealth of Massachusetts v. Pedro Vasquez*.

    iv. On April 5, 2022, I testified for the State of Connecticut, in New Haven Superior Court in *State of Connecticut v. Anthony Smith.*

I was retained by the State of Rhode Island on behalf of Defendant Tamara Wong to provide an independent analysis and opinion regarding the statements in Plaintiff's Expert Report by Meghan Clement at Paragraphs 19, 20, and 22 and in Plaintiff's Expert Report by Susan Peters at Opinion No. 4. This Report represents my opinions based upon my knowledge, training, education, and experience as a researcher in Genetics and DNA science, a forensic consultant on DNA testing, and as a forensic DNA analyst, lead analyst, and Validation Coordinator over the preceding 31 years. The facts and data that I have considered in forming my expert opinions are identified below in Section II. Relevant background information regarding forensic DNA testing that support my opinions are listed in Section III. Facts derived from the records are summarized in Section IV. My opinions and their bases are explained below in Section V.

The State of Rhode Island is paying me my standard rate for consultant services, which is $250 per hour. My opinions are my own and the State is required to pay me for my services no matter the content of my opinions. I reserve the right to change or revise my opinions in the event that information not presently known to me is made available to me in the future.

## II. Facts and Data Considered

Appendix B lists the complete set of case-specific records made available to me.  I relied upon a subset of these records to form my opinions:

1. ECF No. 01 - Complaint
2. Pl 2nd 26a2 Disclosures
3. Pl Expert Report, DNA, Clement 2022-07-14
4. Pl Expert Report, Policing, Peters 2022-07-11
5. Pl Monteiro Response to Wong Second Interrogs (2022.06.23)
6. Cormier, Susan (PPD Det.) - Depo Tr Part 2
7. Cormier, Susan (PPD Det.) - Depo Tr Part 3
8. Wong, Tamara (Dept Health) - Depo Tr (with errata)
9. Ex 004. Arrest Warrant and Affidavit
10. Ex 010. FBI Lab Reports Trace, STR and mtDNA, 2019-2020
11. Ex 011. FBI Lab Report STRs, 2019
12. Ex 015 and 057. DNA Analytical Finds Suppl. Report I 2019-03-19
13. Ex 015 and 059. DNA Analytical Finds Suppl. Report II 2019-07-17
14. Ex 016. T Wong texts w S Cormier (Cormier version)
15. Ex 035. T Wong texts w S Cormier (Wong version)
16. Ex 068. DNA Analytical Finds 2001-03-06
17. Lab Casefile pgs 001-025 (Monteiro-000101 -000125)
18. Lab Casefile pgs 026-056 (Monteiro-000173-000203)
19. Lab Casefile pgs 057-080 (Monteiro-000149-000172)
20. Lab Casefile pgs 081-103 (Monteiro-000126-000148)
21. Lab Casefile pgs 168-169 (RIDOH-000164 -000165)
22. Lab Casefile pgs 208-213 (RIDOH-000166 -000171)
23. Lab Casefile pgs 214-231 (RIDOH-000146 -000163)
24. RIDOH 000001-000163
25. RIDOH 000164-000171

Other documents relied upon for this report:

26. Committee on DNA Technology in Forensic Science Board on Biology, Commission on Life Sciences National Research Council, 1992 (NRC I)

27. The Evaluation of Forensic DNA Evidence.  Committee on DNA Forensic Science: An Update, National Research Council, 1996 (NRC II)

> The National Research Council was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of further knowledge and advising the federal government of the United States. The Council has become the principle operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities.  In 1992 they created a document with recommendations for forensic DNA testing and an updated document in 1996, NRC I and NRC II, respectively (see II-26 & II-27).

28. SWGDAM Interpretation Guidelines for Y-Chromosome STR Typing, Approved March 2, 2022

29. Supplemental Information for the SWGDAM Interpretation Guidelines for Y-Chromosome STR Typing by Forensic DNA Laboratories

>The Scientific Working Group on DNA Analysis Methods (SWGDAM) is a group of approximately 50 scientists representing federal, state, and local DNA laboratories in the United States and Canada. These scientists meet to discuss, share, and evaluate forensic biology methods, protocols, training, and research to enhance forensic biology services as well as provide recommendations to the FBI Director on quality assurance standards for forensic DNA analysis (see SWGDAM guidelines II-28 & II-29).

30. The Quality Assurance Standards for Forensic DNA Testing Laboratories, Effective July 1, 2020

>The Quality Assurance Standards for Forensic DNA Testing Laboratories is an auditing document produced by the FBI that is specific to the DNA section of a forensic laboratory. The DNA section's testing and reporting protocols must fulfill all the applicable requirements in this document if they wish to use the Combined DNA Index System (CODIS) for searching unknown DNA profiles and to receive federal grants. These grants are heavily relied upon to purchase testing equipment and reagents and provide funds for overtime hours worked by laboratory staff to decrease case backlogs and are often a significant portion of the DNA section's budget (see FBI-QAS at II-30).

## III. Relevant Background Information Regarding Forensic DNA Testing

1. Every human cell (with a few exceptions) contains a complete set of the individual's DNA known as the human genome. The DNA is packaged in structures known as chromosomes and humans have 23 pairs of these chromosomes. Twenty-two of the pairs are further categorized as autosomes which are not specific to gender. The remaining pair is categorized as the sex chromosomes and are comprised of the X and Y chromosomes. Females have two copies of the X chromosome while males have one copy of the X and one copy of the Y chromosome. The Y chromosome is generally passed from father to son unchanged, *i.e.* in identical form.

2. Today's forensic DNA profiling (or "typing") techniques are more sensitive than the analytical techniques utilized in 1996, *i.e.* at the time the NRC II was published. Forensic DNA typing methodology in 1996 was anywhere from ~20 to 1,000 fold less sensitive than the current STR

4

typing methodology of the last 20 years. In 1996, the target amount of DNA needed to obtain complete DNA profile results ranged from ~750 to 75,000 human cells worth of DNA depending on which of the two available DNA typing technologies was utilized. The target amount of DNA for the current STR and Y-STR typing technology is ~50 human cells worth of DNA with complete DNA profiles developed from as few as 10.

3. A DNA profile result does not generally provide information as to the human cell type from which it is was derived. Developing a DNA profile requires extracting the DNA from the cell. This process of extraction frees and isolates the DNA from most other components of the cell. The resulting DNA profile — developed after stripping away the majority of the other cellular components — contains inadequate information to identify the type of cell from which the DNA derived. Therefore, obtaining a DNA profile for a biological sample does not generally reveal whether the DNA came from, *e.g.* skin, blood or saliva. There has been research into this area for the last decade or so evaluating other molecules contained in human cells that are specific to certain cell types, but none of this research has resulted in, as yet, a commercially available kit for forensic laboratories to validate and use in their testing process to identify the human cell type from which the DNA profile is derived.

4. A positive serological test result for a human body fluid does not necessarily translate into detectable human DNA from that fluid. The DNA could be degraded such that it is not amplifiable and will not produce a profile while the molecules detected by the serology test are still intact. Additionally, if the serological test is only presumptive, the stain may not be a human body fluid at all. Lastly, there is no serological test, either presumptive or confirmatory, for human epithelial (skin) cells.

5. DNA extracted and profiled from a stain that tests presumptively positive for blood could be derived from the white blood cells of a blood stain, from human skin cells deposited through touch, or both. Today's technology does not enable us to determine what proportion of recovered DNA may have been deposited by blood versus by touch (*i.e.* skin cells). Any human skin cells present on a substrate (or item of evidence) could be spread throughout that substrate - either under, on top of, mixed in with or next to blood cells appearing on the substrate. In that event, it

would not be unusual for DNA detected in the location of a presumptive blood stain to also be detected in an area adjacent to the stain.

## IV. Summary of Testing by Wong

My review of the records reveals the following facts.  Ms. Wong was assigned the task of re-amplifying a DNA extract from the Christine Cole case that was first isolated in 2008 from a cutting from the stain on the victim's purple pants (Item # 1.8).  In 2010, Fairfax Identity Laboratories reported the results of amplifying this extract with a Y-STR DNA amplification kit known as Yfiler and produced a partial single source male Y-STR profile at 6 of the 17 loci tested.  Ms. Wong re-amplified using a more modern Y-STR DNA amplification kit known as PowerPlex Y23 (PPY23).  The PPY23 kit has more testing locations on the Y chromosome (23) than the Yfiler kit (17) and also allows for 75% more volume of the DNA extract to be added to the reaction providing the potential for a Y-STR DNA profile with results at a greater number of testing locations than that produced in 2010.  Indeed, the PPY23 amplification produced a partial Y-STR DNA profile consisting of 12 of this kit's 23 testing locations.  These results were reported to Detective Susan Cormier by the Rhode Island Department of Health, Division of Laboratories, Forensic Biology Unit, Supplemental Report dated March 19, 2019 signed by Tamara Wong.  The Conclusions section of this report state that a partial Y-STR DNA profile was obtained from the stain on the pants that is consistent with an unidentified male donor. The report also states male relatives in the same paternal line will demonstrate the same Y-STR DNA profiles and directs Detective Cormier to submit any available suspect and/or elimination reference samples for comparative DNA analysis.  The partial Y-STR DNA profile obtained from the stain on the pants was searched against a RIDOH Lab internal database of known reference Y-STR DNA profiles and revealed a match to the known Y-STR DNA profile of Jerson Semedo.  Based in part on this information, Mr. Semedo's father, Joao Monteiro, became a subject of Detective Cormier's investigation.

Detective Cormier submitted evidence to the RIDOH Lab in April 2019 with 12 of the items presumably being trash that may have been discarded by Joao Monteiro.  Most of these items had no or insufficient human DNA for testing, but Ms. Wong developed autosomal and Y-STR DNA profiles from three of these items along with a water bottle submitted by Detective Joel Saccoccio in May of 2019.  The four Y-STR DNA profiles generated from these trash items

6

were all excluded as possible sources of the partial Y-STR DNA profile detected on the victim's pants. The RIDOH Lab Supplemental Report II dated July 17, 2019 signed by Ms. Wong contained the results and comparisons of the four items from the trash pull.

A known biological reference sample from Joao Monteiro was submitted on July 17, 2019. The RIDOH Lab Supplemental Report II dated July 17, 2019 identified Mr. Monteiro's STR and Y-STR DNA profiles developed from his reference sample. At 5:53 PM on July 17th, Ms. Wong sent a phone text communication to Detective Cormier regarding Mr. Monteiro's Y-STR DNA profile comparison to the partial Y-STR DNA profile detected on the victim's pants stating "It's a match. Finalizing the report right now." That report was transmitted to Detective Cormier at 7:02 PM on July 17th. In this report, Mr. Monteiro's DNA profiles were compared to the partial Y-STR profile from the pants and the report stated that the DNA profiles were consistent.

In this finalized report, Mr. Monteiro's autosomal and Y-STR DNA profiles were excluded from the profiles of the four trash items, but his Y-STR DNA profile was consistent with the partial Y-STR DNA profile detected from the stain from the victim's purple pants. The finalized report also contained a statistic that was developed using the combined partial Yfiler and PPY23 Y-STR profiles from the victim's pants. This statistic signifies the weight of this match, i.e. the expected frequency of unrelated male individuals in the general population that would match this partial Y-STR DNA profile. Searching the combined partial Y-STR DNA profile against the U.S. Y-HRD database produced a statistic with the 95% upper confidence interval applied of approximately 1 in every 1,909 individuals. This report also includes the statements that male relatives in the same paternal line will demonstrate the same Y-STR DNA profiles and to submit any available suspect and/or elimination reference samples for comparative DNA analysis.

**V. Opinions on Plaintiff's Experts' Statements**

My opinions are expressed to a reasonable degree of scientific certainty. In forming my opinions, I have relied upon my education, training, experience and expertise accumulated over the course of my 31 year career, including more than 17 years as a forensic DNA analyst, lead analyst, validation coordinator, and as a forensic DNA consultant.

### 1. Response to Opinion 19 by Meghan Clement

Ms. Clement is concerned that there appears to be no testing of male individuals/family members living in or routinely frequenting the home of the deceased girl.  Clement is concerned due to the possibility of DNA of the co-habitants transferring to clothing articles either from direct contact or during the washing process and the fact that not only is a Y-STR DNA profile not unique to an individual, but separate unrelated male lineages can also share the same Y-STR DNA profile.  Clement continues that it would be important to rule out males that lived with the victim or frequently visited the house.  I agree with this opinion and based on Tamara Wong's requests to law enforcement she appears to as well.  Clement states that Wong testifies in her deposition (page 86) that Wong did request reference samples from the deceased girl's stepfather or any of his paternal relatives in a text to Detective Cormier.   Additionally, both the Supplemental Report dated March 19, 2019 and the Supplemental Report II dated July 17, 2019 state in the Conclusions Section "Please submit any available suspect and/or elimination reference samples for comparative DNA analysis."  Based on the results of the initial DNA testing and the case scenario, it is routine for DNA analysts to make written requests for elimination known reference samples in the DNA Report or in emails to the investigating officer of the submitting agency.  It is my opinion, based on my education, knowledge, training, and experience as a forensic science DNA analyst, validation coordinator, and lead analyst of 17 years, that it is not one of the job duties of forensic science laboratory analysts to interact with the general public or any civilians involved in the criminal case at hand and make direct requests for, or to write search warrants to obtain, known reference samples from such individuals.  The analyst can make the request to the law enforcement agency that submitted the evidence, but the burden is on the investigating detective to legally obtain such samples for the laboratory to process.  Tamara Wong made several such requests in this case.

### 2. Response to Opinion 20 by Meghan Clement

Ms. Clement states in opinion 20 that testing a substrate control sample from the pants for Y-STR DNA would have determined if there was background DNA on the material.  However, due to the sensitivity of today's DNA typing technologies, the testing of a substrate control is no longer sufficient to determine whether a stain is or is not the source of the detected DNA profile. Both the NRC I document of 1992 (II-26) and the update NRC II document of 1996 (II-27) made

recommendations that it was important to test unstained regions in the proximity of the stained region as a substrate control to rule out contamination from sample handling or from the background environment. However, this recommendation was made at a time when samples tested for DNA consisted predominantly of serologically identified biological stains such as human blood, semen, or saliva. These human body fluids typically contain large numbers of human cells containing DNA. The predominance of testing only these identifiable fluids was due to the sensitivity of DNA testing at that time. The current STR and Y-STR typing technology has increased the sensitivity of DNA testing to such an extent that with the current amplification kits and detection instruments, as few as 10 human cells worth of DNA can routinely result in a complete DNA profile with partial DNA profiles detected with less. This makes possible the detection of human skin cells sloughed off from a person making casual contact with an object or substrate (often referred to as "touch" DNA). This was true in 2008 when the cutting from the crotch of the victim's pants was first extracted for DNA and tested and was even more so in 2019 with the latest generations of STR testing kits available.

As described earlier, a DNA profile does not provide information from which human cell type it was derived (refer to III-3), and a positive serology result does not necessarily translate into detectable human DNA (refer to III-4). In my opinion, these facts and the sensitivity of STR typing to detect a DNA profile from "touch DNA," render the results of substrate control testing inconclusive at best. Finally, testing substrate controls is not a requirement nor recommendation, nor is it even discussed in the FBI's Quality Assurance Standards for Forensic DNA Testing Laboratories (II-30). It is my opinion, based on my education, knowledge, training, and experience as a forensic science DNA analyst, validation coordinator, and lead analyst of 17 years and as a consultant having reviewed the procedures of other laboratories, that substrate controls are rarely processed and profiled in forensic science laboratories performing DNA testing.

### 3. Response to Opinion 22 by Meghan Clement

Megan Clement states in her final opinion that anyone with the education, training, experience, and knowledge of Ms. Wong would know that the testing of the purple pants did not identify the presence of DNA from Mr. Monteiro, but rather that he, all his paternal relatives, and male individuals in approximately 1 in every 1,909 other paternal lineages could be included as a

possible source of the male DNA on the purple pants.  In my opinion, based on my education, knowledge, training, and experience as a forensic science DNA analyst, validation coordinator, and lead analyst of 17 years and on my review of the case records, that Tamara Wong did, in fact, demonstrate this education, training, experience, and knowledge.  As part of the normal course of business of a forensic science examiner at the RIDOH Laboratory, Ms. Wong conducted sophisticated forensic DNA testing that culminated in two formal reports that encompassed all that is stated by Ms. Clement above.  Please refer to the summary (IV) of Ms. Wong's work for this case.

### 4. Response to Opinion No. 4 by Susan Peters

It is Susan Peters' opinion that Tamara Wong communicated misleading information to Detective Cormier regarding the comparison of the known Y-STR DNA profile of Joao Montiero to the partial Y-STR DNA profile detected from the victim's pants by stating in a text message "It's a match.  Finalizing the report right now."  It is my opinion that the word "match" is a scientifically accurate and correct description of the Y-STR DNA profile comparisons reported by Ms. Wong.

The word "match" when comparing DNA profiles from known individuals to evidentiary profiles is absolutely an appropriate and correct term.  When the alleles detected from the known reference are identical to the alleles detected from the evidence, there is a one-to-one correspondence, *i.e.* it is a match.  Match does not mean two things are from the same source, but rather they appear or measure the same.  In forensic DNA testing, finding "a match" between a person's known DNA profile, and a profile from an evidentiary sample, does not necessarily indicate that it is *that* person's DNA on the evidence.  Rather, the finding of "a match" is consistent with that conclusion.  An identity statement  — that it is in fact the DNA of the individual who matches the evidence — is **not** the normal procedure for reporting forensic DNA comparison results/conclusions.  This is due to the fact that a match can result from several possibilities.  First, the DNA on the evidentiary sample is indeed this individual's DNA.  Second, the DNA on the evidentiary sample belongs to the individual's identical twin, or in the case of Y-STRs, a male in the same paternal lineage.  The last possibility is that the DNA on the evidentiary sample is from an unrelated individual who happens to have the same DNA profile as that detected on the evidence.  The probability of this last possibility is referred to as the

"random match probability."  The statistical expectation of this last possibility occurring in the general, unrelated human population is required for presentation of probative DNA evidence in court.  The statistic goes towards the weight of this match.

The word "match" is used in SWGDAM's published DNA testing guidelines.  The latest SWGDAM guidelines (approved in March 2022) for Y-Chromosome STR Typing (II-28) state: "Subsequent to a **match** between two samples using Y-STR testing, a single source, major, or deduced Y-STR haplotype may be searched against a database of Y-STR haplotypes to obtain the sample frequency of the profile, and, as needed, to calculate profile and/or **match** probabilities."  I also use the term "match" when I testify in court and explain DNA testing to a lay jury.  As a qualified expert in DNA testing testifying in Connecticut Superior courts, I routinely describe forensic DNA testing as the following:  "we develop DNA profiles from evidentiary and known samples and then compare the known DNA profile to that of the DNA profile detected from the evidence to see if they **match** or not."

In prior communications between Ms. Wong and Detective Cormier, Ms. Wong clearly communicated that male individuals in the same paternal lineage will share identical Y-STR DNA profiles.  This is true barring a mutation occurring in the Y-STR haplotype during transmission from one generation to the next.  The expectation of  identical Y chromosomes in a paternal lineage was, in fact, the basis for the investigative lead communicated to Detective Cormier by Ms. Wong regarding Jerson Semedo.  Ms. Wong informed Detective Cormier that male relatives of Jerson Semedo, such as his biological father or any paternal uncles, would also match this partial Y-STR DNA profile from the pants by default (barring a mutation).  Therefore, it is not logical that the statement, "it's a match," could be misleading when it is the expected result.

Regardless of the less formal language of the word "match" used in a text to Detective Cormier, the Supplementary Report II, dated July 17, 2019, produced by analyst Tamara Wong to Detective Cormier contains the final, formally reported conclusions.  The Y-STR conclusions on page 5 of the report clearly state that "[m]ale relatives in the same paternal line will demonstrate the same Y-STR DNA profiles," and that the "partial Y-STR DNA profiles obtained from the stain on the victim's purple pants (Item #1.8) is consistent with the known reference profile from Joao Monteiro (Item #23)."  The word "match" has been rephrased as "consistent with."  Detective Cormier's Arrest Warrant and Affidavit for Joao Monteiro (II-9, Ex 004) uses

this phrasing "consistent with."  This language used by Detective Cormier in the warrant would suggest she was not ultimately confused by the use of the word "match."

Finally, in my experience as a Forensic Science Examiner at the Connecticut Division of Scientific Services, I have been contacted many times over the 17 years by police officers and detectives regarding the meaning of the conclusions contained in DNA Reports produced as part of my normal course of business at the laboratory.  Not uncommonly, the officer or detective is trying to clarify for the purposes of writing a search or arrest warrant and I do my best to explain the conclusions in lay person language.  If asked, I will also give advice regarding any wording they have chosen for their warrant.  But, in my opinion, this burden of asking clarifying questions is on the officer or detective.

Respectfully submitted,

John E. Schienman, Ph.D.

# APPENDIX A

# [To Exhibit 4]

# CURRICULUM VITAE

**John E. Schienman, Ph.D.**
**Forensic Consultant**
31 Shanti Place, Tolland, CT 06084
Telephone: (860) 874-3098
Email: jjschien@gmail.com

## Education:

| Ph.D. | Genetics | University of Connecticut, 1999 |
| B.A. | Physics | Case Western Reserve University, 1986 |

## Research and Professional Experience:

***Forensic Science Examiner 2, DNA Section*** (January 2011-Present)
    Criminal DNA Casework, Supervisor, and Validation Coordinator
***Forensic Science Examiner 1, DNA Section*** (August 2005-December 2010)
    Criminal DNA Casework
State of Connecticut Division of Scientific Services, Meriden, CT

***Assistant Professor in Residence*** (January 2003-August 2005)
    Development and Improvement of DNA applications for Forensic Science
Dept. of Molecular and Cell Biology, Center for Applied Genomics and Technology, Forensic Research Laboratory, University of Connecticut at Storrs

***National Science Foundation Postdoctoral Research Fellow*** (August 2000-January 2003)
    The Role of Alu Elements in Regulatory Evolution of Primates: Bioinformatic and Experimental Studies.
***Postdoctoral Research Fellow*** (April 1999-July 2000)
    Analysis of the molecular evolution and gene expression of ribonuclease genes in primate lineages.
Dept. of Biological Sciences, State University of New York at Albany
Dr. Caro Beth Stewart, sponsor.

***Ph.D. Dissertation Research*** (January 1993-April 1999)
    Analysis of genomic organization, molecular basis of variation, and gene expression in the *Drosophila virilis* repetitive histone gene family.
***Supervisor Undergraduate Research Projects*** (January 1993-May 1998)
Dept. of Molecular and Cell Biology, University of Connecticut at Storrs
Dr. Linda Strausbaugh, major advisor

***Research Assistant*** (January 1992-December 1992)
    Mutagenesis of recombinant plasmid DNA with a mini-transposon for facilitation of sequencing of large cloned DNA molecules.
Dept. of Molecular and Cell Biology, University of Connecticut at Storrs
Dr. Linda Strausbaugh and Dr. Claire Berg, advisors

***Research Assistant*** (September 1991-January 1992)
    Analysis of DNA polymorphisms with denaturing gradient acrylamide electrophoresis. Characterization of potential transgenic animals through DNA isolation and Dot Blot analysis.
Dept. of Animal Science, University of Connecticut at Storrs
Dr. Sandra Velleman and Marina Julian, supervisors

**Teaching Experience:**

| | |
|---|---|
| Instructor | Real-Time PCR Module (Sum/Fall 2005, Spr/Sum/Fall 2004, Fall 2003, UCONN), Experiments in DNA Identification (Summer 1997, UCONN) |
| Teaching Associate | Human Genetics (Spring 2003, UCONN), Forensic Applications of DNA Science (Fall 1998, UCONN), Experiments in DNA Identification (1998, 1997, UCONN) |
| Teaching Assistant | Human Genetics (1997, 1996, 1995, UCONN), Genetics (1995, 1994, 1993, UCONN), Recombinant DNA Techniques Laboratory (1992, UCONN) |
| Guest Lecturer | Forensic Applications of DNA Science (2008-2010, UCONN) |

**Academic Awards and Honors:**

NSF Postdoctoral Fellowship in Biological Informatics (Aug. 2000-July 2002)
Department awarded Demi-Fellowship (Fall 1996-Fall 1998)
Phi Kappa Phi Honor Society (Inducted 1995)

**Publications:**

Quintin DM, **Schienman JE**, Adamowicz MS, and San Pietro D.  (2020) Assessment of PowerPlex® Fusion 5C's ability to type degraded DNA.  Science & Justice Volume 60, Issue 5, 423-431.

Ensenberger MG, Lenz KA, Matthies LK, Hadinoto GM, **Schienman JE**, Przech AJ, Morganti MW, Renstrom DT, Baker VM, Gawrys KM, Hoogendoorn M, Steffen CR, Martin P, Alonso A, Olson HR, Sprecher CJ, and Storts DR.  (2016) Developmental Validation of the PowerPlex® Fusion 6C System.  Forensic Science International: Genetics 21, 134-144.

Adamowicz MS, LaBonte RD, and **Schienman JE**.  (2015) The Potential of Cosmetic Applicators as a Source of DNA for Forensic Analysis.  Journal of Forensic Science, July 60 (4), 1001-1011.

**Schienman JE**.  Techniques of DNA Fingerprinting (Chapter 3, pages 23-44).  In: HM Coyle, ed. Non-Human DNA Typing: Theory and Casework Applications.  CRC Press, August 2007.

**Schienman JE**, Holt RA, Auerbach MR, and Stewart CB.  (2006)  Duplication and divergence of two distinct pancreatic ribonuclease genes in leaf-eating African and Asian colobine monkeys. Molecular Biology and Evolution 23(8), 1465-1479.

Weber DS, Stewart BS, **Schienman JE**, and Lehman N.  (2004)  Major histocompatibility complex variation at three class II loci in the northern elephant seal.  Molecular Ecology Mar; 13(3), 711-8.

Xing J, Salem AH, Hedges DJ, Kilroy GE, Watkins WS, **Schienman JE**, Stewart CB, Jurka J, Jorde LB, Batzer MA.  (2003) Comprehensive analysis fo two Alu Yd subfamilies.  Journal of Molecular Evolution 57 Suppl 1, S76-89.

**Schienman JE**, Lozovskaya ER, and Strausbaugh LD.  (1998)  *Drosophila virilis* has atypical kinds and arrangements of histone repeats.  Chromosoma 107, 529-39.

# APPENDIX B
# [To Exhibit 4]

| | RECORD | BATES |
|---|---|---|
| 1 | ECF No. 01 - Complaint | |
| 2 | ECF No. 17 - PPD and City Answer to Complaint | |
| 3 | ECF No. 19 - T Wong Answer to Complaint | |
| 4 | ECF No. 25 - Stipulated Protective Order | |
| 5 | Pl 2nd 26a2 Disclosures | |
| 6 | Pl Expert Report, DNA, Clement 2022-07-14 | |
| 7 | Pl Expert Report, Policing, Peters 2022-07-11 | |
| 8 | Pl Monteiro Req Admissions to Wong (2021-11-19) | |
| 9 | Wong Response to Pl Monteiro Req Admisions (2021-12-01) | |
| 10 | Wong Req Admissions to Pl Monteiro (2022.05.20) | |
| 11 | Pl Monteiro Response to Wong Req Admissions (2022.06.20) | |
| 12 | Pl Monteiro First Interrogs (Corrected) to all Individual Defs (2021.05.24) | |
| 13 | Wong First Interrogs to Pl Monteiro (2021.08.11) | |
| 14 | Wong Response to Pl Monteiro First Interrogatories (2021.08.20) | |
| 15 | Pl Monteiro Initial Response to Wong First Interrogs (2021.09.16) | |
| 16 | Pl Monteiro First Suppl Response to Wong First Interrogs (2021.10.11) | |
| 17 | Wong Second Interrogs to Monteiro (2022.05.24) | |
| 18 | Wong Third Interrogs to Monteiro (2022.06.17) | |
| 19 | Pl Monteiro Second Suppl Response to Wong First Interrogs (2022.06.22) | |
| 20 | Pl Monteiro Response to Wong Second Interrogs (2022.06.23) | |
| 21 | Pl Monteiro Response to Wong Third Interrogs (2022.07.19) | |
| 22 | Cormier, Susan (PPD Det.) - Depo Tr Part 1 | |
| 23 | Cormier, Susan (PPD Det.) - Depo Tr Part 2 | |
| 24 | Cormier, Susan (PPD Det.) - Depo Tr Part 3 | |

| | RECORD | BATES |
|---|---|---|
| 25 | DuBois, Jillian (RIAG Prosecutor) - Depo Tr (with errata) | |
| 26 | Healy, Timothy (RIAG Prosecutor) - Depo Tr (with errata) | |
| 27 | Monteiro, Joao (Plaintiff) - Depo Tr (with exhibits) | |
| 28 | Mullen, Daniel (PPD Major) - Depo Tr | |
| 29 | Wong, Tamara (Dept Health) - Depo Tr (with errata) | |
| 30 | Ex 002. PPD Org Chart | PD-000883 -000835 |
| 31 | Ex 004. Arrest Warrant and Affidavit | PD-000839 -000845 |
| 32 | Ex 005. Arrest Report and Narrative | PD-000846 -000865 |
| 33 | Ex 010. FBI Lab Reports Trace, STR and mtDNA, 2019-2020 | PD-000932 -000941 |
| 34 | Ex 011. FBI Lab Report STRs, 2019 | PD-000947 -000948 |
| 35 | Ex 012 PPD Incident Report and Narrative | PD-000954 -000973 |
| 36 | Ex 014. Search Warrant and Affidavit | PD-000986 -000990 |
| 37 | Ex 015 and 057. DNA Analytical Finds Suppl. Report I 2019-03-19 | PD-000991 -000993 |
| 38 | Ex 015 and 059. DNA Analytical Finds Suppl. Report II 2019-07-17 | PD-000994 -000999 |
| 39 | Ex 016. T Wong texts w S Cormier (Cormier version) | PD-001001 -001016 |
| 40 | Ex 020. PPD Officers Training Records | PD-001025 -001034 |
| 41 | Ex 026. S Cormier Recruit Info Sheet 1993 | PD-001282 |
| 42 | Ex 035. T Wong texts w S Cormier (Wong version) | TWong-000001 -000006 |
| 43 | Ex 036. S Cormier emails to T Wong | Monteiro-000059 -000085 |
| 44 | Ex 037. T Wong emails to S Cormier | Monteiro-000086 -000100 |
| 45 | Ex 038. DOH Chain Custody Rpt | Monteiro- 000051-058 |
| 46 | Ex 041. PPD Background Investigation | PD-Suppl-002793 -003121 |
| 47 | Ex 042. Autopsy Report | PD-Suppl-001604 -001631 |
| 48 | Ex 053. S Cormier, L Iannelli, T Wong email re DNA GED Match, 2019-01-25 | PD-Suppl-001803 |
| 49 | Ex 064. S Cormier, S Medeiros FBI email re Pedigree Info, 2019-07-29 | PD-Suppl-001907 |

B - 2

| | RECORD | BATES |
|---|---|---|
| 50 | Ex 065. S Cormier, E Small email re Christine Cole, 2019-08-12 | PD-Suppl 001909 -001911 |
| 51 | Ex 066. S Cormier, call notes, 2019-01-16 | PD-Suppl-001924 -001927 |
| 52 | Ex 078. PPD Report, purple corduroy slacks, 1988-01-08 | PD-Suppl-002135 |
| 53 | Ex 097. DOH Gen Evidence Exam Worksheet Pants, 2008-06-20 | Monteiro-000148 |
| 54 | Ex 098. DOH Chain Custody Report | Monteiro-000053, 000056 -000058 |
| 55 | Ex 099. DOH Chain Custody Report | Monteiro-000101 -000104 |
| 56 | Ex 100. (Cormier Marked Only) Transcript Jan 2019 Wong Calls | Twong-000007 -000012 |
| 57 | Ex 100. DOH Lab Records, Worksheets etc | Monteiro-000126 -000148 |
| 58 | Ex 101. (Cormier Marked Only) Email T. Wong to S. Cormier, 2019-07-17 | TWong-00023 |
| 59 | Ex 101. DOH Lab Records, Worksheets etc | Monteiro-000149-000172 |
| 60 | Ex 105. DOH Ethics and Inegrity Policy | Monteiro-000204 |
| 61 | Ex 106. DOH Lab Service Manual | Monteiro-000205 -000231 |
| 62 | Ex 107. ANAB Guiding Principles | Monteiro 000232 -000234 |
| 63 | Ex 109. DOH Case Records Policy | Monteiro 000266 -000268 |
| 64 | Ex 110. DOH Chain of Custody Policy | Monteiro-000269 -000270 |
| 65 | Ex 111. DOH Dissemination of Info | Monteiro-000271 -000273 |
| 66 | Ex 112. DOH Evidence Policy | Monteiro-0000274 -275 |
| 67 | Ex 113. DOH Training and Development Policy | Monteiro-000276 -000279 |
| 68 | Ex 114. DOH  Wong Annual Reviews | Monteiro-000280 -000288 |
| 69 | Ex 115. DOH Wong Training Records | Monteiro 000289 -000292 |
| 70 | Ex 116. DOH Wong Forensic Science Assoc. Cert | Monteiro-000293 -000294 |
| 71 | Ex 117. DOH Wong Competency in Serology | Monteiro-000295 -000299 |
| 72 | Ex 068. DNA Analytical Finds 2001-03-06 | PD-Suppl-001993-1998 |
| 73 | Lab Casefile pgs 001-025 (Monteiro-000101 -000125) | Monteiro-000101-000125 |
| 74 | Lab Casefile pgs 026-056 (Monteiro-000173-000203) | Monteiro-000173-000203 |
| 75 | Lab Casefile pgs 057-080 (Monteiro-000149-000172) | Monteiro-000149-000172 |

| | RECORD | BATES |
|---|---|---|
| 76 | Lab Casefile pgs 081-103 (Monteiro-000126-000148) | Monteiro-000126-000148 |
| 77 | Lab Casefile pgs 168-169 (RIDOH-000164 -000165) | RIDOH-000164 -000165 |
| 78 | Lab Casefile pgs 208-213 (RIDOH-000166 -000171) | RIDOH-000166 -000171 |
| 79 | Lab Casefile pgs 214-231 (RIDOH-000146 -000163) | RIDOH-000146 -000163 |
| 80 | RIDOH 000001-000163 | RIDOH 000001-000163 |
| 81 | RIDOH 000164-000171 | RIDOH 000164-000171 |

# EXHIBIT 5

**Clement Consulting, LLC**



PO Box 18014
Raleigh, NC 27619-8014

14 July 22

1. My name is Meghan E. Clement and I am a Forensic Biologist and owner of Clement Consulting, LLC in Raleigh, NC.  I have been retained by Loevy & Loevy, on behalf of the Plaintiff, Joao Monteiro to provide DNA consultation in *Joao Monteiro v. Susan Cormier, Trevor Lefebvre, Daniel Mullen, Tina Congalves, City of Pawtucket, and Tamara Wong.*

2. I received a Bachelor of Science in Biology from Westfield State College in Massachusetts in 1983 and a Master of Science in Forensic Sciences from the University of New Haven in West Haven, Connecticut in 1985.  I began my forensic career at the Albuquerque Police Department Crime Laboratory where I was employed from 1985-1991.  I performed serology testing and blood alcohol analysis, processed crime scenes involving homicides and violent crimes and was instrumental in the original sett up of the DNA laboratory.  In 1991, I began employment at the Tarrant County Medical Examiner's Office Crime Laboratory in Fort Worth, TX and was employed there from 1991-1994.  While there, I performed both serology and DNA analysis on all categories of cases as well as processed crime scenes.

3. In 1994, I became the Assistant Director of the Forensic Identity Department at Roche Biomedical Laboratories in Research Triangle Park, North Carolina.  The company name was changed in 1996 to Laboratory Corporation of America Holdings Inc. (LabCorp) due to a merger.  I spent 17 1/2 years in North Carolina in various Director level positions where I was responsible for all aspects of the forensic DNA laboratory, including supervising technologists, analyzing samples, interpreting results, writing reports and testifying, as well as maintaining quality control and being involved in validations and implementation of new methodologies. In 2012, LabCorp announced the consolidation of the North Carolina office with Orchid Cellmark in Texas after it had been acquired by LabCorp in 2011.  They rebranded the laboratory as Cellmark Forensics and I moved to Texas where I was the  Senior Director.  As Senior Director I was responsible for all the laboratory activities including workflow, contracts, quality control and provided input on budgetary matters.  In 2015, LabCorp announced another consolidation after they acquired The Bode Technology Group in Virginia and rebranded the laboratory as Bode Cellmark Forensics, Inc.  I relocated to Virginia and became Operations Director and Laboratory Director. As Operations Director and Laboratory Director I oversaw all aspects of laboratory work including contracts, workflow, training, research and development and quality control. I retired from Bode Cellmark Forensics, on April 14, 2017, and began consulting independently.  I also entered into a consulting agreement with Bode Cellmark to continue to assist with case consultations and management consultation, which continued through the end of 2019.  In all, I was continuously employed by LabCorp or one of its subsidiaries for over 22 years in various Director level positions.

4. I have developed expertise in all types of laboratory methodologies used to perform DNA testing including, Short Tandem Repeat (STR), Y chromosome STR (Y-STR), and mitochondrial DNA (mtDNA).  I have personally performed testing and/or interpreted DNA

data in well over ten thousand forensic cases and have been qualified as an expert in over three hundred and eighty cases in local, state and federal courtrooms nationwide.  I have been a witness on behalf of the Prosecution in approximately 90% of the cases and on behalf of the Defense in approximately 10% of the cases.  In every instance that I have been offered as an expert witness, the court has always deemed me qualified to testify as such.

5.  I am board certified in Molecular Biology by the American Board of Criminalistics.  I am also a contract Team Leader for ANSI National Accreditation Board (ANAB), one of the leading Forensic Accreditation organizations.  My *curriculum vitae* is attached.

6.  In accordance with my obligation to maintain board certification I routinely keep up with advances in the forensic DNA field by reading journal articles as well as by attending workshops, seminars and/or national meetings at least once a year.

7.  In preparation for preparing this report I have reviewed and relied upon the following documents:

    a.  PDF of Cormier 2021.09.29 Vol. I deposition (246 pg doc)
    b.  PDF Cormier 2021.10.12 Vol II deposition (161 pg doc)
    c.  Exhibits from depositions
        i.  Ex 2: 2 pg org chart
        ii.  Ex 4: 7 pg Arrest warrant and affidavit
        iii.  Ex 14: 5 pg search warrant for DNA sample
        iv.  Ex 20: 10 pg training records
        v.  Ex 26: 1 pg police academy info sheet
        vi.  Ex 41: 329 pg Investigation notes/package
        vii.  Ex 42: 28 pg autopsy report
        viii.  Ex 10:10 pg FBI reports including 1-Trace, 1-STR and 1-mtDNA report
        ix.  Ex 11: STR report
        x.  Ex 16: 16 pg text between Wong and Cormier
        xi.  Ex 36: 27 pgs Cormier emails
        xii.  Ex 37: 15 pg of emails
        xiii.  Ex 38: 8 pgs chain of custody from RI Forensic Science Laboratory
        xiv.  Ex 53: 1 pg email ref genealogy
        xv.  Ex 57: RIDOH report dated 19Mar19
        xvi.  Ex 59: RIDOH report dated 17July19
        xvii.  Ex 64:1 pg email from Cormier to FBI in FL
        xviii.  Ex 66: Jaoa Semedo lead
        xix.  Ex 78: purple pants report-pants found by trash
        xx.  Ex 97: cutting info-sketch of pants
        xxi.  Ex 98: 4 pg chain of custody
        xxii.  Ex 99: 4 pgs of Chain of custody from FBI-RIDOH
        xxiii.  Ex 100: 23 pgs of lab notes
        xxiv.  Ex 101: 24 pgs of case file data
        xxv.  Ex 105: 1 pg Ethics for RIDOH
        xxvi.  Ex 106: 27 pg Lab Service Manual for RIDOH
        xxvii.  Ex 107: 3 pg ANAB Guiding Principal
        xxviii.  Ex 109: RIDOH-case records policy
        xxix.  Ex 110: 2 pg Chain of custody policy

    xxx.  Ex 111: 3 pg Dissemination of Information policy
    xxxi.  Ex 112: 2 pg Evidence policy
    xxxii.  Ex 113: 4 pg Training and Employment policy
    xxxiii.  Ex 115: 4 pg Wong training documentation
    xxxiv.  FBI Aug-Sept 10 analysis: 45 pgs of analysis
    xxxv.  PD_S1RFP: 533-535: 3 pg communication ref genealogy of Y STRs
    xxxvi.  PD_S1RFP 604-632: Autopsy report
    xxxvii.  PD_S1RFP 1664-1682: 19 pgs of notes from first testing at RIDOH
    xxxviii.  PD_S1RFP 1707-1780: 74 pgs of FBI reports as well as additional lab notes

d.  Tamara Wong deposition (~193 pg doc)
e.  Det. Trevor Lefebvre deposition (~133 pg doc)
f.  Chief Goncalves deposition (~100 pg doc)
g.  Maj. Mullen deposition (~77 pg doc)
h.  RIDOH 001-019: 19 pgs including emails, 17 July 19 report from RDOH, FBI report
i.  RIDOH 020-022: 3 pg FBI report dated 10 Jan 89
j.  RIDOH 023-144: 122 pages of Fairfax testing
k.  RIDOH 145: Partial Y-profile w/handwritted info on pants
l.  RIDOH 146-163: 18 pgs final RIDOH DNA report, Serology report from 2010, Fairfax report and tech review forms
m.  RIDOH 164-165-Capillary Electrophoresis Run sheets
n.  RIDOH 166-171-Allele Summary Worksheet and electropherograms

8. I have relied upon my experience, training and education in forensic serology and forensic DNA analysis while reviewing these documents and forming opinions.

9. The sample in question is a purported stain recovered from the purple pants worn by a 10-year-old girl who was found dead a couple months after disappearing from her home in 1988. There were multiple rounds of testing performed by multiple laboratories between 1988 and 2019.

10. From the documentation submitted to me, it appears the first laboratory submission was to the FBI in April 1988.  The FBI lab was requested to examine several items, including the pants referenced in paragraph 9, for any foreign hair or debris.  In a letter dated April 4,1988, to the FBI Director, Chief of Police for the City of Pawtucket Theodore King stated, "THIS EVIDENCE HAS NOT BEEN CONTAMINATED BY ANY SPECIFIC EXAMINATION PROCESS."  The resulting report, dated January 10, 1989, indicated that fibers collected from items Q1 through Q9, which included the pants (Q8), had been preserved for possible future comparisons.

11. There is an additional report authored by Richard A. Guerrieri from the FBI DNA Unit I that was dated January 26, 1998 which discusses results of examinations conducted.  In this report, the FBI analyst indicates that Q8 was examined for the presence of semen and blood, however, **none was found**.

12. The next indication of testing is found on a 'General Evidence Examination Worksheet' that is dated 6-20-08 and documented by Analyst CL (Cara Lupino, from the Rhode Island Department of Health Forensic Biology Unit (RIDOH)). On this page, she notes a hole cut by the FBI on the outer front of the left leg of the pants, so we know this is the same pair of pants previously analyzed at the FBI.  She observed a red/brown stain on the inner crotch of the pants (RIDOH #1.8).  From her notes, it appears she obtained a positive presumptive test for

blood, indicating the stain might be blood, however it also appears she obtained a negative confirmatory test, so it cannot be determined whether the stain was actually blood. There are a number of things that could result in a false positive presumptive test (*e.g.* rust and some vegetation). It is unusual that while the FBI laboratory reported no indication of blood for this item in 1998, there was a purported possible blood stain observed in 2008. I was not provided the FBI case file notes so it is possible either that the FBI had seen a discoloration, tested it, and got negative results, thereby reporting no indication of blood, or that there was no discoloration observed.

13. Cara Lupino went on to test a cutting of the red/brown sample for autosomal DNA. Autosomal DNA is the DNA that is inherited from both your Mother and Father and is unique to each individual, except identical siblings. She issued a report that is dated June 22, 2010, in which Ms. Lupino reports that there was an 'indication' of blood, which could be misleading to lay individuals, because based on her test results she could not say it positively was blood. Trained Forensic Biologists recognize that use of the word, 'indicated' is a trigger that a presumptive test was positive, but that confirmatory tesing was not. When confirmatory tests are positive, an analyst will typically report that blood was 'identified'. She also reported that that the only results she obtained from the autosomal DNA testing was at the Amelogenin locus which is the locus that detects the X and Y alleles (characteristics). She further reports that due to the presence of a Y allele, the item was sent to an outside laboratory, Fairfax Identity Laboratories, for Y-STR DNA analysis.

14. Y-STR DNA testing looks at DNA found only on the male Y chromosome and will ignore all female DNA that may be present in the sample. The Y chromosome is inherited by a son from his father in its entirety. Because of this paternal inheritance, all males in the same paternal lineage will have the same Y-STR DNA profile. This includes, fathers, brothers, uncles, male cousins of an uncle, grandfathers and so on. Not every male lineage has it's own Y-STR DNA profile. Apparently unrelated, distinct male lineages can have the same Y-STR DNA profile and this has been observed in the Forensic field. For this reason, Y-STR results are not nearly as discriminating as autosomal STR DNA profiles. They are even less discriminating if the profile is partial. Y-STR DNA cannot be used to identify a particular individual ever, rather, it can be used to exclude with certainty. If an individual cannot be excluded, one can only conclude that he may be one of a number of possible contributors, including, but not limited to, all his paternal relatives.

15. Fairfax Identity issued a report of the results of their testing that was dated January 13, 2010. The report indicated that they received the extract that had been produced in the RIDOH laboratory and tested that for Y-STRs. They obtained a single source (meaning that the source came from only one individual), partial Y-STR profile. It is unknown what the source of the partial Y-STR profile is from the pants (whether from the stain, from the pants themselves, or from another source). They had used a test kit that analyzed 17 locations (loci) on the Y chromosome and obtained results at only 6 of those.

16. The extract from the deceased's purple pants was again tested by the RIDOH laboratory and was the subject of a report dated March 19, 2019 and authored by Tamara Wong and co-signed by Supervisor, Cara E. Lupino. This testing utilized a kit that analyzed 23 loci on the Y chromosome and the laboratory again obtained a partial Y-STR profile at 12 of the 23 loci. In the conclusions section of the report the laboratory clearly notes that, "Y-STR loci are located on the male specific Y chromosome and are maintained throughout the paternal lineage. Male relatives in the same paternal line will demonstrate the same Y-STR DNA profiles."

17. On July 17, 2019, the RIDOH laboratory received a buccal reference sample from Joao Monteiro and analyzed that sample for both autosomal STR DNA and Y-STR DNA to compare to profiles obtained from various items of evidence previously tested, including the purple pants. The report was issued on the same day, July 17, 2019, and was authored by Tamara Wong and co-signed by Supervisor, Cara E. Lupino. In this report, the author concludes that the partial Y-STR profile obtained from the purple pants (#1.8) is ***consistent with*** (emphasis added) the known reference profile from Joao Monteiro.  They also developed statistics to determine the approximate frequency of occurrence of this partial Y-STR DNA profile and reported that approximately 1 in every 1,909 male individuals would also have this same partial Y-STR DNA profile. The very first paragraph under the heading of "Y-STRs" in the report, again, clearly notes, "Y-STR loci are located on the male specific Y chromosome and are maintained throughout the paternal lineage.  Male relatives in the same paternal line will demonstrate the same Y-STR DNA profiles."

18. From my review of the documentation, all the DNA testing appears to have followed standard testing procedures generally used and accepted during their respective time frames.  Positive and negative controls were employed to ensure the chemicals used were not introducing contamination and that instrumentation and equipment were operating properly.

19. One serious concern with the case is that there does not appear to be any testing of male individuals/family members living in or routinely frequenting the home of the deceased girl.  It is not uncommon to find male DNA from co-habitants on clothing articles.  It is also known that DNA can be transferred to clothing during the washing process.  Because we know that Y-STR DNA profiles are not unique to a specific male lineage, it is important to rule out that the partial profile on the pants originated from a male living in or frequenting the home often.  Anyone working in the field would understand the importance of ruling out this possibility for the reasons identified. In fact, Tamara Wong testified in her deposition (page 86) that she inquired as to whether the deceased girl's step father or or any of his paternal relatives were available to provide a sample so they could determine if that male lineage had the same Y-STR DNA profile as that found on the purple pants.

20. Another serious concern is that, when testing a possible stain (again, it cannot be determined if this discoloration was blood or not) on clothing, you do not know if the resulting profile is from the possible stain or whether it is from background DNA on the clothing. Testing a substrate control sample from the pants for Y-STR DNA would have determine if there was background DNA on the material. A substrate control sample is a separate, unstained area from close to where a stain is, that you would expect to have been exposed to the same conditions as the area of the stain.

21. These pants were collected from the Medical Examiner in 1988 and were sent to the FBI laboratory where they were examined in the Trace Unit for hair, fibers and debris.  Both of these  occurred years prior to clean techniques being implemented in laboratories to prevent DNA contamination and, therefore, there is no way to know if the Y-STR DNA found on the pants was deposited during the handling and/or examination of the pants.

22. Given the circumstances of the evidence, it is impossible to know how the male DNA got on the pants, when the male DNA got on the pants or whether it was from the stain (that may or may not have been blood) or simply on the material below where the stain was found. Additionally, anyone with the education, training, experience, and knowledge of Ms.Wong

would know that the testing of the purple pants did not identify the presence of DNA from Mr. Monteiro, but rather that he, all his paternal relatives, and male individuals in approximately 1 in every 1,909 other paternal lineages could be included as a possible source of the male DNA on the purple pants.

Please feel free to contact me if you have any questions.

Respectfully submitted,

Meghan E. Clement, M.S., ABC-MB

**Curriculum Vitae**

**Meghan E. Clement, MS, D-ABC**

## Education

**1985**    **Master of Science, Forensic Science**
University of New Haven, West Haven, Connecticut
Honors:  Graduate Fellow, 1984

**1983**    **Bachelor of Science, Biology**
Westfield State College, Westfield, Massachusetts
Graduated Cum Laude

## Professional Experience

**FORENSIC SEROLOGY/ DNA CONSULTANT** April 2017-Present
Clement Consulting, LLC
Owner

Provide Forensic Serology and DNA consultation to military and civil attorneys, law enforcement and civilian clients.  Review case files and raw data to assist in understanding the serological and STR, Y-STR or mtDNA testing performed, suggest potential new and/or additional testing if applicable, educate as to what conclusions can and cannot be drawn by the testing results, explain the limitations of testing results and assist with trial preparation as well as cross-examinations.

**CONTRACT LEAD ASSESSOR** December 2018- Present
Lead assessment teams as well as perform technical assessments of laboratories for accreditation by ANSI National Accreditation Board (ANAB).

**DIRECTOR OF OPERATIONS** June 2015- April 2017
Bode Cellmark Forensics, LabCorp Specialty Testing Group
Lorton, VA

Responsibilities:  Oversee all forensic laboratory operations, quality assurance aspects, applied research endeavors and work closely with the General Manager on other aspects of the business, perform case consultations, case reviews and provide expert testimony.

**SENIOR DIRECTOR** July 2012- December 2015
Cellmark Forensics, LabCorp Specialty Testing Group
Dallas, TX

Responsibilities:  Manage the daily responsibilities of laboratory personnel and flow of both contract and independent casework, manage implementation of new tests, participate in analysis of casework and interpretation of results of STR, Y-STR and mtDNA analysis, perform technical reviews and administrative reviews, provide expert testimony, participate in marketing and sales functions.

**TECHNICAL DIRECTOR, FORENSIC IDENTITY** May 2000- July 2012
Laboratory Corporation of America
Research Triangle Park, North Carolina

Responsibilities:  Manage the daily responsibilities of laboratory personnel and flow of casework, as well as implementation of new tests, participate in analysis of casework and interpret results of DNA analysis, prepare reports, provide expert testimony, direct and coordinate marketing and sales functions.

**ASSOCIATE DIRECTOR, FORENSIC IDENTITY** Aug. 1998- May 2000
Laboratory Corporation of America
Research Triangle Park, North Carolina

Responsibilities:  Direct and participate in the DNA analysis of samples submitted to the laboratory, prepare reports of results and provide expert testimony, supervise and direct laboratory technologists and lab clerk positions, direct and coordinate marketing and sales functions.

**ASSISTANT DIRECTOR, FORENSIC IDENTITY** Nov. 1994- Aug. 1998
Laboratory Corporation of America (formerly Roche Biomedical Laboratories)
Research Triangle Park, North Carolina

Responsibilities:  Conduct forensic DNA analysis on biological samples using both RFLP and PCR techniques, oversee and direct the laboratory technologists in the production of forensic DNA casework, prepare reports of results and provide expert testimony, assist in laboratory operations to ensure timely handling of cases and QA/QC measures, assist in the marketing and sales aspects of the Forensic Identity department.

**FORENSIC BIOLOGIST** March 1991 - Nov. 1994
Tarrant County Medical Examiner's Office
Fort Worth, Texas

Responsibilities: Forensic analysis of biological samples using traditional serological techniques as well RFLP DNA profiling, conduct research and validation of new techniques in the forensic biology field, provide expert

testimony, provide training to officer's in various law enforcement agencies concerning the collection and preservation of evidence, crime scene investigation.

**SENIOR CRIMINALIST** March 1985 - March 1991
City of Albuquerque, Police Department, Criminalistics
Albuquerque, New Mexico

Responsibilities:  Assisted in implementing a DNA section including setting up quality control measures and population data bases, as well as performing validation studies, traditional serological analysis, blood/breath alcohol concentration analysis, provide expert testimony, crime scene investigation, train new personnel, officers and detectives.

**TEACHING ASSISTANT, FORENSIC SCIENCE** Sept. 1984- Mar. 1985
University of New Haven, West Haven, Connecticut

Responsibilities:  Assist in teaching serological techniques to graduate students in the Criminalistics laboratories, assist in research projects being conducted.

**TEACHING ASSISTANT, BIOLOGY** Sept. 1983 - Sept. 1984
University of New Haven, West Haven, Connecticut

Responsibilities:  Set up and assist in teaching various biology laboratories to undergraduate students.

**FORENSIC SCIENCE INTERNSHIP**   August 1984
New Mexico State Police Crime Laboratory,
Santa Fe, New Mexico

Observed and participated in case analysis under the supervision of New Mexico State Police forensic analysts in the serology, trace, drugs and firearms sections.

## Affiliations

American Academy of Forensic Sciences, Member

American Society of Crime Laboratory Directors, Retired Member

ANAB Lead Assessor

## Expert Testimony and Depositions

Testified 380+ times in 33 states

Testified in Military, Federal, State and County courts

| Forensic Laboratory Experience | Qualified |
|---|---|
| • RFLP | 1989 |
| • PCR Analysis and Interpretation | 1990 |
| • DQ Alpha + Polymarker Testing | 1995 |
| • Paternity Testing | 1995 |
| • Mitochondrial DNA Analysis | 1997 |
| • Commercial Kit STR Analysis | 2002 |
| • Y-STR Analysis | 2003 |

## Board Certifications

Molecular Biology - American Board of Criminalistics (ABC)

## Publications and Oral Presentations

Budowle, B., Monson, K., Anoe, K.S., Baechtel, S., Bergman, D.L., Buel, E., Campbell, P.A., Clement, M.E. et al (1991) A Preliminary Report on Binned General Population Data on Six VNTR Loci in Caucasians, Blacks and Hispanics from the United States. Crime Lab Digest 18:9-26.

Validation of Multiplex STR Profiling Systems for Forensic Casework Specimens
American Academy of Forensic Sciences, Feb. 1998

Developing a DNA Laboratory on a Shoestring Budget
Southwestern Association of Forensic Scientists, Spring Meeting 1991

## Continuing Education

Feb 2021    ***AAFS Annual Meeting***, Virtual

March 2020  ***2020 Quality Assurance Standards (QAS) Training***

July 2019   ***Green Mountain Conference***, Burlington, VT

July 2018   ***Green Mountain Conference***, Burlington, VT

Feb 2018    ***AAFS Workshops: Moving from CPI to Probabilistic Genotyping for DNA Mixtures and Proposed Revisions to the FBI QA Standards***, Seattle, WA

Feb 2017    ***AAFS Annual Meeting***, New Orleans, LA

| | |
|---|---|
| Sept 2016 | ***International Symposium on Human Identification,*** Minneapolis, MN |
| Oct 2015 | ***International Symposium on Human Identification,*** Grapevine, TX |
| Feb 2015 | ***AAFS Annual Meeting***, Orlando, FL |
| Sept 2014 | ***Genome ID Forum***, Greensboro, NC<br>***Forensic Genomic Applications*** |
| May 2014 | ***ASCLD Annual Meeting***, Scottsdale, AZ<br>***Workshop-Solving Mixtures Genome-wide: Practical, Measureable Solutions*** |
| Feb 2014 | ***AAFS Annual Meeting***, Seattle, WA |
| Oct 2013 | ***International Symposium on Human Identification***, Atlanta, GA |
| Feb 2013 | ***AAFS Annual Meeting***, Washington, DC |
| June 2012 | ***2012 NIJ Meeting***, Arlington, VA |
| Feb 2012 | ***AAFS Annual Meeting***, Atlanta, GA |
| Oct 2011 | ***Mixture Interpretation Workshop-Promega International Symposium on Human Identification,*** National Harbor, DC |
| Nov 2011 | ***CODIS Meeting,*** Jasonville, FL |
| Feb 2010 | ***AAFS Annual Meeting***, Seattle, WA |
| Aug 2009 | ***HID Future Trends in DNA Technology***, Applied Biosystems, Richmond, VA |
| Ape 2009 | ***FBI DNA Auditor's Refresher Training,*** Raleigh, NC |
| Feb 2009 | ***AAFS Annual Meeting***, Denver, CO |
| July 2008 | ***NIJ Meeting,*** Arlington, VA |
| Feb 2007 | ***AAFS Annual Meeting***, San Antonio, TX |
| Aug 2006 | ***AFDAA Summer Meeting***, Austin, TX |
| May 2006 | ***ABI Human Identity University,*** Research Triangle Park, NC |

| | |
|---|---|
| Feb 2006 | ***AAFS Annual Meeting***, Seattle, WA |
| Jun 2005 | ***6th Annual DNA Grantees Workshop,*** Arlington, VA |
| Apr 2004 | ***FBI DNA Auditor's Training,*** Quantico, VA |
| Feb 2004 | ***AAFS Annual Meeting***, Dallas, TX<br>***Forensic Human mtDNA Analysis Workshop*** |
| Oct 2003 | ***International Symposium on Human Identification,*** Phoenix, AZ<br>***Making Sense of Popstats Workshop*** |
| Apr 2003 | ***ASCLD/LAB-Laboratory Inspector Training Course,*** Raleigh, NC |
| Feb 2003 | ***AAFS Annual Meeting***, Chicago, IL<br>***Low Copy Number DNA Analysis Workshop*** |
| Jun 2002 | ***DNA Grantees Workshop***, Arlington, VA |
| Oct 2001 | ***7th Annual CODIS User's Conference,*** Arlington, VA |
| Feb 2001 | ***AAFS Annual Meeting,*** Seattle, WA |
| Feb 2000 | ***AAFS Annual Meeting,*** Reno, NV |
| Oct 1999 | ***NIJ Meeting,*** Arlington, VA |
| Apr 1998 | ***Mitochondrial DNA Analysis and Data Basing,*** presented by Mark Wilson and Clint Stauffer |
| Feb 1998 | ***AAFS Annual Meeting,*** San Francisco, CA |
| Sept 1997 | ***International Symposium on Human Identification,*** Phoenix, AZ |
| Feb 1997 | ***AAFS Annual Meeting,*** NYC, NY |
| Oct 1996 | ***English Speaking Working Group International Society for Forensic Haemogenetics*** |
| Sept 1996 | ***International Symposium on Human Identification,*** Phoenix, AZ |

## Specialized Schools and Training

| | |
|---|---|
| Nov 2018 | ***ANAB LEAD ASSESSOR TRAINING***<br>Denver, CO |

Dec 2011       **ASCLD/LAB TECHNICAL ASSESSOR REFRESHER TRAINING (June 2011 revision-on line training)**

Apr 2009       **DNA AUDITOR REFRESHER TRAINING,** Presented by the FBI, Research Triangle Park, NC

Jan 2006       **ASCLD/LAB-International ASSESSOR TRAINING COURSE,** Houston, TX

Apr 2004       **DNA AUDITOR TRAINING,** FBI Academy, Quantico, VA

Apr 2003       **ASCLD-LAB INSPECTOR TRAINING,** Raleigh, NC

Mar 1995       **FORENSIC AMPLITYPE PM + HLA DQA1 PCR WORKSHOP,** Perkin-Elmer Training Dept., Foster City, CA

June 1991      **ADVANCED FORENSIC DNA TYPING SCHOOL,** FBI Academy, Quantico, Virginia

Mar-Jun 1990  **VISITING SCIENTIST PROGRAM,** FBI Academy, Quantico, Virginia

               Assisted in numerous DNA research projects being conducted by the FBI Research and Training Center including data base compilation, ethidium bromide use in DNA analysis, quantitation of human DNA using slot blot techniques, effect of glycerol concentration on DNA, studies on possible ladders for amplified fragment length polymorphisms (amp-FLPs)/variable number tandem repeats (VNTRs), and population data base compilation of amp-Flp MCT118.

Dec 1989       **FORENSIC APPLICATIONS OF DNA TYPING,** FBI Academy, Quantico, Virginia

Fall 1988       **MOLECULAR GENETICS AND FORENSIC SCIENCE,** University of New Mexico, Albuquerque, New Mexico

May 1988       **DNA POLYMORPHISM AND DNA TYPING COURSE/WORKSHOP,** University of New Haven, West Haven, Connecticut

# Clement Consulting, LLC



# Fee Schedule*

| <u>Service</u> | <u>Price</u> |
|---|---|
| **Forensic Case Reviews / Consultations** | **$ 250.00 per hour or portion thereof** |
| **Depositions** | **$ 250.00 per hour or portion thereof** |
| **Affidavit Preparation** | **$ 250.00 per hour or portion thereof** |
| **Expert Testimony/Pre-Trial/Court Appearance** | **$ 2000.00 per day plus expenses** |
| **Travel time** | **$ 2000.00 per day#** |

*\* Prices Effective 1 June 2019*
*\# Travel less than 200 miles billed at $250.00/hr*

DUNS #: 080585146
Cage Code: 7U6W0
EIN: 82-0593096

# Testimony Over the Past Four Years

| Date | Case | County |
| --- | --- | --- |
| 2018.10.13 | NC v Spruill and Jones (NC Innoc. Inq. Comm) | Wake Co.-Innoc. Inq. Commission hearing, NC |
| 2018.11.29 | US v Mercado (Courts Martial) | US Army, Ft. Bragg, NC |
| 2018.12.17 | US v Antiwan Henning (Motion hearing) | US Army, Ft. Leavenworth, KS |
| 2019.06.05 | NC v Merritt Williams (NC Innoc. Inq. Comm) | Wake Co.-Innoc. Inq. Commission hearing, NC |
| 2019.09.09 | NC v Evans (NC Innoc. Inq. Comm) | Wake Co.-Innoc. Inq. Commission hearing, NC |
| 2019.09.10 | Darryl Howard v. City of Durham (Deposition) | US Middle District of NC |
| 2019.10.15 | Matthew Van Hofwegen v. Officer Joseph Steiner (Deposition) | US Disctrict Court of Minnesota |
| 2019.12.18 | US v Antiwan Henning (Courts Martial) | US Army, Ft. Leavenworth, KS |
| 2020.01.03 | US v Castro (Motions hearing) | US Army, Ft Eustis, VA |
| 2021.01.28 | US v Brugh (Motions hearing) | US Army, Ft Shafter, HI |
| 2021.05.14 | US v Salcedo (Courts Martial) | US Army, Ft Campbell, KY |
| 2021.09.24 | Commonwealth v. Guy Marcus Allen | Jefferson County, KY |
| 2021.11.09 | Darryl Howard v. Darrell Dowdy | US Middle District of NC, Winston-Salem, NC |

# EXHIBIT 6

**PAWTUCKET POLICE DEPARTMENT**

**COMPLAINT REPORT**

| 3. COMPLAINT/OFFENSE RPT. | 4. UCR CLASS | 5. CB. NO. |
|---|---|---|
| Missing Person | 2610 | 88-00837 |

| 6. HOME PHONE No Phone | 7. TIME/DATE RPT'D. | 8. DAY | 9. TAB |
|---|---|---|---|
| BPC PHONE | 2044 HRS 6JA | Wed | 7-7 |

| 1. CODE | 2. PERSON/FIRM/ORGANIZATION CONCERNED | 10. D.O.B. | 11. TIME/DATE OCCURRED |
|---|---|---|---|
| C | Cole Margert. | | 1600 HRS 6JA & 2044 HRS 6JA |

| 12. | CITY Pawt | STATE RI | 13. TYPE OF ENTRY |
|---|---|---|---|
| | | | ☐ UNLAWFUL   ☐ FORCED   ☐ NO FORCE   ☐ ATTEMPT |

| 14. | ☐ ST.  ☐ GAS STA.  ☐ CONV. STORE  ☐ DRUG STORE  ☐ LIQUOR STORE  ☐ BAR  ☐ BANK  ☐ SCHOOL  ☒ RESIDENTIAL  ☐ OTHER COMM. |
|---|---|

| 15. LOCATION OF OFFENSE | 16. POINT OF ENTRY: ☐ FRONT DOOR  ☐ REAR DOOR  ☐ SIDE DOOR  ☐ WINDOW  ☐ UNK.  ☐ OTHER | 17. TOOL USED AGAINST PROP. |
|---|---|---|

| 18. WEAPON OR FORCE: ☐ NONE  ☐ HANDGUN  ☐ OTHER GUN  ☐ KNIFE  ☐ STRONGARM  ☐ HANDS, FIST, FEET  ☐ DNA | 19. I.D. PHOTOS  ☐ YES  ☐ NO |
|---|---|

| 20. DESCRIBE WEAPON: | CAL. GUN | MAKE | MODEL | LENGTH | COLOR | 21. EVIDENCE LOCATED: |
|---|---|---|---|---|---|---|

| 22. QTY. | LOSS | ARTICLE(s) | BRAND NAME | SERIAL NO. | DESCRIPTION | VALUE |
|---|---|---|---|---|---|---|
| | | | | | | |

| 23. YR. VEH. | 24. MAKE | 25. MODEL | 26. | COLOR TOP / BOTTOM | 27. REG. NO. | 28. STATE | 29. YR. | 30. VIN. NO. |
|---|---|---|---|---|---|---|---|---|

| 31. VEH. TOW ☐ YES ☐ NO | 32. TOWED BY | 33. OWNER NOTIFIED ☐ YES ☐ NO BY | 34. TIME/DATE NOTIFIED HRS. | 35. BEING HELD FOR | 36. TT. NO. RAD. NO. 34 CANC. TT / CANC. RAD. |
|---|---|---|---|---|---|

| 37. SUSPECT(s) ☐ ARREST(s) ☐ X Missing (Last, First Middle) | 38. AKA | 39. CELL | 40. RACE | 41. SEX | 42. AGE | 43. DOB | 44. HGT | 45. WGT | 46. EYES | 47. HAIR | 48. COMPLX | 49. BLD. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cole Christine A | Chris | | W | F | 10 | 1-4-78 | 4'6 | 70 | Bro | Bld | M | S |

| 50. | CITY Pawt | STATE RI | 51. SCHOOL/EMPLOYED Baldwin St | 52. CLOTHING WORN: Purple Pants Purple sweater Purple Jacket Blue winbreaker |
|---|---|---|---|---|

| 53. SUSPECT(s) ☐ ARREST(s) ☐ (Last, First, Middle) Has Birth mark under Right Eye | 54. AKA | 55. CELL | 56. RACE | 57. SEX | 58. AGE | 59. DOB | 60. HGT | 61. WGT | 62. EYES | 63. HAIR | 64. COMPLX | 65. BLD. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| 66. ADDRESS | CITY | STATE | 67. SCHOOL/EMPLOYED: | 68. CLOTHING WORN: |
|---|---|---|---|---|

| 70. WITNESS(es) | (Last, First, Middle) | ADDRESS | 71. RACE | 72. SEX | 73. AGE | 74. HOME PHONE BPC PHONE | 75. SCHOOL/EMPLOYED |
|---|---|---|---|---|---|---|---|

**76. NARRATIVE/SUMMARY:** Above Pardy Sent her Daughter to Red's Seafood on MSA at 500pm Christine was Seen at 700pm on Main st Near the Lil General store Mrs Cole stated that Christine has Run away Befor The house was Checked with Neg. Results. Christine had #1000 in Food stamps with her

| 77. COMPLAINANT'S SIGNATURE X Marguret J Cole | 78. REPORTING OFFICER Provost | BADGE NO. #92 | 79. SUPERIOR APPROVING Capt Kennell Carson | 80. REPORT REVIEW OFFICER Cpt. |
|---|---|---|---|---|

ORIGINAL

Pawtucket Defendants - Supplemental 1st RFP - 002129

**PAWTUCKET POLICE DEPARTMENT**

| 1. CONTINUATION: | PAGE _2_ OF _2_ PAGES | | | 2. TAB 7-7 | 3. DAY wed | 4. UCR CLASS 2610 | 5. CR. NO. 00837 |
|---|---|---|---|---|---|---|---|

| 6. CODE C | 7. NAME (Last, First, Middle) COLE MARGuT | | 8. SEX | 9. RACE | 10. AGE | 11. HGT | 12. WGT | 13. HAIR | 14. EYES | 15. COMPLX | 16. BLD. | 17. DOB |
|---|---|---|---|---|---|---|---|---|---|---|---|

| 18. ADDRESS | CITY PawT | STATE R I | 19. SCHOOL/EMPLOYED | | 20. PHONE NO. | 21. BPC PHONE |
|---|---|---|---|---|---|---|

| 22. FOLLOW-UP: | CHANGE UCR CLASS FROM ~~Missing Person~~ | TO | 23. RELATED RPT. NO.(s) | 24. NON-RESIDENT STATEMENT | YES | NO |
|---|---|---|---|---|---|---|

| BY | | | | | | |

25. NARRATIVE

Christine went to Reds for milk and some Seafood. CAR 107
CAR 110 and 115 + 140 were in the Acra looking for Christine
we Checked Several homes in the Acra with Neg Results
Christine has Run Away Befor But Always Returned home
by 1100pm. See Pitcher that was left with Report. C.F
Police was Notified Det Lappiere found a Report from 85
#85-51209 witch was the Same Person Investigation to
be turned over to Youth ~~Bereau~~

        THIRD PLT ALERTED

| 26. CASE STATUS: | ☐ SUSPENDED | ☐ INACTIVE: | ☐ CLOSED BY ARR & PROS | ☐ ARR NO. PROS. | ☐ ADMIN. | ☐ UNFOUNDED | ☐ COMP. WITHDRAWN | ☐ OTHER |
|---|---|---|---|---|---|---|---|---|

| 27. TIME 2044 | 28. DATE 6JA | 29. REPORTING OFFICER Provost | BADGE NO. #92 | 30. SUPERIOR APPROVING | 31. REPORT REVIEW OFFICER Cpt. |
|---|---|---|---|---|---|

ORIGINAL

Pawtucket Defendants - Supplemental 1st RFP - 002130

# EXHIBIT 7

WARWICK POLICE DEPARTMENT

<u>CHECK ONE OF THE FOLLOWING BOXES</u>

STATEMENT OF COMPLAINING WITNESS----☐

STATEMENT OF DEFENDANT--------------☐

STATEMENT OF WITNESS----------------☐

POLICE OFFICER STATEMENT-------------☒

CR #  88-03748

TIME:  1035 hours

DATE:  2/28/88

PLACE: Warwick Police Dept.

I, Sgt. JD Hornoff/ Det. Brandreth                    ,voluntarily,

without threats or promises, make the following statements.

Q.   What is your name?

A.   _____

Q.   What is your present address?

A.   Warwick Police Department

Q.   What is your date of birth?

A.   _____

Q.   What is your occupation?

A.   Investigators

Re. Unidentified victim located on the northerly side- Conimicut Point Beach, Warwick, R.:
CR#88-03748 hours   2/28/88  0755 hours
Complainant:  George G. Guzewicz, ███████████████, Warwick, R.I.

At approximately 0820 hours, 2/25/88, Sgt. Hornoff and Det. Brandreth of the Major Crime
Unit were notified to return to work concerning the discovery of an unknown victim
located on the northerly side of Conimicut Point beach.  The victim was located face down
in wet sand, and the high tide water mark on the beach was approximately ten feet beyond
the victim(inland).  High Tide was at 0456 hours on this date, according to the National
Weather Service.

Also responding, or present at the Crime Scene were the following personnel:
Chief Wesley Blanchard
Commander Mulhearn
Uniform Captain Robert Armstrong
Detective Captain Roger Burlingame
Det. Sgt. Pierce
Sgt. Dufresne
Det. Noviello
Det. Ainsworth
Det. Eastman
Patrolmen Lewis/James Gardiner/Boragine
BCI Detectives:  James Ellis and William C. Reynolds

Medical Examiners Office:  Doctor Garrity/ Dr. Kristen Sweeney

Dr. GArrity responded initially and pronounced the body at 0905 hours this date.  The
victim was badly decomposed with skeletal facial features.  The victim was very small
                                                                                    S18

Statement taken by: _____

SIGNATURE
_____
13

Witnesses:  _____

_____

Pawtucket Defendants - Supplemental 1st RFP - 002234

# EXHIBIT 8

Pawtucket Defendants - Supplemental 1st RFP - 002240

Date Sent ___March 5, 1988___

Case No. ___00-24-88-A___

# OFFICE OF THE MEDICAL EXAMINER
### DEPARTMENT OF HEALTH
#### 48 ORMS STREET
#### PROVIDENCE, R. I. 02904
#### (401) 274-1333

Sent To:

Pawtucket Police Department

~~Warwick Police Department~~
   (Please send incident report.)

Attorney General's Office

## CAUSE OF DEATH

Christine Cole    10 4/F

NAME OF DECEDENT   (First) _____ (Last) _____   AGE | SEX | RACE
                                Pawtucket, Rhode Island

USUAL RESIDENCE   (Number and Street) _____ (City or County) _____ (State)
                  Conimicut Point Beach, Warwick        1/28/88--9:03 a.m.

PRONOUNCED   (Where) _____ Conimicut Point Beach (Date and Time) _____   1/28/88--7:30 p.m.

INCIDENT OCCURRED OR FOUND DEAD   (Where) _____ (Date and Time)

**AMENDED:  July 15, 1988**

Cause of death determined by investigation and:  ☐ Inspection  ☐ Autopsy  RECEIVED
                  Asphyxia with submersion

JUL 25 1988

Other significant findings: _____

POLICE DEPT.
CITY OF WARWICK

Manner of death: _____ XXXXXXXXx Amended to: Undetermined

If Pending: _____ Further Investigation, Studies, etc.
   (Reason)

_____ Deputy Chief Medical Examiner

LAW ENFORCEMENT AGENCY:  Please send investigation report. ☐  Please call this office. ☐  RECEIVED
                  Further investigation needed. ☐
HOSPITAL:  Please send hospital record. ☐  Autopsy Report. ☐  Surgical Path. Report. ☐
   Doctor's Dictated Surgical Report. ☐

JUL 25 1988

OTHER: ☐

POLICE DEPT.
CITY OF WARWICK

# EXHIBIT 9

**RHODE ISLAND DEPARTMENT OF HEALTH**
**MEDICAL EXAMINER CERTIFICATE OF DEATH**

PHYSICIANS MUST COMPLETE SHADED AREAS ONLY. FUNERAL HOME MUST COMPLETE UNSHADED AREAS.

LOCAL FILE NUMBER   88-204

STATE FILE NUMBER

**DECEDENT** — Instructions on Reverse Side. TYPE OR PRINT IN BLACK INK.

1. DECEASED — FIRST NAME / MIDDLE / LAST: **Christine Anne COLE**
2. SEX: **Female**
3. DATE OF DEATH (Month, day, year): **February 28, 1988** (found)

4a. HOSPITAL OR OTHER INSTITUTION — NAME (If not in either, give street and number): **Conimicut Point Beach**
4b. CITY, TOWN, OR LOCATION OF DEATH: **Warwick**

5a. AGE — LAST BIRTHDAY (Years): **10**
5b. UNDER 1 YEAR MOS. / DAYS:
5c. UNDER 1 DAY HOURS / MIN.:
6. DATE OF BIRTH (Month, day, year): **Jan. 4, 1978**
7. BIRTHPLACE (City and State or Foreign Country): **Providence, R.I.**
8. WAS DECEDENT EVER IN U.S. ARMED FORCES? (Specify Yes or No) NAME WAR: **No**

9a. RACE — Am. Indian, Black, White, etc.: **White**
9b. ETHNIC ORIGIN — Cuban, Mexican, P. Rican, Hmong, Laotian, etc. (Specify): **Irish American**
10. MARRIED, NEVER MARRIED, WIDOWED, DIVORCED: **Never Married**
11. SPOUSE (If wife, give maiden name): **- - - -**

12. SOCIAL SECURITY NUMBER: ▉▉▉
13a. USUAL OCCUPATION (Give kind of work done during most of working life, Do NOT use retired): **Student**
13b. KIND OF BUSINESS OR INDUSTRY: **Elementary School**

14a. RESIDENCE ADDRESS (House number, street name): ▉▉▉ue
14b. CITY OR TOWN OF RESIDENCE, STATE & ZIP CODE: **Pawtucket**

15. MAILING ADDRESS — If different from residence address in item above (P.O. Box, RR, City/Town or Village, State, Zip Code)

**PARENTS**

16. FATHER — FIRST NAME / MIDDLE / LAST: **Robert Cole**
17. MOTHER — FIRST NAME / MIDDLE / MAIDEN NAME: **Margaret Salisbury**

18a. INFORMANT — NAME: **Mrs. Margaret Cole**
18b. MAILING ADDRESS (Street or R.F.D. Number, City or Town, State, Zip Code): ▉▉▉ **Pawtucket, R.I. 02860**

**DISPOSITION**

19a. BURIAL, CREMATION, DONATION, OTHER (Specify): **Burial**
19b. PLACE OF DISPOSITION (Name of cemetery, crematory, or other place): **St. Ann's Cemetery, Cranston, R.I.** CITY OR TOWN

20a. SIGNATURE OF FUNERAL HOME LICENSEE: *[signature]*
20b. FUNERAL HOME — NAME: **Lachapelle Funeral Home**
20c. FUNERAL HOME/DIR. LICENSE NUMBER: **338**
20d. FUNERAL HOME (Street or R.F.D. Number, City or Town, State, Zip Code): **643 Main Street, Pawtucket, R.I. 02860**

**MEDICAL EXAMINER**

Requires the physician cause of death to be PRINTED in BLACK INK. Signatures must also be in BLACK INK.

21a. On the basis of examination and/or investigation, in my opinion death occurred at the time, date and place and due to the cause(s) state.
*[signature]* Kristin G. Sweeney, M.D.

21b. DEGREE OR TITLE:
IF HOSP. OR INST. indicate DOA, OP/Emer. Rm., Inpatient (Specify): 21h.
21c. HOUR OF DEATH (if unknown, so state): **unknown**
21d. DATE SIGNED (Month, day, year): **March 4, 1988**
21e. R.I. LICENSE NUMBER: **6376**
21f. PRONOUNCED DEAD (Month, day, year): **Feb. 28, 1988**
21g. PRONOUNCED DEAD (Hour) AT: **9:05 a.m.**

21h. NAME OF MEDICAL EXAMINER (Type or Print): **Kristin G. Sweeney, M.D.**
21i. ADDRESS OF MEDICAL EXAMINER: **48 Orms Street, Providence, Rhode Island 02904**

**REGISTRAR**

22a. REGISTRAR (Signature): *[signature]* Jennie A. Serecchia
22b. FILE DATE — DATE RECEIVED BY REGISTRAR (Month, day, yr.): **MAR 16 1988**

**CAUSE OF DEATH** — INSTRUCTIONS OTHER SIDE.

23. PART I. Enter the diseases, injuries, or complications that caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest, shock or heart failure.

Approximate Interval Between Onset and Death

IMMEDIATE CAUSE (Final disease or condition resulting in death) a. **Asphyxia with submersion**
DUE TO (OR AS A CONSEQUENCE OF):
b. DUE TO (OR AS A CONSEQUENCE OF):
c. DUE TO (OR AS A CONSEQUENCE OF):
d.

Sequentially list conditions, if any, leading to immediate cause. Enter UNDERLYING CAUSE (Disease or injury that initiated events resulting in death) LAST.

PART II. Other significant conditions contributing to death but not resulting in the underlying cause given in Part I.

23a. AUTOPSY (Yes or No): **Yes**
23b. If yes, were findings considered in determining cause of death: **Yes**

24a. ACC., SUICIDE, HOM., UNDET. (Specify): ***Undetermined** 24b. DATE OF INJURY (Mo., day, yr.): ***Unknown**  HOUR OF INJURY: ***Unknown**  DESCRIBE HOW INJURY OCCURRED: ***found submerged in water**

24d. INJURY AT WORK (Yes or No): ***No**  PLACE OF INJURY — At home, farm, street, factory, office building, etc. (Specify): ***Unknown**  LOCATION STREET OR R.F.D. NUMBER / CITY OR TOWN / STATE

*AMENDED 7-20-88
Authorization No. 88-1407

MAR 23 1988

R.I. Law requires Funeral Director to file this certificate with the City or Town Clerk at the Place of Death within 7 days.

Rev. 1-88



# EXHIBIT 10



# CITY OF PAWTUCKET
PAWTUCKET, RHODE ISLAND 02860

PAWTUCKET POLICE DIVISION



RICHARD E. DeLYON
CHIEF OF POLICE

ROBERT E. METIVIER
MAYOR

**September 5, 1996**

The Honorable Louis Freeh
Director
Federal Bureau of Investigation
9th & Pennsylvania Ave.
Washington, DC 20535


ATTN: FBI Laboratory & Identification Division

RE:   Pawtucket, RI  PD Report: 88-00837
      FBI Case No.: 7A-BS-79090


Suspect:   Richard J. Graves
           W/M 5'10" Eyes: Blue   Hair: Brown
           dob: █████████
           NCIC III No. 587726JA5
           Fingerprint Class:        26   63   20   20   16
                                     17   66   15   20   09


Dear Sir:


**Enclosed is a list of items for examination by the FBI Laboratory.**  This examination is being requested pursuant to a homicide investigation.  In reply please refer to the above captioned report number and forward further communication to Det. Todd Stonely.

## Investigative Summary

1.  On January 6, 1988 the Pawtucket Police Dept. initiated an investigation into the disappearance of 10 year old Christine Cole.  Cole was sent to the store by her parents to purchase some clams and a gallon of milk.  Cole was given $10.00 in food stamps to make this purchase.  Investigation revealed that Cole did purchase clams and a gallon of milk, wit the food stamps prior to disappearing.  An extensive investigation was conducted by the Pawtucket Police and the Providence office of the FBI.  The investigation was headed by Lt. John Haberle and Det. Joseph Corey of the Pawtucket Police.

Pawtucket Defendants - Supplemental 1st RFP - 001719

2.   On February 29, 1988, the body of Christine Cole washed up
     from Narragansett Bay onto Conimicut Beach in Warwick, RI,
     after being in the water for some 55 Days.  The body was
     fully clothed with the exception of shoes and underwear.
     Within a few days of the victim being discovered, a full
     gallon of milk washed up on the beach at Fort Adam's State
     Park in Newport, RI. .  The container bore the markings of
     the "Salois Dairy", a local Pawtucket dairy that services
     the stores that the victim was last seen in, however, it
     could never be determined if that container of milk was in
     fact the container of milk that the victim purchased.

     The medical examiner ruled the cause of death to be
     "Asphyxia with Submersion", the manner of death is currently
     listed as undetermined.  At this time several items were
     submitted to the FBI Laboratory for analysis, they included
     all of the clothing found on the body, some sand samples
     taken from the area where the body washed ashore and head
     hair samples taken from the victim.  The results of this
     examination revealed two hairs on the victim's sweater and
     blouse that were unlike the hairs from the known sample of
     Christine Cole's hair.  Other material fibers were also
     seized and have been preserved for comparison purposes.
     These items were then returned to the Pawtucket Police
     Dept..

3.   In May of 1988 the victim's mother, Margaret Cole, received
     a sympathy card and a hand written letter from Richard
     Graves.  The note expressed concern about what had
     apparently happened to Christine and stated that Graves "was
     praying for definite insight into what had happened".  Graves
     stated further that he was going to leave some flowers on
     the victim's grave.  After being made aware of this letter,
     Det. Corey went to the grave site at St. Ann's cemetery in
     Cranston, RI and recovered a vase of plastic flowers and a
     second hand-written note addressed to Christine Cole and
     signed by Rich Graves.

     Concurrent with these events, the Lexington, Mass. PD was
     concluding an investigation into a series of child rapes in
     their jurisdiction.  The target of this investigation was
     Richard Graves.  Graves was arrested in his room at the
     Maynard Motel in Maynard Mass..  At the time of his arrest,
     police found a newspaper clipping (photo) of Christine Cole
     and a hand-written note with some phone numbers and burial
     information regarding Christine Cole.

4.   In June of 1996 the case was reassigned due to the
     retirement of Det. Corey.  Upon review it was learned that
     prior to his arrest Graves lived with the Oulighan family in

3

Concord, Mass.  The Oulighans were contacted and it was
learned that they still had maintained all of Graves
belongings and that they had them stored on their property.
Detectives from the Pawtucket Police Dept. and members of
the FBI went to Concord and retrieved the items.  Police
took possession of some 72 boxes of clothing and personal
items belonging to Richard Graves.

In August of 1996 the Pawtucket Police along with the
assistance of an FBI Evidence Response Team, searched the
boxes and retrieved some 200 items for submission to the FBI
Laboratory for examination by Hair/Fibers, Hand-Writing and
Fingerprint sections.

5.    This investigation is being conducted with the assistance of
the FBI's Child Abduction Serial Killer Unit.  During the
course of this investigation several links have been made to
ongoing investigations of similar nature in Massachusetts.

The Massachusetts State Police and the FBI have current open
cases on the following missing children:

- ███████ W/F ████████

  Last seen on 10-9-85 in Wayland, Mass. ██████ was
  last seen wearing blue jeans, a white sweater,
  white high-top sneakers. ██████ was last seen with
  a "walkman" type radio with silver headphones with
  black foam earpieces.

- ████████████ W/F ████████

  Last seen on 8-13-85 in Stow, Mass. Last seen
  wearing pale blue jeans, red/white/blue
  horizontally striped shirt, "spoon ring" on thumb
  and silver chain link bracelet and a rope
  mariner's bracelet.

# EXHIBIT 11

7-1a (7-16-96)

  

# FEDERAL BUREAU OF INVESTIGATION
## WASHINGTON, D. C. 20535

### Report of Examination

| | |
|---|---|
| Examiner Name: Max M. Houck | Date: ==January 2, 1998== |
| Unit: Trace Evidence | Phone No.: 202-324-4347 |
| FBI File No.: 7A-BS-79090 | Lab No.: 60919091 S/I GX HE BT<br>70213040 S GX |

Results of Examinations:

No head hairs like the K1 or K7 hairs were found in the debris removed from the items submitted from the suspect or the gravesite.

It was not possible to distinguish a suitable hair sample for the suspect from the clothing items submitted. Therefore, ==no determination could be made as to the possible origin of the head hairs previously found on specimens Q2 and Q3.==

No apparent textile fiber transfers were detected between items submitted from the victim and the subject or the gravesite.

TEU - Page 1 of 1

Pawtucket Defendants - Supplemental 1st RFP - 001715

This Report Is Furnished For Official Use Only

# EXHIBIT 12

NARRATIVE FOR DET. SERGEANT RICHARD T STONELY

Ref: 88-00837-OF

2/8/08: This case is re-opened to effect a re-examination of physical evidence using current forensic technologies. Myself and Lt. Whalen inventoried all the physical evidence and re-cataloged it.

2/26/08: Met with Robin Smith, Director of the Forensic Biology unit at the DOH Lab. I provided her with copies of lab reports and findings from the FBI examinations conducted in 1996 along with an investigation summary. Smith expressed concern regarding the state of the evidence and how it had been stored over time and also the fact that the vicitm had been immersed in salt water for so long. (Prolonged exposure of biological material in salt water degrades DNA.)

During this meeting, we identified several items that would most likely be probative to linking Richard Graves to Christine Cole. The following items were transferred from Pawt. PD to health dept. for analysis:

1. CS-1 (Q1) a paper fold containing a fabric cutting of a blood stain from the vicitm's jacket.

2. CS-2 Victim's purple pants.

3. CS-5 Paper fold containing vicitm's head hair.

4. K-10 Dried blood sample of Richard Graves.

5. K-11 and K-12 Dried blood sample from "gray top" tube belonging to Richard Graves.

3/5/08: Spoke with AAG Randy White and advised that we had submitted items for re-examination in this case. a meeting at a later date will be scheduled with him if need be to discuss this case at length.

9/22/08: Received report from health dept. advising that the items submitted were examined and that due to thier current condition no DNA profile was able to be developed from them, which precludes further tests to try and match them. These items will be returned to the police dept.

Due to the lack of physical evidence available, this case will be CLOSED, until such time that new information develops.

3/17/10: Received call from AAG Paul Daley, requesting materials on this investigation, so that a thorough evaluation of physical and other evidence can be undertaken. Advised AG that we would compile the information and forward it to them.

Case status will remain CLOSED until advised by AG that further action is warranted.

11/26/2010: Call to MCI -Norfolk, spoke with Sgt. Mike O'Malley (508-660-5900 x255) and inquired as to the status of Richard Graves. Graves is scheduled to be released on expiration of sentence in 2019. O'Malley was briefed on the background of our investigation. He stated that he would conduct a covert cell search to see if there is any evidence or writing that would be of interest to us.

# EXHIBIT 13

PERSONNEL NARRATIVE FOR DETECTIVE SUSAN CORMIER
Ref: 88-00837-OF

**\*\* This narrative is ongoing.  Do NOT print or release. \*\***

In March 2018, I (Det. Susan Cormier) was assigned to the newly formed Cold Case Unit for the Pawtucket Police Department.  Part of my responsibilities in that unit were to organize the unsolved homicide cases, determine solvability factors, if any, and to further investigate the cases. I began to put binders together for all of the Pawtucket Cold Cases, to include the Christine Cole homicide.  These binders contained all of the neccessary reports, photographs, witness statements, etc to successfully work on these cases.

In July 2018, I reopened the Christine Cole case and began to familiarize myself with the basic facts of this case.  I also contacted Dr. Jeff Araujo of the Central Falls Police to discuss the possibility of meeting in the near future to make any possible comparisons between the Christine Cole homicide in January 1988 and the Michelle Norris Homicide in May 1988.  Both victims were similar in age, appearance, and lived within a mile of one another.   We agreed to meet at a future date to discuss the cases.

In August 2018, I contacted Dave DeTora from the RI State Medical Examiner's Office and requested the original autopsy report and autopsy photographs for this case.   Once those items were received, I set up a meeting with Dr. Priya Banerjee from the Medical Examiner's Office to go over the autopsy report and photographs.  That meeting was scheduled for August 28, 2018.

In September 2018, I met with Det. Jeff Araujo from the Central Falls Police to review the files on both cases and to discuss if there were any possible suspects who were named in both cases.  There were not.  There was one thing that I found of interest, which was hand written detectives notes regarding interviews of two subjects named Pedro Ortiz and Anthony Soares.  I was familiar with Pedro Ortiz from prior dealings in the early nineteen-nineties and the fact that he went to prison in 1999 for murdering his friend in Pawtucket.  I was also aware that Pedro was homeless for many years and occasionally slept behind the Star Market on Barton Street in Pawtucket. There was an unconfirmed sighting of Christine Cole being at the Star Market around 10:00 pm on the night she disappeared.  Based on the above information, I decided to look further into Pedro Ortiz to see if he could be ruled in or ruled out as a suspect in the Christine Cole homicide.  The handwritten notes in the Michelle Norris file were based on an interview of Anthony Soares and him relaying information to the Central Falls Police about Pedro Ortiz.  I then conducted research on Anthony Soares and learned that he was incarcerated at FMC Deven's Federal Prison in Massachusetts. Det. T. Lefebvre and I responded to FMC Devens for a scheduled appointment to interview Anthony Soares on October 19, 2018 at 9:30 am.  Soares had very little memory of the original interview with Central Falls Detectives in 1990 other than he felt that the Detectives did not believe him at the time.   He was not able to offer anything of value to this case.   Neither Ortiz, nor Soares are considered suspects in the Michelle Norris case.

On September 28, 2018, I met with Dr. Banerjee at the Medical Examiner's Office to review the autopsy report and photographs. While reviewing the documents, I noticed that there were some swabs that were taken at the time of the original autopsy of the victims tongue that was said to be a "black greasy substance".  Next to that entry on the form for those swabs, it stated "Hold".  I inquired to Dr. Banerjee where those swabs were "held" because I was not aware of any such swabs in evidence at the Pawtucket Police Evidence Room.  Supervising Medical Examiner Investigator Dave DeTora was present and left the room to go check with Cara Lupino, the Supervisor of Forensic Biology at the Department of Health, which is located in the same building.  Moments later, DeTora came back with a document advising me that Cara Lupino recalled the victims name and believed that she personally had conducting some testing on that case some years back. Lupino then entered the room with two large folders filled with documents regarding forensic testing that had been conducted on this case in 2008.  Due to the fact that the files would require a block of time to fully

PERSONNEL NARRATIVE FOR DETECTIVE SUSAN CORMIER

Ref: 88-00837-OF

review, an appointment was set up to meet with Cara Lupino on October 16, 2018.

On October 16, 2018, I responded to the Department of Health and met with Cara Lupino to go over the files and previous testing on the evidence from the testing conducted in 2008. Cara Lupino and I discussed the case and went over the bench notes for this case. I learned that Det. Sgt. Kevin Whalen, while assigned to the Pawtucket Police BCI Office, had submitted some of the physical evidence in the Christine Cole case to the Department of Health in 2008 for forensic testing. The results of the testing was returned from the RI Department of Health in 2010, however I was unaware of any such testing as there was no paperwork in the original case files at the Pawtucket Police Department. After learning of the evidence submission that took place in 2008, I made an appointment to meet with the Supervisor of Forensic Science (Cara Lupino) at the RI Department of Health on October 16, 2018, to go over the analytical findings of the testing that was performed on this case. During that meeting, it was learned that the pants worn by the victim were submitted for possible DNA testing and that the findings revealed that there was male blood on the inside crotch of the victims pants. Forensic testing of that blood resulted in obtaining a partial Y-STR profile (Short Tandem Repeat for the male Y-Chromosome). Upon learning of this, I requested further testing of the extraction from the blood sample in the hopes that newer advances in technology may reveal more. The results produced a larger Y-STR profile and I was advised that this was checked against a Y-STR database maintained by the RI Department of Health and revealed the closest match to that partial Y-STR profile belonged to a subject by the name of Jerson Semedo, date of birth 06/01/93. Jerson Semedo was in the data base due to an unrelated conviction that resulted in a mandatory collection of his DNA. Jerson Semedo was not born yet when Christine Cole disappeared and was found deceased in 1988. According to the Forensic Scientists at the RI Department of Health, that would indicate that the suspect for the blood found on the victim's pants was in the close male lineage of Jerson Semedo, such as his father, grandfather, uncle, or brother.

A full background check was conducted on Jerson Semedo and it was learned that Semedo was briefly incarcerated at the ACI in Cranston, RI in 2014 and listed his father as being John "Monterio". A background check of Jerson Semedo's sister Jessica revealed her father to be Joao "John" Monteiro, dob 06/28/60. A full background was conducted on Joao "John" Monteiro, by using CLEAR, the IMC data base, Cross Agency, and Facebook, which revealed that he has moved at least nineteen (19) times in the past thirty years with one of the addresses being 78 Slater Street, which is directly above Saints Market where the victim was last seen. Several of the other addresses he had were also in the immediate neighborhood of where the victim lived. Of the nineteen different residences he has had over the years, several of them were checked and none of the addresses that Monteiro uses, including the ones on his license and registration are where he actually resides. Pawtucket Detectives learned the location where Monteiro works in Cumberland (Cintas) and followed him home at the conclusion of his work shift to ascertain where he was currently living. Extensive surveillance has been conducted by Pawtucket Police Detectives on Monteiro, to include doing a trash pull from discarded trash placed curbside on his scheduled trash day. Negative results for DNA or fingerprints matching Monteiro from the items that were seized or even locating any mail addressed to him in that trash. This is a multi-family unit. A request was made to the US Postal Inspector and I was advised that Monteiro does not receive any mail at that address. Due to the fact that he currently lives in Central Falls, I enlisted the assistance of the Central Falls Police to conduct a ruse at Monteiro's apartment to ensure that he does reside there and which apartment he lives in. It was also learned by Detectives that Monteiro parks his vehicle behind the building next door to where he lives and not at his actual residence. It was confirmed by Officer Matook of the Central Falls Police during that ruse that Monteiro resides at the Central Falls address(234 Central Street) and not at the address where he parks his vehicle (226 Central Street). Further surveillance was conducted by following Monteiro several times from his residence to his place of business. Again, Monteiro parks his vehicle in the rear of the lot between two large

delivery trucks, which makes it impossible to see the vehicle from the street. All other employees appear to park in the front parking lot out in the open. Surveillance has been conducted by following Monteiro to and from work and each time he made no stops to or from work. It appears that Monteiro lives his life in a very covert manner.

On April 29, 2019, I contacted Dr. Colleen Fitzpatrick, who specializes in genealogy and is the founder of Identifiers International. I provided Dr. Fitzpatrick with a copy of the Y-STR markers in this case to attempt to do a Y-analysis against the genetic genealogy databases. Due to the fact that there is only a partial Y-STR profile in this case, there were not enough markers to use in the genetic genealogy database, so Dr. Fitzpatrick utilized another tool that can give ethnicity called the Nevgen Haplogroup Predictor. (A haplogroup is a population group that can be associated with a geographical area or ethnicity such as Native American, Oriental, African American, etc). When Dr. Fitzpatrick input the twelve (12) markers into the predictor, it gave a probability of 96% haplogroup E1b1b. This is generally associated with North African, but some subgroups are also found in Mediterranean Europe into Continental Europe. A map of this area showed it to include Cape Verde. Joao "John" Monteiro is from Cape Verde.

Based on the aforementioned facts and circumstances, I applied for a search warrant on July 16, 2019 for two buccal swab samples suitable for DNA analysis from the person of **Joao Monteiro (6/28/60),** which was then submitted to the Rhode Island Department of Health to be compared to the partial Y-STR profile of the blood located on the inside crotch of the victims pants. Joao Monteiro was brought to the Pawtucket Police Department at 8:00 AM on July 17, 2019 the purpose of executing the search warrant. Monteiro was cooperative and allowed Pawtucket Police BCI Detectives to take the buccal swab from him. Detectives Cormier and Lefebvre then spoke with Monteiro about basic background information while the DNA swabs were transported by Pawtucket BCI Detectives to the Department of Health for testing.

Detective Cormier then verbally provided Monteiro with his Miranda Rights, which he stated he understood and agreed to speak with us further. The entire interview was recorded and burned to a DVD. Monteiro was confronted with the covert way he lives his life, the fact that he has moved so many times over the years, and the fact that he once lived at the same address, 76 / 78 Slater Street, where the victim was last seen. Monteiro confirmed the fact that he lived at that address during that same time frame and that he lived alone in that apartment. He told us that he lived there for about three years during the late nineteen-eighties (1980's). Monteiro denied knowing the victim or being responsible for her disappearance and death. He denied ever even seeing the victim.

Due to the fact that the search warrant included taking a hair follicle sample from Monteiro, BCI Detectives Hayes and Ramos took Monteiro to the private search room in the cell block to take hair samples from him and to take photographs of him. He was then escorted back to the Interview Room. We continued to speak with Monteiro to obtain further background information on his family history with particular attention to his male relatives. Monteiro stated that his father is Jose Monteiro, who died at age 97 and his mother, Maria Lopes, died at age 68. When asked where his father was buried, he told us that the cemetery was off Newport Ave in East Providence. When I inquired if it was the cemetery on Newman Ave near the big white church, he confirmed that it was. (Further investigation at a later date by Detectives Cormier and Lefebvre revealed that the cemetery was actually Notre Dame Cemetery on Daggett Ave in Pawtucket and nowhere near where he stated it was.)

Monteiro provided the names of his siblings in order from oldest to youngest to be: Eliza, Jose, Autilio, Eduarda,

Ana, (Joao), Domingos, and Rita. We were advised by Monteiro that his brothers Jose and Autilio had the last name Gonsalves and were only his half brothers. They shared the same mother, but not the same father, therefore they could be excluded as having the same Y-STR. Monteiro confirmed that his only male sibling is Domingos Monteiro. When asked if Domingos was in the area back in the late nineteen-eighties (1980's), Joao told us that Domingos was not around back then and that he has lived in Florida and did not come here. We also asked him about his father. We asked where is father was living back then and he replied "My father? He live with me before." I asked him "Where?" and he replied "On that same street." I repeated what he said "On the same street? Where?" Monteiro avoided giving me a direct answer and stated "Over there, uh, close to the church." He was very vague and avoiding answering the question. At no time did he say that his father lived with him at 78 Slater Street, nor did he point at the picture of the apartment building that was on the desk in front of him to clarify that his father lived with him at the apartment. Instead he stated "But, I don't think my father." I stated "You don't think it was your father?" and he shook his head "No". Monteiro also confirmed when he was directly asked that he had no brothers here in Pawtucket at that time. No other male relatives here except him and his father. He continued to deny knowing Christine or being responsible for her death. He was asked if he would be willing to take a polygraph test and he stated that he would be willing to take the test. He confirmed again that he had no brothers here in Rhode Island at that time and that he and his father were the only two male family members in Pawtucket at the time of her disappearance. Det. Lefebvre and I then left the room to make arrangements for the polygraph test to be administered.

Rhode Island State Police Detective Kyle Draper responded to the Pawtucket Police station at our request to administer the polygraph test that Monteiro voluntarily agreed to take. Det. Draper was escorted to Interview Room 2 to set up the polygraph system, while Monterio remained in Interview Room 1. Once Det. Draper was ready, Monteiro was escorted to Interview Room 2 to take the polygraph. This was recorded and burned to DVD. At the conclusion, Monteiro was escorted back to Interview Room 1.

After reviewing the results of the polygraph test, Det. Draper advised us verbally and later in a formal report stating: "After careful analysis of **Joao Baptista Monteiro's** polygraph charts in this matter, it is my opinion that **Mr. Monteiro's** reactions to the questions listed above indicate he was not truthful in answering them. The overall finding of the examination is, therefore, **Deception Indicated**, demonstrating a high probability that **Mr. Monteiro** was involved in the death of Christine Cole."

Det. Draper advised Monteiro of the test results. Monteiro stated that the machine must have made a mistake. Det. Draper exited the room and Det. Lefebvre and I then entered the room to talk to Monteiro further. We talked to him about the fact that he failed the polygraph test and he continued to state that he did nothing to the girl (Christine) and the machine made a mistake. We confronted him again with the fact that he lived above the store where she was last seen and his sons DNA was the closest match to the DNA found on the victims clothing. The same DNA he shares with his son. He continued to deny being responsible for her death. We asked him if someone else could have been responsible. We asked if it was not him, then who else in his family could it be. about his father and if his father could have done something like that. He stated "I don't know". I then asked where on that same street (Slater St) did his father live because Monteiro told us earlier that his father lived down the street from him. This time, Monteiro told us that his father lived with him in the same house above Saints Market. I confronted him on the fact that he told us something different earlier. He told us that he lived alone and his father lived down the street. He then claimed his father came to live with him. Previously, he told us he lived in that apartment for three years alone. We asked him if his father drove and he stated he did not. This question was asked because the distance from Saints Market to the river where it is believed Christine may have been thrown in the water (Taft St Boat Ramp area) is 1.1 miles away (4 minute drive by a car) or an 18 minute walk. We asked how is father got place to place and he stated he walked. We asked if his father ever borrowed

his car and he stated he did not. We continued to ask him about his father living with him at that time frame and that being in conflict with what he previously told us. We asked him if we spoke to the landlord of that apartment, would he confirm that Monteiro's father lived in that apartment with Monteiro. He then talked in circles saying the landlords brother took care of the place and the landlord wasn't around. He seemed to be making excuses. We asked if he helped move the body for someone else and he said no. We asked if he gave Christine a ride or drove her to the water and he said no that she was never in his car. I asked if she was ever in his apartment and he said no. I asked him if he remembered the police going door to door, checking garages and sheds and houses for the missing girl back then using blood hound dogs and a helicopter and he stated he did not, even though he lived in the same building where she was last seen and that area was the focus of the search. He continued to deny knowing the victim or doing anything to her. The interview was concluded. We advised him that we would be driving him home and I provided him with a copy of the search warrant that authorized us to take a buccal swab for his DNA. Monteiro was provided with lunch and transported to his home by Detectives. Due to the fact that he was going to be slightly late for work, Det. Lefebvre called Monteiro's employer to tell them that he was in a minor fender-bender accident, that he was fine, but would be slightly delayed in getting to work. Once Monteiro was dropped at his residence, members of the Pawtucket Police Special Squad (undercover narcotics unit) were in place to conduct surveillance on Monteiro pending the results of the DNA testing coming back. Special Squad maintained constant surveillance on Monteiro and followed him from his home to his sister Rita's residence in Plainville, Massachusetts where he stayed for approximately twenty minutes. He then drove to work at Cintas in Cumberland, where the Special Squad continued to maintain surveillance.

Forensic Scientist Tamara Wong from the Rhode Island Department of Health contacted Det. Cormier at 5:50 PM on July 17, 2019 to notify her that the DNA reference was compared to the partial Y-STR profile obtained from the blood located on the inside crotch of the victim's pants and confirmed that it was consistent with the known reference DNA profile for Joao Monteiro. Tamara Wong provided a Summary of Analytical Facts Supplemental Report, which detailed her findings. I then notified Major Mullen and AG Tim Healy of the results from the Department of Health and they responded to the station, along with AG Steve Dambrauch, Chief of the Criminal Division at the Attorney General's Office, and AG Jillian Dubois. After discussing the case, an Affidavit and Arrest warrant was prepared for Joao Monteiro for First Degree Murder. Det. Lefebvre and I then drove to Magistrate Patrick O'Neill's residence at to have the warrant reviewed. Magistrate O'Neill signed the arrest warrant at 10:30 pm and we notified the members of the Special Squad who were maintaining surveillance on Monteiro that the warrant had been signed. Moments later, Monteiro emerged from his place of business and entered his vehicle. At that time, the Cumberland Police had arrived to assist the Pawtucket Special Squad and Joao Monteiro was taken into custody without incident. He was transported to the Pawtucket Police cell block and processed by Officers Imondi and Shea.

On July 18, 2019, I arrived at work at 8:00 AM and was met in the lobby by Rita Correia, who identified herself as the sister of Joao Monteiro. She requested to speak with me and stated she had some neccessary medication for Monteiro. The medication was turned over to Sgt. Donely in the Front Office and I told her to have a seat in the lobby temporarily. A short time later, I escorted Rita to Interview Room 1 and Det. Lefebvre and I spoke with her. I asked her what Joao told her about what was going on. She advised me that Joao showed her the paper (search warrant) that we gave to him. She stated that she became nervous yesterday when she could not reach Joao because he calls her son every morning, but he did not call yesterday. She responded to his residence to look for him and called the police to help her look for him. She later learned that from a neighbor that Joao came home and left in his work uniform. He then came to her house to fill her in on what happened at the police station. Rita confirmed that she and John have been in the country since 1982 and she proceeded to give me a full timeline of her life and Joao's life without being asked. She provided a timeline from 1998 to present day. Not from 1988 to present day.

Monteiro was arraigned in District Court on July 18, 2019.

On July 30, 2019, BCI Detectives Saccoccio and Ramos responded to the Rhode Island Department of Health to retrieve all of the evidence on the Christine Cole case. Those pieces of evidence were then transported back to the Pawtucket Police station. All of the items that we seized from Joao Monteiro's trash were logged back into the evidence room. The remaining items: One Buccal Swab collected from Joao Monteiro, face, pubic, and chest hair samples taken from Joao Monteiro, the cuttings from Christine Cole's jacket that contained a spot of blood never previously tested, and an envelope marked "kietha hood" were packaged and transported to the Providence FBI Office. There were met with Special Agent Steve Medeiros, who assisted us in with the proper procedure for us to package, label, and send these items to the FBI Lab in Quantico for further testing. BCI Detective Saccoccio and I then drove the package directly to the FED EX facility in Providence and shipped the package to Quantico. A copy of that shipping receipt was then scanned into this report.

****This investigation is continuing and is not complete. Do not print or release.****

EXHIBIT 14

RHODE ISLAND DEPARTMENT OF HEALTH LABORATORIES

**FORENSIC SCIENCES**
50 ORMS ST., PROVIDENCE, RI 02904-2293; ROOM 306
401-222-5600, TTY 1-800-745-5555

HOURS: M-F, 8:30 a.m. - 4:30 p.m.
(appointment required for special requests)

| CONTACTS: | | |
|---|---|---|
| CHIEF | 222-5593 / 222-6985 FAX | |
| DRUGS | 222-5567 / 222-6064 FAX | |
| TOX/DUI | 222-5565 / 222-5566 FAX | |
| BIO/DNA | 222-5534 / 222-5536 FAX | |
| BREATH | 222-1469 / 222-6985 FAX | |
| EVIDENCE | 222-5569 / 222-6064 FAX | |

## EVIDENCE EXAMINATION REQUEST AND RECEIPT
### (ALL BIOLOGY/DNA CASES REQUIRE A COPY OF THE POLICE REPORT)

| SUBMITTING AGENCY Pawtucket Police Department | COUNTY Providence | SUSPECT (S) 1. Richard J Graves | DOB 6/23/45 |
|---|---|---|---|
| AGENCY CASE # 88-00837 | DATE OF OCCURENCE 1/6/88 | 2. | DOB |
| SUPPLEMENTAL SUBMISSION TO CASE # | JUVENILE ☒  FEDERAL ☒ | 3. | DOB |
| ARRESTING OFFICER | CHARGE | 4. | DOB |
| INVESTIGATING OFFICER Det.Lt. Whalen & Det. Sgt. Stonely | PHONE NUMBER 401-727-9100 EX 744 | VICTIM Christine Cole | DOB 1/4/78 |

| ITEM # | DESCRIPTION OF EACH ITEM SUBMITTED | REQUEST |
|---|---|---|
| 1 | Item CS-1 ( Q1 Victims jacket including paper fold of fabric, blood stain from jacket | DNA comparison Victim vs Suspect |
| 2 | Item CS-3 ( Q8 Victims purple pants ) | DNA comparison Victim vs Suspect |
| 3 | Item CS-5 ( K) Paper fold containing victim's head hair ) | DNA comparison |
| 4 | K-10 Blood sample from suspect Richard Graves ( dried) | DNA comparison with unknown blood stain |
| 5 | K-11 and K12 Grey top blood sample ( dried ) Red top blood sample ( dried ) | DNA comparison with unknown blood stain |

*1 box for*

| THIS BOX MUST BE COMPLETED FOR DUI CASES ONLY | | |
|---|---|---|
| SUSPECT ADDRESS | | DOB |
| TIME OF APPREHENSION | MEDICAL PERSON COLLECTING SAMPLE | MEDICAL PERSON'S PLACE OF EMPLOYMENT |

| LABORATORY DATE/TIME 3/11/08   13:48 | GROSS WEIGHT | SUBMITTED BY (PRINT NAME) DeT. PeTeR HeaLey |
|---|---|---|

SUBMITTED BY (SIGNATURE)
DeT. PeTe Heal

I ACKNOWLEDGE RECEIPT OF EVIDENCE PURPORTED TO BE AS DESCRIBED ABOVE. REQUESTS FOR ANALYSIS ARE ACCEPTED SUBJECT TO REVIEW.
RECEIVED BY (SIGNATURE OF AUTHORIZED LABORATORY PERSON)
*Jane Wilbur*

**Rhode Island Forensic Science Lab**
**FB 08-1089**
Department: Pawtucket Police Dept.//P
Case No : 88-00837

Rev. 3.0 SOB 07/19/06

FORM-FSL-098

Page 1 of 2

Monteiro 000194

# EXHIBIT 15

## General Evidence Examination Worksheet

Reagent Lot Numbers: _____

Item Description: 1,8 mBPB sealed  88-00837
Purple Pants, sealed in plastic bag

HFD: Sand, not collected          C/F: IC



OF  Rusty buckle  soiled + sandy  hole cut by FBI

OB

IF  tags 3 white FBI  mildew + sand

IC

R/B  2 FL+

IB  4 white

| Item#/Stain # | AP | O-Tol S-T/P | f/n | ID | Item#/Stain # | AP | O-Tol | f/n | ID | Item#/Stain # | AP | O-Tol | f/n | ID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| POS |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| neg 1 | NT | (+) | H7C |  |  |  |  |  |  |  |  |  |  |  |
| 2 | +/-u |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 3 | (−) |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 4 | (−) |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

Case # FB08-1089          Analyst/Date  Cl 6-20-08

Rev. 1.0 KLW 03/13/06          FORM-FB-051          Page 1 of 1

Monteiro 000148

# EXHIBIT 16

# In The Matter Of:

*Monteiro vs Cormier*

*Tamara Wong*

*November 4, 2021*



Page 1

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE DISTRICT OF RHODE ISLAND |
| 3 | |
| 4 | Joao Monteiro |
| 5 | VS.             C.A. NO:  21-cv-00046-MSM-LDA |
| 6 | Susan Cormier, Trevor |
| 7 | Lefebvre, Daniel Mullen, Tina Concalves, City of |
| 8 | Pawtucket and Tamara Wong |
| 9 | ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ |
| 10 | |
| 11 | DEPOSITION OF |
| 12 | TAMARA WONG |
| 13 | NOVEMBER 4, 2021 |
| 14 | 9:00 A.M. |
| 15 | |
| 16 | 150 SOUTH MAIN STREET |
|  | PROVIDENCE, RI  02903 |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | ELIZABETH GREELEY |
| 23 | CERTIFIED COURT REPORTER |
| 24 | |
| 25 | |

**Page 2**

**APPEARANCES OF COUNSEL**

2

On Behalf of the Plaintiff, Joao Monteiro:
    LOEVY-LOEVY
    BY:  MARK LOEVY-REYES, ESQ.
    311 N. Aberdeen St.
    3rd Floor
    Chicago, IL  60607
    312-243-5900
    Mark@loevy.com

On Behalf of the Defendant, Tamara Wong:
    STATE OF RHODE ISLAND
    DEPARTMENT OF ATTORNEY GENERAL
    BY:  BETH LANDES, ESQ.
    150 South Main Street
    Providence, RI  02903
    401-274-4400
    Blandes@riag.ri.gov

On Behalf of the Defendants, Cormier, Lefebvre,
Goncalves and Mullen:
    DESISTO LAW
    BY:  RYAN STYS, ESQ.
    BY:  CAROLINE MURPHY, ESQ.
    60 Ship Street
    Providence, RI  02903
    401-272-4442
    Caroline@desistolaw.com

**Page 3**

INDEX OF EXAMINATION

WITNESS:  TAMARA WONG

| EXAMINATION | PAGE |
|---|---|
| BY MR. LOEVY-REYES | 5 |
| BY MS. MURPHY | 164 |

INDEX TO EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 117 | COMPETENCY EVALUATIONS (5 PGS)... | 6 |
| EXHIBIT 115 | COMPETENCY EVALUATION (4 PGS).... | 6 |
| EXHIBIT 42 | AUTOPSY REPORT (28 PGS).......... | 6 |
| EXHIBIT 66 | HANDWRITTEN NOTES (4 PGS)........ | 6 |
| EXHIBIT 15 | SUPPLEMENTAL REPORT (15 PGS)..... | 6 |
| EXHIBIT 3 | EVIDENCE RELEASE SHEET (3 PGS)... | 6 |
| EXHIBIT 7 | DOH SUBMISSION REPORT (2 PGS).... | 6 |
| EXHIBIT 100 | EXTRACTION WORKSHEETS (23 PGS)... | 6 |
| EXHIBIT 101 | GENEMAPPER WORKSHEETS (24 PGS)... | 6 |
| EXHIBIT 102 | EXAMINATION RECEIPT (2 PGS)...... | 6 |

**Page 4**

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 103 | INVENTORY WORKSHEET (3 PGS)...... | 6 |
| EXHIBIT 104 | EVIDENCE RECEIPT (5 PGS)......... | 6 |
| EXHIBIT 38 | CHAIN OF CUSTODY (8 PGS)......... | 6 |
| EXHIBIT 52 | COMMUNICATION LOG (3 PGS)........ | 6 |
| EXHIBIT 10 | LAB REPORT (10 PGS).............. | 6 |
| EXHIBIT 16 | TEXT MESSAGES (16 PGS)........... | 6 |
| EXHIBIT 35 | TEXT MESSAGES (6 PGS)............ | 6 |
| EXHIBIT 36 | E-MAILS (27 PGS)................. | 6 |
| EXHIBIT 37 | E-MAILS (15 PGS)................. | 6 |
| EXHIBIT 57 | RETAINED BY COUNSEL | |
| EXHIBIT 9 | RETAINED BY COUNSEL | |
| EXHIBIT 45 | EVIDENCE RECEIPT (19 PGS)........ | 6 |
| EXHIBIT 53 | E-MAIL (1 PG).................... | 6 |
| EXHIBIT 63 | E-MAIL (2 PGS)................... | 6 |
| EXHIBIT 64 | E-MAIL (1 PG).................... | 6 |
| EXHIBIT 65 | E-MAILS (3 PGS).................. | 6 |

Page 109

1  Q.  Got it.  Do you know, is there any indication
2  on here where the mildew and sand was found?
3      A.  My understanding is anything that has the
4  kind of like sideways hatch marks is an indication of
5  where the observed mildew and sand was located.
6      Q.  I see.  So on here it looks like it was kind
7  of on the left and the right side?
8      A.  Correct.
9      Q.  Just to the right of that drawing there's the
10 initials of IC; do you know what that represents?
11     A.  Yes.  That's Inner Crotch.
12     Q.  There is, it looks like two AXIS; do you know
13 what those represent?
14     A.  Those would represent the seams of the inner
15 crotch.  So the seam that runs from front to back and
16 the seam that runs from inside the legs left to right
17 or right to left.
18     Q.  There is an R/B at the bottom of that; do you
19 know what that is?
20     A.  That is shorthand for Red Brown coloring.
21     Q.  Got it.  There's, it looks like a circle area
22 just to the right of where it says red brown?
23     A.  Ah-ha.
24     Q.  Is that a yes?
25     A.  Yes.  Sorry.

Page 110

1      Q.  Do you know what the number is?  There is a
2  Number 1 just to the upper left of that; do you know
3  what that represents?
4      A.  That represents the stain observed.  The RB
5  represents the color.  One represents how the analyst
6  is categorizing the stain.  Actually, if we go back to
7  the IF, Inner Front section, the three that you had
8  asked about earlier, the three white, and it's pointed
9  to a little circle in the middle of the, I guess what
10 would be the fly area of the pants, that would be a
11 white stain indicated as stain Number 3.
12     Q.  I see.  Okay.  So it looks like then, going
13 back to the IC portion, that there is a Number 2, does
14 that mean to be a second stain?
15     A.  Yes.
16     Q.  It looks like, it's kind of like an oblong
17 shape; is that fair?
18     A.  Yes.
19     Q.  Then just to the right of that there is an FL
20 plus; do you see that?
21     A.  Correct.
22     Q.  Do you know what FL plus means?
23     A.  It would be my assumption that it means
24 Fluorescent Positive.
25     Q.  What does fluorescent positive mean as a

Page 111

1  forensic scientist?
2      A.  My understanding, it would mean that an
3  alternative light source was used, and that area of
4  the inner crotch fluoresced under alternative light
5  source.
6      Q.  Why would that be significant?
7      A.  That's significant for use that a stain of
8  potential biological material is not visible to the
9  naked eye.
10     Q.  Do you know if any analysis was ever done on
11 stain Number 2?
12     A.  It looks to be a serological screening was
13 done on that stain.
14     Q.  You can see that by looking further down at
15 the table; is that right?
16     A.  That's correct.
17     Q.  I'll ask about that in a second.  Let's go to
18 the right of where we just were where it says IB; I'm
19 assuming that's Inner Back?
20     A.  Correct.
21     Q.  Then it looks like it says stain Number 4; is
22 that right?
23     A.  Yes.
24     Q.  It looks like a white stain?
25     A.  Correct.

Page 112

1      Q.  Then if we go down to the table, as you had
2  mentioned, it looks like all four stains were
3  analyzed?
4      A.  That's correct.
5      Q.  Stain Number 1, can you tell me what the
6  information on the row for Number 1 signifies?
7      A.  The information indicates what tests were
8  done based on the column headers of that table.
9      Q.  So what tests were done on stain Number 1?
10     A.  Stain Number 1 was tested for the presence of
11 blood, in this case using HemaTrace and HemaStix.
12     Q.  What was the determination then?
13     A.  That the HemaStix test was positive, and the
14 HemaTrace test was negative.
15     Q.  What are the differences between those two
16 different tests?
17     A.  The HemaStix test is a -- I'm sorry.  I'm
18 losing my words.  The HemaStix test is a preliminary
19 test for blood.  The HemaTrace test is a confirmatory
20 or quasi confirmatory test for human blood.
21     Q.  Which of those two came out positive?
22     A.  The preliminary test.
23     Q.  Do you have an explanation, based upon your
24 education, experience, and training, about why the
25 preliminary test might come out positive but the

Page 169

1  publicize.

2      Q.  Sitting here today, what was your reason for

3  asking her to mention the Rhode Island Department of

4  Health center for forensic sciences if you didn't know

5  what she was going to convey to the news?

6          MS. LANDES:  Objection.

7      A.  As I stated earlier in my testimony, it's

8  not, it wasn't about the specifics of what Detective

9  Cormier was going to say.  It was just an

10  acknowledgment to the Rhode Island Department of

11  Health laboratory in their role within the

12  investigation.

13      Q.  What did you understand the Rhode Island

14  Department of Health's role was in this investigation?

15      A.  Just that the Rhode Island Department of

16  Health and myself included as an analyst for the

17  Department of Health actually did work on evidence

18  within the case.

19      Q.  This is right after there was text message

20  exchanges in which you indicated, It's a match; is

21  that right?

22          MS. LANDES:  Objection.

23          MS. MURPHY:  You can answer.

24      A.  Yes, that appears to be the time line.

25          MS. MURPHY:  Okay.  Let me just check.

Page 170

1  I'm trying to be good with the time frame that I have.

2  I'm trying not to be redundant with questioning.

3  That's all I have.

4          MR. LOEVY-REYES:  Transcript, please.

5          MS. LANDES:  Read and sign.

6          MS. MURPHY:  Transcript.

7      (DEPOSITION CLOSED AT 4:00 P.M.)

Page 171

C-E-R-T-I-F-I-C-A-T-E

I, ELIZABETH GREELEY, a Notary Public, in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing Deposition of Tamara Wong, a Witness in the above-entitled cause, was taken before me on behalf of the Plaintiff, at the offices of the Rhode Island Attorney's General Office, 150 South Main Street, Providence, Rhode Island on November 4, 2021 at 9:00 A.M.; that previous to examination of said witness, who was of lawful age, she was first sworn by me and duly cautioned to testify to the truth, the whole truth, and nothing but the truth, and that she thereupon testified in the foregoing manner as set out in the aforesaid transcript.

I further certify that the foregoing Deposition was taken down by me in machine shorthand and was later transcribed by computer, and that the foregoing Deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rules 5(d) and 30(f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in Court; therefore, the original is delivered to and retained by Plaintiff's Attorney, Mark Loevy-Reyes.

I have enclosed with the Deposition a Correction and Signature page, which must be signed before a Notary Public.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of November, 2021.

_Elizabeth Greeley_

_____
ELIZABETH GREELEY, NOTARY PUBLIC
CERTIFIED COURT REPORTER
MY COMMISSION EXPIRES:  04/07/2022

# EXHIBIT 17

# Rhode Island Forensic Science Laboratory

50 Orms Street
Providence, RI  02904

## Chain of Custody Report

| | |
|---|---|
| **Lab Control Number** | FB 08-1089 |
| **Submitting Agency** | Pawtucket Police Dept. |
| **Incident Number** | 88-00837 |

## Item(s) submitted by Det. Peter Healey on 3/11/2008.

Item #1          One sealed box with: evidence for analysis

| Date | Time | Location / Person | Weight |
|---|---|---|---|
| 03/11/2008 | 13:46 | Forensic Biology Storage | |
| 05/19/2008 | 10:20 | Forensic Biology Storage | |

Item #1.1     One sealed envelope with:  Victim ME 0824-88

| Date | Time | Location / Person | Weight |
|---|---|---|---|
| 05/19/2008 | 10:06 | Cara E. Lupino, M.S. | |
| 05/19/2008 | 10:20 | Forensic Biology Storage | |
| 03/03/2011 | 0:00 | Returned to Department | |
| | | Released to DET RAFAEL PEREZ | |
| 03/03/2011 | 9:29 | Pawtucket Completed Cases | |

Item #1.2     One sealed envelope with: sampled cutting/swab - blood  Q1-1B cutting

| Date | Time | Location / Person | Weight |
|---|---|---|---|
| 05/19/2008 | 10:07 | Cara E. Lupino, M.S. | |
| 05/19/2008 | 10:20 | Forensic Biology Storage | |
| 03/03/2011 | 0:00 | Returned to Department | |
| | | Released to DET RAFAEL PEREZ | |
| 03/03/2011 | 9:29 | Pawtucket Completed Cases | |

Monteiro 000051

Item #1.3        One sealed envelope with: sampled cutting/swab - other DNA source  Q393-45 Entire Stain

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 05/19/2008 | 10:08 | Cara E. Lupino, M.S. | |
| 05/19/2008 | 10:20 | Forensic Biology Storage | |
| 03/03/2011 | 0:00 | Returned to Department | |
| | | Released to DET RAFAEL PEREZ | |
| 03/03/2011 | 9:30 | Pawtucket Completed Cases | |

Item #1.4        One sealed envelope with: sampled cutting/swab - other DNA source  Q105-1 entire stain

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 05/19/2008 | 10:04 | Cara E. Lupino, M.S. | |
| 05/19/2008 | 10:20 | Forensic Biology Storage | |
| 03/03/2011 | 0:00 | Returned to Department | |
| | | Released to DET RAFAEL PEREZ | |
| 03/03/2011 | 9:30 | Pawtucket Completed Cases | |

Item #1.5        One sealed envelope with: evidence for analysis  "kiethia hood"

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 05/19/2008 | 10:05 | Cara E. Lupino, M.S. | |
| 05/19/2008 | 10:20 | Forensic Biology Storage | |
| 03/03/2011 | 0:00 | Returned to Department | |
| | | Released to DET RAFAEL PEREZ | |
| 03/03/2011 | 9:30 | Pawtucket Completed Cases | |

Item #1.6        One sealed plastic bag containing: evidence for analysis  empty slide holders labeled K1, Q1,Q2,Q3,Q4-5,Q6-7,Q8,Q9,Q10-11

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 05/19/2008 | 10:13 | Cara E. Lupino, M.S. | |
| 05/19/2008 | 10:20 | Forensic Biology Storage | |
| 03/03/2011 | 0:00 | Returned to Department | |
| | | Released to DET RAFAEL PEREZ | |
| 03/03/2011 | 9:28 | Pawtucket Completed Cases | |

Item #1.7        One sealed plastic bag containing: evidence for analysis  "know fabric cuttings Q1, Q2, Q3, Q8"

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 05/19/2008 | 10:17 | Cara E. Lupino, M.S. | |
| 05/19/2008 | 10:20 | Forensic Biology Storage | |
| 03/03/2011 | 0:00 | Returned to Department | |
| | | Released to DET RAFAEL PEREZ | |
| 03/03/2011 | 9:27 | Pawtucket Completed Cases | |

Monteiro 000052

Item #1.8      One sealed paper bag with: pants  Q8 Victims purple pants

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 05/19/2008 | 10:18 | Cara E. Lupino, M.S. | |
| 05/19/2008 | 10:20 | Forensic Biology Storage | |
| 03/03/2011 | 0:00 | Returned to Department | |
| | | Released to DET RAFAEL PEREZ | |
| 03/03/2011 | 9:29 | Pawtucket Completed Cases | |

Item #1.8.1      One sealed envelope with: sampled cutting/swab - other DNA source  Q8 Victims purple pants - inner crotch

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 02/17/2015 | 15:07 | Tamara Wong, M.S. | |
| 02/17/2015 | 15:08 | Pawtucket Completed Cases | |
| 02/27/2015 | 11:13 | Returned to Department | |
| | | Det. Peter Spetelunas | |

Item #1.9      One sealed paper bag with: jacket

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 05/19/2008 | 10:19 | Cara E. Lupino, M.S. | |
| 05/19/2008 | 10:20 | Forensic Biology Storage | |
| 03/03/2011 | 0:00 | Returned to Department | |
| | | Released to DET RAFAEL PEREZ | |
| 03/03/2011 | 9:31 | Pawtucket Completed Cases | |

## Item(s) submitted by Carl Horrocks on 5/29/2008.

Item #2      One sealed paper bag with: head hair standard

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 05/29/2008 | 11:53 | Forensic Biology Storage | |
| 03/03/2011 | 0:00 | Returned to Department | |
| | | Released to DET RAFAEL PEREZ | |
| 03/03/2011 | 9:28 | Pawtucket Completed Cases | |

Item #3      One sealed envelope with: head hair standard

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 05/29/2008 | 11:53 | Forensic Biology Storage | |
| 03/03/2011 | 0:00 | Returned to Department | |
| | | Released to DET RAFAEL PEREZ | |
| 03/03/2011 | 9:27 | Pawtucket Completed Cases | |

Monteiro 000053

Item #4        One sealed paper bag with: evidence for analysis

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 05/29/2008 | 11:53 | Forensic Biology Storage | |
| 03/03/2011 | 0:00 | Returned to Department | |
| | | Released to DET RAFAEL PEREZ | |
| 03/03/2011 | 9:28 | Pawtucket Completed Cases | |

Item #5        One sealed paper bag with: reference blood sample  Richard Graves

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 05/29/2008 | 11:53 | Forensic Biology Storage | |
| 02/19/2010 | 11:09 | Fairfax Identity Laboratory | |
| 05/07/2010 | 10:00 | Forensic Biology Storage | |
| 07/07/2010 | 15:32 | Pawtucket Completed Cases | |
| 07/30/2010 | 0:00 | Returned to Department | |
| | | Released to DET. PEREZ | |

**Item(s) submitted by Det. Susan Comier on 4/5/2019.**

Item #10        One sealed paper bag with: questioned swab(s)  from straw in "McDonald's" cup

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/22/2019 | 10:49 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

Item #11        One sealed paper bag with: questioned swab(s)  from medium "Coca-Cola" cup

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/22/2019 | 10:49 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

Monteiro 000054

Item #12        One sealed paper bag with: questioned swab(s) from straw striped #2

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/22/2019 | 10:49 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

Item #13        One sealed paper bag with: questioned swab(s) from striped straw #1

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/22/2019 | 10:49 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

Item #14        One sealed paper bag with: questioned swab(s) from chewed green gum

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/22/2019 | 10:49 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

Item #15        One sealed paper bag with: questioned swab(s) from "Coors Light" can

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/22/2019 | 10:49 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

Item #16        One sealed paper bag with: questioned swab(s) from "Budweiser" can

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/22/2019 | 10:49 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

Monteiro 000055

Item #17        One sealed paper bag with: questioned swab(s)  from "Wendy's" fork

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/22/2019 | 10:49 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

Item #18        One sealed box with: evidence for analysis  cutting from (Q8) victim's pants

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/29/2019 | 13:51 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

Item #19        One sealed box with: evidence for analysis  cutting from (Q1) victim's jacket

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/29/2019 | 13:51 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

Item #20        One sealed envelope with: evidence for analysis  "keithia hood"

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/29/2019 | 13:51 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

Item #21        One sealed envelope with: evidence for analysis  cutting (Q1-1B) from stain on victim's jacket

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/29/2019 | 13:51 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

Monteiro 000056

Item #6        One sealed paper bag with: questioned swab(s)  from pink lollipop

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/22/2019 | 10:49 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

Item #7        One sealed paper bag with: questioned swab(s)  from "Dasani" water bottle

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/22/2019 | 10:49 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

Item #8        One sealed paper bag with: questioned swab(s)  from "Poland Spring" bottle

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/22/2019 | 10:49 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

Item #9        One sealed paper bag with: questioned swab(s)  from "Subway" fork

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 04/05/2019 | 9:36 | Forensic Biology Storage | |
| 04/12/2019 | 16:47 | Tamara Wong, M.S. | |
| 07/22/2019 | 10:49 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | | released to Det. Mark Ramos | |

**Item(s) submitted by Det. Joel Saccoccio on 5/17/2019.**

Monteiro 000057

Item #22        One sealed paper bag with: questioned swab(s)  from water bottle

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 05/17/2019 | 9:05 | Forensic Biology Storage | |
| 05/17/2019 | 10:54 | Tamara Wong, M.S. | |
| 07/22/2019 | 10:49 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | released to Det. Mark Ramos | | |

**Item(s) submitted by Det. Mark Ramos on 7/17/2019.**

Item #23        One sealed paper bag with: reference buccal sample  from Joao Monteiro

| Date | Time | Location / Person | Weight |
|------|------|-------------------|--------|
| 07/17/2019 | 9:10 | Forensic Biology Storage | |
| 07/17/2019 | 9:16 | Tamara Wong, M.S. | |
| 07/22/2019 | 10:49 | Pawtucket Completed Cases | |
| 07/30/2019 | 9:20 | Returned to Department | |
| | released to Det. Mark Ramos | | |

Monteiro 000058

# EXHIBIT 18

# In The Matter Of:

*Monteiro vs Cormier*

*Tamara Wong*

*November 4, 2021*



Page 1

1         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF RHODE ISLAND
2

3

4  Joao Monteiro

5     VS.              C.A. NO:  21-cv-00046-MSM-LDA

6  Susan Cormier, Trevor
   Lefebvre, Daniel Mullen,
7  Tina Concalves, City of
   Pawtucket and Tamara Wong
8

9  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

10

11              DEPOSITION OF
                  TAMARA WONG
12

13            NOVEMBER 4, 2021
                  9:00 A.M.
14

15            150 SOUTH MAIN STREET
              PROVIDENCE, RI  02903
16

17

18

19

20

21

22            ELIZABETH GREELEY
            CERTIFIED COURT REPORTER
23

24

25

Page 2

1         APPEARANCES OF COUNSEL

2    On Behalf of the Plaintiff, Joao Monteiro:
       LOEVY-LOEVY
3      BY:  MARK LOEVY-REYES, ESQ.
       311 N. Aberdeen St.
4      3rd Floor
       Chicago, IL  60607
5      312-243-5900
       Mark@loevy.com
6
     On Behalf of the Defendant, Tamara Wong:
7      STATE OF RHODE ISLAND
       DEPARTMENT OF ATTORNEY GENERAL
8      BY:  BETH LANDES, ESQ.
       150 South Main Street
9      Providence, RI  02903
       401-274-4400
10     Blandes@riag.ri.gov

11   On Behalf of the Defendants, Cormier, Lefebvre,
     Goncalves and Mullen:
12     DESISTO LAW
       BY:  RYAN STYS, ESQ.
13     BY:  CAROLINE MURPHY, ESQ.
       60 Ship Street
14     Providence, RI  02903
       401-272-4442
15     Caroline@desistolaw.com

16

17

18

19

20

21

22

23

24

25

Page 3

1              INDEX OF EXAMINATION

2  WITNESS:  TAMARA WONG

3  EXAMINATION                             PAGE
   BY MR. LOEVY-REYES                         5
4
   BY MS. MURPHY                            164
5

6

7

8              INDEX TO EXHIBITS

9  EXHIBIT        DESCRIPTION            PAGE

10 EXHIBIT 117   COMPETENCY EVALUATIONS (5 PGS)...   6

11 EXHIBIT 115   COMPETENCY EVALUATION (4 PGS)....   6

12

13 EXHIBIT 42    AUTOPSY REPORT (28 PGS)..........   6

14 EXHIBIT 66    HANDWRITTEN NOTES (4 PGS)........   6

15

16 EXHIBIT 15    SUPPLEMENTAL REPORT (15 PGS).....   6

17 EXHIBIT 3     EVIDENCE RELEASE SHEET (3 PGS)...   6

18

19 EXHIBIT 7     DOH SUBMISSION REPORT (2 PGS)....   6

20 EXHIBIT 100   EXTRACTION WORKSHEETS (23 PGS)...   6

21

22 EXHIBIT 101   GENEMAPPER WORKSHEETS (24 PGS)...   6

23 EXHIBIT 102   EXAMINATION RECEIPT (2 PGS)......   6

24

25

Page 4

1  NO.            DESCRIPTION             PAGE

2

3  EXHIBIT 103   INVENTORY WORKSHEET (3 PGS)......   6

4  EXHIBIT 104   EVIDENCE RECEIPT (5 PGS).........   6

5

6  EXHIBIT 38    CHAIN OF CUSTODY (8 PGS).........   6

7  EXHIBIT 52    COMMUNICATION LOG (3 PGS)........   6

8

9  EXHIBIT 10    LAB REPORT (10 PGS)..............   6

10 EXHIBIT 16    TEXT MESSAGES (16 PGS)...........   6

11

12 EXHIBIT 35    TEXT MESSAGES (6 PGS)............   6

13 EXHIBIT 36    E-MAILS (27 PGS).................   6

14

15 EXHIBIT 37    E-MAILS (15 PGS).................   6

16 EXHIBIT 57    RETAINED BY COUNSEL

17

18 EXHIBIT 9     RETAINED BY COUNSEL

19 EXHIBIT 45    EVIDENCE RECEIPT (19 PGS)........   6

20

21 EXHIBIT 53    E-MAIL (1 PG)...................   6

22 EXHIBIT 63    E-MAIL (2 PGS)..................   6

23

24 EXHIBIT 64    E-MAIL (1 PG)...................   6

25 EXHIBIT 65    E-MAILS (3 PGS).................   6

Page 125

1 submitted, especially for DNA analysis and potentially
2 CODIS upload, because of the requirements that the FBI
3 mandates for that DNA database upload.
4      Q.   Sure, that makes sense.  In order to obtain
5 the information that you would need for that, do you
6 rely on law enforcement to provide that information to
7 you?
8      A.   Yes.
9      Q.   It wouldn't be something that you would
10 conduct an independent investigation on?
11      A.   That is correct.
12      Q.   If you could put out Exhibit 103, please?
13 You've been given what's been marked as Exhibit 103;
14 have you ever seen that before?
15      A.   Just portions.
16      Q.   Which portions have you seen?
17      A.   The first two pages, I'm familiar with.  Oh,
18 I guess all of them, yes, all three pages.
19      Q.   When you were doing your work on the
20 Christine Cole investigation, did you have an
21 awareness about a prior investigation of a Richard
22 Graves?
23      A.   Vaguely.
24      Q.   Did you have an understanding as to what role
25 the Department of Health might have played in that

Page 126

1 investigation?
2      A.   I don't recall specifically.
3      Q.   Okay.  If you can pull out Exhibit 104,
4 please?  I'm going to ask you to take a look at
5 Exhibit 104, and tell me if you recognize that.
6      A.   Yes.  It looks like portions of the forensic
7 biology laboratory's case file.
8      Q.   Page 1 looks like it has, again, additional
9 information about a Richard Graves.  After looking at
10 Exhibit 104, do you have any refreshed memory at all
11 about the investigation that involved Mr. Graves?
12      MS. LANDES:   Objection.
13      A.   Based on the information on the first page,
14 Mr. Graves was listed as a possible suspect in the
15 Christine Cole case.
16      Q.   Obviously, that is something that you took no
17 part in investigating, correct?
18      A.   That's correct.
19      Q.   This looks like it was probably before your
20 time in the lab?
21      A.   That is correct.
22      Q.   If you can go to the last page of
23 Exhibit 104, which is page Monteiro 203, does this
24 appear to be one of the electropherograms related to
25 your analysis in this case?

Page 127

1      A.   Yes, it's one of the pages from my analysis.
2      Q.   Does it look like it's a control, or actually
3 a page from the work?
4      A.   It looks like a control.
5      Q.   How can you tell the difference between a
6 control and doing an analysis of an individual's DNA?
7      A.   The each electropherogram is identifiable by
8 the sample name at the top of each of the, I guess,
9 graphs or sections.  So at the top of 203, the first
10 column says Sample Name, and just below it is the
11 indication that it is a known reagent blank control.
12      Q.   If you can pull out Exhibit 38, please?
13 You've been given what's been marked as Exhibit 38.
14 I'm going to ask you to look through that, and tell me
15 if you recognize what that is.
16      A.   This looks like a chain of custody report for
17 the forensic biology laboratory case for Christine
18 Cole.
19      Q.   I'm going to ask you to go to the third page
20 of Exhibit 38.  The second box down on Exhibit 38
21 lists item Number 1.8.1.  It describes it as one
22 sealed envelope with:  Sample cutting/swab-other DNA
23 source, QA victim's purple pants inner; do you know
24 what that represents?
25      A.   This would represent the, the sampled cutting

Page 128

1 of the inner crotch of the purple pants.
2      Q.   Did you actually receive the cutting itself?
3      A.   I believe so, yes.  That was submitted.
4      Q.   Were you able to observe the cutting itself?
5      A.   I did no analysis on that.
6      Q.   Did you look to determine whether you would
7 be able to obtain any biological sample from the
8 cutting itself?
9      A.   No, I did not.
10      Q.   Why didn't you do that?
11      A.   It's a matter of working with a product that
12 you already have as opposed to potentially consuming
13 more, more sample from an item of evidence.
14      Q.   Did you, based upon your education, training,
15 and experience, believe that you had the best source
16 of DNA that you were ever going to develop based upon
17 the extract that you already had in your possession?
18      A.   Yes.
19      Q.   The Department of Health uses a barcode
20 system, is that right, with respect to its property
21 that it takes in?
22      A.   That's correct.
23      Q.   So when the property comes into the
24 Department of Health's inventory, there is a code that
25 will be scanned; is that right?

Page 169

1  publicize.

2      Q.  Sitting here today, what was your reason for

3  asking her to mention the Rhode Island Department of

4  Health center for forensic sciences if you didn't know

5  what she was going to convey to the news?

6          MS. LANDES:  Objection.

7      A.  As I stated earlier in my testimony, it's

8  not, it wasn't about the specifics of what Detective

9  Cormier was going to say.  It was just an

10 acknowledgment to the Rhode Island Department of

11 Health laboratory in their role within the

12 investigation.

13     Q.  What did you understand the Rhode Island

14 Department of Health's role was in this investigation?

15     A.  Just that the Rhode Island Department of

16 Health and myself included as an analyst for the

17 Department of Health actually did work on evidence

18 within the case.

19     Q.  This is right after there was text message

20 exchanges in which you indicated, It's a match; is

21 that right?

22         MS. LANDES:  Objection.

23         MS. MURPHY:  You can answer.

24     A.  Yes, that appears to be the time line.

25         MS. MURPHY:  Okay.  Let me just check.

Page 170

1  I'm trying to be good with the time frame that I have.

2  I'm trying not to be redundant with questioning.

3  That's all I have.

4          MR. LOEVY-REYES:  Transcript, please.

5          MS. LANDES:  Read and sign.

6          MS. MURPHY:  Transcript.

7          (DEPOSITION CLOSED AT 4:00 P.M.)

Page 171

2                  C-E-R-T-I-F-I-C-A-T-E

3  I, ELIZABETH GREELEY, a Notary Public, in and for the
   State of Rhode Island, duly commissioned and qualified
4  to administer oaths, do hereby certify that the
   foregoing Deposition of Tamara Wong, a Witness in the
5  above-entitled cause, was taken before me on behalf of
   the Plaintiff, at the offices of the Rhode Island
6  Attorney's General Office, 150 South Main Street,
   Providence, Rhode Island on November 4, 2021 at
7  9:00 A.M.; that previous to examination of said
   witness, who was of lawful age, she was first sworn by
8  me and duly cautioned to testify to the truth, the
   whole truth, and nothing but the truth, and that she
9  thereupon testified in the foregoing manner as set out
   in the aforesaid transcript.

10
   I further certify that the foregoing Deposition was
11 taken down by me in machine shorthand and was later
   transcribed by computer, and that the foregoing
12 Deposition is a true and accurate record of the
   testimony of said witness.

13
   Pursuant to Rules 5(d) and 30(f) of the Federal Rules
14 of Civil Procedure, original transcripts shall not be
   filed in Court; therefore, the original is delivered
15 to and retained by Plaintiff's Attorney, Mark
   Loevy-Reyes.

16
   I have enclosed with the Deposition a Correction and
17 Signature page, which must be signed before a Notary
   Public.

18
   IN WITNESS WHEREOF, I have hereunto set my hand this
19 10th day of November, 2021.

20

21

22

23 ELIZABETH GREELEY, NOTARY PUBLIC
   CERTIFIED COURT REPORTER
24 MY COMMISSION EXPIRES:  04/07/2022

25

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JOAO MONTEIRO,                          :
      Plaintiff,                    :
                                 :
v.                                      :         C.A. No. 1:21-cv-00046-MSM-LDA
                                 :
SUSAN CORMIER, TREVOR                    :
LEFEBVRE, DANIEL MULLEN, TINA            :
GONCALVES, CITY OF PAWTUCKET,            :
and TAMARA WONG,                         :
      Defendants.                   :

## EVIDENTIARY STIPULATION

NOW COME  Plaintiff Joao Monteiro and Defendant Tamara Wong, by and through their attorneys of record, and hereby stipulate and agree as follows.

The twenty-three numbered "Stipulated Facts" herein are the product of meet-and-confer conferences between counsel for Plaintiff Monteiro and Defendant Tamara Wong.  Defendant Wong agrees that Plaintiff Monteiro's entry into this Evidentiary Stipulation is adequate to resolve Defendant Wong's outstanding dispute regarding the adequacy of Plaintiff Monteiro's Response and Supplemental Response to Defendant Wong's First Set of Requests for Admission served on Plaintiff Monteiro.

Plaintiff Monteiro's entry into this Evidentiary Stipulation renders moot Defendant Wong's anticipated motion to the Court for resolution of her dispute with Plaintiff Monteiro regarding the adequacy of his Responses to her Requests for Admission.

Plaintiff Monteiro and Defendant Wong agree that the Stipulated Facts set forth herein are agreed to as true and accurate by each party. Moreover, the stipulations below may be treated by

either party as "admissions" of Plaintiff Monteiro, as if provided by Plaintiff Monteiro in direct response to Requests for Admission propounded by Defendant Wong.

## STIPULATED FACTS

1) No later than 2010, staff from the Rhode Island Department of Health (DOH) tested a cutting from the decedent's purple pants and detected the presence of DNA on the cutting (Item 1.8).

2) The DNA present on the cutting from deceased's purple pants was tested by staff from DOH in or before 2010, and they detected the presence of a Y allele.

3) Staff from DOH obtained an extract of the DNA present on the cutting from the deceased's purple pants.

4) Staff from DOH sent the DNA extract to Fairfax Identity Laboratories for Y-STR DNA analysis.

5) Staff from Fairfax Identity Laboratories tested the extract for Y-STRs and obtained a single source, partial Y-STR profile.

6) In 2010, staff from Fairfax Identity Laboratories reported to staff from DOH the single-source, partial Y-STR profile obtained from testing the extract from the deceased's purple pants.

7) Plaintiff does not challenge the accuracy of the partial Y-STR DNA profile that staff from Fairfax Identity Laboratories obtained from testing the extract, and that such staff reported to staff from DOH in January of 2010.

8) Staff from the Department of Health conducted additional testing of the extract and obtained a partial Y-STR profile.

9) Plaintiff does not contest the accuracy of the partial Y-STR DNA profile that Tamara Wong obtained from testing the extract, in a "Supplemental Report I" dated March 19, 2019.

10) On July 17, 2019, staff from the Department of Health received a buccal reference sample from Joao Monteiro and Tamara Wong conducted autosomal STR DNA and Y-STR DNA analysis on Mr. Monteiro's reference sample.

11) Tamara Wong of the Department of Health obtained a Y-STR DNA profile from Mr. Monteiro's reference sample.

12) Plaintiff does not contest the accuracy of Tamara Wong's July 17, 2019 report of Mr. Monteiro's Y-STR DNA profile.

13) The July 17, 2019 report states that the partial Y-STR DNA profiles obtained from the extract from the cutting of the deceased's purple pants are consistent with the known reference profile from Mr. Monteiro.

14) The partial Y-STR DNA profiles obtained from the extract from the cutting of the deceased's purple pants are consistent with the known reference profile from Mr. Monteiro.

15) Approximately 1 in every 1,909 male individuals is expected to have the same partial Y-STR DNA profile as that obtained from the extract from the cutting of the deceased's purple pants.

16) Plaintiff does not challenge or otherwise contest that staff from DOH, including Tamara Wong, followed appropriate testing procedures in developing the DNA evidence in this case.

17) Plaintiff does not challenge or otherwise contest that staff from DOH, including Tamara Wong, followed appropriate testing procedures in the physical handling of the DNA evidence in this case.

18) Plaintiff does not claim that Tamara Wong  tampered with the extract, the cutting,from the purple pants, or Mr. Monteiro's reference sample.

19) The July 17, 2019-report states, "Y-STR loci are located on the male specific Y chromosome and are maintained throughout the paternal lineage. Male relatives in the same paternal line will demonstrate the same Y-STR DNA profiles."

20) Plaintiff does not contest as improper the testing process used by Tamara Wong in developing the DNA profile of Mr. Monteiro or the partial Y-STR DNA profile obtained from the extract from the deceased's purple pants

21) The partial Y-STR DNA profile obtained from the extract from the deceased's purple pants was accurately reported by Ms. Wong in her March 2019-report.

22) The partial Y-STR DNA profile obtained from the extract from the deceased's purple pants was accurately reported by Ms. Wong in her July 17, 2019-report.

23) Plaintiff does not contend that the DNA profile results from the Y-STR testing performed by Ms. Wong are inaccurate.


**[Bottom of Page Intentionally Left Blank]**

**Stipulated and Agreed:**

For Plaintiff, Joao Monteiro

By his attorney,

For Defendant, Tamara Wong

By her attorney,

PETER F. NERONHA,
ATTORNEY GENERAL

_/s/_  Mark Loevy-Reyes
_on_ December7, 2022

_/s/_ Beth Landes
_on_ December7, 2022

Mark Loevy-Reyes, Esq. (_pro hac vice_)
LOEVY & LOEVY
311 n. Aberdeen St., 3ʳᵈ Floor
Chicago, Illinois 60607
(312) 243-5900 Telephone
mark@loevy.com

Beth Landes, Esq., Bar No. 10429
Special Assistant Attorney General
R.I. Office of Attorney General
150 South Main Street
Providence, RI  02903
Tel: (401) 274-4400 ext. 2296
blandes@riag.ri.gov

## <u>CERTIFICATION</u>

I, the undersigned, hereby certify that on the 7ᵗʰ day of December, 2022, I served this document on all counsel of record by email.

_/s/ Beth Landes_

4

# EXHIBIT 20

**Rhode Island Department of Health**
**Division of Laboratories**
**Forensic Biology Unit**
**50 Orms Street**
**Providence, RI 02904**
**(401) 222-5534, FAX (401) 222-5536**

**Summary of Analytical Findings**

June 22, 2010

**To:**   Det. Lt. Whalen                         **Case #** FB 08-1089
         Pawtucket Police Dept.               **Your Case #** 88-00837

**Victim(s):**   Christine Cole               **DOB:** 1/4/1978

**Suspect(s):**   Richard Graves            **DOB:** 6/23/1945

**Sub # 1**   **Evidence Submitted By:** Det. Peter Healey, Pawtucket Police Dept.
              **Date Received:** March 11, 2008

Item # 1.1   One sealed envelope with: reference blood sample from ME 0824-88
Item # 1.2   One sealed envelope with: blood described as Q1-1B cutting
Item # 1.3   One sealed envelope with: sampled cutting/swab described as Q393-45 Entire Stain
Item # 1.4   One sealed envelope with: sampled cutting/swab described as Q105-1 entire stain
Item # 1.5   One sealed envelope with: evidence for analysis described as "kiethia hood"
Item # 1.6   One sealed plastic bag containing: evidence for analysis described as empty slide
             holders labeled K1, Q1,Q2,Q3,Q4-5,Q6-7,Q8,Q9,Q10-11
Item # 1.7   One sealed plastic bag containing: evidence for analysis described as "know fabric
             cuttings Q1, Q2, Q3, Q8"
Item # 1.8   One sealed paper bag with: purple pants from Christine Cole
Item # 1.9   One sealed paper bag with: jacket

**Sub # 2**   **Evidence Submitted By:** Carl Horrocks, Pawtucket Police Dept.
              **Date Received:** May 29, 2008

Item # 2   One sealed paper bag with: head hair standard
Item # 3   One sealed envelope with: head hair standard
Item # 4   One sealed paper bag with: evidence for analysis
Item # 5   One sealed paper bag with: reference blood sample from Richard Graves

**RESULTS and OBSERVATIONS**

Microscopic examination fails to reveal the presence of spermatozoa and/or partially intact
spermatozoa on the purple pants (Item #1.8).

The presence of blood was indicated on the pants (Item #1.8).  STR DNA/PCR typing was
performed on the pants, however only Amelogenin alleles were detected.

Page 1 of 2

RIDOH000157

FB 08-1089 (continued)

Due to the detection of a Y allele, Items #1.8 and #5 were sent to Fairfax Identity Laboratories for Y-STR DNA analysis.  Refer to the enclosed Fairfax Identity Laboratories report for DNA analysis results.

These items were submitted, but were not tested: Items #1.1 - #1.7 and #1.9, Items #2, #3 and #4.


**DISPOSITION OF EVIDENCE:**

All items of evidence, sample cuttings, and any hairs, fibers, and/or debris collected are ready for release. Please call the Forensic Biology Unit at (401) 222-5534 to arrange a date and time.

Sample extracts will remain in storage indefinitely at the Forensic Biology Unit.




Cara E. Lupino, M.S.
Senior Forensic Scientist

Robin M. Smith, M.S.
Chief Forensic Sciences


Page 2 of 2

RIDOH000158

# EXHIBIT 21

## Allele Summary Worksheet

Analyst _____ *Cl* _____

Date : _____ 7-7-08 _____

Case Number   FB 08-1089

☐ Questioned Samples
☐ Victim Reference
☐ Suspect Reference
☐ Second Read
☐ Other _____

| Loci | Pos. Control 9947A | Ext. Control 08-974 | #1, 8 (pants) Item # | Item # | Item # | Item # | Item # |
|------|------|------|------|------|------|------|------|
| D3S1358 | 14, 15 | 14, 16 | NT | | | | |
| vWA | 17, 18 | 18, 19 | NT | | | | |
| FGA | 23, 24 | 22, 26 | NT | | | | |
| Amel | X | X, Y | X Y | | | | |
| D8S1179 | 13 | 13, 14 | N T | | | | |
| D21S11 | 30 | 29, 31 | | | | | |
| D18S51 | 15, 19 | 11, 16 | | | | | |
| D5S818 | 11 | 11, 13 | | | | | |
| D13S317 | 11 | 10, 13 | ↓ | | | | |
| D7S820 | 10, 11 | 8 | NT | | | | |
| | 75-400 | ROX | | | | | |
| D3S1358 | 14, 15 | 14, 16 | NT | | | | |
| D16S539 | 11, 12 | 9, 11 | | | | | |
| Amel | X | X, Y | | | | | |
| TH01 | 8, 9.3 | 9.3 | | | | | |
| TPOX | 8 | 8, 11 | | | | | |
| CSF1PO | 10, 12 | 11, 12 | | | | | |
| D7S820 | 10, 11 | 8 | ↓ | | | | |

Rev.5.0 MHz 05/13/08          FORM-FB-062          Page 1 of 1

08/27/19 FB 08-1089 PAGE: 088

Monteiro 000133

## Allele Summary Worksheet

Analyst : _Barbara Serabian_

Date : _6-22-10_

Case Number : FB _08-1089_

- ☐ Questioned Samples
- ☐ Victim Reference
- ☐ Suspect Reference
- ☐ Second Read
- ☐ Other _____

| Loci | Pos. Control 9947A | Ext. Control 08-974 | Item # 1, 8 | Item # | Item # | Item # | Item # |
|------|------|------|------|------|------|------|------|
| D3S1358 | 14, 15 | 14, 16 | nR | | | | |
| vWA | 17, 18 | 18, 19 | | | | | |
| FGA | 23, 24 | 22, 26 | | | | | |
| Amel | X | X, Y | X, Y | | | | |
| D8S1179 | 13 | 13, 14 | nR | | | | |
| D21S11 | 30 | 29, 31 | | | | | |
| D18S51 | 15, 19 | 11, 16 | | | | | |
| D5S818 | 11 | 11, 13 | | | | | |
| D13S317 | 11 | 10, 13 | | | | | |
| D7S820 | 10, 11 | 8 | | | | | |
| | 75-400 | ROX | | | | | |
| D3S1358 | 14, 15 | 14, 16 | nR | | | | |
| D16S539 | 11, 12 | 9, 11 | | | | | |
| Amel | X | X, Y | | | | | |
| TH01 | 8, 9.3 | 9.3 | | | | | |
| TPOX | 8 | 8, 11 | | | | | |
| CSF1PO | 10, 12 | 11, 12 | | | | | |
| D7S820 | 10, 11 | 8 | | | | | |

Rev.5.0 MHz 05/13/08          FORM-FB-062          Page 1 of 1

Monteiro 000131

# EXHIBIT 22

# In The Matter Of:

*Monteiro vs Cormier*

*Tamara Wong*

*November 4, 2021*



Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF RHODE ISLAND
 2

 3

 4  Joao Monteiro

 5     VS.              C.A. NO:  21-cv-00046-MSM-LDA

 6  Susan Cormier, Trevor
    Lefebvre, Daniel Mullen,
 7  Tina Concalves, City of
    Pawtucket and Tamara Wong
 8

 9  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

10

11                   DEPOSITION OF
                      TAMARA WONG
12

13                  NOVEMBER 4, 2021
                       9:00 A.M.
14

15                150 SOUTH MAIN STREET
                  PROVIDENCE, RI  02903
16

17

18

19

20

21

22                 ELIZABETH GREELEY
23             CERTIFIED COURT REPORTER

24

25
```

Page 2

```
 1             APPEARANCES OF COUNSEL

 2

 3   On Behalf of the Plaintiff, Joao Monteiro:
        LOEVY-LOEVY
 3      BY:  MARK LOEVY-REYES, ESQ.
        311 N. Aberdeen St.
 4      3rd Floor
        Chicago, IL  60607
 5      312-243-5900
        Mark@loevy.com
 6
     On Behalf of the Defendant, Tamara Wong:
 7      STATE OF RHODE ISLAND
        DEPARTMENT OF ATTORNEY GENERAL
 8      BY:  BETH LANDES, ESQ.
        150 South Main Street
 9      Providence, RI  02903
        401-274-4400
10      Blandes@riag.ri.gov

11   On Behalf of the Defendants, Cormier, Lefebvre,
     Goncalves and Mullen:
12      DESISTO LAW
        BY:  RYAN STYS, ESQ.
13      BY:  CAROLINE MURPHY, ESQ.
        60 Ship Street
14      Providence, RI  02903
        401-272-4442
15      Caroline@desistolaw.com

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1                  INDEX OF EXAMINATION

 2  WITNESS:  TAMARA WONG

 3  EXAMINATION                                 PAGE
    BY MR. LOEVY-REYES                             5
 4
    BY MS. MURPHY                                164
 5

 6

 7

 8                  INDEX TO EXHIBITS

 9  EXHIBIT       DESCRIPTION                   PAGE

10  EXHIBIT 117   COMPETENCY EVALUATIONS (5 PGS)...  6

11  EXHIBIT 115   COMPETENCY EVALUATION (4 PGS)....  6

12

13  EXHIBIT 42    AUTOPSY REPORT (28 PGS).........   6

14  EXHIBIT 66    HANDWRITTEN NOTES (4 PGS)........  6

15

16  EXHIBIT 15    SUPPLEMENTAL REPORT (15 PGS).....  6

17  EXHIBIT 3     EVIDENCE RELEASE SHEET (3 PGS)...  6

18

19  EXHIBIT 7     DOH SUBMISSION REPORT (2 PGS)....  6

20  EXHIBIT 100   EXTRACTION WORKSHEETS (23 PGS)...  6

21

22  EXHIBIT 101   GENEMAPPER WORKSHEETS (24 PGS)...  6

23  EXHIBIT 102   EXAMINATION RECEIPT (2 PGS)......  6

24

25
```

Page 4

```
 1  NO.           DESCRIPTION                    PAGE

 2

 3  EXHIBIT 103   INVENTORY WORKSHEET (3 PGS)......  6

 4  EXHIBIT 104   EVIDENCE RECEIPT (5 PGS).........  6

 5

 6  EXHIBIT 38    CHAIN OF CUSTODY (8 PGS).........  6

 7  EXHIBIT 52    COMMUNICATION LOG (3 PGS)........  6

 8

 9  EXHIBIT 10    LAB REPORT (10 PGS)..............  6

10  EXHIBIT 16    TEXT MESSAGES (16 PGS)...........  6

11

12  EXHIBIT 35    TEXT MESSAGES (6 PGS)............  6

13  EXHIBIT 36    E-MAILS (27 PGS).................  6

14

15  EXHIBIT 37    E-MAILS (15 PGS).................  6

16  EXHIBIT 57    RETAINED BY COUNSEL

17

18  EXHIBIT 9     RETAINED BY COUNSEL

19  EXHIBIT 45    EVIDENCE RECEIPT (19 PGS)........  6

20

21  EXHIBIT 53    E-MAIL (1 PG)....................  6

22  EXHIBIT 63    E-MAIL (2 PGS)...................  6

23

24  EXHIBIT 64    E-MAIL (1 PG)....................  6

25  EXHIBIT 65    E-MAILS (3 PGS)..................  6
```

Page 93

1  kit.

2     Q.  Below that, it reads, master mix lot number;
3  can you explain what that means?

4     A.  Again, another component of the
5  quantification kit.

6     Q.  Below that, it reads, dilution buffer lot
7  number; what does that signify?

8     A.  It is, again, another component of the
9  quantification kit.

10    Q.  Finally, the last one I'll ask you about is
11 DNA standard lot number; what does that represent?

12    A.  That represents a DNA sample of known, of
13 known concentration, which is also a component of the
14 kit.

15    Q.  If you can go to the next page, which has a
16 Bates number of Monteiro 127, up at the top there's a
17 box.  The top box, it reads, Notes.  Underneath it
18 says, LNS protocol used, then there is some
19 handwriting; is that your handwriting?

20    A.  Yes.

21    Q.  What does that handwriting say?

22    A.  It says number 500 microliter elution.

23    Q.  What does that mean?

24    A.  So that means on instrument Number 5, if you
25 look under Part B, the far right column says

Page 94

1  instrument Number 5, meaning that all the samples on
2  Instrument 5, when they were extracted, were eluted to
3  the volume of a hundred microliters.

4     Q.  Just below that there is a table under
5  Part A, Cellular Digestion.  It indicates number of
6  samples is 35; what does that relate to?

7     A.  That relates to the number of samples within
8  the extraction run, to assess the quantities of
9  reagents needed to process that many samples.

10    Q.  Just to the right of that there is a box that
11 says, Buffer/Pro K Ratio; what does that mean?

12    A.  That is a ratio of the reagents needed to
13 digest samples for DNA extraction.

14    Q.  To the right of that there is a box that has
15 Vortex, and it has a check where it says Completed;
16 what does that mean?

17    A.  That's just the process of initiating the
18 cellular digestion, meaning that each sample tube was
19 vortex.

20    Q.  To the right of that there is a box which
21 indicates 56 Degrees Centigrade, then it has a check
22 mark next to the box where it says Completed; what
23 does that mean?

24    A.  That is for completion of the, the heating
25 portion of the cellular digestion.

Page 95

1     Q.  To the right of that there is a box that
2  reads, Elution, E-L-U-T-I-O-N, Volume and checks where
3  it says 50 UL and 100 UL; what does that signify?

4     A.  Those signify the elution volumes of
5  50 microliters and 100 microliters within this
6  extraction set.

7     Q.  Going down to the bottom of the page, the
8  last two rows, are those for controls, those numbers?

9     A.  Yes.

10    Q.  How are those controls, how do those work?

11    A.  Again, those are controls of known standards
12 for, known standards and, known standards, known
13 standards of samples that contain DNA for extraction
14 and the correlating reagent plain, which is a sample
15 that should contain no DNA.

16    Q.  I'll ask you to turn to page Monteiro 131 in
17 Exhibit 100; can you tell me what's on this page?

18    A.  This is an allele summary worksheet of
19 autosomal DNA analysis done on Item 1.8.

20    Q.  Item 1.8 was the bloodstain on Christine
21 Cole's pants, correct?

22    A.  Correct.

23    Q.  This was an analysis that you didn't do; is
24 that fair?

25    A.  That is correct.

Page 96

1     Q.  But you had this, though, when you were doing
2  your own analysis; is that right?

3     A.  That is correct.

4     Q.  Is there any significance in the data that's
5  included on Page 131 in Exhibit 100?

6     A.  Yes.  Essentially that no reportable profile
7  was obtained from that stain, aside from the sex
8  determining chromosomes giving an X and a Y.

9     Q.  When you say the sex determining chromosome
10 gave an X and a Y, what does that mean?

11    A.  That means this sample contains potential DNA
12 from at least one male subject.

13    Q.  Did it rule out whether the potential sample
14 also could have contained DNA from a female
15 individual?

16    A.  It does not rule that out, no.

17    Q.  Because a female DNA chromosome would have an
18 X, correct?

19    A.  That is correct.

20    Q.  Can you tell me what is depicted on Page 132
21 of Exhibit 100?

22        MS. LANDES:  Objection.

23    A.  This is a review worksheet.

24    Q.  Did the Rhode Island Department of Health
25 forensic lab have a worksheet like this since you've

Page 97

1   been working there?

2       A.  Yes.  Different versions, but essentially,

3   yes.

4       Q.  If you can go to the next page, which is

5   Monteiro 133 in Exhibit 100, do you know what this

6   page is?

7       A.  This is another allele summary worksheet of

8   autosomal STRs.

9       Q.  It looks like this one was done a couple of

10  years earlier than the one we looked at two pages ago

11  on Page 131 is that right?

12      A.  Yes.

13      Q.  Are the conclusions identical between the

14  two?

15      A.  It appears to be, yes.

16      Q.  If you can go to the next page, which is

17  Monteiro 134, and tell me if you recognize what this

18  sheet is.

19      A.  This is an older CE, or electrophorese run

20  sheet.

21      Q.  What is shown on this run sheet?

22      A.  This sheet shows the samples that were run on

23  June 25, 2008, on an ABI310 genetic analyzer.

24      Q.  Is this a Department of Health document, do

25  you know?

Page 98

1       A.  Yes.

2       Q.  Do you know what the results were of this

3   analysis?

4       A.  I'm sorry, as far as?

5       Q.  Anything.  Like what is Page 134; what

6   information does it have on it?

7       A.  It has information on extraction controls,

8   amplification controls, and the sample from the

9   Christine Cole case being run on a genetic analyzer.

10      Q.  Does it have any results?

11      A.  No.

12      Q.  If you can go to the next page, which is

13  Monteiro 135, do you know what is depicted on this

14  page?

15      A.  This is an amplification sheet, worksheet.

16      Q.  What does the amplification worksheet provide

17  as far as information?

18      A.  It provides information on the samples that

19  were amplified, along with their correlating controls.

20      Q.  Does this give any DNA analysis information?

21      A.  No.

22      Q.  If you can go to the next page, which is

23  Monteiro 136, do you recognize what this page shows?

24      A.  Yes.  This is extraction method, a DNA

25  extraction method worksheet.

Page 99

1       Q.  Does this worksheet give any DNA analysis

2   information?

3       A.  No.

4       Q.  If you can go to the next page, which is

5   Monteiro 137, what does Monteiro 137 show?

6       A.  This, again, is another DNA extraction

7   worksheet.

8       Q.  Does the DNA extraction worksheet on

9   Monteiro 137 provide any DNA analysis?

10      A.  No DNA analysis results, no.

11      Q.  Does it show what the process was that was

12  used?

13      A.  Yes.

14      Q.  If you can go to the next page, which is

15  Monteiro 138, what information is on Monteiro 138?

16      A.  This is a quantification worksheet, which

17  gives information on how much DNA is within the named

18  samples.

19      Q.  Does Page 138 provide any information about

20  how much DNA was in the sample?

21      A.  Yes.

22      Q.  Where does it show that?

23      A.  The table in the box, that would be

24  correlated with E4, showing FB08-1089, Number 1.8.1,

25  gives a handwritten quantification number of 0.0288.

Page 100

1       Q.  What does that number mean as a forensic

2   scientist?

3       A.  That number is a concentration of DNA in

4   nanograms per microliter.

5       Q.  Does that have any significance to you as a

6   forensic scientist, meaning the number .0288?

7       A.  It just signifies the amount that the analyst

8   has to work with.

9       Q.  Do you know whether it's a high amount

10  relative to the stain?

11      A.  This is a relatively small amount of DNA.

12      Q.  Do you know why there would be a relatively

13  small amount of DNA if the source were blood?

14      A.  There are a multitude of reasons for that.

15      Q.  I think you already explained some of those?

16      A.  Correct.

17      Q.  Are there any more, outside of what you

18  already explained?

19      A.  There are.  Just the process of DNA

20  extraction, again, nothing in science or life is

21  perfect.  So we have to account that there could have

22  been loss of DNA within the steps of the extraction

23  process.

24      Q.  Got it.  Is there any other important

25  information that's depicted on Page 138 regarding the

Page 169

1  publicize.

2      Q.  Sitting here today, what was your reason for

3  asking her to mention the Rhode Island Department of

4  Health center for forensic sciences if you didn't know

5  what she was going to convey to the news?

6              MS. LANDES:  Objection.

7      A.  As I stated earlier in my testimony, it's

8  not, it wasn't about the specifics of what Detective

9  Cormier was going to say.  It was just an

10  acknowledgment to the Rhode Island Department of

11  Health laboratory in their role within the

12  investigation.

13     Q.  What did you understand the Rhode Island

14  Department of Health's role was in this investigation?

15     A.  Just that the Rhode Island Department of

16  Health and myself included as an analyst for the

17  Department of Health actually did work on evidence

18  within the case.

19     Q.  This is right after there was text message

20  exchanges in which you indicated, It's a match; is

21  that right?

22             MS. LANDES:  Objection.

23             MS. MURPHY:  You can answer.

24     A.  Yes, that appears to be the time line.

25             MS. MURPHY:  Okay.  Let me just check.

Page 170

1  I'm trying to be good with the time frame that I have.

2  I'm trying not to be redundant with questioning.

3  That's all I have.

4             MR. LOEVY-REYES:  Transcript, please.

5             MS. LANDES:  Read and sign.

6             MS. MURPHY:  Transcript.

7          (DEPOSITION CLOSED AT 4:00 P.M.)

Page 171

2                  C-E-R-T-I-F-I-C-A-T-E

3  I, ELIZABETH GREELEY, a Notary Public, in and for the
   State of Rhode Island, duly commissioned and qualified
4  to administer oaths, do hereby certify that the
   foregoing Deposition of Tamara Wong, a Witness in the
5  above-entitled cause, was taken before me on behalf of
   the Plaintiff, at the offices of the Rhode Island
6  Attorney's General Office, 150 South Main Street,
   Providence, Rhode Island on November 4, 2021 at
7  9:00 A.M.; that previous to examination of said
   witness, who was of lawful age, she was first sworn by
8  me and duly cautioned to testify to the truth, the
   whole truth, and nothing but the truth, and that she
9  thereupon testified in the foregoing manner as set out
   in the aforesaid transcript.

11  I further certify that the foregoing Deposition was
    taken down by me in machine shorthand and was later
11  transcribed by computer, and that the foregoing
    Deposition is a true and accurate record of the
12  testimony of said witness.

    Pursuant to Rules 5(d) and 30(f) of the Federal Rules
14  of Civil Procedure, original transcripts shall not be
    filed in Court; therefore, the original is delivered
15  to and retained by Plaintiff's Attorney, Mark
    Loevy-Reyes.

    I have enclosed with the Deposition a Correction and
17  Signature page, which must be signed before a Notary
    Public.

    IN WITNESS WHEREOF, I have hereunto set my hand this
19  10th day of November, 2021.

21              Elizabeth Greeley

23  ELIZABETH GREELEY, NOTARY PUBLIC
    CERTIFIED COURT REPORTER
24  MY COMMISSION EXPIRES:  04/07/2022

# EXHIBIT 23

# Fairfax Identity Laboratories

## A Division of Commonwealth Biotechnologies, Inc.

601 Biotech Drive
Richmond, VA 23235
Phone 804-648-3820

### Forensic DNA Case Report

January 13, 2010

**Contact:** Robin Smith
    Rhode Island Dept. of Health Laboratories
    Forensic Biology Laboratory
    50 Orms Street
    Providence, RI 02904

**FIL Case #:** C0900327
**RI Lab #:** 08-1089
**Victim:** Christine Cole
**Suspect:** Richard Graves

**List of Evidence Received on October 23, 2009, via Federal Express.**
Federal Express Tracking #: 797042286308

| FIL Item # | Item Description |
|---|---|
| 01.1 | Described as "Item # 1.8 - extract" |
| 02.1 | Described as "Item #RB - Reagent blank" |

All evidence will be returned to the Rhode Island Dept of. Health Laboratories – Forensic
Biology Laboratory.

## CASE REVIEW AND RESULTS:

Items C0900327 01.1 and C0900327 02.1 were processed for DNA typing by analysis of the
following Short Tandem Repeat (STR) loci specific to the male Y chromosome, also called Y-
STRs: (DYS456, DYS389I, DYS390, DYS389II, DYS458, DYS19, DYS385a/b, DYS393,
DYS391, DYS439, DYS635, DYS392, Y GATA H4, DYS437, DYS438, and DYS448). The
samples were analyzed using Applied Biosystems' AmpFlSTR Y-Filer kit. The DNA profiles
reported in this case were determined by procedures that have been validated in the FBI's
Quality Assurance Standards for Forensic DNA Testing Laboratories.

See Table A for results.

Page 1 of 2

RIDOH000159

**FIL Case #:** C0900327
**RI Lab #:** 08-1089

## Table A
### Summary of Results

| LOCUS | 01.1 – Item # 1.8 - extract | 02.1 – Item #RB - Reagent blank |
|-------|------|------|
| DYS456 | 18 | NR |
| DYS389I | 13 | NR |
| DYS390 | NR | NR |
| DYS389II | NR | NR |
| DYS458 | 15 | NR |
| DYS19 | NR | NR |
| DYS385a/b | NR | NR |
| DYS393 | 13 | NR |
| DYS391 | NR | NR |
| DYS439 | NR | NR |
| DYS635 | 21 | NR |
| DYS392 | NR | NR |
| Y GATA H4 | 11 | NR |
| DYS437 | NR | NR |
| DYS438 | NR | NR |
| DYS448 | NR | NR |

NR= no result

## CONCLUSIONS:

A partial profile, consistent with one male contributor, was obtained from Item #1.8 – extract 01.1.

No results were obtained from Item #RB - Reagent blank 02.1.

Marisa A. Fahrner, MSFS
Forensic DNA Analyst

Charles Kelly, Ph.D.,
Laboratory Director
Administrative Reviewer

RIDOH000160

# EXHIBIT 24





STATE OF
RHODE ISLAND
AND
PROVIDENCE
PLANTATIONS

**AFFIDAVIT AND ARREST WARRANT**

| AFFIDAVIT | | | | | | |
|---|---|---|---|---|---|---|
| **AFFIANT** Det. Susan Cormier | **AGENT OF** The Pawtucket Police Department | | | | | |
| **DEFENDANT** Joao Monteiro, alias John Monteiro | **ADDRESS** LKA | **NO.** | **STREET** 234 Central Street, Central Falls, RI | | **CITY/TOWN** | **STATE** |

**AFFIDAVIT**

Your affiant upon oath states that he has reason to believe and does believe that grounds for issuance of an arrest warrant exists and states the following facts on which such belief is founded:

\*\*\*See attached Affidavit\*\*\*

☒ IF SPACE IS NOT SUFFICIENT, CHECK (X) HERE AND ATTACH ADDITIONAL INFORMATION

**AFFIANT**
X _____

SUBSCRIBED AND SWORN TO BEFORE ME AT (CITY/TOWN)

**DATE** 7-17-19

JUDGE OF DISTRICT COURT, JUSTICE OF SUPERIOR COURT, OR ANY OTHER AUTHORIZED OFFICER
X _____

| ARREST WARRANT | | | | | | |
|---|---|---|---|---|---|---|
| **STATE, EX REL** **CITY/TOWN** Pawtucket | **COUNTY** Providence | | **DATE OF BIRTH** 06/28/60 | **DIVISION** 6th | **RHODE ISLAND DISTRICT COURT** | **WARRANT DATE** |
| **VS. DEFENDANT** Joao Monteiro, alias John Monteiro | **ADDRESS** LKA | **NO.** | **STREET** 234 Central Street, Central Falls, RI | **CITY/TOWN** | **STATE** | |

TO ANY AUTHORIZED OFFICER: Affidavit (and complaint) having been made to me under oath, and as I am satisfied that there is probably cause for the belief therein set forth that grounds for issuing an arrest warrant exists, you are hereby commanded to arrest the defendant forthwith and to bring him before a judge of this court without unnecessary delay.

| BAIL $ | **SURETY** ☐ with ☐ without | **DATE SIGNED** 7-17-19 | JUDGE OF DISTRICT COURT, JUSTICE OF SUPERIOR COURT, OR ANY OTHER AUTHORIZED OFFICER X _____ |
|---|---|---|---|

**RETURN OF SERVICE**

I have apprehended the within named defendant and have presented him/her before the court as herein commanded.

| SERVICE $ | MILEAGE $ | DATE OF RETURN | AUTHORIZED OFFICER X |
|---|---|---|---|

Pawtucket Defendants - 1st RFP - 000839

## Joao Monteiro Affidavit

On January 6, 1988, Christine Cole, who had just turned ten (10) years old two days prior, left her residence located at 67 West Avenue at approximately 4:00 PM in Pawtucket to walk to the store to purchase some items for her mother.  Police at the time confirmed that Christine made three stops after leaving her home; The first was to Red's Seafood at approximately 4:15 PM to buy clams for dinner, the second stop was at a friend's house nearby, who stated Christine arrived at 5:30 PM and played dolls with her until 6:30 PM, and the last stop was to Saints Market located at 76 Slater Street to buy milk.  The store clerk confirmed Christine came to the store at approximately 7:00 PM purchase the milk and then left the store.  It should be noted that the temperature that afternoon was approximately 18 degrees outside and the store clerk recalled that Christine was not properly dressed for the weather and did not have a hat or gloves on.  Sunset on January 6, 1988 was 4:29 PM, therefore it was dark out when Christine left her home to walk to the store.  Christine never made it home and a massive search was conducted to include police, bloodhound dogs, and a helicopter over the next few days to no avail.  Christine's lifeless body washed up on Conimicut Point Beach in Warwick, Rhode Island fifty-four (54) days later on February 28, 1988.  The University of Rhode Island's Graduate School of Oceanography was contacted and Professor Malcom Spaulding determined that this trip under normal conditions would take from three (3) to seven (7) days.  He explained that the channel runs the Pawtucket area right past the beach where Christine washed ashore.  He also stated that due to ice conditions that winter, the body could have hung up in numerous locations, but that the body would always be pulled back into the channel when the tide went out.  Conimicut Beach, is an unobstructed path that starts in the Blackstone River, which connects to Seekonk River to Conimicut Point Beach and is roughly ten (10) nautical miles.  The victim was fully clothed at the time her body was discovered with the exception of her underwear, to which the victim's mother stated that the child always wore.  Her shoes were also missing.  Detectives at the time conducted a search of the child's

bedroom and confirmed that there were more than a dozen pairs of underwear in the child's dresser drawer. It should also be noted that when the victim's body was located, her pants were fastened in a manner that appeared to be extremely tight and haphazardly. It did not appear to be fastened in a normal fashion. The victim's last known location was Saint's Market located at 76 Slater Street at approximately 7:00 PM. The distance from Saint's Market to the victim's home at 67 West Avenue is .3 miles. The closest water access to the Blackstone River from that location is an additional .7 miles. The victim would have had to walk directly past her residence and continue walking an additional .7 miles in the frigid temperature and in the dark to get to the water. Detectives at the time also learned from the victim's mother and classmates that the victim was deathly afraid of the water and could not swim. Those that were interviewed stated that the victim would never have gone to the water by choice. Detectives and the FBI worked on the case extensively, but were unable to identify the person(s) responsible for her disappearance and death. In 1996, two Pawtucket Detectives reopened the case and conducted a new investigation. A potential suspect was identified however he was later cleared by DNA testing.

In August 2018, your affiant reopened the Christine Cole case and scheduled a meeting on September 28, 2018 with the State Medical Examiner's Office to review the autopsy report and autopsy photographs with the Forensic Pathologist. During that meeting, it was learned that evidence was submitted on this case in 2008 to the RI Department of Health by a Pawtucket Detective, who has long since retired. The results of the testing was returned from the RI Department of Health in 2010, however your affiant was unaware of such testing as there was no paperwork in the original case files at the Pawtucket Police Department. After learning of the evidence submission that took place in 2008, your affiant made an appointment to meet with the Supervisor of Forensic Science at the RI Department of Health on October 16, 2018, to go over the analytical findings of the testing that was performed on this case. During that meeting, it was learned that the pants worn by the victim

were submitted for possible DNA testing and that the findings revealed that there was male blood on the inside crotch of the victims pants. Forensic testing of that blood resulted in obtaining a partial Y-STR profile (Short Tandem Repeat for the male Y-Chromosome). Upon learning of this, your affiant requested further testing of the extraction from the blood sample in the hopes that newer advances in technology may reveal more. The results produced a larger Y-STR profile and your affiant was advised that this was checked against a Y-STR database maintained by the RI Department of Health and revealed the closest match to that partial Y-STR profile belonged to a subject by the name of Jerson Semedo, date of birth 06/01/93. Jerson Semedo was in the data base due to an unrelated conviction that resulted in a mandatory collection of his DNA. Jerson Semedo was not born yet when Christine Cole disappeared and was found deceased in 1988. According to the Forensic Scientists at the RI Department of Health, that would indicate that the suspect for the blood found on the victim's pants was in the close male lineage of Jerson Semedo, such as his father, grandfather, uncle, or brother.

A full background check was conducted on Jerson Semedo and it was learned that Semedo was briefly incarcerated at the ACI in Cranston, RI in 2014 and listed his father as being John "Monterio". A background check of Jerson Semedo's sister Jessica revealed her father to be Joao "John " Monteiro, dob 06/28/60. A full background was conducted on Joao "John" Monteiro, by using CLEAR, the IMC data base, Cross Agency, and Facebook, which revealed that he has moved at least nineteen (19) times in the past thirty years with one of the addresses being 78 Slater Street, which is directly above Saints Market where the victim was last seen. Several of the other addresses he had were also in the immediate neighborhood of where the victim lived. Of the nineteen different residences he has had over the years, several of them were checked and none of the addresses that Monteiro uses, including the ones on his license and registration are where he actually resides. Pawtucket Detectives learned the location where Monteiro works in Cumberland and followed him home at the conclusion of his work shift

to ascertain where he was currently living.   Extensive surveillance has been conducted by Pawtucket Police Detectives on Monteiro, to include doing a trash pull from discarded trash placed curbside on his scheduled trash day.  Negative results for DNA or fingerprints matching Monteiro from the items that were seized or even locating any mail addressed to him in that trash.  This is a multi-family unit.  A request was made to the US Postal Inspector and your affiant was advised that Monteiro does not receive any mail at that address.  Due to the fact that he currently lives in Central Falls, your affiant enlisted the assistance of the Central Falls Police to conduct a ruse at Monteiro's apartment to ensure that he does reside there and which apartment he lives in.  It was also learned by Detectives that Monteiro parks his vehicle behind the building next door to where he lives and not at his actual residence. It was confirmed that Monteiro resides at the Central Falls address and not at the address where he parks his vehicle.  Further surveillance was conducted by following Monteiro several times from his residence to his place of business.  Again, Monteiro parks his vehicle in the rear of the lot between two large delivery trucks, which makes it impossible to see the vehicle from the street.  All other employees appear to park in the front parking lot out in the open.  Surveillance has been conducted by following Monteiro to and from work and each time he made no stops to or from work.  It appears that Monteiro lives his life in a very covert manner.

On April 29, 2019, your affiant contacted Dr. Colleen Fitzpatrick, who specializes in genealogy and is the founder of Indentifiers International. Your affiant provided Dr. Fitzpatrick with the Y-STR markers in this case to attempt to do a Y-analysis against the genetic genealogy databases.  Due to the fact that there is only a partial Y-STR profile in this case, there were not enough markers to use in the genetic genealogy database, so Dr. Fitzpatrick utilized another tool that can give ethnicity called the Nevgen Haplogroup Predictor. (A haplogroup is a population group that can be associated with a geographical area or ethnicity such as Native American, Oriental, African American, etc).  When Dr. Fitzpatrick input the 12 markers into the predictor, it gave a probability

of 96% haplogroup E1b1b. This is generally associated with North African, but some subgroups are also found in Mediterranean Europe into Continental Europe. A map of this area showed it to include Cape Verde. Joao "John" Baptista is from Cape Verde.

Based on the aforementioned facts and circumstances, your affiant applied for a search warrant on July 16, 2019 for two buccal swab samples suitable for DNA analysis from the person of **Joao Monteiro (6/28/60),** which was then submitted to the Rhode Island Department of Health to be compared to the partial Y-STR profile of the blood located on the inside crotch of the victims pants. Joao Monteiro was brought to the Pawtucket Police Department at 8:00 AM on July 17, 2019 the purpose of executing the search warrant. Monteiro was cooperative and allowed Pawtucket Police BCI Detectives to take the buccal swab from him. Detectives Cormier and Lefebvre then spoke with Monteiro about basic background information while the DNA swabs were transported by Pawtucket BCI Detectives to the Department of Health for testing. Detective Cormier then verbally provided Monteiro with his Miranda Rights, which he stated he understood and agreed to speak with us further. The entire interview was recorded and burned to a DVD. Monteiro was confronted with the covert way he lives his life, the fact that he has moved so many times over the years, and the fact that he lived at the same address, 76 / 78 Slater Street, where the victim was last seen. Monteiro confirmed the fact that he lived at that address during that same time frame. Monteiro continued to deny knowing the victim or being responsible for her disappearance and death. He denied ever knowing or even seeing the victim. Upon completion of the interview, Monteiro was transported to his home by Detectives.

Forensic Scientist Tamara Wong from the Rhode Island Department of Health contacted Det. Cormier at 5:50 PM on July 17, 2019 to notify her that the DNA reference was compared to the partial Y-STR profile obtained from the blood located on the inside crotch of the victim's pants and confirmed that it was consistent with the known reference DNA profile for Joao Monteiro. Tamara Wong provided a Summary of

Analytical Facts Supplemental Report, which detailed her findings. Please see the attached report for further details.

Pawtucket Defendants - 1st RFP - 000845

# EXHIBIT 25

# In The Matter Of:

*Monteiro vs Cormier*

*Tamara Wong*

*November 4, 2021*



---

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF RHODE ISLAND
 2

 3

 4  Joao Monteiro

 5       VS.              C.A. NO:  21-cv-00046-MSM-LDA

 6  Susan Cormier, Trevor
    Lefebvre, Daniel Mullen,
 7  Tina Concalves, City of
    Pawtucket and Tamara Wong
 8

 9  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

10

11               DEPOSITION OF
                 TAMARA WONG
12

13             NOVEMBER 4, 2021
                 9:00 A.M.
14

15            150 SOUTH MAIN STREET
              PROVIDENCE, RI  02903
16

17

18

19

20

21

22            ELIZABETH GREELEY
23         CERTIFIED COURT REPORTER

24

25
```

---

Page 2

```
 1        APPEARANCES OF COUNSEL

 2
     On Behalf of the Plaintiff, Joao Monteiro:
 3       LOEVY-LOEVY
         BY:  MARK LOEVY-REYES, ESQ.
 4       311 N. Aberdeen St.
         3rd Floor
 5       Chicago, IL  60607
         312-243-5900
 6       Mark@loevy.com

 7   On Behalf of the Defendant, Tamara Wong:
         STATE OF RHODE ISLAND
 8       DEPARTMENT OF ATTORNEY GENERAL
         BY:  BETH LANDES, ESQ.
 9       150 South Main Street
         Providence, RI  02903
10       401-274-4400
         Blandes@riag.ri.gov
11
     On Behalf of the Defendants, Cormier, Lefebvre,
12   Goncalves and Mullen:
         DESISTO LAW
13       BY:  RYAN STYS, ESQ.
         BY:  CAROLINE MURPHY, ESQ.
14       60 Ship Street
         Providence, RI  02903
15       401-272-4442
         Caroline@desistolaw.com
16

17

18

19

20

21

22

23

24

25
```

---

Page 3

```
 1             INDEX OF EXAMINATION

 2  WITNESS:  TAMARA WONG

 3  EXAMINATION                          PAGE
    BY MR. LOEVY-REYES                      5
 4
    BY MS. MURPHY                         164
 5

 6

 7

 8            INDEX TO EXHIBITS

 9  EXHIBIT        DESCRIPTION              PAGE

10  EXHIBIT 117    COMPETENCY EVALUATIONS (5 PGS)...    6

11  EXHIBIT 115    COMPETENCY EVALUATION (4 PGS)....    6

12

13  EXHIBIT 42     AUTOPSY REPORT (28 PGS).........    6

14  EXHIBIT 66     HANDWRITTEN NOTES (4 PGS)........    6

15

16  EXHIBIT 15     SUPPLEMENTAL REPORT (15 PGS).....    6

17  EXHIBIT 3      EVIDENCE RELEASE SHEET (3 PGS)...    6

18

19  EXHIBIT 7      DOH SUBMISSION REPORT (2 PGS)....    6

20  EXHIBIT 100    EXTRACTION WORKSHEETS (23 PGS)...    6

21

22  EXHIBIT 101    GENEMAPPER WORKSHEETS (24 PGS)...    6

23  EXHIBIT 102    EXAMINATION RECEIPT (2 PGS)......    6

24

25
```

---

Page 4

```
 1  NO.            DESCRIPTION              PAGE

 2

 3  EXHIBIT 103    INVENTORY WORKSHEET (3 PGS)......    6

 4  EXHIBIT 104    EVIDENCE RECEIPT (5 PGS).........    6

 5

 6  EXHIBIT 38     CHAIN OF CUSTODY (8 PGS).........    6

 7  EXHIBIT 52     COMMUNICATION LOG (3 PGS)........    6

 8

 9  EXHIBIT 10     LAB REPORT (10 PGS).............    6

10  EXHIBIT 16     TEXT MESSAGES (16 PGS)...........    6

11

12  EXHIBIT 35     TEXT MESSAGES (6 PGS)............    6

13  EXHIBIT 36     E-MAILS (27 PGS).................    6

14

15  EXHIBIT 37     E-MAILS (15 PGS).................    6

16  EXHIBIT 57     RETAINED BY COUNSEL

17

18  EXHIBIT 9      RETAINED BY COUNSEL

19  EXHIBIT 45     EVIDENCE RECEIPT (19 PGS)........    6

20

21  EXHIBIT 53     E-MAIL (1 PG)....................    6

22  EXHIBIT 63     E-MAIL (2 PGS)...................    6

23

24  EXHIBIT 64     E-MAIL (1 PG)....................    6

25  EXHIBIT 65     E-MAILS (3 PGS)..................    6
```

---

Page 49

1 into a more user-friendly version, which is typically
2 what's included in case files, the paper printout.
3      Q.   Okay.  Then going below the GeneMapper ID
4 there is a section for data entry, what were you
5 trained about data entry?
6      A.   I don't recall specifically.  Yes, I don't
7 recall specifically.
8      Q.   Just below that, Number 3 has PopStats, what
9 are PopStats?
10      A.   PopStats are, again, another software
11 utilized by the FBI in their CODIS database.
12      Q.   Does the Department of Health use PopStats?
13      A.   Yes.
14      Q.   Did you use PopStats at all regarding the
15 Christine Cole case?
16      A.   No.
17      Q.   Okay.  Going below there, it says searches;
18 what were you trained about searches?
19      A.   I don't recall specifically.
20      Q.   Do you recall generally?
21      A.   I would be safe to assume searches is in
22 regard to the CODIS database.
23      Q.   That was my assumption as well.  But as we
24 sit here today, you don't recall exactly if that's
25 right?

Page 50

1      A.   That's correct.
2      Q.   Going down below under 3, Number 2, Witness
3 expert testimony; what were you trained about witness
4 expert testimony?
5      A.   I don't recall specifically what that
6 training entailed.
7      Q.   You were trained at some point by the
8 Department of Health that your role as a forensic
9 scientist would be to be a neutral determiner of what
10 the science reveals; is that fair?
11          MS. LANDES:  Objection.
12      A.   That's correct.
13      Q.   What training did you receive about that?
14      A.   I don't recall specifically what the training
15 entailed.  But in general, it's, you know, just --
16 it's just the explanation of the science.  That's all
17 that it is that we do is provide, provide details to
18 the science.
19      Q.   Do you think you did that in the Christine
20 Cole investigation?
21          MS. LANDES:  Objection.
22      A.   I'm sorry, I don't really understand your
23 question.
24      Q.   Sure.
25      A.   Because I didn't give any testimony.

Page 51

1      Q.   No, no, no.  I understand that.  Let me ask
2 it this way:  During the work that you had and the
3 interactions that you had involving the Christine Cole
4 investigation, do you believe that you remained
5 neutral, meaning a neutral scientist where you only
6 reported the scientific facts?
7          MS. LANDES:  Objection.
8      A.   Yes, absolutely.
9      Q.   How did you first learn about the Christine
10 Cole investigation?
11      A.   I don't recall specifically.
12      Q.   Do you recall generally?
13      A.   I believe when it was reopened and assigned
14 to me.
15      Q.   Who made the assignment to you?
16      A.   I believe that would have been my supervisor,
17 Cara Lupino.
18      Q.   How long had Ms. Lupino been your supervisor
19 before you were assigned the Christine Cole case?
20      A.   She's been my supervisor since I started at
21 the forensic biology laboratory.
22      Q.   Back in -- let me rephrase it.  Back when you
23 were assigned to work on the Christine Cole
24 investigation, what was the case assignment procedure
25 in the lab?

Page 52

1          MS. LANDES:  Objection.
2      A.   I don't know that there is a procedure for
3 assigning cases.
4      Q.   How many forensic scientists were there back
5 when you were assigned the Christine Cole
6 investigation?
7      A.   That's a good question.  I believe there were
8 three analysts, including myself.
9      Q.   As you sit here today, is it fair to say you
10 do not recall exactly how it was procedurally how
11 Ms. Lupino would make case assignments?
12          MS. LANDES:  Objection.
13      A.   There is no set procedure.  However, it's
14 typically based on experience and essentially your,
15 your title.  So we already went through --
16      Q.   Sure.
17      A.   -- associate, senior, principal.
18      Q.   Got it.  Were you one of the more senior
19 analysts when you were assigned the Christine Cole
20 case?
21      A.   Correct.
22      Q.   Were there any other scientists who had any
23 more experience than you at that point?
24      A.   No.
25      Q.   When you received the assignment, what's the

Page 169

1  publicize.

2      Q.  Sitting here today, what was your reason for

3  asking her to mention the Rhode Island Department of

4  Health center for forensic sciences if you didn't know

5  what she was going to convey to the news?

6          MS. LANDES:  Objection.

7      A.  As I stated earlier in my testimony, it's

8  not, it wasn't about the specifics of what Detective

9  Cormier was going to say.  It was just an

10  acknowledgment to the Rhode Island Department of

11  Health laboratory in their role within the

12  investigation.

13     Q.  What did you understand the Rhode Island

14  Department of Health's role was in this investigation?

15     A.  Just that the Rhode Island Department of

16  Health and myself included as an analyst for the

17  Department of Health actually did work on evidence

18  within the case.

19     Q.  This is right after there was text message

20  exchanges in which you indicated, It's a match; is

21  that right?

22         MS. LANDES:  Objection.

23         MS. MURPHY:  You can answer.

24     A.  Yes, that appears to be the time line.

25         MS. MURPHY:  Okay.  Let me just check.

Page 170

1  I'm trying to be good with the time frame that I have.

2  I'm trying not to be redundant with questioning.

3  That's all I have.

4          MR. LOEVY-REYES:  Transcript, please.

5          MS. LANDES:  Read and sign.

6          MS. MURPHY:  Transcript.

7          (DEPOSITION CLOSED AT 4:00 P.M.)

Page 171

2                 C-E-R-T-I-F-I-C-A-T-E

3  I, ELIZABETH GREELEY, a Notary Public, in and for the
   State of Rhode Island, duly commissioned and qualified
4  to administer oaths, do hereby certify that the
   foregoing Deposition of Tamara Wong, a Witness in the
5  above-entitled cause, was taken before me on behalf of
   the Plaintiff, at the offices of the Rhode Island
6  Attorney's General Office, 150 South Main Street,
   Providence, Rhode Island on November 4, 2021 at
7  9:00 A.M.; that previous to examination of said
   witness, who was of lawful age, she was first sworn by
8  me and duly cautioned to testify to the truth, the
   whole truth, and nothing but the truth, and that she
9  thereupon testified in the foregoing manner as set out
   in the aforesaid transcript.

11 I further certify that the foregoing Deposition was
   taken down by me in machine shorthand and was later
11 transcribed by computer, and that the foregoing
   Deposition is a true and accurate record of the
12 testimony of said witness.

14 Pursuant to Rules 5(d) and 30(f) of the Federal Rules
   of Civil Procedure, original transcripts shall not be
14 filed in Court; therefore, the original is delivered
15 to and retained by Plaintiff's Attorney, Mark
   Loevy-Reyes.

17 I have enclosed with the Deposition a Correction and
   Signature page, which must be signed before a Notary
17 Public.

19 IN WITNESS WHEREOF, I have hereunto set my hand this
   10th day of November, 2021.

21          Elizabeth Greeley

23 ELIZABETH GREELEY, NOTARY PUBLIC
   CERTIFIED COURT REPORTER
24 MY COMMISSION EXPIRES:  04/07/2022

# EXHIBIT 26



**Rhode Island Department of Health**
**Division of Laboratories**
**Forensic Biology Unit**
**50 Orms Street**
**Providence, RI 02904**
**(401) 222-5534, FAX (401) 222-5536**

**Summary of Analytical Findings**

**SUPPLEMENTAL REPORT**
March   19, 2019

**To:**   Det. Susan Cormier
Pawtucket Police Dept.

**Case** # FB 08-1089
**Your Case** # 88-00837

**Victim(s):**   Christine Cole

**DOB:** 01/04/1978

Note:  Please refer to the report dated June 22, 2010 and the Fairfax Identify Laboratories' reports dated May 10, 2010 and January 13, 2010 for all previous evidence submissions and analytical findings.

**Sub # 1**   **Evidence Submitted By:** Det. Peter Healey, Pawtucket Police Dept.
**Date Received:** March 11, 2008

Item # 1.8   One sealed paper bag with: (Q8) victim's purple pants

**RESULTS and OBSERVATIONS**

The DNA extracts from the stain on the victim's purple pants (Item # 1.8) was analyzed for Y-STRs using the PowerPlex Y23 amplification kit.

See table for Y-STR DNA-PCR typing results for Item # 1.8.

Page 1 of 3

The above tests conducted are accredited under the laboratory's ISO/IEC 17025 accreditation issued by the ANSI-ASQ National Accreditation Board/ANAB. Refer to certificate #FT-0004 and scope of accreditation. If any tests are subcontracted, they will be designated as such.

FB 08-1089 (continued)

| SUMMARY OF **Y-STR** DNA-PCR TYPING: | |
|---|---|
| **Locus** | **Item # 1.8** <br> **pants ST** |
| **DYS576** | 18 |
| **DYS389 I** | 13 |
| **DYS448** | 20 |
| **DYS389 II** | bt |
| **DYS19** | NT |
| **DYS391** | 11 |
| **DYS481** | 22 |
| **DYS549** | 13 |
| **DYS533** | 12 |
| **DYS438** | bt |
| **DYS437** | bt |
| **DYS570** | 18 |
| **DYS635** | 21 |
| **DYS390** | 24 |
| **DYS439** | NT |
| **DYS392** | NT |
| **DYS643** | NT |
| **DYS393** | 13 |
| **DYS458** | 15 |
| **DYS385** | bt |
| **DYS456** | NT |
| **YGATAH4** | NT |

NT: no type
bt: below threshold

## CONCLUSIONS

The partial Y-STR DNA profile obtained from the stain on the victim's purple pants (Item # 1.8) is consistent with an unidentified male donor.

Y-STR loci are located on the male specific Y chromosome and are maintained throughout the paternal lineage. Male relatives in the same paternal line will demonstrate the same Y-STR DNA profiles.

Please submit any available suspect and/or elimination reference samples for comparative DNA analysis.

The above tests conducted are accredited under the laboratory's ISO/IEC 17025 accreditation issued by the ANSI-ASQ National Accreditation Board/ANAB. Refer to certificate #FT-0004 and scope of accreditation. If any tests are subcontracted, they will be designated as such.

Pawtucket Defendants - 1st RFP - 000992

FB 08-1089 (continued)

## DISPOSITION OF EVIDENCE

All items of evidence, sample cuttings, and any hairs, fibers, and/or debris collected are ready for release. Please call the Forensic Biology Unit at (401) 222-5534 to arrange a date and time.

Sample extracts will remain in storage indefinitely at the Forensic Biology Unit.


Tamara Wong
_____
Tamara Wong
Senior Forensic Scientist

Cara E. Lupino
_____
Cara E. Lupino, M.S.
Supervisor, Forensic Biology

The above tests conducted are accredited under the laboratory's ISO/IEC 17025 accreditation issued by the ANSI-ASQ National Accreditation Board/ANAB. Refer to certificate #FT-0004 and scope of accreditation. If any tests are subcontracted, they will be designated as such.

Pawtucket Defendants - 1st RFP - 000993

# EXHIBIT 27



**Rhode Island Department of Health**
**Division of Laboratories**
**Forensic Biology Unit**
**50 Orms Street**
**Providence, RI 02904**
**(401) 222-5534, FAX (401) 222-5536**

**Summary of Analytical Findings**
**SUPPLEMENTAL REPORT II**
**July 17, 2019**

**To:**  Det. Susan Cormier                              **Case # FB 08-1089**
Pawtucket Police Dept.                          **Your Case # 88-00837**

**Victim(s):**   Christine Cole                        **DOB:** 1/4/1978

**Suspect(s):**  Joao Monteiro                      **DOB:** 6/28/1960

Note: Please refer to the reports dated March 19, 2019 and June 22, 2010, and the Fairfax
Identity Laboratories' reports dated May 10, 2010 and January 13, 2010 for all previous
evidence submissions and analytical findings.

**Sub # 3**    **Evidence Submitted By:** Det. Susan Cormier, Pawtucket Police Dept.
**Date Received:** April 05, 2019

Item # 6    One sealed paper bag with: questioned swab(s) from pink lollipop
Item # 7    One sealed paper bag with: questioned swab(s) from "Dasani" water bottle
Item # 8    One sealed paper bag with: questioned swab(s) from "Poland Spring" bottle
Item # 9    One sealed paper bag with: questioned swab(s) from "Subway" fork
Item # 10   One sealed paper bag with: questioned swab(s) from "McDonald's" straw in cup
Item # 11   One sealed paper bag with: questioned swab(s) from medium "Coca-Cola" cup
Item # 12   One sealed paper bag with: questioned swab(s) from straw striped #2
Item # 13   One sealed paper bag with: questioned swab(s) from striped straw #1
Item # 14   One sealed paper bag with: questioned swab(s) from chewed green gum
Item # 15   One sealed paper bag with: questioned swab(s) from "Coors Light" can
Item # 16   One sealed paper bag with: questioned swab(s) from "Budweiser" can
Item # 17   One sealed paper bag with: questioned swab(s) from "Wendy's" fork
Item # 18   One sealed box with: cutting from (Q8) victim's pants
Item # 19   One sealed box with: cutting from (Q1) victim's jacket
Item # 20   One sealed envelope with: "keitha hood"
Item # 21   One sealed envelope with: cutting of stain (Q1-1B) from victim's jacket

**Sub # 4**    **Evidence Submitted By:** Det. Joel Saccoccio, Pawtucket Police Dept.
**Date Received:** May 17, 2019

Item # 22   One sealed paper bag with: questioned swab(s) from water bottle

**Sub # 5**    **Evidence Submitted By:** Det. Mark Ramos, Pawtucket Police Dept.
**Date Received:** July 17, 2019

Item # 23   One sealed paper bag with: buccal reference sample from Joao Monteiro

Page 1 of 6

The above tests conducted are accredited under the laboratory's ISO/IEC 17025 accreditation issued by the ANSI-ASQ National Accreditation
Board/ANAB. Refer to certificate #FT-0004 and scope of accreditation. If any tests are subcontracted, they will be designated as such.

FB 08-1089 (continued)

## RESULTS and OBSERVATIONS

Human DNA was not detected on Item # 16, therefore no further testing was performed.

Insufficient human DNA was detected on Items # 11-13 and # 17, therefore no further testing was performed.

Human male DNA was not detected on Item # 7, therefore no further testing was performed.

Insufficient human male DNA was detected on Items # 8-9 and # 15, therefore no further testing was performed.

These items were submitted, but not tested: the cutting from (Q8) victim's pants (Item # 18), the cutting from (Q1) victim's jacket (Item # 19), the "keithia hood" (Item #20), and the cutting of stain (Q1-1B) from victim's jacket (Item # 21).

See table for autosomal and Y-STR DNA-PCR typing results.

| | SUMMARY OF AUTOSOMAL STR DNA-PCR TYPING: | | | | |
|---|---|---|---|---|---|
| Locus | Item # 6 lollipop | Item # 10 straw | Item # 14 gum | Item # 22 water bottle | Item # 23 Joao Monteiro |
| Amel | XY | [X]Y | XY | XY | XY |
| D3S1358 | 14, 17 | 14, [17] | [15], 19 | 15, 16 | 16, 18 |
| D1S1656 | [15], 15.3, [16] | 15.3, 16 | 13, 14 | 15.3, 16 | 14, 18.3 |
| D2S441 | 10, 11 | 10, bt | 10, 11 | 11, [11.3] | 10, 11.3 |
| D10S1248 | 13, 14 | 13 | 14, 15 | 14, 15 | 11, 16 |
| D13S317 | 9 | 9 | 9, 13 | 12 | 11 |
| Penta E | 10, 20 | 10, 19, 20 | 12, 22 | [7], 14, [20] | 7, 13 |
| D16S539 | 8, 12 | [8], 12 | 9, 12 | 11 | 11, 12 |
| D18S51 | [14], 15, [17] | 15, [17] | 14, 17 | [16], 17 | 10, 14 |
| D2S1338 | [19], 25 | 19, 25 | 19, 23 | 16, 19 | 19, 20 |
| CSF1P0 | [10], 11, [12] | [11], 12 | 9, 12 | 12 | 10 |
| Penta D | 10 | [10], 13, [15] | 7, 10 | 10 | 11 |
| TH01 | [6, 7], 9, [9.3] | [6], 9 | 6, 9 | 8, [9, 9.3] | 6, 9 |
| vWA | 15, [19] | 15 | 16 | 14, 17 | 13, 15 |
| D21S11 | 30, 33.2 | [29], 30, [33.2] | 30, 31 | 30.2, 32.2 | 30, 32.2 |
| D7S820 | [8], 9, [12] | 8, [9] | 8, 10 | 11, 12, [13] | 11, 12 |
| D5S818 | 7, [12], 13 | 7, 13 | 11, [12] | 11, [12] | 12 |
| TPOX | 8, [11] | 8, [10] | 11, 12 | 8 | 6, 11 |
| DYS391 | [10], 11 | NT | 10 | 11 | 11 |
| D8S1179 | 12, [13], 14 | 12, [13, 14] | 13, 15 | 13, 14 | 11, 14 |
| D12S391 | 18 | 18 | 18, 21 | 18, 22 | 18, 20 |
| D19S433 | 13, 14 | [13], 14 | 14 | 13.2, 14.2 | 14.2, 15.2 |
| FGA | 21, 22 | 21, 22 | 20, 24 | 23 | 20, 29 |
| D22S1045 | [14], 16 | [14], 16 | 11, 16 | 15, [16] | 15 |

DYS391 is a gender specific locus located on the Y chromosome
[ ]: unbalanced allele/minor component
NT: no type

Page 2 of 6

The above tests conducted are accredited under the laboratory's ISO/IEC 17025 accreditation issued by the ANSI-ASQ National Accreditation Board/ANAB. Refer to certificate #FT-0004 and scope of accreditation. If any tests are subcontracted, they will be designated as such.
Pawtucket Defendants - 1st RFP - 000995

FB 08-1089 (continued)

| Locus | Item # 6 lollipop | Item # 10 straw | Item # 14 gum | Item # 22 water bottle |
|---|---|---|---|---|
| DYS576 | 18 | 18 | 18 | 20 |
| DYS389 I | 13 | NT | 13 | 13 |
| DYS448 | 19 | 19 | 19 | 20 |
| DYS389 II | 29 | NT | 30 | 31 |
| DYS19 | 14 | 14 | 13 | 15 |
| DYS391 | 11 | 11 | 10 | 11 |
| DYS481 | 22 | 22 | 26 | 30 |
| DYS549 | 12 | NT | 12 | 11 |
| DYS533 | 12 | 12 | 11 | 12 |
| DYS438 | 10 | NT | 11 | 10 |
| DYS437 | 15 | 15 | 15 | 15 |
| DYS570 | 17 | 17 | 19 | 17 |
| DYS635 | NT | 23 | 22 | 24 |
| DYS390 | 24 | 24 | 24 | 24 |
| DYS439 | 12 | NT | 12 | 13 |
| DYS392 | 14 | 14 | 14 | 11 |
| DYS643 | 10 | 10 | 10 | 10 |
| DYS393 | 13 | 13 | 14 | 13 |
| DYS458 | [15], 16 | 16, [17] | 17 | 19 |
| DYS385 | 11, [14] | 11, [14] | 14, 17 | 14, [15] |
| DYS456 | 15 | 15 | 15 | 15 |
| YGATAH4 | 11 | 11 | 12 | 11 |

Caption: SUMMARY OF Y-STR DNA-PCR TYPING:

[ ]: unbalanced allele/minor component
NT: no type

The above tests conducted are accredited under the laboratory's ISO/IEC 17025 accreditation issued by the ANSI-ASQ National Accreditation Board/ANAB. Refer to certificate #FT-0004 and scope of accreditation. If any tests have been performed, they will be designated as such.

Pawtucket Defendants - 1st RFP - 000996

FB 08-1089 (continued)

| SUMMARY OF Y-STR DNA-PCR TYPING: | | |
|---|---|---|
| Locus | Item # 1.8 pants ST (composite) | Item # 23 Joao Monteiro |
| DYS576 | 18 | 18 |
| DYS389 I | 13. | 13 |
| DYS448 | 20 | 20 |
| DYS389 II | bt | 30 |
| DYS19 | NT | 13 |
| DYS391 | 11 | 11 |
| DYS481 | 22 | 22 |
| DYS549 | 13 | 13 |
| DYS533 | 12 | 12 |
| DYS438 | bt | 10 |
| DYS437 | bt | 14 |
| DYS570 | 18 | 18 |
| DYS635 | 21 | 21 |
| DYS390 | 24 | 24 |
| DYS439 | NT | 12 |
| DYS392 | NT | 11 |
| DYS643 | NT | 12 |
| DYS393 | 13 | 13 |
| DYS458 | 15 | 15 |
| DYS385 | bt | 17,18 |
| DYS456 | * 18 | 18 |
| YGATAH4 | * 11 | 11 |

NT: no type
bt: below threshold
*: composite profile - alleles were previously analyzed and reported

## CONCLUSIONS

### Autosomal STRs

The autosomal DNA profile obtained from the questioned swab from pink lollipop (Item # 6) is consistent with mixture of, at least, two contributors. The major component is consistent with an unidentified male contributor. Joao Monteiro (Item # 23) can be excluded as a possible contributor to this mixed autosomal DNA profile.

The partial autosomal DNA profile obtained from the questioned swab from straw in "McDonald's" cup (Item #10) is consistent with mixture of, at least, two contributors. The major component is consistent with the major component from the pink lollipop (Item # 6). Joao Monteiro (Item # 23) can be excluded as a possible contributor to this mixed autosomal DNA profile.

The autosomal DNA profile obtained from the questioned swab from green gum (Item # 14) is consistent with a second unidentified, single source, male donor. Joao Monteiro (Item # 23) can be excluded as a possible contributor to this autosomal DNA profile.

The above tests conducted are accredited under the laboratory's ISO/IEC 17025 accreditation issued by the ANSI-ASQ National Accreditation Board/ANAB. Refer to certificate #FT-0004 and scope of accreditation. If any tests are subcontracted, they will be designated as such.

Pawtucket Defendants - 1st RFP - 000997

The autosomal DNA profile obtained from the questioned swab from water bottle (Item # 22) is consistent with mixture of, at least, two contributors. The major component is consistent with a third unidentified male contributor. Joao Monteiro (Item # 23) can be excluded as a possible contributor to this mixed autosomal DNA profile.

**Y-STRs**

Y-STR loci are located on the male specific Y chromosome and are maintained throughout the paternal lineage. Male relatives in the same paternal line will demonstrate the same Y-STR DNA profiles

The partial Y-STR DNA profiles obtained from the questioned swabs from pink lollipop (Item # 6) and from straw in "McDonald's" cup are consistent with the same unidentified male donor. The male donor from this item can be excluded as a possible contributor to the previously reported partial Y-STR profile obtained from the stain on the victim's purple pants (Item # 1.8). Joao Monteiro (Item # 23) can be excluded as a possible contributor to this Y-STR DNA profile.

The Y-STR DNA profile obtained from the questioned swab from green gum (Item # 14) is consistent with a second unidentified male donor. The male donor from this item can be excluded as a possible contributor to the previously reported Y-STR profile obtained from the stain on the victim's purple pants (Item # 1.8). Joao Monteiro (Item # 23) can be excluded as a possible contributor to this Y-STR DNA profile.

The Y-STR DNA profile obtained from the questioned swab from water bottle (Item # 22) is consistent with a third unidentified male donor. The male donor from this item can be excluded as a possible contributor to the previously reported Y-STR profile obtained from the stain on the victim's purple pants (Item # 1.8). Joao Monteiro (Item # 23) can be excluded as a possible contributor to this Y-STR DNA profile.

The previously reported partial Y-STR DNA profiles obtained from the stain on the victim's purple pants (Item # 1.8) is consistent with the known reference profile from Joao Monteiro (Item # 23).

Statistics were developed using all suitable loci tested and the haplotype from the stain on the victim's purple pants (Item # 1.8) is found in 0 of 5,717 total individuals within the combined U.S. Y-HRD database. Applying the 95% upper confidence interval results in a frequency of approximately 1 in every 1,909 individuals.

Please submit any available suspect and/or elimination reference samples for comparative DNA analysis.

The DNA profiles obtained in this case have been reviewed by the CODIS Administrator and are not eligible* for entry into the Rhode Island State and National DNA Databases.

*An eligible DNA profile is defined as having a direct link with the crime scene and is expected to have originated from a potential perpetrator. If specific documentation showing the origin of the evidence and its relation to the crime scene is not submitted/communicated, the profile will not be eligible for CODIS entry and will be not searched.

The above tests conducted are accredited under the laboratory's ISO/IEC 17025 accreditation issued by the ANSI-ASQ National Accreditation Board/ANAB. Refer to certificate #FT-0004 and scope of accreditation. If any tests are subcontracted, they will be designated as such.

Pawtucket Defendants - 1st RFP - 000998

FB 08-1089 (continued)

## DISPOSITION OF EVIDENCE

All items of evidence, sample cuttings, and any hairs, fibers, and/or debris collected are ready for release. Please call the Forensic Biology Unit at (401) 222-5534 to arrange a date and time.

Sample extracts will remain in storage indefinitely at the Forensic Biology Unit.


*Tamara Wong*

Tamara Wong, M.S.
Senior Forensic Scientist


*Cara E Lupino*

Cara E. Lupino, M.S.
Supervisor, Forensic Biology


Page 6 of 6

The above tests conducted are accredited under the laboratory's ISO/IEC 17025 accreditation issued by the ANSI-ASQ National Accreditation Board/ANAB. Refer to certificate #FT-0004 and scope of accreditation. If any tests are subcontracted, they will be designated as such.

Pawtucket Defendants - 1st RFP - 000999

# EXHIBIT 28

submission. And for the interview we have to coordinate with the PIO who must also be present during the taping. All sorts of red tape with the State.
7/16/19, 9:22 AM · SMS

Ok.  No worries.  Don't want to make anything too complicated. I appreciate you asking.  On another note, I am hoping to get the search warrant signed today on the Christine Cole case and if so, I will bring it to you first thing in the morning.  How many how's do you think it might take to do what you need to?
7/16/19, 9:48 AM

6-8 hours hopeful without any issues
9:50 AM · SMS

⬇ See latest message

Do you have the FBI report(s) for the Cole case? Can I have a copy?
7/17/19, 10:28 AM · SMS

Yes. Stand by. Do you want me to fax or email?
7/17/19, 10:34 AM

Email please tamara .wong@health.ri.gov
7/17/19, 10:35 AM · SMS

What exactly do you need
7/17/19, 10:42 AM

Do you need it right now or later
7/17/19, 10:43 AM

I want the report that itemizes 1B) that
⬇ See latest message

👌 no pressure or anything
7/17/19, 2:49 PM · SMS

😬
7/17/19, 2:49 PM · SMS

Sorry.  This is a major case and we have waited 30 years
7/17/19, 2:50 PM

I understand 🙂
7/17/19, 2:56 PM · SMS

Wednesday, Jul 17, 2019 · 5:53 PM

It's a match. Finalizing the report right now.
7/17/19, 5:53 PM · SMS

⬇ See latest message

---

7/16/19, 9:50 AM · SMS

🙂 I am on the edge of my damn seat right now knowing that we are sooo close to an answer.
7/16/19, 9:51 AM

I hope it leads to answers and not more questions.
7/16/19, 10:39 AM · SMS

Me too!  Thanks Tamara! Fingers crossed girlfriend!
7/16/19, 10:42 AM

Tuesday, Jul 16, 2019 · 12:44 PM

The judge just signed the warrant. we will execute the warrant first thing in the mor⬇  s to
⬇ See latest message

I want the report that itemizes the evidence (ei Q1 -1B) that was sent to them
7/17/19, 10:44 AM · SMS

Sent you what I have
7/17/19, 11:00 AM

Got it, thanks
7/17/19, 11:14 AM · SMS

Wednesday, Jul 17, 2019 · 1:18 PM

Are you holding Monteiro? Do you need a report today or can it wait until tomorrow?
7/17/19, 1:18 PM · SMS

We need it today as soon as poss⬇  s
⬇ See latest message

Omg!!!
7/17/19, 5:54 PM

    
7/17/19, 5:54 PM · SMS

Nice detective work Sue!!! Congrats!
7/17/19, 5:54 PM · SMS

I love you!!
7/17/19, 5:55 PM


7/17/19, 5:56 PM · SMS

I'll email the report as soon as cial.
⬇ See latest message

---

warrant. we will execute the warrant first thing in the morning and get the swabs to you immediately hopefully by 8 a.m. 8:30
7/16/19, 12:44 PM

Sounds good!
7/16/19, 12:50 PM · SMS

Wednesday, Jul 17, 2019 · 8:20 AM

The  DNA swabs are on their way to you now
7/17/19, 8:20 AM

Ok
7/17/19, 8:21 AM · SMS

Wednesday, Jul 17, 2019 · 10:28 AM

⬇ See latest message
eport(s)

We need it today as soon as possible.  He is still with us
7/17/19, 2:28 PM

Is it a match???
7/17/19, 2:28 PM

Definitely cannot wait until tomorrow
7/17/19, 2:29 PM

Still waiting for data.
7/17/19, 2:32 PM · SMS

Ok
7/17/19, 2:32 PM · SMS

We are all on the edge of our seat waiting for your reply . My chief major and FBI
7/17/19, 2:34 PM

⬇ See latest message

I'll email the report as soon as it's finished and official.
7/17/19, 6:00 PM · SMS

Thanks!!!
7/17/19, 6:03 PM

Email sent.
7/17/19, 7:02 PM · SMS

You are a rock star!! From the bottom of my heart, thank you Tamara!!
7/17/19, 7:03 PM

😊 You're welcome!
7/17/19, 7:08 PM · SMS

I have one request...when ews with ion the
⬇ See latest message

TWong_000004

this one please mention the RI Dept. Of Heath Center for Forensic Sciences 😉

7/17/19, 7:09 PM • SMS

Oh make no mistake that I will mention the lab and you personally!!!

7/17/19, 7:10 PM

So, there is no " 1 in 10 billion" match type of stats... Just 95% confident?

7/17/19, 7:10 PM

Unfortunately not with Y-STRs, because they are shared with family members, the stats are always low.

7/17/19, 7:12 PM • SMS

Can you tell? I need you to trans... [See latest message] uage.

We just hired an evidence tech...

8/16/19, 5:19 PM • SMS

Have her check https://www .crime-scene-investigator.net /employment.html#3

↻
Tap to load preview

8/16/19, 5:20 PM • SMS

And here https://webdata.aafs .org/public/jobs/postings.aspx

8/16/19, 5:21 PM • SMS

Internships are the best way to get a foot in the door, especially if she is still in school.

[See latest message] 5:22 PM • SMS

Wednesday, Nov 6, 2019 • 6:18 PM

I'm coming tonight, just a bit late

11/6/19, 6:18 PM • SMS

Thursday, Nov 21, 2019 • 10:27 AM

Hey Tam- when you get a chance, can you please check to see what evidence you might have on the ███████ case? I know you mentioned last night that you recalled seeing ██ name and that you have some type of evidence. Thanks!

11/21/19, 10:27 AM

Thursday, Nov 21, 2019 • 11:30 AM
[See latest message]

---

family members, the stats are always low.

7/17/19, 7:12 PM • SMS

Can you talk? I need you to translate this into my language. Dumb it done for mw

7/17/19, 7:12 PM

Sure!

7/17/19, 7:12 PM • SMS

Thursday, Jul 18, 2019 • 6:40 PM

You name dropped! Oh boy. Nice job today though.

7/18/19, 6:40 PM • SMS

Friday, Aug 16, 2019 • 4:55 PM

Hey T███████ ██ have a ve... [See latest message]

Monday, Sep 23, 2019 • 10:29 AM

Hey Tamara- did you speak to Cara about the letter I was hoping you guys could write about the M-Vac that I could add to my request to the police chiefs to pitch in to pay for the M-Vac?

9/23/19, 10:29 AM

She just got back today. I'll remind her. She wants to run it across with the chief too.

9/23/19, 10:31 AM • SMS

Okay 👍

9/23/19, 10:31 AM

Wednesday, Sep 25, 2019 • 10:48 AM
[See latest message]

I will check

11/21/19, 11:30 AM • SMS

Thursday, Nov 21, 2019 • 12:52 PM

I can't find a forensic biology case number, but we have an ████ swab & smear, a ████ swab & smear, and a ████ from ████████ The medical examiners might have more.

11/21/19, 12:52 PM • SMS

Excellent! Thanks!!

11/21/19, 1:38 PM

Can we test them?

11/21/19, 1:38 PM

The swabs will be crap. The ████ [See latest message] ting.

---

Hey Tamara- question....I have a very close friend who is looking for some help getting his daughter a job.. she is a great kid. Degree in (Major) Criminal Justice and minor in Forensics. Looking to get a foot in the door. Anything open at your place or anywhere else that you know of ?

8/16/19, 4:55 PM

What classes does she have in forensics? I know MA state lab is hiring in DNA, but you have to have specific coursework completed.

8/16/19, 5:19 PM • SMS

We just hired an evidence tech...

8/16/19, 5:19 PM • SMS

[See latest message] s://www

Hi- are you coming to the meeting tonight?

9/25/19, 10:48 AM

I was just going to send you an email, unfortunately no. I was really looking forward to hearing about ████ case.

9/25/19, 10:50 AM • SMS

Damn. Ok thanks. You will be missed.

9/25/19, 10:52 AM

Sorry. I had something come up.

9/25/19, 11:08 AM • SMS

No worries

9/25/19, 11:20 AM

[See latest message]

Everything was packages poorly for DNA testing, but we can try. I'd be more interested in the ████████ and ████

11/21/19, 1:40 PM • SMS

I would love to try. What do we have to lose...I don't know where the ████████ and ████ Couldn't find them in evidence. Gonna look again and see if FBI has any thing on this case.

11/21/19, 1:42 PM

👍

11/21/19, 1:44 PM • SMS

M█ [See latest message] AM


TWong_000005

# EXHIBIT 29

# In The Matter Of:

*Monteiro vs Cormier*

*Tamara Wong*

*November 4, 2021*



Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF RHODE ISLAND
 2

 3

 4  Joao Monteiro

 5       VS.              C.A. NO:  21-cv-00046-MSM-LDA

 6  Susan Cormier, Trevor
    Lefebvre, Daniel Mullen,
 7  Tina Concalves, City of
    Pawtucket and Tamara Wong
 8

 9  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

10

11                  DEPOSITION OF
                     TAMARA WONG
12

13               NOVEMBER 4, 2021
                     9:00 A.M.
14

15             150 SOUTH MAIN STREET
                PROVIDENCE, RI  02903
16

17

18

19

20

21

22             ELIZABETH GREELEY
23          CERTIFIED COURT REPORTER

24

25
```

Page 2

```
 1            APPEARANCES OF COUNSEL

 2

 3    On Behalf of the Plaintiff, Joao Monteiro:
        LOEVY-LOEVY
 4      BY:  MARK LOEVY-REYES, ESQ.
        311 N. Aberdeen St.
 5      3rd Floor
        Chicago, IL  60607
 6      312-243-5900
        Mark@loevy.com
 7
      On Behalf of the Defendant, Tamara Wong:
 8      STATE OF RHODE ISLAND
        DEPARTMENT OF ATTORNEY GENERAL
 9      BY:  BETH LANDES, ESQ.
        150 South Main Street
10      Providence, RI  02903
        401-274-4400
11      Blandes@riag.ri.gov

12    On Behalf of the Defendants, Cormier, Lefebvre,
      Goncalves and Mullen:
13      DESISTO LAW
        BY:  RYAN STYS, ESQ.
14      BY:  CAROLINE MURPHY, ESQ.
        60 Ship Street
15      Providence, RI  02903
        401-272-4442
16      Caroline@desistolaw.com

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1              INDEX OF EXAMINATION

 2  WITNESS:  TAMARA WONG

 3  EXAMINATION                              PAGE
    BY MR. LOEVY-REYES                          5
 4
    BY MS. MURPHY                             164
 5

 6

 7

 8              INDEX TO EXHIBITS

 9  EXHIBIT        DESCRIPTION              PAGE

10  EXHIBIT 117    COMPETENCY EVALUATIONS (5 PGS)...   6

11  EXHIBIT 115    COMPETENCY EVALUATION (4 PGS)....   6

12

13  EXHIBIT 42     AUTOPSY REPORT (28 PGS)..........   6

14  EXHIBIT 66     HANDWRITTEN NOTES (4 PGS)........   6

15

16  EXHIBIT 15     SUPPLEMENTAL REPORT (15 PGS).....   6

17  EXHIBIT 3      EVIDENCE RELEASE SHEET (3 PGS)...   6

18

19  EXHIBIT 7      DOH SUBMISSION REPORT (2 PGS)....   6

20  EXHIBIT 100    EXTRACTION WORKSHEETS (23 PGS)...   6

21

22  EXHIBIT 101    GENEMAPPER WORKSHEETS (24 PGS)...   6

23  EXHIBIT 102    EXAMINATION RECEIPT (2 PGS)......   6

24

25
```

Page 4

```
 1  NO.            DESCRIPTION              PAGE

 2

 3  EXHIBIT 103    INVENTORY WORKSHEET (3 PGS)......   6

 4  EXHIBIT 104    EVIDENCE RECEIPT (5 PGS).........   6

 5

 6  EXHIBIT 38     CHAIN OF CUSTODY (8 PGS).........   6

 7  EXHIBIT 52     COMMUNICATION LOG (3 PGS)........   6

 8

 9  EXHIBIT 10     LAB REPORT (10 PGS)..............   6

10  EXHIBIT 16     TEXT MESSAGES (16 PGS)...........   6

11

12  EXHIBIT 35     TEXT MESSAGES (6 PGS)............   6

13  EXHIBIT 36     E-MAILS (27 PGS).................   6

14

15  EXHIBIT 37     E-MAILS (15 PGS).................   6

16  EXHIBIT 57     RETAINED BY COUNSEL

17

18  EXHIBIT 9      RETAINED BY COUNSEL

19  EXHIBIT 45     EVIDENCE RECEIPT (19 PGS)........   6

20

21  EXHIBIT 53     E-MAIL (1 PG)....................   6

22  EXHIBIT 63     E-MAIL (2 PGS)...................   6

23

24  EXHIBIT 64     E-MAIL (1 PG)....................   6

25  EXHIBIT 65     E-MAILS (3 PGS)..................   6
```

Page 145

1  Cole case that were previously analyzed by the FBI.

2      Q.  Was there a reason why you wanted that

3  information?

4      A.  Yes, to better understand the items that were

5  submitted.  They were submitted with designations that

6  were given by the FBI.  So the description of the

7  items are not abundantly clear without the FBI's

8  report.

9      Q.  I see.  When you asked for the FBI report,

10 was that when you were doing your DNA analysis

11 regarding Mr. Monteiro's buccal swab?

12     A.  I don't think my inquiry had anything to do

13 with Mr. Monteiro's buccal swab.  Again, this is just

14 going back to items that were submitted, or I should

15 say, resubmitted.

16     I don't know how to explain that, in the sense

17 that, again, the designations were initially the

18 FBI's.  Just trying to understand the evidence that I

19 had in my custody with regard to the Christine Cole

20 case that wasn't apparent trash scrap items, but were

21 actual physical items from the Christine Cole case.

22     Q.  Going to the next page, 1014, this kind of

23 clarifies, I think, what you were just testifying

24 about.  I want the report that itemizes the evidence

25 (EI Q1-IB) that was sent to them.  Does that confirm

Page 146

1  what you were just testifying about, that you were

2  looking for the description of evidence that came from

3  the original Christine Cole case?

4      A.  Correct.

5      Q.  That is something separate from all the trash

6  that had been submitted to you?

7      A.  That's correct.

8      Q.  Did you receive that?  I see that the next

9  text says, Sent you what I had.  Did that include the

10 information that you were looking for?

11     A.  I believe so, yes.

12     Q.  Going down further, about a quarter of the

13 page up from the bottom, two texts below where it says

14 Wednesday, 2:18 p.m., there's three texts from

15 Ms. Cormier.  We need it today as soon as possible.

16 He is still with us.

17     Next text is, Is it a match???  Then it says,

18 Definitely cannot wait until tomorrow.  Do you

19 remember receiving those?

20     A.  Yes.

21     Q.  If you go to the next page, about a third of

22 the way up there is another emoji.  How do you

23 describe this one?  I'm so bad at describing emojis.

24 You're better than I am.  You got the grimace earlier,

25 which was better than my scrunched-up face.  This is

Page 147

1  more like a nervous emoji, isn't it?

2      A.  Yes, I would say that, like a nervous smile.

3      Q.  The nervous smile, that emoji that you sent,

4  was that because you felt like a lot of, not

5  necessarily pressure, but you were constantly being

6  asked whether you had the report yet?

7      A.  That's a fair assumption, yes.

8      Q.  Going to the next page, which is 1016, the

9  top text reads, right underneath Wednesday, 5:53 p.m.,

10 It's a match.  Finalizing the report now.

11     That's a text from you.  Is there a reason why

12 you said, It's a match?

13     A.  Again, this is just an informal

14 communication.  Trying to explain the formal

15 explanation in a summarized fashion would be, It's a

16 match, indicating that the DNA sample, the reference

17 sample from Mr. Monteiro was consistent with the DNA

18 sample from the pants.

19     Q.  You testified earlier that was sort of a

20 foregone conclusion, since you already knew that

21 Mr. Monteiro's son had matched that piece of, had

22 matched the partial Y-STR, that you had also then

23 expected Mr. Monteiro to match it; is that right?

24     A.  Assuming that Mr. Monteiro is a family

25 relative of Mr. Semedo, that would be correct.  Again,

Page 148

1  however, I don't know the workings behind that, so all

2  I see is the DNA.

3      Q.  That's a fair point.  You had no personal

4  knowledge as to whether Mr. Monteiro was the

5  biological father of Mr. Semedo?

6      A.  Correct.

7      Q.  But you knew that if he was, then you would

8  expect there to be a consistent Y-STR match?

9      A.  That's correct.

10     Q.  Then it indicates, Finalizing the report

11 right now.

12     Did you send it over that day?

13     A.  Yes, that evening.

14     Q.  That's when we looked at it earlier, which

15 had a July 17, 2019 date on it?

16     A.  Correct.

17     Q.  That's what provided your official findings

18 related to your DNA analysis?

19     A.  Correct.

20     Q.  So this text, would you describe this text as

21 being an official report?

22     A.  Not an official report.

23     Q.  In fact, the July 17, 2019 report, that was

24 your final report as it related to comparing the Y-STR

25 partial profile from the sample Number 1.8 with

Page 149

1 Mr. Monteiro's buccal swab?

2    A.  That is the formal finalized report, correct.

3    Q.  Now, down below, about halfway down there is

4 another series of emojis.  I'm going to guess at

5 these.  It looks like nausea, followed by vomit,

6 followed by nervous, followed my smiling emojis.  What

7 was the purpose of those emojis that you sent?

8    A.  I can't specifically.

9    Q.  Do you recall generally why you sent those?

10   A.  I would say generally it was more just a

11 nervous kind of break in the cold case with regard to

12 DNA analysis.

13   Q.  Why did you think it was a break?

14   A.  Because at that point there was no, there was

15 no known reference sample that could be compared to

16 the sample from the pants.  Everything before was

17 unofficial, and having an actual known reference

18 sample, in this case from Mr. Monteiro, that was

19 consistent with the sample from the pants was a step

20 forward.

21   Q.  But you knew at the time, though, that

22 consistent sample was not individualized to

23 Mr. Monteiro, correct?

24   A.  That's correct.

25   Q.  Is there a reason why you didn't include that

Page 150

1 information in your text?

2        MS. LANDES:  Objection.

3    A.  I don't know why I didn't.  I guess I didn't

4 think that it was relevant at the time.  I was

5 assuming that Detective Cormier understood what Y-STRs

6 meant and how the paternal lineage, the paternal link

7 plays out.

8    Q.  Why would you think that she understood that?

9    A.  I assumed that she would understand that, or

10 at least know that based on the information that I

11 gave her regarding Jerson Semedo, that the Y-STR

12 profile would be consistent with any of his male

13 relatives, and that it was fair to say it wasn't

14 Semedo, being not born at the time of Christine Cole's

15 death.

16   Q.  You had testified earlier during the

17 conversation you had with Ms. Cormier you had

18 explained to her that the Y-STR analysis itself would

19 implicate, potentially implicate any of Mr. Semedo's

20 male relatives, correct?

21   A.  Correct.

22   Q.  In fact, that's why you had the discussion

23 with Ms. Cormier about Joao and Jose Semedo?

24   A.  Correct.

25   Q.  Can you pull out Exhibit 35?  Let me ask you

Page 151

1 to look through Exhibit 35, and tell me if you

2 recognize what that is.

3    A.  This is, so Exhibit 35, again, appears to be

4 text messages between myself and Detective Cormier.

5    Q.  Do these appear to be from your phone?

6    A.  Yes.

7    Q.  I'm going to ask you to go to Page T Wong

8 00004, in particular, the bottom right-hand text.  I

9 know it's a little cut off, but there is a text that

10 appears from you, and it appears to be on 8/17/19

11 around 7:08 p.m.  It says, I have one request...

12 When -- I can't see it -- news with, and if you go to

13 the top of the next page, this one, Please mention the

14 RI Department of Health center for forensic sciences.

15     You had just testified that regarding the press

16 conference you had asked that there at least be some

17 mention of the work that was done in your lab; is that

18 right?

19   A.  That's correct.

20   Q.  Does this appear to be the text that relates

21 to that?

22   A.  Yes.

23   Q.  Under that, it says, Oh, make no mistake that

24 I will mention the lab and you personally.  Was that

25 Ms. Cormier's response to you?

Page 152

1    A.  Yes.

2    Q.  Just below that where it has a time

3 underneath it of 7/17/19 at 7:10 p.m., there is a text

4 from Ms. Cormier that says, So, there is no "1 in 10

5 billion" match type of stats... just 95 percent

6 confident?

7      Do you see that?

8    A.  Yes.

9    Q.  Was that after you had sent her your report

10 that was dated July 17, 2019?

11   A.  Yes, that would be correct.

12   Q.  In fact, in the report that is dated July 17,

13 2019, there is the 95 percent confidence interval that

14 is mentioned, correct?

15   A.  Correct.

16   Q.  Then just below that, is this your response

17 to her, at 7:12 p.m. on July 17, 2019, Unfortunately

18 not with Y-STRs, because they are shared with family

19 members.  The stats are always low.

20     That was your response?

21   A.  Yes.

22   Q.  Just to the right of there there is a text

23 that says, Can you talk?  I need you to translate this

24 for my language.  Dumb it down for me.  That was at

25 7:12 p.m.  It looks like it came right after yours.

Page 169

1  publicize.

2      Q.  Sitting here today, what was your reason for

3  asking her to mention the Rhode Island Department of

4  Health center for forensic sciences if you didn't know

5  what she was going to convey to the news?

6          MS. LANDES:  Objection.

7      A.  As I stated earlier in my testimony, it's

8  not, it wasn't about the specifics of what Detective

9  Cormier was going to say.  It was just an

10 acknowledgment to the Rhode Island Department of

11 Health laboratory in their role within the

12 investigation.

13     Q.  What did you understand the Rhode Island

14 Department of Health's role was in this investigation?

15     A.  Just that the Rhode Island Department of

16 Health and myself included as an analyst for the

17 Department of Health actually did work on evidence

18 within the case.

19     Q.  This is right after there was text message

20 exchanges in which you indicated, It's a match; is

21 that right?

22         MS. LANDES:  Objection.

23         MS. MURPHY:  You can answer.

24     A.  Yes, that appears to be the time line.

25         MS. MURPHY:  Okay.  Let me just check.

Page 170

1  I'm trying to be good with the time frame that I have.

2  I'm trying not to be redundant with questioning.

3  That's all I have.

4          MR. LOEVY-REYES:  Transcript, please.

5          MS. LANDES:  Read and sign.

6          MS. MURPHY:  Transcript.

7          (DEPOSITION CLOSED AT 4:00 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 171

2          C-E-R-T-I-F-I-C-A-T-E

3  I, ELIZABETH GREELEY, a Notary Public, in and for the
   State of Rhode Island, duly commissioned and qualified
4  to administer oaths, do hereby certify that the
   foregoing Deposition of Tamara Wong, a Witness in the
5  above-entitled cause, was taken before me on behalf of
   the Plaintiff, at the offices of the Rhode Island
6  Attorney's General Office, 150 South Main Street,
   Providence, Rhode Island on November 4, 2021 at
7  9:00 A.M.; that previous to examination of said
   witness, who was of lawful age, she was first sworn by
8  me and duly cautioned to testify to the truth, the
   whole truth, and nothing but the truth, and that she
9  thereupon testified in the foregoing manner as set out
   in the aforesaid transcript.

10
   I further certify that the foregoing Deposition was
11 taken down by me in machine shorthand and was later
   transcribed by computer, and that the foregoing
12 Deposition is a true and accurate record of the
   testimony of said witness.

13
   Pursuant to Rules 5(d) and 30(f) of the Federal Rules
14 of Civil Procedure, original transcripts shall not be
   filed in Court; therefore, the original is delivered
15 to and retained by Plaintiff's Attorney, Mark
   Loevy-Reyes.

16
   I have enclosed with the Deposition a Correction and
17 Signature page, which must be signed before a Notary
   Public.

18
   IN WITNESS WHEREOF, I have hereunto set my hand this
19 10th day of November, 2021.

20

21              Elizabeth Greeley

22

23 ELIZABETH GREELEY, NOTARY PUBLIC
   CERTIFIED COURT REPORTER
24 MY COMMISSION EXPIRES:  04/07/2022

25

# EXHIBIT 30

EX 101

**Wong, Tamara (RIDOH)**

| | |
|---|---|
| **From:** | Wong, Tamara (RIDOH) |
| **Sent:** | Wednesday, July 17, 2019 7:02 PM |
| **To:** | Susan Cormier |
| **Subject:** | FB 08-1089 / Pawtucket 88-00837 DNA Report |
| **Attachments:** | Report FB 08-1089 supplI.pdf |

Sue,

I have attached the finalized supplemental DNA Report with regards to the reference sample from Joao Monteiro. A paper copy will be dropped in the mail in the morning, unless you want to swing by and pick it up. Let me know.

Respectfully,

*Tamara L. Wong*, M.S.
Senior Forensic Scientist
Rhode Island Department of Health Laboratories
Forensic Biology/CODIS Unit
50 Orms Street
Providence, RI 02904
P- (401) 222-4766
F- (401) 222-5536

 

CONFIDENTIALITY: This message and all attachments may contain information that is confidential and/or proprietary to the Department of Health, including personal health information, and disclosure or distribution to anyone other than the intended recipient is prohibited.  If you believe you have received this information in error, please notify the sender by replying to this email and immediately delete this message without disclosure.  Thank you.



1

TWong_000023

# EXHIBIT 31

# In The Matter Of:

*Monteiro vs Cormier*

*CONFIDENTIAL - Detective Susan Cormier, Vol. II*

*October 12, 2021*



Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF RHODE ISLAND
 2

 3

 4  Joao Monteiro           :

 5       VS.              :C. A. NO:  21-cv-00046-MSM-LDA
                              VOLUME II
 6  Susan Cormier, Trevor :
    Lefebvre, Daniel      :
 7  Mullen, Tina          :
    Goncalves, City of    :
 8  Pawtucket, and Tamara :
    Wong                  :
 9
                  CONFIDENTIAL
10

11          CONTINUED DEPOSITION OF DETECTIVE
    SUSAN CORMIER, a Defendant in the above-entitled
12  cause, taken on behalf of the Plaintiff, before
    Elizabeth Greeley, Notary Public, in and for the
13  State of Rhode Island, at the offices of D'Amico
    Burchfield, LLP, 536 Atwells Avenue, Providence,
14  Rhode Island, on October 12, 2021, at 1:00 p.m.

15

16

17  PRESENT:

18  FOR THE PLAINTIFF.......LOEVY & LOEVY
            BY:  MARK LOEVY-REYES, ESQUIRE
19               311 N. ABERDEEN STREET
                 CHICAGO, IL  60607
20                  -AND-
                 D'AMICO BURCHFIELD, LLC
21          BY:  WILLIAM DEVINE, ESQUIRE

22  FOR THE DEFENDANT.......DESISTO LAW
    (CORMIER)     BY:  RYAN STYS, ESQUIRE
23
    FOR THE DEFENDANT.......STATE OF RHODE ISLAND
24  (WONG)             DEPT. OF ATTORNEY GENERAL
            BY:  BETH LANDES, ESQUIRE
25
```

Page 2

```
 1                I N D E X

 2  WITNESS                              PAGE

 3  DETECTIVE SUSAN CORMIER

 4  EXAMINATION BY MR. LOEVY-REYES................  4
    EXAMINATION BY MS. LANDES.................... 103

 5

 6

 7

 8

 9              EXHIBITS FOR I.D.

10  EXHIBIT        DESCRIPTION              PAGE
    PLAINTIFF'S
11  EXHIBIT 97     WORKSHEET (1 PG)............    3
    EXHIBIT 4      AFFIDAVIT (7 PGS)...........    3
12
    EXHIBIT 51     AUDIO RECORDING.............    3
13                 (RETAINED BY COUNSEL)
    EXHIBIT 66     HANDWRITTEN NOTES (4 PGS).......  3
14
    EXHIBIT 41     BACKGROUND INVESTIGATION (329 PGS) 3
15  EXHIBIT 59     SUPPLEMENTAL REPORT (6 PGS).....  3

16  EXHIBIT 44     HANDWRITTEN NOTES (10 PGS).......  3
    EXHIBIT 17     WAIVER OF RIGHTS (1 PG).........  3
17
    EXHIBIT 28     CHARGE DISMISSAL (1 PG).........  3
18  EXHIBIT 14     WARRANT AFFIDAVIT (5 PGS).......  3

19  EXHIBIT 13     ARREST WARRANT DRAFT (12 PGS)....  3
    EXHIBIT 18     POLYGRAPH REPORT (3 PGS)........  3
20
    EXHIBIT 12     POLICE REPORT (20 PGS).........  3
21  EXHIBIT 42     AUTOPSY REPORT (28 PGS).........  3

22  EXHIBIT 15     DOH SUPPLEMENTAL REPORT (15 PGS).  3
    EXHIBIT 6      POWERPOINT (16 PGS)............  3
23
    EXHIBIT 8      E-MAILS (5 PGS)................  3
24  EXHIBIT 9      E-MAILS (22 PGS)...............  3

25  EXHIBIT 16     TEXT MESSAGES (16 PGS).........  3
    EXHIBIT 35     TEXT MESSAGES (6 PGS)..........  3
```

Page 3

```
 1  NO.            DESCRIPTION                PAGE

 2  EXHIBIT 36     E-MAILS (27 PGS)..............  3
    EXHIBIT 37     E-MAILS (15 PGS)..............  3

 3  EXHIBIT 47     TEXT MESSAGES (27 PGS)........  3
    EXHIBIT 45     E-MAILS (19 PGS)..............  3

 4  EXHIBIT 55     E-MAILS (9 PGS)...............  3
    EXHIBIT 62     E-MAILS (3 PGS)...............  3

 5  EXHIBIT 53     E-MAIL (1 PG)................   3
    EXHIBIT 56     POLICE NARRATIVE (1 PG).......  3

 6  EXHIBIT 58     E-MAILS (2 PGS)...............  3
 7  EXHIBIT 75     NORRIS NOTES (5 PGS)..........  3

 8  EXHIBIT 68     ANALYTICAL FINDINGS (6 PGS)......  3
 9  EXHIBIT 69     DIAGRAM (1 PG)................  3

10  EXHIBIT 70     TYPED/HANDWRITTEN NOTES (4 PGS)..  3
11  EXHIBIT 71     HANDWRITTEN NOTES (1 PG).......  3

12  EXHIBIT 73     WINFACTS REPORT (1 PG)..........  3
13  EXHIBIT 76     COMPLAINT REPORT (2 PGS)........  3

14  EXHIBIT 77     POLICE REPORT (1 PG).........   3
15  EXHIBIT 78     POLICE REPORT (1 PG).........   3

16  EXHIBIT 80     POLICE REPORT (3 PGS).........  3
17  EXHIBIT 81     POLICE REPORT (3 PGS).........  3

18  EXHIBIT 82     HANDWRITTEN REPORT (1 PG).......  3
19  EXHIBIT 83     POLICE REPORT (1 PG).........   3

20  EXHIBIT 84     AUDIO RECORDING...............  3
                   (RETAINED BY COUNSEL)
21  EXHIBIT 86     POLICE REPORT (2 PGS).........  3

22  EXHIBIT 87     POLICE REPORT (2 PGS).........  3
23  EXHIBIT 88     POLICE REPORT (1 PG).........   3

24  EXHIBIT 89     POLICE REPORT (1 PG).........   3
    EXHIBIT 90     POLICE REPORT (1 PG).........   3

    EXHIBIT 94     PHOTOS (2 PGS)................  3
    EXHIBIT 91     LETTER (1 PG)................   3

25  EXHIBIT 100    AUDIO TRANSCRIPT (16 PGS)........ 105
    EXHIBIT 101    E-MAIL (1 PG)................  121
```

Page 4

```
 1       (DEPOSITION COMMENCED AT 1:00 P.M.)

 2     (EXHIBITS 1 - 97 PREVIOUSLY MARKED FOR ID)

 3            DETECTIVE SUSAN CORMIER

 4       Being duly sworn, deposes and testifies as

 5  follows:

 6          THE REPORTER:  Would you state your name

 7  for the record, please?

 8          THE WITNESS:  Susan, S-U-S-A-N, Cormier,

 9  C-O-R-M-I-E-R.

10          MR. LOEVY-REYES:  Before we start the

11  deposition, we were just discussing how much time the

12  remainder of this continuation of the deposition will

13  be.  I estimate that I probably have about two hours

14  left.

15          MS. MURPHY:  Okay, okay.  That's helpful.

16          MR. LOEVY-REYES:  That's my best estimate

17  right now.

18          MS. LANDES:  I probably have about an

19  hour.

20          MR. LOEVY-REYES:  I think we're all

21  agreeable with that.  With that, why don't we proceed?

22          MS. MURPHY:  Thank you.

23          EXAMINATION BY MR. LOEVY-REYES

24  Q.  Ms. Cormier, welcome back to your deposition.

25  I'm going to show you what's been marked as
```

Page 117

1  this affidavit did you understand that anyone in
2  Jerson Semedo's male lineage would have the same Y-STR
3  DNA as Jerson Semedo?
4        A.  No.  What I understood was that the Y-STR, I
5  was under the impression and understanding that the
6  Department of Health would be able to tell me who it
7  was, if I was submitting water bottles and lollypop
8  sticks and things from the trash.  That they would be
9  able to decipher whose Y-STR from the other.
10 That's why I was bringing stuff down.
11 Q.  My question, though, is whether you understood
12 that Jerson Semedo's Y-STR DNA would be the same as
13 another person's Y-STR DNA if that person was in
14 Jerson Semedo's male lineage?
15          MS. MURPHY:  Objection.  Answer to the
16 best of your ability.
17       A.  I think I'm understanding you correctly.  I
18 believed at the time that they would be able to tell
19 me it was in his family's line, but be able to
20 determine a difference.  I don't know if I'm answering
21 correctly.
22 Q.  I guess it's sort of a yes-or-no answer.  It
23 sounds like the answer is no, that you did not
24 understand that other people in his family would have
25 the same Y-STR DNA as Jerson Semedo?

Page 118

1        A.  No, I didn't.
2  Q.  If we could look back at Exhibit 15 briefly, you
3  read from this a few minutes ago.  Exhibit 15, second
4  page, which is Bates 992, do you recall reading the
5  line that says, Male relatives in the same paternal
6  line will demonstrate the same Y-STR DNA profiles?
7        A.  Yes.
8  Q.  Do you recall receiving that e-mail on March 19,
9  2019 from Tamara wrong?
10       A.  Yes.
11 Q.  However, at this time on July 16, 2019, when
12 filling out this affidavit, your testimony is that
13 that was not your understanding, that persons within
14 Jerson Semedo's male lineage would demonstrate the
15 same Y-STR DNA profile as Jerson Semedo?
16          MS. MURPHY:  Objection.
17       A.  Yes.
18 Q.  Let's look back at these text messages for a
19 moment, please.  This is Exhibit 35.  A couple of
20 times today we heard testimony about Ms. Wong's text
21 message to you.  Something to the effect of, It's a
22 match.  Do you remember testifying about that today?
23       A.  Yes.
24 Q.  I believe you can see that text message on
25 Page 004.  It is in the bottom left image.

Page 119

1        A.  Yes.
2  Q.  These images are across the page rather than up
3  and down.  So they read from left to right.
4        A.  Oh, okay.
5  Q.  Top, then center, then bottom.  Hard to follow.
6          MR. LOEVY-REYES:  That is helpful.
7  Q.  There's a text there where Tamara Wong writes to
8  you, It's a match, finalizing the report right now.
9  Do you see that?
10       A.  Yes.
11 Q.  Following that, there's conversation back and
12 forth.  There are emojis.  Then Tamara Wong writes,
13 I'll e-mail the report as soon as it's finished and
14 official; do you see that?
15       A.  Yes.
16 Q.  That was September at 6 p.m., I'll e-mail the
17 report as soon as it's finished and official; is that
18 correct, according to this document?
19       A.  Yes.
20 Q.  What time, according to this document, was the,
21 It's a match, text sent?
22       A.  5:53.
23 Q.  5:53 p.m.  Excellent.  When you received this
24 note from Tamara indicating she will send a report as
25 soon as it's finished and official about seven minutes

Page 120

1  later, did that indicate to you that this text message
2  exchange was not an official report?
3        A.  Yes.
4  Q.  You know, generally when you receive analysis
5  from the Department of Health is it in the form of a
6  text message, or is it in the form of a report like
7  the ones we've seen from March and July 2019?
8        A.  A report.
9  Q.  If this text message exchange were an official
10 document that would be relied on by detectives and
11 perhaps one day by a prosecution, I suspect that there
12 would be things in here that you would have omitted
13 rather than included.  I'll be specific.
14    Do you see on Page 003 in the center, middle
15 block, if you will, an exchange where you write, Thank
16 you.  I swear I am just going to punch this guy in the
17 mouth to obtain his blood?
18       A.  Yes.
19 Q.  Tamara replies, LMFAO?
20       A.  Yes.
21 Q.  Does that indicate to you that this exchange
22 perhaps used shorthand or some colloquialisms and was
23 not an official report?
24       A.  Yes.
25 Q.  Shortly after, Tamara informed you that she'll

Case 1:21-cv-00046-MSM-LDA   Document 48   Filed 02/14/23   Page 222 of 303 PageID #: 762

10/12/2021                    CONFIDENTIAL - Defendre Sneath-Cormier, vol. II                    31 (121 - 124)

Page 121

1  e-mail you the report as soon as it's finished and
2  official.  You wrote, Thanks.  At 6:03 p.m. you wrote,
3  Thanks; do you see that?
4      A.  Yes.
5  Q.  Then almost an hour later she wrote to you,
6  E-mail sent; do you see that?
7      A.  Yes.
8  Q.  That e-mail, let's take a look at it briefly.
9  We'll mark this Exhibit 101.  Can you take a look at
10  101 and tell me if you recognize this e-mail?
11      A.  This is an e-mail from Tamara Wong dated
12  July 17, 2009, to me regarding the supplemental
13  report.
14  Q.  Just for the record, is it in 2009 or 2019?
15      A.  Did I say 2009?  Sorry, 2019.
16  Q.  Thank you.  Unless I misheard you.  For the
17  record, the attachment referenced here is report
18  FB08-1089 SUP2.PDF.  That was sent at 7:02 p.m.; is
19  that correct?
20      A.  Yes.
21          (EXHIBIT 101 MARKED FOR ID)
22  Q.  Does that appear to be the e-mail described in
23  the text message exchange from Exhibit 35?
24      A.  Yes.
25  Q.  Excellent.  Would that attachment be the

Page 122

1  attachment that we see at Exhibit 15 starting on
2  Page 0994?  Exhibit 15 has both reports sequentially.
3  Do you see the July 17, 2019 date?
4      A.  Yes.
5  Q.  Does that appear to be the exhibit attached to
6  the 7:02 p.m. e-mail of July 17, 2019?
7      A.  Yes.
8  Q.  If you'll turn to Page 998 in Exhibit 15, do you
9  recall testifying about the -- withdrawn.  If you'll
10  turn to 998, the fifth paragraph down, I'm going to
11  read it out loud for the record.  The previously
12  reported Y-STR DNA profiles obtained from the stains
13  on the victim's purple pants, Item 1.8, is consistent
14  with the known reference profile of Joao Monteiro,
15  item Number 23.  Do you see that line?
16      A.  Yes.
17  Q.  Right under it is a paragraph that's indented.
18  Do you recall testifying about this paragraph earlier
19  today?
20      A.  Yes.
21  Q.  I'm going to draw your attention to the second
22  and last sentence in that paragraph.  Can you read
23  that out loud for me?  It starts with applying.
24      A.  Applying the 95 percent upper confidence
25  interval results in a frequency of approximately 1 in

Page 123

1  every 1,909 individuals.
2  Q.  Thank you.  If you'll refer back to Exhibit 35,
3  at the top of 005, top left, there is an exchange
4  where you write to Tamara, Oh, make no mistake that I
5  will mention the lab and you personally; do you see
6  that?
7      A.  Yes.
8  Q.  Can you read for the record the next remark that
9  you sent to Tamara?
10      A.  So there is no 1 in 10 billion match type of
11  stat, just 95 percent confident?
12  Q.  Does that reference to 95 percent confident
13  appear to be a reference to the sentence you just read
14  in Exhibit 15, applying a 95 percent upper confidence
15  interval results in the frequency of approximately 1
16  in every 1,909 individuals?
17      A.  Yes.
18  Q.  Does that indicate that when you received this
19  report at 7:02 p.m. you read it?
20      A.  Yes.
21  Q.  Because at 7:10 p.m. you appeared to have a
22  question about this that you sent to Tamara; is that
23  correct?
24      A.  Yes.
25  Q.  Tamara's response is, Unfortunately not with

Page 124

1  Y-STRs, because they are shared with family members.
2  The stats are always low.  Do you see that response?
3      A.  Yes.
4  Q.  What do you write to her after that; can you
5  please read it for the record?
6      A.  There is a black bar across mine.
7          MS. MURPHY:  It carries into the top one
8  right here.
9      A.  Can you talk?  I need you to translate this
10  into my language, dumb it down for me.
11  Q.  Does that indicate that you and Tamara then spoke
12  on the phone?
13      A.  We spoke on the phone a couple of times.  So
14  after the first text message of, It's a match, we were
15  on the phone with each other.  She told me it was a
16  match.
17  Q.  Interesting.  When was that -- just going back,
18  when you said that she told that to you on the phone,
19  would that have been after she texted it to you at
20  5:53 p.m.?
21      A.  Yes.
22  Q.  So at 5:53 p.m. she texted you, It's a match,
23  finalizing the report right now, and then the next few
24  minutes appear to be consumed with emojis back and
25  forth until 5:56 p.m.  Is that when you think you

Page 125

1  might have spoken on the phone with her?
2      A.  I don't know if it was in between all of this
3  or right after.  It was all around the same time frame
4  I was on the phone with her.
5  Q.  Pawtucket Police Department records phone calls
6  that are external to the department, right, external
7  coming in or department going out; is that correct?
8      A.  Yes, but I was on my cell phone.
9  Q.  Are those recorded?
10     A.  No.
11 Q.  Do you have notes of that call?
12     A.  No, but Detective Trevor Lefebvre was
13 standing there.
14 Q.  He was standing there?
15     A.  Yes.
16 Q.  Did he hear what Ms. Wong was saying?  I guess I
17 should ask, was she on speaker?
18     A.  No, she was not on speakerphone.
19 Q.  But at least he heard what you were saying, if
20 nothing else?
21     A.  Yes.
22 Q.  Excellent.  Thank you.  This would be at least
23 the second phone call then that I'm referring to at
24 7:12 p.m. where you ask, Can you talk?  I need you to
25 translate this into my language; is that correct?

Page 126

1      A.  What was the question?
2  Q.  Would that be the second phone call of the night
3  at least?
4      A.  I believe so.  Again, I'm not sure if it was.
5  I believe that would be the second call.
6  Q.  During this phone call, was Ms. Wong able to
7  provide a 1 in 10 billion type of stat for you?
8      A.  No.
9  Q.  But did she explain why it is that she could not
10 provide that kind of stat?
11     A.  No.
12 Q.  Was the ostensible subject of the call to
13 translate into your language why it is that that stat
14 is not available?
15     A.  I'm not sure.  I don't recall what the exact
16 conversation was.  Usually when I talk with Tamara
17 about things from the lab, it's usually over my head.
18 She's a forensic scientist.  I'm not.  That's why I
19 asked her to dumb it down.  I don't understand a lot
20 of the markers and that.
21 Q.  If we turn back to Exhibit 15 briefly, to the
22 sentence you just read out loud a moment ago regarding
23 the 95 percent upper confidence interval, that
24 sentence identifies a frequency of approximately 1 in
25 every 1,909 individuals.  Does that statistic have any

Page 127

1  significance to you?
2          MS. MURPHY:  Objection.
3      A.  No, because I don't know what the number is
4  supposed to be.  That's what I relied on her for.
5  Q.  Were you hoping to say something closer to 1 in
6  10 billion than 1,900?
7      A.  Yes.
8  Q.  Did it concern you that you got 1 in 1,900 and
9  not 1 in 10 billion?
10         MS. MURPHY:  Objection.
11     A.  No, because I was being facetious when I said
12 one in a billion.  You know, I don't know what the
13 number is supposed to be.  You know, I was asking, is
14 it one in a billion?  Is it one -- you know, so I'm
15 not sure what the number is supposed to be.  I still
16 don't know.
17 Q.  Do you know how many people roughly live in
18 Pawtucket?  It's okay, if you don't.
19     A.  No.
20 Q.  Do you think it's more than 1,900 people?
21     A.  Yes.
22 Q.  With this frequency rate of 1 in 1,900
23 individuals, would that indicate that this Y-STR
24 profile might be found in more than 1 person in 3 in
25 Pawtucket?

Page 128

1          MS. MURPHY:  Objection.
2      A.  I don't know.
3  Q.  Well, what don't you know exactly?  I guess I can
4  rephrase the question maybe.  If there are more than
5  1,900 people in a sect, and we're talking about a
6  frequency rate of 1 in every 1,900 individuals, would
7  that suggest that we got more than 1 person in a sect
8  greater than 1,900?
9          MS. MURPHY:  Objection.
10     A.  Again, I'm not a scientist.  I don't know.  I
11 was going by Tamara telling me it's a match.  I
12 really, I don't know.
13 Q.  I understand you're not a scientist, but you are
14 a detective, correct?
15     A.  Yes.
16 Q.  You're required to swear out affidavits to obtain
17 a search warrant and to obtain an arrest warrant in
18 this case, were you not?
19     A.  Yes.
20 Q.  If you'll turn to Exhibit 4, which we visited
21 several times today.  If you still have it, I can
22 provide another copy of the exhibit if you'd like.
23 Looking at Exhibit 4, do you recognize this as the
24 document we discussed earlier?  It is the affidavit
25 and arrest warrant?

Page 129

1    A.  Yes.
2  Q.   Let's go to Page 844, please.  Can you read out
3  your statement, the very last paragraph on Page 844,
4  starting with, Forensic scientist, Tamara Wong?
5    A.  Forensic scientist, Tamara Wong, from the
6  Rhode Island Department of Health contacted Detective
7  Cormier at 5:50 p.m. on July 17, 2019 to notify her
8  that the DNA reference was compared to the partial
9  Y-STR profile obtained from the blood located on the
10  inside crotch of the victim's pants and confirmed that
11  it was consistent with the known reference DNA profile
12  for Joao Monteiro.  Do you want me to keep going?
13  Q.   Yes, read the next line, too.
14    A.  Tamara Wong provided a summary of analytical
15  facts supplemental report which detailed her findings.
16  Q.   Thank you.  So your understanding was that the
17  supplemental report detailing her findings, in fact,
18  detailed that the DNA reference was compared to the
19  partial Y-STR profile obtained from blood located on
20  the inside crotch of the victim's pants and confirmed
21  it was consistent with the known reference DNA profile
22  for Joe Monteiro; is that accurate?
23    A.  Yes.
24  Q.   Now, earlier today we looked at a draft of this
25  affidavit prior to the time it had been marked up by

Page 130

1  Mr. Dambruch; do you remember discussing that?
2    A.  Yes.
3  Q.   That's Exhibit 13.  I'm only going to briefly
4  have you look at this, at the last page, Line 79, to
5  confirm that in that paragraph that you just read
6  there was a change in your original language to the
7  language ultimately used in your arrest affidavit.
8    A.  Yes.
9  Q.   That change, it was taking out the term match; is
10  that correct?
11    A.  Yes.
12  Q.   And instead of the term match, using the term
13  consistent with the known reference DNA profile for
14  Joe Monteiro?
15    A.  Yes.
16  Q.   Is there a difference in meaning between the term
17  match and the term that was ultimately used,
18  consistent with the profile?
19         MS. MURPHY:  Objection.
20    A.  When I typed it, I was using the words that
21  Tamara said to me in the text.  Steve Dambruch wanted
22  to change it to the words that were in the
23  supplemental report.
24  Q.   I see.  But this is your affidavit; is that
25  correct?

Page 131

1    A.  Yes.
2  Q.   When I say this, I'm referring to Exhibit 47
3  which has the final language in it.  Your affidavit
4  says on Page 844, it confirms that it was consistent
5  with the known reference DNA profile for Joe Monteiro?
6    A.  Yes.
7  Q.   Did you understand what that meant at the time
8  that you swore to it?
9         MS. MURPHY:  Objection.
10    A.  That it was consistent with the buccal swab
11  and the pants.
12  Q.   Okay.  Is that different than what you understood
13  Tamara to say to you?
14    A.  No.  I understood it to be the same thing,
15  that it was a match, or the word consistent or match.
16  She said consistent to me in a text and on the phone.
17  When she sent the e-mail of the report and it had the
18  word consistent with, that's the wording that we
19  changed it to.
20  Q.   I see.  How many examples can you think of where
21  you quoted a text message in an affidavit for an
22  arrest warrant?
23    A.  None.
24  Q.   Usually do you quote the official report that DOH
25  provides?

Page 132

1    A.  Yes.
2  Q.   Let's move on.  I'm just going to try to briefly
3  nail down the time line for that evening.  If you'll
4  turn to Exhibit 35, which is, again, text messages,
5  you will a see on Page 04, TWONG04, you asked --
6  withdrawn.  On Page 05 we talked about your text to
7  Tamara where you asked, Can you talk?  I need you to
8  translate this, dumb it down for me; do you recall
9  that conversation?
10    A.  Yes.
11  Q.   Then you indicated that there was a phone call
12  that took place in that time frame, correct?
13    A.  Yes.
14  Q.   That happened, or that exchange, before the phone
15  call happened at 7:12 p.m., according to this
16  document; is that correct?
17    A.  Say that again, please.
18  Q.   Did that exchange about can you talk, did that
19  happen at 7:12 p.m.?
20    A.  Yes.
21  Q.   So by 7:12 p.m., do you agree you may have
22  received the supplemental report two that we saw in
23  the second part of Exhibit 15 and had read it, had
24  asked Tamara about the 95 percent confidence interval,
25  and had a phone call with her about it?

Page 133

1    A.  Yes.

2  Q.   Exhibit 7 -- withdrawn.  In Exhibit 12, please,

3  Exhibit 12, Page 969, do you have that from earlier

4  today?

5    A.  What am I looking for, what page?

6  Q.   969.  Earlier today do you remember identifying

7  this as part of your personal narrative that you

8  updated over time with respect to this case?

9    A.  Yes.

10 Q.   In the first full paragraph, which is in the

11 middle of the page, the second sentence reads, Tamara

12 Wong provided a summary of analytical facts

13 supplemental report which detailed her findings; do

14 you see that?

15   A.  Yes.

16 Q.   You then write, I then notified Major Mullen and

17 AG Tim Healy of the results from the Department of

18 Health, and they responded to the station, along with

19 others who are named as well.  You then write, After

20 discussing this case, an affidavit and arrest warrant

21 was prepared for Joao Monteiro for first degree

22 murder; do you see that?

23   A.  Yes.

24 Q.   Do you agree that this paragraph indicates that

25 you first received a summary of analytical findings

Page 134

1  supplemental report from Tamara Wong before notifying

2  Major Mullen and AG Healy that they should respond to

3  the station?

4    A.  I'm sorry, could you ask the question again?

5  Q.   Did you notify Major Mullen and AG Tim Healy of

6  the results from the Department of Health before or

7  after you received Tamara Wong's report?

8    A.  I notified them after the text message and

9  the phone call.

10 Q.   Was that also after the time you received Tamara

11 Wong's supplemental report which provided the official

12 analysis?

13   A.  I don't recall.

14 Q.   Well, if you look back at Exhibit 35, I believe

15 we can narrow this down, because the report was

16 received prior to the 95 percent confident text

17 exchange on TWONG105.  Do you recall that we discussed

18 that you would have received the report before writing

19 to Tamara Wong about the 95 percent confidence

20 statistic?

21   A.  Yes.

22 Q.   Therefore, if we go back to Exhibit 12 and we

23 look at 969 where it says that Tamara Wong provided a

24 summary of analytical facts supplemental report which

25 detailed her findings, and I then notified Major

Page 135

1  Mullen and Tim Healy of the results from the

2  Department of Health, can you determine from that

3  information that we just reviewed whether or not you

4  contacted Major Mullen and Tim Healy before or after

5  you received and read the analytical facts

6  supplemental report?

7    A.  To my memory, I notified the major after the

8  text messages and phone calls.  I don't, I'm not sure

9  when the supplemental was e-mailed.  I know it was at

10 7:12, but there were a lot of moving parts.  There

11 were a lot of people there.  After I talked to Tamara

12 and got the text messages, I notified him of what she

13 said to me.

14 Q.   At 7:02 p.m. do you agree that Tamara Wong

15 e-mailed you the second supplemental report?  That

16 would have been Exhibit 101.

17   A.  Yes.

18 Q.   By 7:10 p.m. do you agree that you had read that

19 report, at least in part, because you asked Tamara

20 about a reference in it, the 95 percent statistic?

21   A.  Yes.

22 Q.   Exhibit 12, going back to 969, states in the

23 second paragraph, After discussing the case, an

24 affidavit and arrest warrant was prepared for Joao

25 Monteiro for first-degree murder.  Do you believe that

Page 136

1  the affidavit and arrest warrant was prepared before

2  or after you received Tamara Wong's supplemental

3  second report?

4    A.  I'm not sure.

5  Q.   Does it help if you look at Exhibit 4, which is

6  the final arrest affidavit?  If you look at the bottom

7  of 844 into the top of 845 where it reads, Tamara Wong

8  provided a summary of analytical facts supplemental

9  report, does that refresh your recollection of whether

10 you had the supplemental report before you finalized

11 this affidavit?

12   A.  I don't know.  I'm getting confused with all

13 these.  I know I had the text message conversation.  I

14 know I had the phone message.  I know there are

15 e-mails.  The bosses and AGs were there.  I don't know

16 the exact time frames.  I know what is stamped on and

17 that I wrote.  So the first conversation I had with

18 her was at like 5:50, but --

19 Q.   Do you have any reason to doubt the time stamp on

20 the e-mail of the supplemental report to that, that

21 Tamara Wong sent you on July 17, 2019 at 7:02 p.m.?

22     MS. MURPHY:  Objection.  Answer.

23     A.  No.

24 Q.   Do you have any reason to doubt the time stamp on

25 the text message exchange in Exhibit 35 where you ask

Page 137

1  Tamara about the 95 percent confidence statistic?
2      A. No.
3  Q. That exchange, or that question was at 7:12 p.m.;
4  is that correct?
5      A. Yes.
6  Q. Excuse me, it's 7:10?
7      A. 7:10.
8  Q. Thank you. If we turn back to Exhibit 12, the
9  next line in that second paragraph on 969 reads,
10 Magistrate O'Neil signed the arrest warrant at
11 10:30 p.m. Is that an accurate statement, to the best
12 of your recollection, that the arrest warrant was
13 signed by Magistrate O'Neil at 10:30 p.m.?
14     A. Yes.
15 Q. Again, this is July 17, 2019?
16     A. Yes.
17 Q. So if you read Tamara Wong's supplemental report
18 two at no later than 7:10 p.m. on July 17 and the
19 arrest warrant was signed no later than or around
20 10:30 p.m. that same evening, is your testimony that
21 you had and you had read the supplemental report two
22 prior to finalizing this arrest warrant affidavit?
23     A. I had the report that she sent to me. I had
24 conversations on the phone with her. So if I worded
25 that it was at 5:50, those were the first

Page 138

1  conversations in text messages that I had of her
2  telling me it was a match. Then she sent me, she was
3  asking me, you know, Can this wait until the morning?
4  I said no. Then she sent me the report.
5      The AGs and the bosses were all there when this
6  was all taking place. I don't know right now. I can
7  tell you that this was the time frame that I, you
8  know -- if I misspoke or I had the times wrong, I
9  don't know.
10 Q. Okay. No one is accusing you of misspeaking or
11 having the times wrong. I know it's a long day. I
12 promise we're getting to the end of it. It is
13 important we nail down who provided what information
14 when, because I want to be sure that Ms. Wong's words
15 and your words are properly attributed.
16     A. Ah-ha.
17 Q. All I'm really asking is if by 10:30 when this
18 arrest warrant was signed, is it true that you and all
19 the others gathered in the room that you described,
20 had Tamara Wong's supplemental report two for at
21 least, you know, three hours?
22     A. Yes, I believe so.
23     MS. LANDES: Okay. Is there any
24 reason -- withdrawn. You thank you. I may be done.
25     (OFF THE RECORD)

Page 139

1  Q. At 7:02 p.m. -- withdrawn. At 5:50, 5:53 p.m. on
2  July 17, 2019, I can understand that maybe you had an
3  impression that Ms. Wong suggests that there is a
4  match. Whatever that means, the term it's a match was
5  used. By 7:10 p.m., after you had read the
6  supplemental report two, is there any reason to still
7  believe that the proper way to characterize Ms. Wong's
8  analysis was as a match rather than as a Y-STR DNA
9  profile consistent with that found on Christine Cole's
10 pants?
11     MS. MURPHY: Objection.
12     A. I went by what she told me on the phone and
13 what she told me on the text, that it was a match, and
14 you know, having one request. When you're on the news
15 for this, you know, make sure you mention the
16 Department of Health. I'm not sure how else I should
17 have taken all of this.
18     I have a forensic scientist telling me,
19 Congratulations, it's a match, nice work, make sure
20 you name us on the news. That, to me, was her telling
21 me time and again that we have the right person.
22 That's what I believed in my heart 100 percent.
23 Q. I'm not disputing that you believed that. But
24 did you go by what she wrote in her actual official
25 report, speaking for the Department of Health

Page 140

1  providing official analytical results on your DNA
2  sample? Did you go by that report, or did you go by
3  the text?
4      MS. MURPHY: Objection.
5      A. I provided all of that information to AGs
6  Dambruch, Jill Dubois, Tim Healy, all of this, the
7  text messages, the phone calls, the supplemental. We
8  all sat at a conference no different than this. They
9  were there with me writing this. That's what I
10 believed at the time. I am not sure how many ways I
11 can answer, or if I'm not understanding it correctly.
12 Q. I'm only asking a narrow question, which is --
13 you partially answered it. You said that you went by
14 the test. I'm saying all right, please confirm that
15 that means that you did not go by the supplemental
16 report that was the official results and analysis?
17     MS. MURPHY: Objection.
18     A. We used the report that she sent to us.
19 Q. Is it on the basis of that report that you
20 understood Steve Dambruch to make that change that we
21 reviewed before from match to consistent with?
22     A. Yes.
23     MS. LANDES: Okay. All right. Thank
24 you.
25     MS. MURPHY: No questions.

Page 141
(DEPOSITION CLOSED AT 5:15 P.M.)

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 142

```
 1              C-E-R-T-I-F-I-C-A-T-E

 2
 3   I, ELIZABETH GREELEY, a Notary Public, in and for the
     State of Rhode Island, duly commissioned and qualified
 4   to administer oaths, do hereby certify that the
     foregoing Deposition of Detective Susan Cormier, a
 5   Defendant in the above-entitled cause, was taken
     before me on behalf of the Plaintiff, at the offices
 6   of D'Amica Burchfield, LLP, 536 Atwells Avenue,
     Providence, Rhode Island on October 12, 2021 at
 7   1:00 P.M.; that previous to examination of said
     witness, who was of lawful age, she was first sworn by
 8   me and duly cautioned to testify to the truth, the
     whole truth, and nothing but the truth, and that she
 9   thereupon testified in the foregoing manner as set out
     in the aforesaid transcript.

10   I further certify that the foregoing Deposition was
     taken down by me in machine shorthand and was later
11   transcribed by computer, and that the foregoing
     Deposition is a true and accurate record of the
12   testimony of said witness.

13   Pursuant to Rules 5(d) and 30(f) of the Federal Rules
     of Civil Procedure, original transcripts shall not be
14   filed in Court; therefore, the original is delivered
     to and retained by Plaintiff's Attorney, Mark
15   Loevy-Reyes.

16   Reading and signing of the Deposition was waived by
     the Witness.

17
     IN WITNESS WHEREOF, I have hereunto set my hand this
18   21st day of October, 2021.

19
20               Elizabeth Greeley
21         _____
22   ELIZABETH GREELEY, NOTARY PUBLIC
     CERTIFIED COURT REPORTER
23   MY COMMISSION EXPIRES:  04/07/2022
24
25
```

# EXHIBIT 32

**verizon**

PO BOX 489
NEWARK, NJ 07101-0489

**Billing period**      Jun 23, 2019 - Jul 22, 2019
**Account number**
**Invoice number**      2058

TAMARA WONG

**See last page for payment options and how to split your bill.**
Questions? Visit vzw.com/contactus



# Hi Tamara, here's your bill for this month.

**10**    **MORE Everything Unlimited Talk, Text & 10GB**

.1650        page 3

Tamara Wong 0951        page 3

**Surcharges**

**Taxes and government fees**

**Due August 14**

TWong_000024

# verizon✓

**Billing period** Jun 23, 2019 to Jul 22, 2019 | **Account #** ████████ | **Invoice #** ████2058

# Tamara Wong

████.0951 | Moto G6 Unlocked XT1925-6

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Jun 29 | 12:59 PM | ██50 | ██ | ██ | 2 | -- | -- | -- |
| Jun 29 | 2:00 PM | ██50 | ██ | ██ | 2 | -- | -- | -- |
| Jun 30 | 11:33 AM | ██47 | ██ | ██ | 2 | -- | -- | -- |
| Jun 30 | 1:45 PM | ██50 | ██ | ██ | 2 | -- | -- | -- |
| Jul 1 | 3:21 PM | ██52 | ██ | ██ | 3 | -- | -- | -- |
| Jul 1 | 3:26 PM | ██00 | ██ | ██ | 4 | -- | -- | -- |
| Jul 1 | 5:51 PM | ██50 | ██ | ██ | 1 | -- | -- | -- |
| Jul 1 | 6:37 PM | ██50 | ██ | ██ | 3 | -- | -- | -- |
| Jul 2 | 12:24 PM | ██11 | ██ | ██ | 6 | -- | -- | -- |
| Jul 2 | 9:18 PM | ██50 | ██ | ██ | 1 | -- | -- | -- |
| Jul 3 | 9:30 AM | ██650 | ██ | ██ | 3 | -- | -- | -- |
| Jul 3 | 12:47 PM | ██11 | ██ | ██ | 1 | -- | -- | -- |
| Jul 3 | 12:58 PM | ██86 | ██ | ██ | 1 | -- | -- | -- |
| Jul 3 | 3:02 PM | ██1 | ██ | ██ | 1 | -- | -- | -- |
| Jul 3 | 6:11 PM | ██50 | ██ | ██ | 1 | -- | -- | -- |
| Jul 5 | 2:04 PM | ██50 | ██ | ██ | 2 | -- | -- | -- |
| Jul 5 | 3:43 PM | ██50 | ██ | ██ | 2 | -- | -- | -- |
| Jul 5 | 5:58 PM | ██50 | ██ | ██ | 1 | -- | -- | -- |
| Jul 5 | 8:28 PM | ██29 | ██ | ██ | 1 | -- | -- | -- |
| Jul 5 | 8:31 PM | ██50 | ██ | ██ | 2 | -- | -- | -- |
| Jul 5 | 8:33 PM | ██50 | ██ | ██ | 1 | -- | -- | -- |
| Jul 6 | 3:20 PM | ██50 | ██ | ██ | 5 | -- | -- | -- |
| Jul 7 | 9:35 AM | ██90 | ██ | ██ | 1 | -- | -- | -- |
| Jul 7 | 11:29 AM | ██62 | ██ | ██ | 2 | -- | -- | -- |
| Jul 7 | 2:20 PM | ██50 | ██ | ██ | 1 | -- | -- | -- |
| Jul 7 | 2:24 PM | ██50 | ██ | ██ | 4 | -- | -- | -- |
| Jul 7 | 9:24 PM | ██90 | ██ | ██ | 6 | -- | -- | -- |
| Jul 8 | 4:47 PM | ██50 | ██ | ██ | 1 | -- | -- | -- |
| Jul 8 | 6:19 PM | ██50 | ██ | ██ | 1 | -- | -- | -- |
| Jul 9 | 8:20 PM | ██86 | ██ | ██ | 1 | -- | -- | -- |
| Jul 10 | 9:39 AM | 401.569.3773 | Sterling, CT | Providence, RI | 5 | -- | -- | -- |
| Jul 10 | 12:00 PM | ██00 | ██ | ██ | 46 | -- | -- | -- |
| Jul 11 | 6:08 PM | ██84 | ██ | ██ | 3 | -- | -- | -- |
| Jul 13 | 6:08 PM | ██50 | ██ | ██ | 2 | -- | -- | -- |
| Jul 13 | 6:10 PM | ██90 | ██ | ██ | 1 | -- | -- | -- |
| Jul 13 | 6:11 PM | ██50 | ██ | ██ | 1 | -- | -- | -- |
| Jul 13 | 6:12 PM | ██50 | ██ | ██ | 3 | -- | -- | -- |
| Jul 13 | 6:58 PM | ██86 | ██ | ██ | 1 | -- | -- | -- |
| Jul 13 | 7:19 PM | ██90 | ██ | ██ | 4 | -- | -- | -- |
| Jul 14 | 5:25 PM | ██90 | ██ | ██ | 3 | -- | -- | -- |
| Jul 15 | 7:54 AM | ██50 | ██ | ██ | 2 | -- | -- | -- |
| Jul 15 | 8:51 PM | ██50 | ██ | ██ | 7 | -- | -- | -- |
| Jul 16 | 11:39 AM | ██50 | ██ | ██ | 2 | -- | -- | -- |
| Jul 16 | 9:00 PM | ██50 | ██ | ██ | 1 | -- | -- | -- |
| Jul 17 | 7:13 PM | 401.569.3773 | Providence, RI | Incoming, CL | 5 | -- | -- | -- |
| Jul 17 | 7:31 PM | ██50 | ██ | ██ | 1 | -- | -- | -- |

TWong_000041



 **verizon**✓   Billing period Jun 23, 2019 to Jul 22, 2019 | Account # ████████ | Invoice # ████2058

# Tamara Wong
████ 0951 | Moto G6 Unlocked XT1925-6

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| Jul 17 | 7:47 PM | ████650 | ████ | ████ | 3 | -- | -- | -- |
| Jul 18 | 7:27 PM | 401.569.3773 | Sterling, CT | Incoming, CL | 10 | -- | -- | -- |
| Jul 18 | 9:41 PM | ████36 | ████ | ████ | 12 | -- | -- | -- |
| Jul 19 | 8:58 AM | ████32 | ████ | ████ | 2 | -- | -- | -- |
| Jul 19 | 5:14 PM | ████650 | ████ | ████ | 2 | -- | -- | -- |
| Jul 19 | 6:41 PM | ████50 | ████ | ████ | 2 | -- | -- | -- |

TWong_000042

# EXHIBIT 33

# In The Matter Of:

*Joao Monteiro vs.*
*Susan Cormier, et al*

---

*Susan Cormier*
*June 21, 2022*

---

*Heather A. Lussier Court Reporting*
*4 Garfield Drive*
*Coventry, Rhode Island 02816*
*(401) 527-5592*
*HLsteno@gmail.com*

Original File LOEVY06212022_1.TXT
**Min-U-Script® with Word Index**

Page 1

```
 1          UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF RHODE ISLAND
 3
 4
 5    JOAO MONTEIRO,
 6
 7        Plaintiff
 8    VS.        C. A. NO. 21-cv-00046-MSM-LDA
 9
10    SUSAN CORMIER, TREVOR LEFEBVRE,
      DANIEL MULLEN, TINA GONCALVES,
11    CITY OF PAWTUCKET, and TAMARA WONG
12
13    --------------------------------/
14
15
16        DEPOSITION OF SUSAN CORMIER, a
17    Defendant, in the above-entitled cause,
18    taken on behalf of the Plaintiff, pursuant
19    to notice, before Jo Anne M. Sutcliffe,
20    Notary Public in and for the State of Rhode
21    Island, via web-based conference, on
22    June 21, 2022, at 2:00 p.m.
23
24
```

Page 2

```
 1
 2    APPEARANCES
 3
 4    (Via teleconference)
      FOR THE PLAINTIFF:
 5
 6        MARK LOEVY-REYES, ESQ.
          LOEVY & LOEVY
 7        311 N. Aberdeen Street, Third Floor
          Chicago, Illinois 60607
 8        Mark@loevy.com.
 9
10    (Via teleconference)
      FOR DEFENDANTS SUSAN CORMIER, TREVOR
11    LEFEBVRE, DANIEL MULLEN, TINA GONCALVES AND
      CITY OF PAWTUCKET:
12
          RYAN STYS, ESQ.
13        DESISTO LAW OFFICES
          60 Ship Street
14        Providence, Rhode Island 02903
          Ryan@desistolaw.com
15
16    (Via teleconference)
      FOR DEFENDANT TAMARA WONG:
17
          BETH A. LANDES, SAAG
18        RHODE ISLAND DEPT. OF ATTORNEY GENERAL
          4 Howard Avenue
19        Cranston, Rhode Island 02920
20
21
22
23
24
```

Page 3

```
 1              I-N-D-E-X
 2
 3                         PAGE NO.
 4    SUSAN CORMIER
 5    Examination by Mr. Loevy          4
      Examination by Ms. Landes        71
 6    Further Examination by Mr. Loevy 75
 7
 8           E-X-H-I-B-I-T-S
 9    EXHIBIT NO.                 PAGE NO.
10         FOR THE PLAINTIFF
11
12    130 Text messages beginning on
          Wednesday, July 17, 2019, 9:39 p.m. 4
13    131 Susan Cormier's Response to
          Plaintiff's Second Set of
14        Interrogatories                  4
15    132 Notice of Deposition            4
16    133 Two-page document Bates stamped
          141 and 142                     4
17    134 Text messages beginning on Tuesday,
18        July 16, 2019, 9:49 a.m.        4
19
20
21
22
23
24
```

Page 4

```
 1            (COMMENCED AT 2:02 P.M.)
 2         (WHEREUPON, EXHIBITS 130 - 134
              MARKED FOR IDENTIFICATION)
 3
 4      SUSAN CORMIER,
 5    Being duly sworn, deposes and testifies in
 6    the following manner:
 7    EXAMINATION BY MR. LOEVY
 8         THE COURT REPORTER: Would you
 9    state your full name for the record, please?
10         THE WITNESS: Susan Cormier,
11    C-O-R-M-I-E-R.
12 Q. Ms. Cormier, thank you for coming back
13    again.  As you know from before, I'm going
14    to ask you some questions and you're under
15    oath.  I doubt we're going to go as long as
16    we did the other day, but if you need to
17    take a break, please let me know, and, as
18    always, we'll be happy to break for you.
19    Sound good?
20 A. Okay.
21 Q. Also, if I ask you a question that you don't
22    understand, please let me know so I can
23    rephrase it.  Okay?
24 A. Okay.
```

Page 69

1  Q. Did you bring cards this night when he
2     signed the arrest warrant?
3     A. I think so.
4  Q. When you say you think so, do you have a
5     memory of it?
6     A. No. If I said it, I'm sure I probably
7     did.
8  Q. Okay. And his response to you was, "I was
9     going to turn you away if you didn't have
10    the cards!!" Does that suggest that you
11    were on planning on bringing them that night?
12    A. Yes.
13 Q. And then he indicates, "See you in a bit."
14    He recognizes that at least -- let me
15    rephrase that.
16        When he said see you in a bit, did
17    you understand that to mean that he knew you
18    were on your way?
19    A. He was just saying he'll see me in a bit.
20    He knew I was going to be coming sometime
21    soon.
22 Q. Right. And when he texted you see in a bit,
23    it was your understanding that he knew you
24    were on the way?

Page 70

1     A. Yes.
2  Q. And then you put in, "Ha ha." Is that in
3     response to him saying he was going to turn
4     you away if you didn't have the cards?
5     A. Yes.
6  Q. And then you gave him your estimated time of
7     arrival at 30 minutes, is that right?
8     A. Yes.
9  Q. And then in response to that he just said,
10    "Got it," correct?
11    A. Correct.
12 Q. And did you arrive in 30 minutes?
13    A. I don't know.
14        MR. LOEVY: All right. I think
15    that's all the questions I have. Let me
16    just look at my notes really quickly. Yes.
17    That's all I have.
18        MS. LANDES: All right. Hi,
19    Detective Cormier. I'm Beth Landes. You
20    may remember I represent Tamara Wong in this
21    litigation.
22        THE WITNESS: Yes.
23        MS. LANDES: I don't have a lot of
24    questions for you. I am going to try to

Page 71

1     share my screen and I am going to use the
2     same exhibits that Mr. Loevy just used.
3        EXAMINATION BY MS. LANDES
4  Q. So with any luck you are looking at Exhibit
5     134, is that right?
6     A. Yes.
7  Q. I just want to return to the beginning of
8     Exhibit 134. I'm going to scroll down to
9     Page -- Page 10 of 15. Do you see the pink
10    text box underneath the date July 17, 2019
11    at 6:08 p.m.?
12    A. Yes.
13 Q. All right. And the second sentence, it
14    reads, "We executed the warrant, did the DNA
15    and we got a match!" Do you see that text?
16    A. Yes.
17 Q. All right. And did you ever specify to
18    Magistrate Judge O'Neill that the match you
19    got was a Y-STR DNA match?
20    A. No.
21 Q. And did you ever specify to him that the
22    match you said you got is not an exclusive
23    match?
24    A. No.

Page 72

1  Q. Now, did you have the opportunity to inform
2     Magistrate Judge O'Neill that the match
3     statistics you got here were not the type
4     that can be characterized as one in ten
5     billion?
6     A. No.
7  Q. Did you inform him that the match statistics
8     were closer to one in nineteen hundred than
9     one in ten billion?
10    A. No.
11 Q. But you did attach Tamara Wong's
12    supplemental report two of July 17, 2019 to
13    your affidavit, is that correct?
14    A. Yes.
15 Q. So information that was in supplemental
16    report two was provided to the Magistrate
17    Judge before he signed the arrest warrant,
18    is that correct?
19    A. Yes.
20 Q. Did you bring the Magistrate Judge's
21    attention to that statistics language in
22    Tamara Wong's July 17, 2019 report?
23    A. No.
24 Q. Now, I believe on Exhibit 34 (sic) down on

Page 77

C E R T I F I C A T E

1
2        I, JO ANNE M. Sutcliffe, Notary Public,
3    in and for the State of Rhode Island, duly
4    commissioned and qualified to administer
5    oaths, do hereby certify that the foregoing
6    deposition of SUSAN CORMIER was taken before me
7    on behalf of the Plaintiff, pursuant to
8    Notice to Take Deposition, via web-based
9    conference, on June 21, 2022, at 1:00 p.m.;
10   that said witness appeared via web-based
11   conference; that previous to the examination
12   of said witness, who was of lawful age, she
13   was sworn by me, whereupon she was first
14   duly cautioned and sworn to testify the
15   truth, and that she thereupon testified as
16   in the foregoing manner as set out in the
17   annexed report.
18       I further certify that the
19   foregoing deposition was taken down by me in
20   stenotype and was later reduced by computer
21   to typewriting; and that the foregoing
22   deposition is a true and accurate record of
23   the testimony of said witness.
24       IN WITNESS WHEREOF, I have set my
15   hand this 16th day of July 2022.



                _____
                JO ANNE M. SUTCLIFFE, CSR/RPR
                Notary Public, State of Rhode Island
                My Notary Expires on 10/10/2024

# EXHIBIT 34

# In The Matter Of:

*Joao Monteiro vs.*
*Susan Cormier, et al*

---

*J. Patrick O'Neill*
*September 22, 2022*

---

*Heather A. Lussier Court Reporting*
*4 Garfield Drive*
*Coventry, Rhode Island 02816*
*(401) 527-5592*
*HLsteno@gmail.com*

Original File LOVEY09222022.txt
**Min-U-Script® with Word Index**

Case 1:21-cv-00046-MSM-LDA    Document 48    Filed 02/14/23    Page 239 of 303 PageID #: 779

Joao Monteiro vs.                                                                    J. Patrick O'Neill
Susan Cormier, et al                                                                 September 22, 2022

Page 1

```
 1         UNITED STATES DISTRICT COURT

 2        FOR THE DISTRICT OF RHODE ISLAND

 3

 4

 5   JOAO MONTEIRO,

 6

 7        Plaintiff

 8   VS.        C. A. NO. 21-cv-00046-MSM-LDA

 9

10   SUSAN CORMIER, TREVOR LEFEBVRE,
     DANIEL MULLEN, TINA GONCALVES,
11   CITY OF PAWTUCKET, and TAMARA WONG

12

13   --------------------------------/

14

15

16        DEPOSITION OF J. PATRICK O'NEILL, a

17   witness, in the above-entitled cause, taken

18   on behalf of the Plaintiff, pursuant to

19   notice, before Jo Anne M. Sutcliffe, Notary

20   Public in and for the State of Rhode Island,

21   at the offices of D'Amico & Burchfield, LLP,

22   536 Atwells Avenue, Providence, Rhode

23   Island, on September 22, 2022, at 3:30 p.m.

24
```

Page 3

```
 1               I-N-D-E-X

 2                              PAGE NO.

 3

 4   J. PATRICK O'NEILL

 5   Examination by Mr. Loevy          4

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 2

```
 1
     APPEARANCES
 2

 3

 4   FOR THE PLAINTIFF:

 5        MARK LOEVY-REYES, ESQ.
          LOEVY & LOEVY
 6        311 N. Aberdeen Street, Third Floor
          Chicago, Illinois 60607
 7        Mark@loevy.com.

 8

 9
     FOR DEFENDANTS SUSAN CORMIER, TREVOR
10   LEFEBVRE, DANIEL MULLEN, TINA GONCALVES AND
     CITY OF PAWTUCKET:
11
          RYAN STYS, ESQ.
12        DeSISTO LAW OFFICES
          60 Ship Street
13        Providence, Rhode Island 02903
          Ryan@desistolaw.com
14

15
     FOR DEFENDANT TAMARA WONG:
16
          BETH A. LANDES, SAAG
17        RHODE ISLAND DEPT. OF ATTORNEY GENERAL
          4 Howard Avenue
18        Cranston, Rhode Island 02920

19
     FOR THE DEPONENT:
20
          KATHLEEN KELLY, GENERAL COUNSEL,
21        RHODE ISLAND SUPREME COURT

22

23

24
```

Page 4

```
 1          (COMMENCED AT 3:40 P.M.)

 2   J. PATRICK O'NEILL,

 3   Being duly sworn, deposes and testifies in

 4   the following manner:

 5   EXAMINATION BY MR. LOEVY

 6          THE COURT REPORTER: Would you

 7   state your full name for the record, please?

 8          THE WITNESS: Sure.  James Patrick

 9   O'Neill.  Last name is spelled

10   O-'-N-E-I-L-L.

11   Q.  I'm going to ask you the same thing just to

12       ask the question.  Can you please state your

13       name?

14   A.  Sure.  James Patrick O'Neill.

15   Q.  Mr. O'Neill, you are a sitting judge,

16       correct?

17   A.  Sitting magistrate.

18   Q.  Sitting magistrate?

19   A.  Yes.

20   Q.  What's the difference in Rhode Island

21       between a magistrate and a judge?

22   A.  It's how it's selected.  So the judges

23       are selected, have to go through the

24       judicial nominating commission.  Five names
```

Joao Monteiro vs.
Susan Cormier, et al

J. Patrick O'Neill
September 22, 2022

Page 45

1    A. Do you want those back?
2 Q. Sure.  Why not?  You've had a chance to look
3    through Exhibit 14?
4    A. Yes.
5 Q. Do you recall seeing that before?
6    A. I honestly don't recall seeing it
7    beforehand.  I was reminded over the last
8    few days that I had signed the search
9    warrant for the DNA, but I don't have an
10    independent recollection of actually signing
11    that.
12 Q. Would it be fair to say that you've signed
13    hundreds of warrants in your work as an
14    magistrate judge?
15    A. At least hundreds if not thousands.
16 Q. I think you testified earlier, and I
17    apologize if I am repeating questions, but
18    you don't recall if you were on the bench
19    when you were presented with Exhibit 14?
20    A. I honestly don't recall.
21 Q. Do you recall having an opportunity to read
22    through Exhibit 14?
23    A. I don't recall actually signing that.  I
24    wouldn't sign anything unless I read through

Page 46

1    it, I know that.
2 Q. Would it be fair to say that that's your
3    practice, anything that you sign you would
4    want to read through entirely?
5    A. Of course.
6 Q. And I think I already asked you this, too,
7    and I apologize if this is a repeat, but you
8    don't recall Susan Cormier telling you
9    anything else about the information when she
10    was seeking a search warrant outside of
11    what's in Exhibit 14, do you?
12    A. I don't have any recollection.
13 Q. Okay.  I'm going to show you what's been
14    marked as Exhibit 4 previously and ask you
15    to look through this.
16    (BRIEF PAUSE)
17 Q. You've had a chance to look through Exhibit
18    4?
19    A. I have.
20 Q. Do you recognize what that is?
21    A. I do.
22 Q. What is that?
23    A. That's the affidavit and arrest warrant I
24    signed on July 17th of 2017.

Page 47

1 Q. Outside of the affidavit and arrest warrant
2    in Exhibit 4, do you recall receiving any
3    other information from Susan Cormier outside
4    of the text messages regarding this case?
5    A. I cannot recall.
6 Q. I think you testified earlier that it was
7    your practice any time that you would sign
8    off on something you would read through it
9    first, is that right?
10    A. That's correct.
11 Q. Would it be fair to say that you read
12    through Exhibit 4?
13    A. Absolutely.
14 Q. Do you know if Exhibit 4 had attached to it
15    a DNA report from the Rhode Island
16    Department of Health?
17    A. I don't recall if it did.
18 Q. And outside of what you testified here
19    today, did you receive any other information
20    from Susan Cormier regarding the Monteiro
21    case?
22    A. Not that I can recall.
23 Q. Outside of what you testified about here
24    today, did you receive any information about

Page 48

1    the Monteiro case from anybody else?
2    A. No.
3       MR. LOEVY: That's all I have.
4       THE WITNESS: Great.
5       MR. LOEVY: See?  I told you less
6    than an hour.
7       MS. KELLY: You were right.  I'm
8    very impressed.
9       MR. STYS: I don't have any
10    questions.  Thank you.
11       MS. LANDES: Nothing.
12       MR LOEVY: Thanks for coming in.
13       THE WITNESS: Nice meeting you.
14       THE COURT REPORTER: Can I ask for
15    transcript orders, if anybody wants one?
16       MR. LOEVY: I don't need one.
17       MR. STYS: Electronic.
18       MS. LANDES: Same.
19       MS. KELLY: Same.
20       (ADJOURNED AT 4:20 P.M.)
21
22
23
24

Page 49

```
 1              C E R T I F I C A T E

 2      I, Jo Anne M. Sutcliffe, Notary Public,
 3  in and for the State of Rhode Island, duly
 4  commissioned and qualified to administer
    oaths, do hereby certify that the foregoing
 5  deposition of J. PATRICK O'NEILL, a witness
    in the above-styled cause, was taken before
 6  me on behalf of the Plaintiff, pursuant to
    Amended Notice of Deposition, at the offices
 7  of D'Amico & Burchfield, LLP, 536 Atwells
    Avenue, Providence, Rhode Island, on
 8  September 22, 2022; that the said witness was
    personally appeared; that previous to the
 9  examination of said witness, who was of
    lawful age, he was sworn by me, whereupon he
10  was first duly cautioned and sworn to
    testify the truth, and that he thereupon
11  testified as in the foregoing manner as set
    out in the annexed report.
12      I further certify, that the
    foregoing deposition was taken down by me in
13  stenotype and was later reduced by computer
    to typewriting, and that the foregoing
14  deposition is a true and accurate record of
    the testimony of said witness.
15      IN WITNESS WHEREOF, I have set my
    hand this day of 8th day of October 2022.
16

17

18

19              _____
                JO ANNE M. SUTCLIFFE, CSR/RPR
20              Notary Public, State of Rhode Island
                My Notary Expires on 10/10/2024
21

22

23

24
```

# EXHIBIT 35

Date: 10/7/2022



# R.I. DEPARTMENT OF CORRECTIONS
# RAP SHEET FOR INMATE # 510166510166



**ID: 510166  NAME: JOAO  MONTEIRO B**          SECURITY:               **DOB: 06/28/1960**

| EVENT DATE | EVENT TYPE | REASON | DESCRIPTION |
|---|---|---|---|
| 07/18/2019 | TRANSFER | IN-HOUSE | ISC HOLD      - ISC K      09B |
| 07/18/2019 | COMMITMENT | | INMATE RECOMMITED ISC |
| 07/19/2019 | BAILED | | INMATE BAILED       FROM ISC |
| 07/19/2019 | COMMENT | | PRESIGNED WAIVER OF EXTADITION 62197946 |
| 07/19/2019 | COMMENT | | 621907946 WAS HWOB TO 50,000 W/S |

*True Copy* Ⓒ

PAUL J. RAO
Notary Public, State of Rhode Island
Commission # 57203

exp 3-11-25

Signed 10/7/2022

# EXHIBIT 36

**In The Matter Of:**

*Joao Monteiro*

*Susan Cormier*

---

*Timothy Healy*

*December 22, 2021*

---



401-352-6869 / www.premierlegalsupport.com

*Original File 12-22-21-Timothy Healy.txt*

*Min-U-Script® with Word Index*

**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF RHODE ISLAND

 3

 4

 5

 6    **************************

      JOAO MONTEIRO,        *    C.A. NO.

 7        Plaintiff,        * 21-cv-00046-MSM-LDA
                            *
 8    vs.                   * Hon. Mary S. McElroy
                            * District Judge
 9    SUSAN CORMIER, TREVOR *
      LEFEBVRE, DANIEL MULLEN,* Hon. Lincoln D. Almond
10    TINA GONCALVES, CITY OF * Magistrate Judge
      PAWTUCKET, and TAMARA *
11    WONG,                 * JURY TRIAL DEMANDED
          Defendants.       *
12    **************************

13

14

15        DEPOSITION OF TIMOTHY HEALY, a witness in

16   the above-entitled cause, taken remotely on behalf

17   of the Plaintiff, pursuant to notice, before Sally

18   Brassard, CSR, a Notary Public in and for the

19   State of Rhode Island through the Office of

20   Premier Legal Support, Inc., 22 London Street,

21   Suite 2, East Greenwich, Rhode Island, on December

22   22, 2021, scheduled at 9:00 a.m.

23

24

25
```

**Page 2**

```
 1   APPEARANCES:

 2
     FOR THE PLAINTIFF:
 3   LOEVY & LOEVY
     BY:  MARK LOEVY-REYES, ESQUIRE
 4   311 N. Aberdeen Street - 3rd Floor
     Chicago, Illinois  60607
 5   (312) 243-5900
     mark@loevy.com
 6
     FOR THE DEFENDANT CITY OF PAWTUCKET:
 7   DeSISTO LAW
     BY:  CAROLINE MURPHY, ESQUIRE
 8   60 Ship Street
     Providence, RI  02903
 9   (401) 649-4303
     caroline@desistolaw.com
10
     FOR THE DEFENDANT TAMARA WONG:
11   OFFICE OF THE ATTORNEY GENERAL
     BY:  BETH LANDES, SPECIAL ASSISTANT ATTORNEY
12   GENERAL, CIVIL DIVISION
     150 South Main Street
13   Providence, RI  02903
     (401) 274-4400 Ext. 2296
14   blandes@riag.ri.gov
15
     FOR THE WITNESS JILLIAN Dubois:
16   OFFICE OF THE ATTORNEY GENERAL
     BY:  CHRISANNE WYRZYKOWSKI, SPECIAL ASSISTANT
17   ATTORNEY GENERAL, CIVIL DIVISION
     150 South Main Street
18   Providence, RI  02903
     (401) 274-4400 Ext. 2296
19   cwyrzykowski@riag.ri.gov
20
21
22
23
24
25
```

**Page 3**

```
 1                    I-N-D-E-X

 2           DEPOSITION OF TIMOTHY HEALY

 3

 4                                           PAGE

 5   Examination by Mr. Loevy-Reyes............   6

 6   Examination by Ms. Murphy.................  87

 7   Examination by Ms. Landes.................  91

 8

 9

10

11

12

13

14

15        QUESTIONS INSTRUCTED NOT TO ANSWER

16             PAGE        LINE

17              11          24

18

19

20

21

22   REPORTER'S NOTE:  All exhibits are being sent
     electronically by Attorney Loevy-Reyes to all
23   counsel present.

24

25
```

**Page 4**

```
 1   (DEPOSITION COMMENCED AT 9:13 A.M.)
 2   TIMOTHY HEALY,
 3   having first been duly sworn by the Notary Public,
 4   testified as follows:
 5   THE COURT REPORTER: Please state your
 6   full name, and spell your last name for the
 7   record.
 8   THE WITNESS: Timothy Healy (H-e-a-l-y).
 9   MS. WYRZYKOWSKI: I represent, as an
10   officer of the court, that this is Mr. Healy from
11   the Attorney General's office.
12   MR. LOVEY-REYES: Plaintiff agrees that
13   Mr. Healy is who he says he is.  In addition, Mr.
14   Healy's attorney and then, I believe, Ms. Dubois'
15   attorney this afternoon and I have had a
16   discussion before we started, that Plaintiff has
17   previously tendered to counsel, including counsel
18   for all the Defendants, Exhibits 1 through 117.
19   Those are exhibits that will be inclusive
20   for the depositions that we're taking today, Mr.
21   Healy and Ms. Dubois, and they're the exact same
22   numbers that we've been using for all prior
23   depositions.  So, we just want to make it clear we
24   are not anticipating asking that the court
25   reporter append these to the deposition
```

Page 65

1 Q. Okay. And for what reason did you want to do
2 that?
3 A. As I said, I had concerns about us proving that Mr.
4 Monteiro committed this crime. That the evidence
5 wasn't what I had originally thought it was.
6 Q. Okay. And was that an unusual thing to do, to go
7 into court and ask that bail be set in a capital
8 case?
9 A. You know, I mean, in a capital case, we'll, you
10 know, sometimes agree to bail. I think what was
11 unusual about it was the case was not on the
12 calendar that day. That the -- you know, I had
13 reached out to Mr. Devine and said I wanted to get
14 into court and that it was my request at this
15 point. So, I think that was kind of the unusual
16 circumstances.
17 Q. And, obviously, Mr. Devine did not object to that,
18 did he?
19 A. He did not.
20 Q. Would it be fair to say that you made the decision
21 to go back into court unscheduled because you
22 viewed it in the interest of justice to do so?
23 A. Yes, that's true.
24 Q. Okay. And did you then go into court either the
25 day of the arraignment or the next day to ask that

Page 66

1 bail be set?
2 A. It was the day following the arraignment where I
3 went to court, yes.
4 Q. Okay. What did you say in court about why you
5 were asking to have bail be set?
6 A. I don't think I wanted to give much information
7 about the investigation. This was all kind of, in
8 my view, developing in terms of, you know, the
9 details, and the investigation was still ongoing.
10 So, I don't think I said much, other than the fact
11 that -- something vague to the effect that, you
12 know, based on the evidence at this point, we were
13 asking that bail be set.
14 Q. Okay. And was bail set at that point?
15 A. It was.
16 Q. What was it set at?
17 A. I believe it was $50,000 with surety. I'm not 100
18 percent sure about that.
19 Q. And how did that number get arrived at?
20 A. I think I had spoken with Mr. Devine about kind of
21 an amount of bail that Mr. Monteiro would be able
22 to post. I remember I had a conversation with Mr.
23 Devine about that. So, I think that's what the
24 situation was.
25 Q. You had a tentative agreement with Mr. Devine

Page 67

1 about a bail amount that would allow Mr. Monteiro
2 to go free?
3 A. Right.
4 Q. Was your decision in reaching that agreement with
5 Mr. Devine, was that based on the interest of
6 justice according to your analysis?
7 A. Yes. Definitely.
8 THE WITNESS: Can I just correct
9 something? I don't recall, to be honest, as I sit
10 here, whether it was surety bail or what the bail
11 was set at. I just wanted to clarify that.
12 Q. Sure, but, regardless, whatever was said allowed
13 Mr. Monteiro to walk free?
14 A. Correct.
15 Q. Okay. And that was a decision that you made after
16 analyzing the case?
17 A. Yes. I made it -- I would have -- I made it
18 probably, you know, in conjunction with the other
19 prosecutors.
20 Q. Sure. Sure. What's the next thing that you
21 recall happening regarding the Christine Cole case
22 after the bail hearing?
23 A. So, my recollection is he gets arraigned on a
24 Thursday. We go back before the court on a
25 Friday, me and Mr. Devine. At that time, Mr.

Page 68

1 Monteiro was not in court, because nobody had him
2 scheduled on the calendar. So, he wasn't on the
3 bus from the prison. So, what the judge had
4 wanted was for him to come back that following
5 Monday so he could essentially be advised of the
6 conditions of his bail. So, we had made that
7 accommodation where the judge would order that the
8 bail be set on a Friday, even though Mr. Monteiro
9 couldn't physically be there, and come back on
10 Monday. So, we did that.
11 Q. Okay. So, you came back the following Monday for
12 the conditions to be read to Mr. Monteiro?
13 A. Right. I believe I signed some paperwork as well.
14 Q. Did you have any conversations with anybody about
15 the Christine Cole investigation from the time the
16 bail hearing until that following Monday when Mr.
17 Monteiro was brought into court?
18 A. I'm sure I had conversations with other
19 prosecutors. You know, the prosecutors were
20 working on it, but not anything that stands out to
21 me.
22 Q. Sure. Nothing that you remember as we sit here
23 today; fair?
24 A. Fair. Yes.
25 Q. Okay. What's the next thing that you recall

Page 93

1    MS. LANDES: Okay.  Thank you.
2    MR. LOEVY-REYES: I have no additional
3  questions.
4    THE REPORTER: Can I place your transcript
5  orders on the record?
6    MR. LOEVY-REYES: I'd just like a
7  straight-up electronic.  No index.
8    MS. WYRZYKOWSKI: We need a copy, please,
9  for the read and sign.  Electronic is fine.
10    MS. MURPHY: Electronic, please.
11    MS. LANDES: Electronic is fine.
12    THE REPORTER: Am I correct that no one
13  needs a copy of the exhibits to go with the
14  transcript?
15    MR. LOEVY-REYES: Yes, that is correct.
16    MS. WYRZYKOWSKI: Yes.
17    MS. LANDES: Yes.
18    MR. MURPHY: Yes.
19    (DEPOSITION CONCLUDED AT 11:36 A.M.)
20
21
22
23
24
25

Page 94

1                C-E-R-T-I-F-I-C-A-T-I-O-N
2
3        STATE OF RHODE ISLAND
4        PROVIDENCE, SC.
5
6            I do hereby certify that I am expressly
7      approved as a person qualified and authorized to
8      take depositions pursuant to the Rules of Civil
9      Procedure of this Court, especially, but without
10     restriction thereto, under Rule 28 of said Rules;
11     that the witness was first sworn by me; that the
12      transcript contains a true record of the
13       proceedings.
14          Reading and signing of the transcript was
15     requested by the deponent or any parties involved
16      upon completion of the deposition.
17          IN WITNESS WHEREOF, I have hereunto set my
18      hand this 29th day of December, 2021.
19
20         _Sally Brassard_
21
22       _____
          SALLY BRASSARD, CSR/RPR
          NOTARY PUBLIC NO: 35591
          MY COMMISSION EXPIRES:  1/16/25
23
24
25

# EXHIBIT 37

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOAO MONTEIRO, | ) | |
| | ) | C.A. No. 1:21-cv-00046-MSM-LDA |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SUSAN CORMIER, TREVOR | ) | |
| LEFEBVRE, DANIEL MULLEN, TINA | ) | |
| GONCALVES, CITY OF PAWTUCKET, | ) | **JURY TRIAL DEMANDED** |
| and TAMARA WONG, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF JOAO MONTEIRO'S SUPPLEMENTAL ANSWERS
## TO DEFENDANT TAMARA WONG'S REQUESTS FOR ADMISSION

Plaintiff JOAO MONTEIRO, by and through his attorneys, under Federal Rule of Civil Procedure 36, provides the following supplemental objections and answers to Defendant Tamara Wong's Requests for Admission:

### OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

Plaintiff's investigation is ongoing as to all matters referenced in the objections and responses below. Plaintiff's objections and responses are based upon, and necessarily limited by, information now reasonably available to Plaintiff. Plaintiff specifically reserves all rights to revise, correct, supplement, modify, or clarify the content of his objections and responses below, in accordance with the applicable Federal Rules of Civil Procedure and Federal Rules of Evidence.

Each objection below applies to each instruction, definition, and specific request included in the requests for production; and unless otherwise stated, shall have the same force and effect as if set forth in full in response to each instruction, definition, and specific request.

Plaintiff objects to the instructions and definitions provided by Defendant Wong to the extent they depart from the requirements of the Federal Rules of Civil Procedure or do not accurately reflect the law or rules governing this case on the ground that these definitions and instructions impose an undue burden on Plaintiff. Plaintiff further objects to the Defendant Tamara Wong's requests as overly burdensome.  Defendant Wong has propounded 309 separate requests for admission, many of which seek admissions or denials about subject matter that is not within Plaintiff's knowledge and/or about topics about which he does not have the expertise to admit or deny.

Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

## ANSWERS TO REQUESTS FOR ADMISSION

1.   DOH COC REPORT is a Bates-stamped duplicate of the document identified at Tamara Wong's Deposition as Wong Exhibit 38[.]

**Response:** Plaintiff objects to this request because it is vague. Subject to and without waiving the above objections, Plaintiff admits that the documents Bates numbered by Plaintiff as Monteiro 51-58 are Bates numbered copies of Deposition Exhibit 38, which was not numbered. Investigation continues.

2

**Response:** Plaintiff objects to this request because it relates to facts that are not in Plaintiff's personal knowledge. Subject to and without waiving the above objections, Plaintiff denies. Investigation continues.

252.   In Detective Cormier's PPD PERSONNEL NARRATIVE, Detective Cormier states that Magistrate J. O'Neill signed the arrest warrant at 10:30pm on July 17, 2019. *See* PD–1st RFP–000969.

**Response:** Subject to and without waiving the above objections, Plaintiff admits. Investigation continues.

253.   You do not contest that on July 17, 2019, Tamara Wong provided DOH SUPPL. REPORT II to Detective Cormier more than three hours before Magistrate J. O'Neill signed the Arrest Warrant for Joao Monteiro. *See* PD-1st RFP -000969.

**Response:** Plaintiff objects to this request because it relates to facts that are not in Plaintiff's personal knowledge. Subject to and without waiving the above objections, Plaintiff denies. Investigation continues.

254.   Tamara Wong did not testify before Magistrate J. O'Neill on July 17, 2019.

**Response:** Plaintiff objects to this request because it relates to facts that are not in Plaintiff's personal knowledge. Investigation continues.

255.   You do not contend that Tamara Wong was physically present with Detective Cormier when Detective Cormier drafted an affidavit seeking a warrant for Mr. Monteiro's arrest.

**Response:** Plaintiff objects to this request because it relates to facts that are not in Plaintiff's personal knowledge. Investigation continues.

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving the objections stated above, Plaintiff admits.

256.   You do not contend that Tamara Wong was physically present when Detective Cormier presented her affidavit to Magistrate Judge O'Neill on July 17, 2019.

**Response:** Plaintiff objects to this request because it relates to facts that are not in Plaintiff's personal knowledge. Investigation continues.

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving the objections stated above, Plaintiff admits.

257.    You do not contend that Tamara Wong was physically present with Mr. Monteiro when Mr. Monteiro was detained on July 17, 2019.

**Response:** Plaintiff does not know Defendant Wong's whereabouts on July 17, 2019 and therefore cannot admit or deny this request. Investigation continues.

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving the objections stated above, Plaintiff admits.

258.    The DOH SUPPL. REPORT II (July 17, 2019) (PD-1st-RFP-000994 to -999) contains no false statement.

**Response:** Plaintiff objects to this request because it is vague and relates to facts that are not in Plaintiff's personal knowledge. Subject to and without waiving the above objections, Plaintiff denies. Investigation continues.

259.    You do not contend that Tamara Wong made a false statement to a prosecutor in connection with any judicial proceeding against Joao Monteiro.

**Response:** Plaintiff objects to this request because it is vague and relates to facts that are not in Plaintiff's personal knowledge. Subject to and without waiving the above objections, Plaintiff denies. Investigation continues.

260.    Tamara Wong made no false statement to a prosecutor in connection with any judicial proceeding against Joao Monteiro.

**Response:** Plaintiff objects to this request because it is vague and relates to facts that are not in Plaintiff's personal knowledge. Subject to and without waiving the above objections, Plaintiff denies. Investigation continues.

261.    You do not contend that Tamara Wong made a false statement to Magistrate J. O'Neill in connection with any judicial proceeding against Joao Monteiro.

**Response:** Plaintiff objects to this request because it is vague and relates to facts

105

RESPECTFULLY SUBMITTED,

JOAO MONTEIRO

By:   /s/ Mark Loevy-Reyes
        *One of Plaintiff's Attorneys*

Jon Loevy*
Mark Loevy-Reyes*
Megan Pierce*
LOEVY & LOEVY

311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
mark@loevy.com
*Admitted *pro hac vice*

William Devine (R.I. Bar No. 3897)
D'AMICO BURCHFIELD, LLP
536 Atwells Avenue
Providence, RI 02909
(401) 490-4803
WVD@dblawri.com

116

## <u>CERTIFICATE OF SERVICE</u>

I, Mark Loevy-Reyes, an attorney, hereby certify that on November 4, 2022, I served PLAINTIFF'S SUPPLEMENTAL ANSWERS TO DEFENDANT TAMARA WONG'S REQUESTS FOR ADMISSION on all counsel of record for via electronic mail.

<u>/s/ Mark Loevy-Reyes</u>
*One of Plaintiff's Attorneys*

117

# EXHIBIT 38

# EXHIBIT 28

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

STATE OF RHODE ISLAND

     VS

                                DISTRICT COURT NO:  62-2019-07946

JOAO MONTEIRO
DOB: 6/28/60

The Office of Attorney General has reviewed this case and determined, at this time, there is insufficient evidence to proceed with a prosecution against Joao Monteiro for the murder of Christine Cole.  The Office of Attorney General has not, and based upon the current state of the evidence, will not present the case to a Grand Jury.  The key evidence tying the defendant to the alleged murder is a DNA profile obtained from a sample found on Christine Cole's clothing. That profile is, however, for Y-STR DNA, which while not excluding the defendant, includes all of his paternal male relatives.  That means absent the ability to eliminate the defendant's father, brothers, uncles and cousins on his father's side of the family as suspects, we cannot definitively establish that the defendant was the source of that inculpatory DNA sample.  Since other potential suspects have not been excluded and there is no other conclusive evidence establishing that this defendant murdered Christine Cole, the State is currently unable to satisfy its burden of proof.  The Office of Attorney General remains ready to work with the Pawtucket Police Department on the investigation of Christine Cole's murder.

Respectfully Submitted,

STATE OF RHODE ISLAND

PETER F. NERONHA
ATTORNEY GENERAL

*Timothy Healy*
ASSISTANT ATTORNEY GENERAL

1/31/20
Date

cc: Pawtucket Police Department

Pawtucket Defendants - 1st RFP - 001532

# EXHIBIT 39

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| JOAO MONTEIRO, | ) | |
| | ) | C.A. No. 1:21-cv-00046-MSM-LDA |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SUSAN CORMIER, TREVOR | ) | |
| LEFEBVRE, DANIEL MULLEN, TINA | ) | |
| GONCALVES, CITY OF PAWTUCKET, | ) | |
| and TAMARA WONG, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF JOAO MONTEIRO'S RULE 26(a)(2) DISCLOSURES**

Plaintiff Joao Monteiro, by his undersigned attorneys, under Federal Rule of Civil Procedure 26(a)(2), hereby provides the following initial disclosures:

Plaintiff identifies the following witnesses who are expected to present testimony under Federal Rule of Evidence 702, 703, or 705:

**WITNESSES DESIGNATED UNDER RULE 26(A)(2)(B)**

1.     **Susan Peters** may be called as a retained expert to present evidence at trial under Federal Rules of Evidence 702, 703, or 705, consistent with the signed report attached to this disclosure. Her CV, list of publications, past testimony, and rate of compensation are included in this disclosure.

2.     **Meghan Clement** may be called as a retained expert to present evidence at trial under Federal Rules of Evidence 702, 703, or 705, consistent with the signed report attached to this disclosure. Her CV, list of publications, past testimony, and rate of compensation are included in this disclosure.

## WITNESSES DESIGNATED UNDER RULE 26(A)(2)(C)

Plaintiff identifies the following witnesses who are expected to present

testimony under Federal Rule of Evidence 702, 703, or 705:

**Jacine Vilches**
**Euclides Gibau**
South bay Community Services
103 Commercial Street
Brockton, MA 02302-3101

They will testify regarding the subject matters that are included in the

documents produced as Monteiro 000487-895, which contain the facts and opinions to

which each witness is expected to testify.

**Cailin McDeed, D.O.**
Mansfield Health Center
200 Copeland Drive
Mansfield, MA 02048
(508) 339-4144

Dr. McDeed will testify regarding the subject matters that are included in the

documents produced as Monteiro 000306-431, which contain the facts and opinions to

which the witness is expected to testify.

**Hua Lu, M.D.**
6 Blackstone Valley Place
Suite 502
Lincoln, RI 02865

Dr. Lu will testify regarding the subject matters that are included in the

documents produced as Monteiro 001576-1867, which contain the facts and opinions

to which the witness is expected to testify

Plaintiff's investigation continues and he reserves the right to supplement his

disclosure should additional witnesses be identified.

RESPECTFULLY SUBMITTED,

**JOAO MONTEIRO**

BY: /s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*

Jon Loevy*
Mark Loevy-Reyes*
Megan Pierce*
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
mark@loevy.com
*Admitted *pro hac vice*

William Devine
D'AMICO BURCHFIELD, LLP
536 Atwells Avenue
Providence, RI 02909
(401) 490-4803
WVD@dblawri.com

## CERTIFICATE OF SERVICE

I, Mark Loevy-Reyes, an attorney, hereby certify that on July 20, 2022, I

served the foregoing Rule 26(a)(2) disclosure on all counsel of record for Defendants

by electronic mail.

/s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*

Jon Loevy*
Mark Loevy-Reyes*
Megan Pierce*
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
mark@loevy.com
*Admitted *pro hac vice*

William Devine
D'AMICO BURCHFIELD, LLP
536 Atwells Avenue
Providence, RI 02909
(401) 490-4803
WVD@dblawri.com

# EXHIBIT 40

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOAO MONTEIRO, | ) | |
| | ) | C.A. No. 1:21-cv-00046-MSM-LDA |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SUSAN CORMIER, TREVOR | ) | |
| LEFEBVRE, DANIEL MULLEN, TINA | ) | |
| GONCALVES, CITY OF PAWTUCKET, | ) | |
| and TAMARA WONG, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF JOAO MONTEIRO'S SECOND SUPPLEMENTAL RESPONSE TO DEFENDANT TAMARA WONG'S FIRST SET OF INTERROGATORIES

Plaintiff JOAO MONTEIRO, by his undersigned attorneys, hereby responds

as follows to the First Set of Interrogatories from Defendant Tamara Wong:

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

Plaintiff's investigation is ongoing as to all matters referenced in the

objections and responses below. Plaintiff's objections and responses are based upon,

and necessarily limited by, information now reasonably available to Plaintiff.

Plaintiff specifically reserves all rights to revise, correct, supplement, modify, or

clarify the content of his objections and responses below, in accordance with the

applicable Federal Rules of Civil Procedure and Federal Rules of Evidence.

Each objection below applies to each instruction, definition, and specific

request included in the interrogatories; and unless otherwise stated, shall have the

same force and effect as if set forth in full in response to each instruction, definition,

and specific request.

Plaintiff objects to Defendant Wong's interrogatories to the extent they seek Documents or information protected by the attorney-client privilege, work product doctrine, psychotherapist-patient privilege, or other common law or statutory privileges. Plaintiff also objects to the interrogatories to the extent they seek publicly available Documents or information, or Documents or information that are equally accessible to Defendant Wong. Plaintiff further objects to each of Defendant's interrogatories to the extent they mischaracterize allegations in Plaintiff's Complaint, which speaks for itself. Moreover, Plaintiff objects to each of the interrogatories below to the extent that it uses vague and ambiguous terms that are undefined and to the extent that it is not limited temporally to the time frame relevant to this lawsuit. Plaintiff objects further to the extent that the interrogatories call for Documents or information that are irrelevant to this lawsuit or that are not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff objects to the instructions and definitions provided by Defendant Wong to the extent they depart from the requirements of the Federal Rules of Civil Procedure or do not accurately reflect the law or rules governing this case on the ground that Defendant Wong's definitions and instructions impose an undue burden on Plaintiff. For example, Plaintiff objects to Defendant's instructions and definitions regarding the identification of Documents responsive to each interrogatory. Defendant's instructions and definitions exceed the requirements of the Federal Rules of Civil Procedure, are unduly burdensome and disproportionate

to the needs of the case, and seek information equally available to Defendants, as well as invade Plaintiff's work product. Plaintiff further objects to Defendant Wong's interrogatories as overly burdensome to the extent they seek a privilege log for Documents which constitute communications between Plaintiff and his counsel in this matter or the work product of Plaintiff and his counsel created in the course of this civil litigation.

Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

## ANSWERS

1.     Identify the "DNA evidence" which You allege, in Paragraph No. 17 of the Complaint, was "supplied" by Ms. Wong, and "was either manipulated by the Pawtucket Defendants to pursue the wrongful arrest of Plaintiff or that was intentionally fabricated to falsely implicate Plaintiff."

**ANSWER:** Plaintiff objects to this Request as premature because this interrogatory is being propounded at the beginning of discovery, and so Plaintiff has not had the opportunity to conduct depositions and anticipates the production of substantial additional documents. Plaintiff further objects because the information relevant to this inquiry is principally in the possession, custody, or control of Defendants. Plaintiff also objects to the extent the interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other statutory or common law privilege. Subject to and without waiving these objections, Plaintiff refers Defendant Wong to his complaint, where he alleges in greater detail that Defendant Wong, in conspiracy with the other Defendants, falsely asserted that the DNA evidence obtained from blood on Christine Cole's pants matched a DNA sample from Plaintiff and that this fabricated evidence was used by Defendants to arrest and initiate criminal proceedings against Plaintiff. Plaintiff's investigation into this matter continues, and he reserves the right to supplement this response as the litigation proceeds.

**SUPPLEMENTAL OBJECTIONS AND ANSWER:** Plaintiff incorporates all objections stated above and additionally objects because Plaintiff fact discovery is ongoing and Plaintiff has the right to be afforded full discovery before responding to this contention interrogatory. *See Summer Infant (USA), Inc. v. TOMY International, Inc.*, C.A. No. 17-549MSM, 2019 WL 5448680 (D. R.I. 10/24/2019).

Subject to and without waiving the above objections, Plaintiff states that Defendant Wong's purported DNA evidence can be found at PD 1664-1682, Monteiro 149-72, 181-82, 203.

In addition, Plaintiff refers Defendant Wong to Defendant Cormier's deposition testimony that Defendant Wong verbally advised Defendant Cormier that Defendant Wong's analysis concluded a direct DNA match between Plaintiff and the purported DNA evidence.

Plaintiff further states that the underlying DNA analytical documents are deficient and do not support Defendant Wong's assertion that the Y-STR testing does not rule out Plaintiff's male relatives. First, there are a number of missing items, information, and/or documents including, but not limited to, the following: (1) the analysis does not include the DNA quantification for sample 1.8 (the purported blood stain from purple pants of victim); (2) there are no electropherograms from the DNA analysis performed by Fairfax Labs, a now defunct laboratory; (3) evidence that additional Y-STR analysis was performed by another lab; (4) documentation of the basis for the conclusion in a report that describes the data from Fairfax lab as well as the report from Fairfax lab as below threshold and/or data not observed (no lab report describes re-analyzing the Fairfax data to reach this conclusion); (5) documentation of additional Y-STR testing despite a note about a consensus Y-STR result; (6) documentation about whether female DNA was contained in the DNA analysis from the purported blood stain from the pants; and/or (7) the electropherograms and the electronic data related to the analysis.

Y-STR analysis can never be used to identify one individual. Defendant Wong conveyed to investigators that the "closest" match implicated Plaintiff's son without identifying the limitations of that analysis or stating what "closest" match meant scientifically. There is no document that demonstrates that Defendant Wong conveyed the above information to any of the police investigators. Moreover, the proper procedure, from a scientific standpoint, would have been to obtain elimination standards from any male who had contact or access to the victim or was otherwise a suspect in the unsolved death of Christine Cole. There is no evidence that Defendant Wong sought to do that or to advise investigators of the need to do so.

Under well-established scientific practices, a substrate control (an area of the pants with no stain) was needed to be processed, but Defendant Wong did not undertake to ensure that the analysis was done. Defendant Wong never identified why she was not able to obtain an autosomal (CODIS) DNA profile from the blood sample itself. Defendant Wong did not include in her reports or otherwise advise investigators about the examination or testing for Y-STR of the pants. This includes that Defendant Wong did not advise investigators that the pants were sealed in plastic (which is an improper way to retain evidence) and contained mold (evidence of improper retention of evidence that could lead to inaccurate analysis).

Plaintiff's investigation into this matter continues, and he reserves the right to supplement this response as the litigation proceeds.

**SECOND SUPPLEMENTAL OBJECTIONS AND ANSWER:** Subject to and without waiving the above objections, Plaintiff states that Defendant Wong supplied false DNA analysis to Defendant Cormier in the form of advising Defendant Cormier that there was a "match" between Plaintiff's DNA and the partial Y-STR profile. Defendant Wong supplied that false evidence to Defendant Cormier knowing that Defendant Cormier did not understand the scientific nature of the DNA analysis and that the false evidence would be used as a basis to arrest Plaintiff. Investigation continues.

2.    Identify each fact that supports Your allegation, in Paragraph No. 17 of the Complaint, that Ms. Wong "supplied DNA evidence related to this case that was either manipulated by the Pawtucket Defendants to pursue the wrongful arrest of Plaintiff or that was intentionally fabricated to falsely implicate Plaintiff."

**ANSWER:** Plaintiff refers Defendant Wong to his objections and response to Interrogatory No. 1, which he incorporates here by reference.

**SUPPLEMENTAL OBJECTIONS AND ANSWER:** Plaintiff refers Defendant Wong to his supplemental objections and response to Interrogatory No. 1, which he incorporates here by reference.

**SECOND SUPPLEMENTAL OBJECTIONS AND ANSWER:** Subject to and without waiving the above objections, Plaintiff states that Defendant Wong supplied false DNA analysis to Defendant Cormier in the form of advising Defendant Cormier that three was a "match" between Plaintiff's DNA and the partial Y-STR profile when Defendant Wong knew that it was not true. Defendant Wong supplied that false evidence to Defendant Cormier knowing that Defendant Cormier did not understand the scientific nature of the DNA analysis and that the false evidence would be used as a basis to arrest Plaintiff. Investigation continues.

3.     To the extent You allege that *Ms. Wong* "fabricated," "manipulated," "falsifi[ed],"or otherwise altered DNA evidence, Identify all facts that support Your averments in Paragraph Nos. 17 and 44 that:

    a.     Ms. Wong "fabricated" the referenced "DNA evidence" (¶ 17);

    b.     Ms. Wong's purported fabrication was undertaken "intentionally" (¶ 17);and/or

    c.     Ms. Wong was "utilized" by Pawtucket Defendants "to accomplish the falsification of this [DNA] evidence" (¶ 44).

However, if You do not allege that Ms. Wong fabricated, manipulated, falsified or otherwise altered DNA evidence, an unqualified statement to that effect is adequate to satisfy thisRequest.

**ANSWER:** Plaintiff refers Defendant Wong to his objections and response to Interrogatory No. 1, which he incorporates here by reference. Plaintiff further objects to this interrogatory as compound and will treat it as such.

**SUPPLEMENTAL OBJECTIONS AND ANSWER:** Plaintiff refers Defendant Wong to his supplemental objections and response to Interrogatory No. 1, which he incorporates here by reference.

**SECOND SUPPLEMENTAL OBJECTIONS AND ANSWER:** Plaintiff objects to this interrogatory because it is compound and will be treated as such. Subject to and without waiving the above objections, Plaintiff states that Defendant Wong supplied false DNA analysis to Defendant Cormier in the form of advising Defendant Cormier that there was a "match" between Plaintiff's DNA and the partial Y-STR profile when Defendant Wong knew that it was not true. Defendant Wong supplied that false evidence to Defendant Cormier knowing that Defendant Cormier did not understand the scientific nature of the DNA analysis and that the false evidence would be used as a basis to arrest Plaintiff. The contemporaneous communications, including but not limited to telephone conversations, text exchanges, and email messages, between Defendants Wong and Cormier support each of the above three separate compound interrogatories. *See* contemporaneous emails, text messages, phone recordings, and phone records as well as the depositions Defendants Wong and Cormier. Investigation continues.

4.     Identify all facts that support Your allegation in Paragraph No. 44 that Ms. Wong was "utilized" by Pawtucket Defendants "to accomplish the falsification of this [DNA] evidence," including without limitation all facts which, together or alone, Identify the nature of the alleged utilization of Ms. Wong by Pawtucket Defendants, and all facts which, together or alone, Identify Pawtucket Defendants' particular

acts or omissions which constitute their alleged utilization of Ms. Wong.

      **ANSWER:** Plaintiff refers Defendant Wong to his objections and response to Interrogatory No. 1, which he incorporates here by reference.

      **SUPPLEMENTAL OBJECTIONS AND ANSWER:** Plaintiff refers Defendant Wong to his supplemental objections and response to Interrogatory No. 1, which he incorporates here by reference.

      **SECOND SUPPLEMENTAL OBJECTIONS AND ANSWER:** Subject to and without waiving the above objections, Plaintiff states that Defendant Wong supplied false DNA analysis to Defendant Cormier in the form of advising Defendant Cormier that there was a "match" between Plaintiff's DNA and the partial Y-STR profile when Defendant Wong knew that it was not true. Defendant Wong supplied that false evidence to Defendant Cormier knowing that Defendant Cormier did not understand the scientific nature of the DNA analysis and that the false evidence would be used as a basis to arrest Plaintiff. The contemporaneous communications, including but not limited to telephone conversations, text exchanges, and email messages, between Defendants Wong and Cormier support each of the above three separate compound interrogatories. *See* contemporaneous emails, text messages, phone recordings, and phone records as well as the depositions Defendants Wong and Cormier. Investigation continues.

      5.     Identify all facts that support Your allegation in Paragraph No. 45 that Ms. Wong "participat[ed]" in an alleged misrepresentation of "the findings of Defendant Wong's analysis," including without limitation all facts which, together or alone, Identify the nature of Ms. Wong's alleged "participation," and all facts which, together or alone, Identify Ms. Wong's particular acts or omissions which constitute her alleged "participation."

      **ANSWER:** Plaintiff refers Defendant Wong to his objections and response to Interrogatory No. 1, which he incorporates here by reference.

      **SUPPLEMENTAL OBJECTIONS AND ANSWER:** Plaintiff refers Defendant Wong to his supplemental objections and response to Interrogatory No. 1, which he incorporates here by reference.

      **SECOND SUPPLEMENTAL OBJECTIONS AND ANSWER:** Subject to and without waiving the above objections, Plaintiff states that Defendant Wong supplied false DNA analysis to Defendant Cormier in the form of advising

Defendant Cormier that there was a "match" between Plaintiff's DNA and the partial Y-STR profile when Defendant Wong knew that it was not true. Defendant Wong supplied that false evidence to Defendant Cormier knowing that Defendant Cormier did not understand the scientific nature of the DNA analysis and that the false evidence would be used as a basis to arrest Plaintiff. The contemporaneous communications, including but not limited to telephone conversations, text exchanges, and email messages, between Defendants Wong and Cormier support each of the above three separate compound interrogatories. *See* contemporaneous emails, text messages, phone recordings, and phone records as well as the depositions Defendants Wong and Cormier. Investigation continues.

6.      Identify all facts that support Your allegation in Paragraph No. 48 of Your Complaint that Defendant Wong "falsely asserted that the DNA evidence was a match to Plaintiff's DNA," including without limitation all facts that support Your averments that: Ms. Wong "asserted that the DNA evidence was a match," and that the purported assertion of a match was (or is) false.

**ANSWER:** Plaintiff refers Defendant Wong to his objections and response to Interrogatory No. 1, which he incorporates here by reference.

**SUPPLEMENTAL OBJECTIONS AND ANSWER:** Plaintiff refers Defendant Wong to his supplemental objections and response to Interrogatory No. 1, which he incorporates here by reference.

**SECOND SUPPLEMENTAL OBJECTIONS AND ANSWER:** Plaintiff objects to this interrogatory because it is compound and will be treated as such. Subject to and without waiving the above objections, Plaintiff states that Defendant Wong supplied false DNA analysis to Defendant Cormier in the form of advising Defendant Cormier that there was a "match" between Plaintiff's DNA and the partial Y-STR profile when Defendant Wong knew that it was not true. Defendant Wong supplied that false evidence to Defendant Cormier knowing that Defendant Cormier did not understand the scientific nature of the DNA analysis and that the false evidence would be used as a basis to arrest Plaintiff. The contemporaneous communications, including but not limited to telephone conversations, text exchanges, and email messages, between Defendants Wong and Cormier support each of the above three separate compound interrogatories. *See* contemporaneous emails, text messages, phone recordings, and phone records as well as the depositions Defendants Wong and Cormier. Plaintiff further states that he will produce expert opinion evidence related to DNA analysis through at least one witness who has education, training, or experience in the science of DNA analysis.

Investigation continues.

7.    Identify which of Your references to unspecified "Defendants," in the following paragraphs of Your Complaint, refer to Ms. Wong (whether alone or as one member of a group of defendants): Paragraph Nos. 5-7, 10, 39, 51-52, 59-62, 65-66, 68-69, 71, 77, 85, 87, 89-91, 94-96, 100, 104, 107-108, 110, 113, 119, 121, 127, and 129-130. For each paragraph specified in this Interrogatory Request, Your response shall include the following information:

    a.    If the term "Defendants" in that paragraph *does not* refer to Ms. Wong: provide an unqualified statement that Ms. Wong is not among the defendants to whom the term "Defendants" refers, and identify the defendants to whom the term *does* refer.

    b.    If the term "Defendants" in that paragraph *does* refer to Ms. Wong: specifically identify Ms. Wong's purported participation or role in each act and/or omission alleged in the Paragraph, and the purported participation or role of each other defendant to whom the term "Defendants" also refers.

**ANSWER:** Plaintiff objects to this interrogatory as compound and will treat it as such. Plaintiff refers Defendant Wong to his objections and response to Interrogatory No. 1, which he incorporates here by reference. As made clear by the Complaint, the term "Defendants" is intended to refer to all Defendants (including Defendant Wong). When a smaller group of Defendants or [a] particular Defendant is referenced, that smaller group or particular Defendant is referenced explicitly. Plaintiff's investigation into this matter continues, and he reserves the right to supplement this response as the litigation proceeds.

8.    Identify which of the ten (10) counts in Your Complaint (numbered I - X), is brought against Ms. Wong and all facts which support Your claim that Ms. Wong is liable to You pursuant to that count. For each of the ten (10) counts in Your Complaint, Your response shall include the following information:

    a.    If the count is not brought against Ms. Wong, provide an unqualified statement to that effect.

    b.    If the count is brought against Ms. Wong, identify all facts which form the basis of Your averment that Ms. Wong is liable to You pursuant to that count, and identify each other defendant (if any) against whom

the count is also brought.

**ANSWER:** Plaintiff objects to this interrogatory as compound and will treat it as such. Plaintiff refers Defendant Wong to his objections and response to Interrogatory No. 1, which he incorporates here by reference. Subject to and without waiving Plaintiff's objections, Plaintiff further directs Defendant Wong to his complaint, which speaks for itself and makes clear that Counts I-VIII have been brought against Defendant Wong and each of the other Defendants.

9.      Identify all facts not identified in Your response to another Interrogatory Request on which You base any claim or allegation against Ms. Wong.

**ANSWER:** Plaintiff refers Defendant Wong to his objections and response to Interrogatory No. 1, which he incorporates here by reference.

**SUPPLEMENTAL OBJECTIONS AND ANSWER:** Plaintiff further object to this interrogatory because it is confusing and seeks information protected from disclosure by the attorney work product privilege. Investigation continues.

10.      List each of Your prior arrests and, for each, include the date, the jurisdiction, the offense(s) charged, and the ultimate disposition of the charge.

**ANSWER:** Plaintiff objects to this interrogatory as harassing and disproportionate to the needs of the case. Plaintiff further objects to this interrogatory because it seeks inadmissible information that has no relevance to any claim or defense raised in this case. Plaintiff also objects because the request is overbroad in that it is not limited in timeframe. Plaintiff's investigation into this matter continues, and he reserves the right to supplement this response as the litigation proceeds.

**SUPPLEMENTAL OBJECTIONS AND ANSWER:** See documents produced by the Pawtucket Defendants and testimony from Plaintiff at his deposition. Investigation continues.

11.      State the name, residence and business address of each person whom You expect to call as a lay witness or expert witness in this case, and give a brief summary of the expected testimony of each witness.

**ANSWER:** Plaintiff objects to this request as premature and to the extent it exceeds the requirements of the Federal Rules of Civil Procedure and invades

Plaintiff's work product. Plaintiff will make all pretrial disclosures required by Rule 26(a) as required by the Federal Rules of Civil Procedure and on the schedule set by the Court. Plaintiff's investigation into this matter continues, and he reserves the right to supplement this response as the litigation proceeds.

**SUPPLEMENTAL OBJECTIONS AND ANSWER**: Subject to and without waiving the above objections, Plaintiff states that he reserves the right to call any witness at trial who has been identified by any party in their disclosures under Federal Rule of Civil Procedure 26, any witness identified in response to any party's discovery responses, and/or any witness who has been deposed in this matter. Investigation continues.

12.    Identify each Document, piece of documentary evidence or exhibit You intend to present at trial in this action.

**ANSWER:** Plaintiff objects to this request as premature. Plaintiff will make all pretrial disclosures required by Rule 26(a)(3) as required by the Federal Rules of Civil Procedure and on the schedule set by the Court. Plaintiff's investigation into this matter continues, and he reserves the right to supplement this response as the litigation proceeds.

13.    State the name and address of each witness to any allegation of your Complaint who has not been previously identified in Your answers to these Interrogatories.

**ANSWER:** Plaintiff objects to this interrogatory as overbroad and disproportionate to the needs of the case. Subject to and without waiving these objections, Plaintiff directs Defendant Wong to his Rule 26(a)(1) disclosures in this case. Plaintiff's investigation into this matter continues, and he reserves the right to supplement his response to this request and his Rule 26(a)(1) disclosures as the litigation proceeds.

14.    Identify any and all Documents that substantiate your claims against Tamara Wong in this matter.

**ANSWER:** Plaintiff refers Defendant Wong to his objections and response to Interrogatory No. 1, which he incorporates here by reference. Plaintiff further objects to this interrogatory as unduly burdensome. Subject to and without waiving Plaintiff's objections, he refers Defendant Wong to all documents produced by the parties in this matter.

**SUPPLEMENTAL OBJECTIONS AND ANSWER:** Plaintiff refers Defendant Wong to his supplemental objections and response to Interrogatory No. 1, which he incorporates here by reference.

RESPECTFULLY SUBMITTED,

JOAO MONTEIRO

By:   /s/ Mark Loevy-Reyes
      *One of Plaintiff's Attorneys*

Jon Loevy*
Mark Loevy-Reyes*
Megan Pierce*
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
mark@loevy.com
*Admitted *pro hac vice*

William Devine (R.I. Bar No. 3897)
D'AMICO BURCHFIELD, LLP
536 Atwells Avenue
Providence, RI 02909
(401) 490-4803
WVD@dblawri.com

**VERIFICATION**

I, Joao Monteiro, have reviewed the foregoing Supplemental Responses to Defendant Tamara Wong's First Set of Interrogatories and verify that the answers are true and correct to the best of my knowledge.

Date: 6/16/22

Joao Monteiro

## <u>CERTIFICATE OF SERVICE</u>

I, Mark Loevy-Reyes, an attorney, hereby certify that on June 23, 2022, I

served Plaintiff's Second Supplemental Response to Defendant Tamara Wong's

First Set of Interrogatories on all counsel of record for Defendants via electronic

mail on counsel of record for all Defendants.

<u>/s/ Mark Loevy-Reyes</u>
*One of Plaintiff's Attorneys*

# EXHIBIT 41

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOAO MONTEIRO, | ) | |
| | ) | C.A. No. 1:21-cv-00046-MSM-LDA |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SUSAN CORMIER, TREVOR | ) | |
| LEFEBVRE, DANIEL MULLEN, TINA | ) | |
| GONCALVES, CITY OF PAWTUCKET, | ) | |
| and TAMARA WONG, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF JOAO MONTEIRO'S RESPONSE TO DEFENDANT
## TAMARA WONG'S SECOND SET OF INTERROGATORIES

Plaintiff JOAO MONTEIRO, by his undersigned attorneys, pursuant to

Federal Rule of Civil Procedure 33, hereby responds as follows to the Second Set of

Interrogatories from Defendant Tamara Wong:

### OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

Plaintiff's investigation is ongoing as to all matters referenced in the

objections and responses below. Plaintiff's objections and responses are based upon,

and necessarily limited by, information now reasonably available to Plaintiff.

Plaintiff specifically reserves all rights to revise, correct, supplement, modify, or

clarify the content of his objections and responses below, in accordance with the

applicable Federal Rules of Civil Procedure and Federal Rules of Evidence.

Each objection below applies to each instruction, definition, and specific

request included in the interrogatories; and unless otherwise stated, shall have the

2

same force and effect as if set forth in full in response to each instruction,

definition, and specific request.

Plaintiff objects to Defendant Wong's interrogatories to the extent they seek

Documents or information protected by the attorney-client privilege, work product

doctrine, psychotherapist-patient privilege, or other common law or statutory

privileges. Plaintiff also objects to the interrogatories to the extent they seek

publicly available Documents or information, or Documents or information that are

equally accessible to Defendant Wong. Plaintiff further objects to each of

Defendant's interrogatories to the extent they mischaracterize allegations in

Plaintiff's Complaint, which speaks for itself. Moreover, Plaintiff objects to each of

the interrogatories below to the extent that it uses vague and ambiguous terms

that are undefined and to the extent that it is not limited temporally to the time

frame relevant to this lawsuit. Plaintiff objects further to the extent that the

interrogatories call for Documents or information that are irrelevant to this lawsuit

or that are not reasonably calculated to lead to the discovery of admissible

evidence. Plaintiff objects to each interrogatory below because Defendant Wong has

exceeded the number of interrogatories, including distinct compound

interrogatories, allowed under the rules in her first sent of interrogatories

Plaintiff objects to the instructions and definitions provided by Defendant

Wong to the extent they depart from the requirements of the Federal Rules of Civil

Procedure or do not accurately reflect the law or rules governing this case on the

ground that Defendant Wong's definitions and instructions impose an undue

burden on Plaintiff. For example, Plaintiff objects to Defendant's instructions and definitions regarding the identification of Documents responsive to each interrogatory. Defendant's instructions and definitions exceed the requirements of the Federal Rules of Civil Procedure, are unduly burdensome and disproportionate to the needs of the case, and seek information equally available to Defendants, as well as invade Plaintiff's work product. Plaintiff further objects to Defendant Wong's interrogatories as overly burdensome to the extent they seek a privilege log for Documents which constitute communications between Plaintiff and his counsel in this matter or the work product of Plaintiff and his counsel created in the course of this civil litigation.

Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

**ANSWERS**

15. For each Constitutional or federal right of which You have been deprived, identify the specific conduct by Tamara Wong which caused You to be deprived of that Constitutional or federal right.

**ANSWER:** In addition to the above objections, Plaintiff objects to this interrogatory because it is vague and overbroad. Moreover, this interrogatory expressly calls for information that is outside of the personal knowledge of Plaintiff. Subject to and without waiving the above objections, Plaintiff states that Defendant Wong fabricated material evidence against Plaintiff in the form of false DNA evidence that Defendant Wong knew would be used to cause Plaintiff's arrest. Defendant Wong falsely represented to the Pawtucket Defendants that she had developed DNA evidence that demonstrated that Plaintiff's DNA "matched" a partial profile of Y-STR DNA that was purportedly obtained from Christine Cole's pants. In fact, the DNA sample from the pants was a Y-STR sample that, at best, can be used to identify male family relatives. In this case, the Y-STR sample was a partial sample that could not be used to narrow down the potential source to Plaintiff's family, and could only be used to narrow the potential source to thousands of other individuals in the New

4

England area. Regardless of that limitation, Defendant Wong expressly and falsely told Defendant Cormier that the samples were a "match." Defendant Wong's fabrication of evidence led to the violation of Plaintiff's rights, resulting in: (1) arrest without probable cause; (2) malicious prosecution; (3) a violation of his right to equal protection; and/or (4) false arrest/wrongful imprisonment. Investigation continues.

16.    For each instance in which the conduct of a person other than Tamara Wong deprived You of one of Your Constitutional or federal rights, describe the steps that You contend Tamara Wong was required to take to intervene in that conduct. Specifically, for each such instance, You are directed to respond by identifying:

   (a) the offending conduct, including date, time, place and perpetrator, and the right of which You were deprived by the conduct;

   (b) the facts about the conduct and deprivation which were known to Tamara Wong at the time and place the conduct was perpetrated; and

   (c) the particular steps that you contend Tamara Wong had the opportunity and legal responsibility to take, including the date, time and place at which she was required to take each such step.

   **ANSWER:** In addition to the above objections, Plaintiff objects to this interrogatory because it is vague and overbroad. Moreover, this interrogatory expressly calls for information that is outside of the personal knowledge of Plaintiff and in the subjective knowledge of Defendant Wong. Subject to and without waiving the above objections, Plaintiff states that Defendant Wong fabricated material evidence against Plaintiff in the form of false DNA evidence that Defendant Wong knew would be used to cause Plaintiff's arrest. Defendant Wong falsely represented to the Pawtucket Defendants that she had developed DNA evidence that demonstrated that Plaintiff's DNA "matched" a sample of DNA that was purportedly obtained from Christine Cole's pants. In fact, the DNA sample from the pants was a partial Y-STR profile that, at best, can be used to identify male family relatives. In this case, the Y-STR sample was a partial sample that could not be used to narrow down the potential source to Plaintiff's family, and could only be used to narrow the potential source to thousands of other individuals in the New England area. Regardless of that limitation, Defendant Wong expressly and falsely told Defendant Cormier that the samples were a "match." Defendant Wong was advised that the evidence she falsified would be used to arrest Plaintiff. Plaintiff had a duty to intervene to prevent the other Defendants from using her fabricated evidence as a basis to arrest Plaintiff. Investigation continues.

17.    Identify by name and contact information (sufficient to permit service of a subpoena upon such person) each individual You contend was similarly

situated to You and was treated differently by Tamara Wong than You were treated by Tamara Wong.

**ANSWER:** In addition to the above objections, Plaintiff objects to this interrogatory because it is vague and overbroad. Subject to and without waiving the above objections, Plaintiff states that Defendant Wong was aware that the DNA evidence she developed narrowed down the potential pool of possible contributors to one out of every 1,909 groups of male relatives. Despite the awareness that there were thousands of other potential person who could have had a partial profile consistent with the partial profile purportedly obtained from the pants, Defendant Wong treated Plaintiff differently by falsely claiming that only he "matched" the partial Y-STR DNA profile purportedly taken from Christine Cole's pants.

Plaintiff objects to identifying by name and contact information the other persons who are similarly situated because that information is exclusively in the hands of Defendants here. For instance, Defendant Wong used a database, not authorized for law enforcement purposes. Plaintiff does not have equal access to that database to identify any of the other thousands of potential persons who were similarly situated to him. Nor does Plaintiff have access to authorized law enforcement databases, such as CODIS, to identify any of the other similarly situated person. Investigation continues.

18. Describe each of Your injuries caused by Tamara Wong's text message communication of approximately 5:53pm on July 17, 2019, to Detective Susan Cormier, which read: "It's a match. Finalizing the report right now."[1]

**ANSWER:** In addition to the above objections, Plaintiff objects to this interrogatory because it is vague and overbroad. Plaintiff further objects to the extent that the interrogatory is premised on only one event out of a series of actions by Defendant Wong that caused Plaintiff's damages. Subject to and without waiving the above objections, Plaintiff states that he has identified his damages in his Complaint as well as at his deposition. Plaintiff refers Defendant Wong to those two sources. In addition, Plaintiff states that his life was completely upended by Defendant Wong's misconduct in falsifying DNA evidence against him. Plaintiff suffered and continues to suffer mental and emotional harm from that misconduct. This includes but is not limited to anxiety, memory loss, constant fear, and post-traumatic stress disorder. In addition, Plaintiff lost his job, his housing, his car, and his ability to live independently. In addition, Plaintiff suffered from a loss of liberty and fear and anxiety that he would be imprisoned for the rest of his life based on falsified evidence

---

[1] *See* TWong_000005.

for a crime that he did not commit and for a death that may not have been a crime. Investigation continues.

19.  To the extent you contend that Tamara Wong made any statement(s) to Susan Cormier on a telephone call on July 17, 2019, prior to 7:12pm, describe each statement by Tamara Wong which caused You to suffer an injury, and the injury or injuries it caused You.

**ANSWER:** In addition to the above objections, Plaintiff objects to this interrogatory because it is vague and overbroad. Plaintiff further objects to the extent that the portion of this compound interrogatory related expressly to damages is premised on only one event out of a series of actions by Defendant Wong that caused Plaintiff's damages. Subject to and without waiving the above objections, Plaintiff states that Tamara Wong fabricated evidence that was relayed to Defendant Cormier by at least one telephone call on the evening of July 17, 2019. *See* Defendant Cormier's deposition related to evidence about the substance of that telephone call. Plaintiff has identified his damages stemming from Defendant Wong's fabrication of evidence that led to his wrongful arrest in his Complaint as well as at his deposition. Plaintiff refers Defendant Wong to those two sources. In addition, Plaintiff states that his life was completely upended by Defendant Wong's misconduct in falsifying DNA evidence against him. Plaintiff suffered and continues to suffer mental and emotional harm from that misconduct. This includes but is not limited to anxiety, memory loss, constant fear, and post-traumatic stress disorder. In addition, Plaintiff lost his job, his housing, his car, and his ability to live independently.  In addition, Plaintiff suffered from a loss of liberty and fear and anxiety that he would be imprisoned for the rest of his life based on falsified evidence for a crime that he did not commit and for a death that may not have been a crime. Investigation continues.

20.  When do you contend that Detective Cormier came into possession of information sufficient to conclude that the DNA profiles of persons *other than* Joao Monteiro and Jerson Semedo were consistent with (or upon analysis, would prove to be consistent with) the Y-STR DNA profile obtained from the stain on the inside crotch of the pants found on Christine Cole's body.

**ANSWER:** In addition to the above objections, Plaintiff objects to this interrogatory because it is vague and overbroad. Plaintiff objects because the interrogatory is premised on assumed facts that are disputed. Subject to and without waiving the above objections, Plaintiff further objects because the interrogatory asks for Plaintiff to speculate about what evidence would be sufficient to cause Defendant Cormier to conclude something and Plaintiff cannot place himself into Defendant

Cormier's mind to state what evidence would cause her to come to such conclusion(s). Investigation continues.

21.     Identify each statement that You claim Tamara Wong presented, or caused to be presented, to Magistrate Judge O'Neill on the evening of July 17, 2019, and whether each such statement was true or false.

        **ANSWER:** In addition to the above objections, Plaintiff objects to this interrogatory because it is vague and overbroad. Subject to and without waiving the above objections, Plaintiff states that Defendant Wong caused her false representation that Plaintiff "matched" the partial Y-STR profile purportedly taken from Christine Cole's pants to be presented to the judge who signed the arrest warrant. Investigation continues.

22.     Identify each individual act or omission by Tamara Wong that You claim was motivated by discriminatory animus towards You on the basis of Your membership in a protected class, and the evidence you intend to present at trial in support of that motive.

        **ANSWER:** In addition to the above objections, Plaintiff objects to this interrogatory because it is vague and overbroad. Plaintiff specifically objects to the portion of the compound interrogatory that seeks Plaintiff's attorneys' work product about what evidence he intends to present at trial on any subject because such an inquiry is privileged from disclosure. Subject to and without waiving the above objections, Plaintiff states that Defendant Wong's fabrication of evidence against Plaintiff as stated above was motivated by discriminatory animus. Investigation continues.


                        RESPECTFULLY SUBMITTED,

                        JOAO MONTEIRO

                        By: /s/ Mark Loevy-Reyes
                        *One of Plaintiff's Attorneys*

**VERIFICATION**

I, Joao Monteiro, have reviewed the foregoing Responses to Defendant Tamara Wong's Second Set of Interrogatories and verify that the answers are true and correct to the best of my knowledge.

Date: 6/16/22

Joao Monteiro

Jon Loevy*
Mark Loevy-Reyes*
Megan Pierce*
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
mark@loevy.com
*Admitted *pro hac vice*

William Devine (R.I. Bar No. 3897)
D'AMICO BURCHFIELD, LLP
536 Atwells Avenue
Providence, RI 02909
(401) 490-4803
WVD@dblawri.com


### CERTIFICATE OF SERVICE

I, Mark Loevy-Reyes, an attorney, hereby certify that on June 23, 2022, I

served Plaintiff's Response to Defendant Tamara Wong's Second Set of

Interrogatories on all counsel of record for Defendants via electronic mail on counsel

of record for all Defendants.

/s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*

# EXHIBIT 42

IN THE COMMON PLEAS COURT OF LICKING COUNTY, OHIO

STATE OF OHIO,                    )

        PLAINTIFF,              )

  -VS-                            )  CASE NO. 04 CR 00464

ROLAND T. DAVIS,

        DEFENDANT.              )

- - - - -

## JURY TRIAL

## VOLUME VII

### PAGES 1650 THRU 1804

- - - - -

TRANSCRIPT OF PROCEEDINGS, VOLUME VII,
before the Honorable Thomas M. Marcelain, Judge,
taken by me, Cathleen M. Lenhart, Registered
Professional Reporter, at the Licking County Common
Pleas Court, Courthouse Square, Newark, Ohio 43055,
on Wednesday, July 6th, 2005, beginning at 9:17 a.m.

- - - - -

CATHLEEN M. LENHART, RPR
Official Court Reporter
Licking County Common Pleas Court
Courthouse Square
Newark, Ohio  43055
(740) 670-5778

APPEARANCES:

ON BEHALF OF THE STATE:

**KENNETH OSWALT**
Asst. Licking County Prosecutor
20 South Second Street
Newark, Ohio 43055

ON BEHALF OF THE DEFENDANT:

**KIRK MCVAY, ESQUIRE**
755 South High Street
Columbus, Ohio 43206

**ANDREW SANDERSON, ESQUIRE**
Law Offices of Kristin Burkett
21 West Church Street
Suite 201
Newark, Ohio 43055

```
1                            WEDNESDAY MORNING SESSION
                                   JULY 6, 2005
2                             - - - - -

3          THE FOLLOWING TOOK PLACE OUTSIDE THE

4    PRESENCE AND HEARING OF THE JURY:

5          THE COURT:  Good morning.  May the record

6       reflect the Defendant is present here in open

7       Court, represented by counsel.  Counsel for the

8       State is present.  This is Thursday --

9       Wednesday, July 6th, second working day of the

10      week.  The jury has not yet been brought back

11      into the courtroom.  The air conditioning is

12      working today.  The microphones still are out

13      of order.  Maybe tomorrow.

14          The secretary just handed me a first draft

15      of some jury instructions.  I've asked her to

16      make three extra copies, so you should look for

17      those on your desk.  Again, this is just the

18      first draft, so don't skewer me too much if it

19      doesn't look right.  I haven't even read it

20      and, let's see, it runs 26 pages so not too

21      bad.

22          Anything you can think of before we get

23      started, Mr. Oswalt?

24          MR. OSWALT:  No, sir.

25          THE COURT:  Anything come to mind, Mr.
```

Cathleen M. Lenhart, RPR   *   (740) 670-5778

1    stipulate to the following.  Had the State of

2    Ohio recalled Detective Tim Elliget to the

3    stand, he would have testified that the hair

4    identified by criminalist Ramen Tejwani of the

5    Columbus Police Department as item T15 and

6    which produced a DNA profile, but one that did

7    not match the DNA profile of Elizabeth Sheeler,

8    was a hair found at 972 Grafton Road, Apartment

9    6, which is the vacant apartment above the

10   apartment belonging to Mrs. Sheeler.

11        The parties agree that these facts may be

12   accepted by the trier of fact without the need

13   to have any further evidence on these matters.

14        The parties agree that this stipulation

15   will be read to the trier of fact and will be

16   admitted into evidence without objection.

17   Bears my signature and Mr. Sanderson's

18   signature.

19        And at this time, Your Honor, the State

20   would call Meghan Clement.

21                   - - - - -

22              MEGHAN CLEMENT

23   being first duly sworn, as provided by law, was

24   examined and testified as follows:

25        BAILIFF:  Please be seated.  Ma'am, our

          Cathleen M. Lenhart, RPR    *    (740) 670-5778

1    microphones got zapped in a lightning storm, so

2    you have to speak up loud and clear so

3    everybody can hear you.  Can you please state

4    your full name, spelling your last name,

5    please, for the record.

6         WITNESS:  My name is Meghan Clement.  The

7    last name is spelled C-L-E-M-E-N-T.

8         BAILIFF:  Thank you, ma'am.

9         THE COURT:  Please proceed, Mr. Oswalt.

10        MR. OSWALT:  Thank you, Your Honor.

11                   - - - - -

12               DIRECT EXAMINATION

13   BY MR. OSWALT:

14        Q    Good morning, ma'am.  How are you this

15   morning?

16        A    Fine, thank you.

17        Q    Can you tell the ladies and gentlemen of

18   the jury what you do.

19        A    I am the technical director in the

20   forensic identity testing department at Laboratory

21   Corporation of America Holdings, Incorporated, which

22   has trademarked the name Lab Corp.  The facility

23   that I work in is located in Research Triangle Park,

24   North Carolina.

25        Q    Okay.  And what exactly do you do for that

1    Q    If some indication from the evidence that

2    the fitted sheet and the mattress pad were both on

3    the bed in their common order, that is fitted sheet

4    on top of a mattress pad and then the mattress, and

5    they were pulled off in one grab, if you would,

6    would that at all be unusual to find DNA on the top

7    of the two layers but not on the second?

8    A    No, not at all.

9    Q    All right.  You indicated that you found

10   male DNA on 4.4, 4.6 and 4.7.  What then did you set

11   about doing?

12   A    We then attempted to develop a Y

13   chromosome profile, and also we had extracted the

14   known reference sample of Roland Davis to use as a

15   comparison for those evidentiary items.

16        We were successful in developing a

17   profile on all three of those samples, as well as

18   the reference sample from Mr. Davis.

19   Q    And a full profile, we've had some

20   testimony about 13 different locations or loci or

21   whatever terminology in another form of DNA.  How

22   many locations, to avoid using technical terms, does

23   the YSTR look for?

24   A    The YSTR kit looks at 12 different

25   locations on the Y chromosome.

Cathleen M. Lenhart, RPR    *    (740) 670-5778

1    Q    And are these generally accepted areas of

2    the Y chromosome to be looking at in an effort to

3    make some form of identification?

4    A    Yes.

5    Q    Tell us what result you were able to come

6    up with respect to 4.4, 4.6 and 4.7.

7    A    The 4.4, 4.6 and 4.7 all revealed the same

8    Y chromosome profile, and those three profiles are

9    the profile that all matched the reference sample

10   from Mr. Davis.  So, we could not exclude Mr. Davis

11   or a paternal relative as being the source of the

12   male DNA in 4.4, 4.6 and 4.7.

13   Q    Okay.  You said you can't exclude him, so

14   it matches him.

15   A    That's correct.

16   Q    Okay.  You also talked you couldn't

17   exclude paternal relatives.  Tell us a little bit of

18   why that is.

19   A    Because the Y chromosome is inherited

20   completely from father to son, Mr. Davis' father has

21   the same Y chromosome profile that he does, and his

22   grandfather has the same Y chromosome profile that

23   his father has and that he has.  So, it -- because

24   it's a paternal passage, you can't exclude either

25   that individual or a paternal relative.

Cathleen M. Lenhart, RPR    *    (740) 670-5778

1     Q    Okay.  Paternal male relative though,

2    correct?

3     A    That's correct.  It has to be a paternal

4    male relative because only males have Y chromosomes.

5     Q    So, it could be Mr. Davis, his father, his

6    grandfather, if he has any children that are male,

7    or any of his brothers.

8     A    That's correct.

9     Q    Okay.  Anybody in that same blood line

10   that's a male.

11    A    That's correct.

12    Q    Okay.  Are there -- we've heard some

13   testimony yesterday about statistics and/or

14   frequency of certain profiles appearing in the

15   population.  That's a little different when we talk

16   about YSTR, is that correct?

17    A    It is, yes, that's correct.

18    Q    Tell us why that is.

19    A    The reason the Y chromosomes are different

20   than the autosomal or nuclear STRs is because the Y

21   chromosome is inherited as a single entity from

22   father to son.  Whereas, the autosomal there's a lot

23   of mixing and matching.  So, siblings, although they

24   have the same source mom and dad, their DNA is

25   completely different.  That's not true with the Y

Cathleen M. Lenhart, RPR    *    (740) 670-5778

1    chromosome.  It's all inherited as a single entity,

2    so you can't look at each different area and use

3    databases to multiply across.

4                 What we do with Y chromosome DNA is

5    there have been various databases that have been

6    compiled, and what we can do is we can look at these

7    databases to see whether this particular profile has

8    been seen before in the various databases.  It's

9    literally accounting method.  If you want to know

10   are green cars common in Newark, you might go out to

11   the corner and just sit there and count how many

12   cars go by and how many of them are green to give

13   you an idea of is a green car in Newark common or

14   not.  So, we're simply searching a database to

15   determine whether the profile that was seen in

16   samples 4.4, 4.6, 4.7 which matched Mr. Davis is a

17   common profile or not a common profile.

18       Q    And what was the -- what was the result

19   when you did a comparison of this profile with the

20   databases available to you?

21       A    We looked at two different databases, and

22   let me refer -- the first one is a world wide

23   database which has populations from Europe, South

24   Africa, North America, South America.  It has

25   approximately 24,189 individual profiles in it, and

          Cathleen M. Lenhart, RPR    *    (740) 670-5778

# EXHIBIT 43

2001 WL 34886304 (Ind.Super.) (Expert Trial Transcript)

Superior Court of Indiana.

STATE,

v.

COMM.

No. 22D01-0010-CF-343.

2001.

**Testimony of Megan E. Clement**

**Name of Expert:** Meghan E. Clement

**Area of Expertise:** Accounting & Economics >> Business Valuation

**Area of Expertise:** Accounting & Economics >> Corporate

**Representing:** Unknown

**Jurisdiction:** Ind.Super.

with the next.

MR. FAITH: Right. We'd called, the State would call Megan E. Clement.

THE COURT: Come on up. Raise your right hand. Do you swear to tell the truth, the whole truth and nothing but the truth, so help you God?

WITNESS: Yes, I do.

THE COURT: Please be seated and move up to the microphone.

**TESTIMONY OF MEGAN E. CLEMENT:**

DIRECT EXAMINATION:

BY: STANLEY 0. FAITH

Q For the record, would you state your name, please, and spell your last name?

A Yes. May name is Megan Clement. The last name is spelled C-1-e-m-e-n-t.

Q And what's your occupation?

A I am the Technical Director in the Forensic Identity Testing Department at LabCorp, which is a company located in Research Triangle Park, North Carolina.

Q And what, among other things, do you test there?

Q So when we talked about what you did in testing and so forth, we're talking about the other three also, which we, uh, I can't get on that screen?

A That's correct.

Q So over on the very left where it says area 30, you have an X, what does that mean?

A What that means is that we only saw an X chromosome, or again, two copies of the X chromosome and so we know that the stain on area 30 originated from a female. When we look across at the various genetic areas that, were tested, the D3, we saw a 15 and a 16. When we compared that to our reference samples we saw that both Kim Camm had a 15 and a 16, and Jill had a 15 and a 16. So at this point we could not exclude either of them as being a possible source of that particular sample. We then looked at the second area, VWA, and we see only a 17, or two copies of the 17, and when we compared that to Kim and Jill we see that Kim has a 17 and an 18, whereas Jill only has a 17. At this point we can exclude Kim, because we do-not see the 18, but we cannot exclude Jill. And if we look further down the line at every one of the genetic areas that were tested, we see the characteristics found in area 30 are the same as the characteristics found in Jill's reference sample, and as well on the three additional, uh, loci that were on the second page. Therefore, we cannot exclude Jill as being the source of the stain in that area 30.

Q Now, when you use the language "cannot exclude" what do you mean?

A What we mean is that there is a match between the profile on the shirt stain, area 30, and the reference sample from Jill Camm, therefore, it could have originated from her, or is consistent, both profiles are the same.

Q And do you have, what area 30 is it as you remember it or do have it in your notes?

A Uh, the only thing I was aware of is that it was from a shirt. I don't know where.

Q Okay. Is it, is it a small swatch?

A Yes, it is, it's small piece of cloth with a, with a very small stain on it.

Q Okay. Let's go to area 5.

A Area 5 ....

Q What was that, first of all, if you can? What-what did you actually test there?

A Area 5, again, was a swatch of cloth with a stain on it, a small stain. And actually, urn, both areas 5 and 6 show a X and Y chromosomes, showing that originated from a male. Under the D3 we found 15, or two copies of the 15, in each. And when we compared that to the known reference samples, both Bradley and David have 15s, so at this point we can't exclude either. When we go do the VWA we see a 17, and Bradley has a 17, David as a 15 and a 17. So we cannot exclude Bradley. And if we go across on each of the other genetic systems the characteristics we see are consistent with those that we find in the reference sample of Bradley Camm and, therefore, we cannot exclude Bradley Camm as being the source of the stains in area 5 and 6. Now, in this VWA there's a superscripted B, which indicates that there is some very, very weak additional activity in that particular sample, and that was a very weak 15. So at that point we couldn't exclude David Camm as being a possible contributor of that particular 15 on that sample.

Q So this one is a slight mixture between Bradley Camm and the Defendant?

A The ma-

MR. MCDANIEL: I would have an objection. That, it's a mixture of someone.

Q - It's consis- well, tell us.

THE COURT: Right, explain.

A The major profile is the same as the profile from Bradley Camm. The weak additional activity, which is a 15, I can't exclude as having originated from David Camm, but I couldn't say for certain.

Q And this is also from, uh, the shirt?

A That's correct.

Q And area 40?

A Area 40, again, showed us only X, which is consistent with originating from a female. A 15 and 16 at D3, which is, at this point, consistent with either Kim or Jill, but in looking a the VWA we saw only a 17. On Kim's we see a 17 and an 18, so we can exclude Kim as being a possible source, but we cannot exclude Jill. And if you look across at all of the other genetic areas you can see that the characteristics are the same at all of the additional areas that we tested for, as well as the three on the next page. Therefore, the sample 40, uh, we cannot exclude as having originated from Jill.

Q Okay. Ar- Item 5, which is a shoelace?

A The shoelace, again, showed us only an X, a 15 and 16 at D3, and a 17 and an 18 at VWA. At this point we don't know whether it's just a single source or it could be a mixture. So if we look further on at each of the genetic areas where we do see reportable results the characteristics were consistent with characteristics possessed by Kim Camm at this point. And there were differences to the reference sample from Jill. In here you se- do not see a 10 on the shoelace that Jill possesses and at this point we have excluded Jill as a possible source of the shoelace, but we cannot exclude Kim. And again, in each of the areas where we do have reportable results the characteristics are the same.

Q Now, you have an NR and you have NA, what are those?

A What that indicates is that those particular areas either did not yield any results, NA is no activity detected, NR is that there was no reportable activity. We have a certain threshold where a peak has to hit a certain height in order for it to meet reporting standards. Where there's NR it means there might have been a peak there, but it did not meet reporting standards. If the peak was in an area which was not consistent is characteristic possessed by, in this instance, Kim, who we are saying cannot be excluded, we would have excluded. So even though we can't report those results we still do look at them to be sure that they wouldn't exclude someone.

Q What's the YB?

A Uh, it's actually a 9 with a B. The B, meaning that there was some very weak additional activity. That weak additional activity was actually an 8, but also did not meet the reporting standards. So the only characteristic that did was the 9, uh, but that weak additional activity was an 8.

Q Now, on the charts that they cannot see on the shoelace, THO1, TPOX and CSF, what were they?

A The THO1 for the shoelace was 6,7 and Kim Camm was also a 6,7. For the TPOX was an 8, uh, Kim was also an 8. And for the CSF we did not obtain any activity.

Q Okay. Area 1 and, I mean, 6, Item 6, area 1, uh, what was that?

A Area 1 from the shoe, uh, showed us an X, a very strong X with a very small amount of Y activity. So here, again, we know we have a mixture. We know the major component is of a, from a female donor and when we look across at the profile that was obtained, the profile that met reporting standards in each of the instances were characteristics that were consistent with the. profile that we see from Kim. Excuse me, here we go, area A. Therefore, we could not exclude Kim as being the major source of the DNA from area A, or excuse me, area 1 of the shoe. However, there was very weak additional male activity.

Q And Item 7?

A Item 7 and area 3 from the shoe. Again, only showed an X. At each of the areas where we obtained reportable results those characteristics are consistent with characteristics possessed by Kim and, therefore, we cannot exclude Kim as a possible source, but we do exclude Jill as the source.

Q Now, what happened with, uh, 8 and 9?

A 8 and 9 we did not obtain any results from, there was simply insufficient amounts of DNA recovered from those two swabs for us to be able to even obtain any profile at all.

Q And Item 10?

A Item 10, which was swab C, uh, again, came from a female and when we looked across at the profile where we obtained reportable results it was consistent with Jill Camm and different than Kim.

Q And swab C came from where?

A Swab C was from the, um, a piece of upholstery, I believe it was, in a vehicle.

Q A piece of upholstery in. a vehicle?

A I believe so, yes.

Q Okay. And that was sent to you by Indiana State Police Lab?

A That is correct.

Q So let's look at that again. Who-who is, uh, swab C?

A Swab C is consistent with Jill Camm and it's different than Kim. There is no 18 that Kim has there at VWA. Uh, at D16 there is an 11,13 and Kim has a 12,13, so Kim is excluded, but Jill cannot be excluded.

Q Okay. Now, you have some numbers, can you explain about those numbers that you have?

A Yes. Once a match is declared between a reference profile and an evidentiary profile we calculate what is called a random match probability to assist in helping you understand how common or how rare that particular profile is. When we used the random match probability for the stains from area 30 and area 40 on the sheet, which matched Jill Camm, the probability of randomly selecting a unrelated individual would be one in greater than six billion in the African-American population, one in greater than six billion for the Caucasian population, and one in greater than six billion for the Hispanic population.

Q Here's some more numbers.

A Yes.

Q Let me get it up.

A For area 5 and 6, from the shirt, where the major profile, the profile matched that of Bradley Camm, once again, the probability of randomly selecting an unrelated individual with a profile that matched that profile at the 13 genetic area is one in greater than six billion in the African- American population, one in greater than six billion in the Caucasian, and one in greater than six billion in the Hispanic population.

Q And what about the next?

A And for the area 1 of the shoe, which matched Kim, the probability of randomly selecting an unrelated individual is one in greater than six billion for he African-American population, one in one billion nine hundred and ninety million for the Caucasian population, and one in greater than six billion for the Hispanic population.

Q How man people are on the planet right now, do you know what the population?

A It is just slightly over six billion, which is why we use six billion in our laboratory as a cutoff for reporting purposes. The numbers were actually larger than that when we report out one in greater than six billion.

Q So the probabilities are that there's no other living person on the planet like that?

A I wouldn't expect more than one individual to have those, that combination of profiles.

Q Let me check my notes. What's your title at the laboratory?

A Technical Director.

Q How many people work under you?

A There are six employees currently working under me.

MR. FAITH: You may ask, Mr. McDaniel.

MR. MCDANIEL: Thank you.

CROSS EXAMINATION:

BY: MICHAEL J. MCDANIEL