UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                        )
JOAO MONTEIRO,                          )
                        Plaintiff,      )
                                        )
            v.                          )          No. 1:21-cv-00046-MSM-LDA
                                        )
SUSAN CORMIER,                          )
                        Defendant.      )
_____ )


**MEMORANDUM & ORDER**

Mary S. McElroy, United States District Judge.

## I.    INTRODUCTION

Ten-year-old Christine Cole ("Christine") disappeared from Pawtucket, Rhode Island, on January 6, 1988. She was last seen about one-half mile from the Blackstone River. Fifty-four days later, her body was discovered washed up on the beach at Conimicut Point in Warwick, some miles away but connected to the point of last appearance by a series of waterways. The cause of death was drowning. (ECF No. 50-2 at 76-77.) Christine was reportedly afraid of water and could not swim. There was no evidence of sexual assault or other physical trauma. *Id.* at 77-80. Nothing in the autopsy report "suggest[ed] anything besides her death was caused by an accidental drowning." (ECF No. 50-2 at 83.) For the next thirty years, there were virtually no leads into what had happened to the child. Then, in August 2018, based

on a familial DNA result,[1] the Pawtucket Police Department ("Department") reopened the investigation. Nearly a year later, on July 17, 2019, the Department held a press conference to announce the arrest of plaintiff Joao Monteiro for murder.

Although there is no transcript of the press conference,[2] it is fair to infer that credit for Monteiro's arrest was given to the lead detective on the case, defendant Det. Susan Cormier, and perhaps to her partner, defendant Det. Trevor LeFebvre. Mr. Monteiro was held in jail for three days until bail was set at his arraignment. Six months later, all charges were dismissed after a review of the evidence by the Attorney General's prosecution staff. (ECF No. 50-49.)

Mr. Monteiro brought this action against the City of Pawtucket and several of its police officers to recover for a series of constitutional and state law torts that stemmed from what he claims was a reckless or deliberate mischaracterization of the DNA results to give the false impression that his DNA was a specific, exclusive "match" to that recovered from Christine's clothing. It is undisputed that even though state forensic expert defendant Tamara Wong found that the similarities

---

[1] Familial DNA refers to a DNA result that instead of "matching" to a particular person matches a family line whose members share genetic markers. When a perpetrator's DNA is not contained in a national database, it is sometimes the case that the DNA of a relative of that person is in the database. In that event, knowing it has "familial DNA" rather than the DNA of a specific singular person, law enforcement can focus on the members of the family of the person whose DNA shared markers with the perpetrator. *See* Global Justice Information Sharing Initiative, "An Introduction to Familial DNA Searching, https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/an_introduction_to_familial_dna_searching1.pdf (Sept. 26, 2003).

[2] The plaintiff has submitted a newspaper article that recounts what was said at the press conference concerning DNA. (ECF No. 50-19.)

between Mr. Monteiro's DNA and that of the stain would be shared by as many as 1 out of every 1,909 males, she informed Det. Cormier that the analysis of Mr. Cormier's DNA produced "a match." The plaintiff alleges that despite being told that Mr. Monteiro's results were "shared with family members," Det. Cormier believed that this result pointed to Mr. Monteiro as a specific, unique DNA match — a "1 in 10 billion match" -- and proceeded as if that understanding were correct.

At the time of Mr. Monteiro's arrest, he was married and had four children.[3] As a result of the publicity accusing him of Christine's murder, Mr. Monteiro alleges that he lost his job despite his tenure of 15 years with a single employer and has not been able to work since. He has reported that he became homeless. According to a declaration from his sister, he became a recluse in the wake of the publicity identifying him as a child murderer. (ECF No. 50-56.)

## II.    JURISDICTION AND STANDARD OF REVIEW

Federal question jurisdiction is invoked pursuant to 28 U.S.C. § 1331. The lawsuit is brought under the umbrella of 42 U.S.C. § 1983, alleging violations of civil rights by state officials. Mr. Monteiro seeks damages for constitutional malicious prosecution (Count I), arrest without probable cause (Count II), conspiracy to deprive of constitutional rights (Count IV), and failure to intervene to prevent unconstitutional conduct (Count V). He has sued under state law for false

---

[3] Mr. Monteiro's wife died in 2019. (ECF No. 50-42.)

3

arrest/imprisonment (Count VI), the tort of malicious prosecution (Count VII), intentional infliction of emotional distress (Count VIII), and slander (Count IX).[4]

All defendants have moved for summary judgment.[5] Summary judgment's role in civil litigation is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug Inc.,* 895 F.2d 46, 50 (1st Cir. 1990). Summary judgment can be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir. 2000) (quoting *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir. 2000) (citing *Mulero–Rodriguez v. Ponte,*

---

[4] Mr. Monteiro dismissed Count III, alleging a denial of equal protection. Count X claims indemnification by the City of Pawtucket and is not itself a cause of action; instead, it goes to the allocation of damages, if any, between the City employees and the municipality.

[5] *See* ECF No. 43 (Pawtucket and Pawtucket Police defendants), ECF No. 47 (Tamara Wong).

*Inc.,* 98 F.3d 670, 672 (1st Cir. 1996)). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I,* 53 F.3d 454, 460 (1st Cir. 1995).

## III.  BACKGROUND

### A. Christine's Disappearance

Christine reportedly left her house on West Avenue, Pawtucket, at about 5:15 p.m. on January 6, 1988, sent by her mother to do several errands. (ECF No. 50-21.) When she had not returned after more than an hour, her mother's boyfriend went looking for her. That evening she was observed at Saint's Market at 76 Slater Street, Pawtucket, at about 7 p.m., where she was given a single glove because her bare hands were cold in the January air. *Id.* She was seen later, at about 10 pm, by several people at a nearby Star Market. She never returned home. *Id.* Christine's whereabouts that evening are integral to Mr. Monteiro's claim. Christine was a child who frequently roamed the streets without supervision. It is undisputed that she was known to shoplift food, rummage through garbage cans, and steal money, and that she was afraid of her mother's boyfriend. (ECF No. 56, ¶ ¶ 6-10).

### B. Joao Monteiro

Mr. Monteiro immigrated legally to the United States from Cape Verde and settled in Pawtucket. (ECF No. 1, ¶ 1.) He worked loading trucks at the same business for fifteen years, from 2004 until his arrest in 2019. (ECF No. 50, ¶ 131.) By all accounts, including that of Pawtucket Police, his English was limited; he spoke

Cape Verdean Creole. (ECF No. 1, ¶ 39.) Before his arrest, he lived independently, cooking and cleaning and visiting friends and family. (ECF No. 50-56, ¶¶ 4, 5.) After his arrest, he moved in with his sister and stopped doing those activities. He "became fearful" and rarely left the house. *Id.* ¶ ¶ 7, 8. His sister began to care for his personal hygiene, which he no longer accomplished by himself. *Id.* ¶ ¶ 8, 10.

### C. The DNA

When Christine's body was found, there was a very small brown stain that could have been blood in the crotch of her pants. Investigators did not know whether the stain pre-dated the drowning or resulted from debris in which the body was found. (ECF No. 50-2.) The stain was "indicated" as blood (ECF No. 51 ¶ 50(b)), but the record is unclear on whether the stain was ever confirmed as positive for blood. That may be because the stain was not even mentioned in 1988 (ECF No. 56 at 23-25) and was not tested until the pants were re-examined in 2008. (ECF No. 50-3 at 5.) At that time, an investigator at the Rhode Island Department of Health (RIDOH) tested the stain for DNA.[6] In 2018, the investigation reopened. Whether the stain was blood or not, it generated DNA, ECF No. 51 ¶ 35), and forensic scientist Wong took over the testing of the stain.

---

[6] An expert retained by the plaintiff, Meghan E. Clement, testified at a deposition that a 2010 report noted there was an "indication" of blood, meaning a positive presumption, but that it could have been a false positive, as a confirmatory test read negative for blood. (ECF No. 50-14 ¶ ¶ 12-13.)

The uncontested record supplies an elemental course in DNA forensics.[7]  Only so much as is necessary to the Court's decision will be described here.  Testing produced a Y-STR profile.  A Y-STR profile is a DNA profile which follows the "Y", or male, chromosome.  It is undisputed that by definition it can match no further than the "Y" chromosome genetic marker, which is shared by all males in direct line of descent.  Thus, a Y-STR profile from a sample male will match, in relevant respect, the DNA of male predecessors of that male as well as male successors.  Because the "Y" chromosome, which signifies male gender, is passed down intact, all males up and down the gene line will share the profile.

The DNA profile resulting from 2008 testing was a partial one, identifying "alleles"[8] at only six of seventeen loci on the "Y" chromosome for testing.  Testing obtained in 2018, during the re-opened investigation, was still partial, but identified alleles at twelve loci, four of which had been identified previously but eight of which were new.  At this point, defendant Wong had a total of fourteen alleles to test – six from 2010 and eight from a buccal swab taken from Mr. Monteiro in 2019.  The

---

[7] A detailed description of the DNA analysis is contained in Ms. Wong's Statement of Undisputed Facts (ECF No. 48) and it is largely undisputed in Mr. Monteiro's Statement of Disputed Facts (ECF No. 51).

[8] A DNA sequence is composed of "alleles" which are at specific locations on one of a person's 44 autosomes.  There are twenty-two pairs of autosomes composed of genes inherited from both parents.  A twenty-third – either an XX or XY – indicates gender. Any single DNA sequence can be the same as someone else's, but the *combination* of all DNA across all locations on all autosomes is unique.

sample produced a positive "hit" for Jerson S. ("Jerson"),[9] whose DNA was in the Rhode Island Department of Health database.[10]  Police knew the perpetrator could not be Jerson because he was born after 1988 when Christine disappeared.  Mr. Monteiro, however, is Jerson's father, and police immediately began to focus on him.[11]  Det. Cormier does not dispute she began to focus on Mr. Monteiro because he was the first male she found related to Jerson.

The emergence of Mr. Monteiro's name, as Jerson's father and therefore one sharing his "Y" chromosome, sparked an intensive scrutiny of the plaintiff.  Det. Cormier led the investigation, assisted by Det. Lefebvre.

### D.  The Defendants

#### 1.  Pawtucket Police

Det. Susan Cormier was assigned to lead the Pawtucket Police Department ("PPD") Cold Case unit shortly before the investigation into Christine's death was

---

[9] Jerson S, who was identified in the papers filed in the case, had no connection to Christine's disappearance.  The Court therefore does not identify him beyond his first name.

[10] Mr. Monteiro does not agree to the accuracy of the Y-STR profile because the DNA testing done by Dr. Wong consumed the entire sample, precluding confirmatory testing.  He does not, however, contest it either.  (ECF No. 51 ¶ ¶ 61, 70.)

[11] According to Det. Cormier, police did not proceed to identify or investigate any others of Jerson's male relatives.  (ECF No. 50-2 at 96.)  Ms. Wong alleged she told Det. Cormier to obtain DNA samples from males who lived with Christine because transfer of DNA onto fabric is common.  That cohabitation testing appears to be routine protocol, as an expert retained by the plaintiff testified at deposition that the absence of testing of males living in or frequenting Christine's home was a "serious concern."  Det. Cormier did not do that, nor did she do a "substrate control," which is a test of fabric generally to determine any effect from contamination by a family member.  (ECF No. 50-14 ¶ ¶ 19-20.)

reopened in 2018. Her partner on this case was Det. Trevor Lefebvre. Det. Lefebvre participated in the interview of Mr. Monteiro, was present at his arrest and a pre-arrest meeting with state prosecutors, and was familiar with at least some of the evidence Det. Cormier gathered. *See* Lefebvre deposition (ECF No. 50-6). Det. Cormier and Det. Lefebvre together conducted an interview of Anthony Soares (ECF No. 50-2 at 61), where they learned of statements by Pedro Ortiz, which could be interpreted as inculpating Ortiz in Christine's death.

Daniel Mullen was a PPD Major, responsible for overall supervision of the investigation. (ECF No. 50-8 at 10, 20; ECF No. 50-7 at 12.) Tina Goncalves was the Chief of Police, responsible for all policies. (ECF No. 50-7 at 11.) She was briefed periodically by Major Mullen, but she had no involvement with Det. Cormier except at the press conference held to announce Mr. Monteiro's arrest. *Id.* at 15, 17, 65. Her deposition established that Pawtucket had no system in place for supervision of investigations generally, and none in place for Det. Cormier despite her having been reprimanded many years before for inadequate investigations. (ECF No. 50-7 at 52.) Both Major Mullen and Chief Goncalves testified in depositions that they were unaware of any previous discipline of Det. Cormier for conducting inadequate investigations. (ECF Nos. 50-7 at 50-51; 50-8 at 16.)

### 2. Tamara Wong

Tamara Wong was a senior forensic scientist for the Rhode Island Department of Health. (ECF No. 51 ¶ 1.) She conducted the re-testing of the alleged bloodstain on Christine's pants. Central to Mr. Monteiro's complaint is the communication

between Det. Cormier and Ms. Wong.  Although the initial testing had revealed only a familial DNA match, Det. Cormier maintains that she was led to believe by Ms. Wong that further testing would produce more specific results.  At 5:53 p.m., Ms. Wong texted the Detective: "It's a match!"  (ECF No. 50-31 at 17.)  Det. Cormier responded, "OMG!"  *Id.*  Ms. Wong complimented her on her "[n]ice detective work," including in the text a "happiness" emoji.  *Id.*  Ms. Wong acknowledges that a lay person would take "match" to mean a unique match.  Det. Cormier testified that because she already knew from the earlier testing that Mr. Monteiro's DNA was "consistent" with the sample, she believed from the 5:53 p.m. text that something new – a unique match – had been found.  Det. Cormier knew she didn't understand the DNA process, and at 7:12 she texted Ms. Wong, asking the scientist to "translate this into my language.  Dumb it done [sic] for mw [sic]."  (ECF No. 51 ¶ 92.)  Det. Cormier maintains that in clarifying the results, Ms. Wong did not explain that the results meant only that "approximately 1 in every 1,909 male individuals is expected to have the same partial Y-STR DNA profile as that obtained from the [stain on the pants]." (ECF No. 51 ¶ 85.)   Det. Cormier testified she did not learn the match was "not a direct match" until days after Mr. Monteiro's arrest.  (ECF No. 50-2 at 51.)  Indeed, even at the time of her deposition in 2021, Det. Cormier continued to refer to the results as "a match" without qualification.  (ECF No. 50-2 at 23.)

### E.  The Allegedly Misleading Warrant Applications

There were two warrants obtained and executed.  First was a search warrant executed on July 17, 2019, to obtain Mr. Monteiro's DNA swab.  (ECF No. 50-28.)  The

second was an arrest warrant, also executed on July 17, 2019. (ECF No. 50-35.) The Affidavits[12] in support of the applications were identical except that the arrest warrant added information about the DNA testing. The warrant affidavit included and omitted the following information:

### 1. Christine's Death

The warrant affidavit included the information that Christine was found many miles downriver and that Christine was deathly afraid of the water and would not have entered it voluntarily. (ECF No. 50-35.) She was fully clothed except for underwear which her mother said she always wore. The affidavit described her pants as "extremely tight and haphazardly [fastened]" – "not fastened in a normal fasten." (ECF No. 50-35.) It omitted

- the medical examiner's description that the pants "were fully zipped and tightly buckled twice at the waistline." (ECF No. 50-24.)

- the autopsy finding of no injuries or trauma to Christine's genital area and no signs of sexual assault, even while including information that might raise a suspicion of sexual assault (the pants and lack of underwear). *Id.*

- that oral, rectal and vaginal smears tested negative for spermatozoa. *Id.*

- the absence of trauma or bone injury such as fractures anywhere about the body, and the absence of any internal hemorrhaging. *Id.*

- that the cause of death was asphyxia due to drowning and the manner of death was undetermined. *Id.*

---

[12] The affidavits are referred to in the singular, as it is only the arrest warrant that is relevant to the claims for relief.

## 2. <u>Suspicion of Mr. Monteiro</u>

The affidavit alleged that Mr. Monteiro lived a "covert" lifestyle, having moved at least 19 times in 30 years. (ECF No. 50-35.) It asserted that he did not live at the address he identified as his residence, pointing to his parking in a lot next to that building and receiving mail at his sister's. *Id.* It omitted

- that he maintained a public Facebook account containing his photograph, that he had worked for the same employer for 15 years, and that he wore a uniform identifying where he worked.

- that many of the addresses were not verified as ones he used. Mr. Monteiro has produced evidence indicating that at least two of these addresses belonged to a different Joao B. Monteiro.

- his explanation that his landlord had assigned him a parking spot in the lot next door and his assertion when interviewed that mail was more reliably received at his sister's nearby.

The affidavit claimed Christine was last seen about 7 p.m. at Saint's Market and that Mr. Monteiro had admitted living in the building containing the Market "during that same time frame" of the disappearance. It omitted

- that when interviewed Mr. Monteiro *denied* living there in the late 1980's and that a stolen car report corroborated that he had lived there in 2001. Det. Cormier had found the owner of the building but not interviewed him about who lived there at what time.

- that the interview at which the detectives claimed Mr. Monteiro admitted living above Saint's Market occurred in English, which was not Mr. Monteiro's native language. It omitted that he had asked for an interpreter and been denied one.

- that well after she was seen at Saint's Market, Christine was seen in the Star Market by a clerk at about 9:30 p.m. and had been caught shoplifting there at 10 p.m.

12

- that a police dog had tracked her scent from Saint's Market to Star Market.  The Affidavit also omitted that Christine was seen after leaving the Star Market, walking toward the railroad tracks.

- Mr. Monteiro's claim that when he lived above Saint's Market, he worked night shifts.

### 3.  <u>Alternate Suspect</u>

Dets. Cormier and Lefebvre had interviewed a person named Anthony Soares in 2019 at Fort Devens federal prison.  (ECF No. 50-2 at 44.)  Soares reported speaking to fellow prison inmate named Pedro Ortiz.  Soares told the detectives that Ortiz talked about his encounter with a child named Christine, saying:

> [I] took her to the fort.  She kept saying she didn't like it.  She no swim. She no like it but I take her anyway.  She no get dirty.  She no like the water.  They never know.  They no find her.  She kept crying but I make her stop.  He liked to play with her.  Don't know if it was sexual.  She can't swim.  She no swim.  She no like the water.  I no care. …

> She wouldn't shut up, but I made her shut up.  Talked in Spanish.  She wouldn't be quiet.  Christine.  I hurt her but I didn't mean it. … She kept crying, but I made her stop.  Kept saying she was cute little girl.  She was beautiful.  Kristine beautiful little girl kept crying but I made her stop.

> They never know.  They no find her.

(ECF No. 50-43.)  Soares also claimed that Ortiz attributed a scar on his forearm to "the little bitch."  *Id*.  The detectives had access to Ortiz' blood but never tested his DNA.  The Affidavit omitted

- all mention of the Soares interview and existence of Pedro Ortiz.  It omitted Soares' claim that Ortiz also referred to "Margie," a reference Det. Cormier acknowledged could have referred to Christine's mother who was called "Margie."  (ECF No. 50-3 at 78.)

- that Ortiz lived in the back corner of the Star Market parking lot where Christine was last seen. (ECF No. 50-43.)

- that Ortiz was in prison for murder, that he was homeless and lived on the railroad tracks which Christine was seen walking towards from Star Market. (ECF No. 50-2 at 46.)

### 4. Arrest Warrant – issued at 10:30 pm. 7/17/19.

The arrest warrant mirrored the search warrant but added information about the DNA testing. The affidavit described that testing revealed male blood on the "inside crotch of the victim's pants." (ECF No. 50-35.) It asserted that the closest match to the blood was that of Jerson S. *Id.* While Jerson was ruled out as a suspect, the affidavit declared that "the suspect for the blood found on the victim's pants was in the close male lineage of Jerson S[], such as his father, grandfather, uncle, or brother." (ECF No. 50-35.) The affidavit went on to state that the blood "was consistent" with Mr. Monteiro's DNA profile. *Id.* The affidavit omitted

- that while the stain had preliminarily appeared to be blood, a confirmatory test was negative, a fact that Det. Cormier does not dispute. (ECF No. 56 ¶ 67.)

- Ms. Wong's conclusion that the findings were consistent with every male in Jerson's lineage, and that the DNA profile would match one in every 1,909 men. It asserted to the contrary that "the suspect for the blood found on the victim's pants was in the *close male lineage* of Jerson Semedo, such as his father, grandfather, uncle, or brother." (ECF No. 50-35) (emphasis supplied).

- It is disputed whether the application attached Ms. Wong's Supplemental Report which explained the 1:1,909 probability. The affidavit refers to an "attached" report. Mr. Monteiro relies on an inference that it was *not* attached, stemming from the Magistrate's lack of memory of such a report as well as the assertions from several staff of

the Attorney General[13] that it was not attached to the paperwork shown to them, when Det. Cormier went over the warrant application with them.

Significantly, Det. Cormier supplied information to the magistrate *not* contained in the written affidavit.  It is undisputed that she had called him earlier in the day to tell him she had a suspect and was expecting a DNA analysis.  When she texted him to confirm her appointment to bring the arrest warrant application to him, she wrote, "We executed the warrant, did the DNA and we got a MATCH."  (ECF No. 50-4 at 57.)  He responded, "That's pretty f**ing awesome!" (ECF No. 50-4 at 59), from which a jury could infer he, too, believed a "match" was a unique identifier, not merely a 1:1,909 possibility.   While the affidavit indicates there was a report attached, referring to Ms. Wong's supplemental report, the Magistrate testified he could not recall any report and only remembered receiving the text messages, affidavit, and warrant application.  (ECF No. 50-11.)

### F.  Aftermath:  Arraignment and Release

The Pawtucket complaint remained pending for six months.  On January 31, 2020, after reviewing the evidence, the Attorney General declined to continue to prosecute and dismissed the case.

---

[13] *See e.g.*, *Deposition of Timothy Healy,* ECF No. 50-10, at 48.  Stephen Dambruch testified his only information when prosecutors met with Pawtucket detectives was that the Rhode Island Department of Health had communicated that Mr. Monteiro's DNA was "a match" to the blood on the pants.  (ECF No. 50-20 at 31.)

## IV.  THE LAWSUIT

In his Complaint, the plaintiff consistently referred to "defendants" in the collective and described nine claims.  All defendants have moved for summary judgment.  The plaintiff has explicitly described the claims he is pressing, waiving all others (ECF No. 52 at 27 n.6):

1.   Counts I and VII: Constitutional and state tort malicious prosecution against defendants Cormier, Lefebvre, and Wong; supervisory liability for Count I against defendants Goncalves and Mullen;

2.   Count II and VI:  Arrest without probable cause in violation of the Fourth Amendment and common law false arrest against defendants Cormier, Lefebvre, and Wong; supervisory liability for Count II against defendants Goncalves and Mullen;

3.   Count IV:  Conspiracy to violate civil rights against defendants Cormier, Lefebvre, and Wong; municipal liability against City of Pawtucket;

4.   Count V:  Failure to intervene to prevent malicious prosecution and arrest without probable cause against Det. Lefebvre; municipal liability against City of Pawtucket.

5.   Count VIII:   Intentional infliction of emotional distress against all individual defendants;

6.  Count IX:  Slander against defendants Cormier and Goncalves.

## V.  SUMMARY JUDGMENT ANALYSIS

### A.  Supervisory Liability - Counts I and II (constitutional malicious prosecution and arrest without probable cause)

Supervisory liability must be predicated on the supervisor's own conduct. There must be an "affirmative link between the behavior of a subordinate and the action or inaction of his supervisor … such that the supervisor's conduct led inexorably to the constitutional violation." *Feliciano-Hernandez v. Pereira-Castillo*, 663 F.3d 527, 533 (1st Cir. 2011).  At the least, a supervisory official must have had

actual or constructive notice of the violation.  *Rodriguez-Garcia v. Miranda-Marin,* 610 F.3d 756, 768 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 1016 (2011).

### 1. Major Daniel Mullen

Accepting the facts in favor of the plaintiff, it appears that Major Mullen played a very limited role in the investigation of Christine's death and subsequent investigation of the plaintiff and no direct role in any of the wrongs Mr. Monteiro alleges.  The plaintiff has presented evidence that Major Mullen drafted the press release, based on his being told that Mr. Monteiro's DNA was a direct match to the suspected blood stain.  (ECF No. 50-2.)  Det. Cormier told him it was a "hit."  (ECF No. 50-8 at 41.)  There is no contradiction of his assertion that he knew nothing of Det. Cormier's reprimand or inadequacy of her investigative work.  *Compare Diaz v. Martinez,* 112 F.3d 1, 4 (1st Cir. 1997) (supervisory liability where Assistant Superintendent of Police was aware of the dangerousness of an officer and his checkered history of grave disciplinary problems).  There is no contradiction of his assertion that he did not review the warrant applications and that it was not part of his duties to do so.  (ECF No. 50-8.)  There is no evidence that he was in possession of information – or should have been in possession of information – that would lead him to doubt the truth and accuracy of what he was told.  Moreover, Major Mullen testified that he was told by Det. Cormier that the Attorney General staff had approved the warrant application.  (ECF No. 50-8.)  It is undisputed that he knew Mr. Monteiro was being investigated because he was a direct male relative of

Jerson's, and a partial DNA profile was consistent with those relatives (ECF No. 50-8), but there is no evidence that he knew anything more.

There is insufficient evidence produced by the plaintiff to warrant a conclusion of supervisory liability against Major Mullen. His Motion for Summary Judgment on Counts I and II is GRANTED.

### 2. Chief Goncalves

Chief Goncalves stands in a different position. The plaintiff has alleged liability against both the Chief and the City for the failure of Det. Cormier to have received any training in DNA which would have enabled her to understand and evaluate what Ms. Wong was telling her. Inadequate training is actionable under 42 U.S.C. § 1983, *Kibbe v. City of Springfield*, 777 F.2d 801, 803 (1st Cir. 1985), *cert. granted,* 475 U.S. 1064 (1986) *and then dismissed,* 480 U.S. 257 (1987), if the failure results in a program "grossly inadequate to prevent the type of harm suffered by the plaintiff." A jury must be able to find "a policy of failure to train arising from deliberate indifference to citizens' rights." *Santiago v. Fenton,* 891 F.2d 373, 382 (1st Cir. 1989). A finding of deliberate indifference can be predicated on a failure to provide adequate training that is not merely negligent but is grossly negligent. *Maldonado-Denis v. Castillo-Rodriguez,* 23 F.3d 576, 582-83 (1st Cir. 1994).

While Chief Goncalves' direct actions were limited to involvement with the press conference, her duties as Chief of the Department could support a finding that she was deliberately indifferent to the need for training and the lack of relevant training that Det. Cormier received. The Chief, according to her deposition, was

responsible for all policies concerning training. She acknowledged that the only training members of the PPD were required to have was in firearms and dealing with mentally ill individuals. (ECF No. 50-7 at 96.) Det. Cormier corroborated that the only training she had received at all concerning DNA was how to take a swab. (ECF No. 50-2 at 32.) She received no training in how to handle exculpatory information, nor in framing applications for warrants. She also maintained she received no training in how to handle requests for interpreters by suspects. (ECF No. 50-2 at 180.)

Mr. Monteiro alleges that his injuries were directly caused by Det. Cormier's failure to understand the meaning of what Ms. Wong told her about the DNA testing. Chief Goncalves acknowledged the PPD had conducted no training at all in the use of DNA evidence. (ECF No. 50-7 at 47.) There is no requirement that detectives using DNA evidence undergo any training outside the department. *Id.* Clearly, the lack of any substantive training in DNA could be found to have directly contributed to that Det. Cormier's alleged failure to understand the results. In addition, the warrant application was allegedly filled with misleading information, and exculpatory information was omitted. The failure to provide training in the obligation to present complete and truthful information could have led directly to Det. Cormier's failure to do so. Finally, if there was any confusion about what Mr. Monteiro had said when being interviewed, a jury could find that it was due to the failure to provide an interpreter even when he requested one. A jury could find a direct causal connection between the lack of training provided by Chief Goncalves and constitutional

violations committed by the detectives.  A jury could also find that misunderstanding the significance of DNA testing was a foreseeable risk of the lack of training. *Maldonado-Denis,* 23 F.3d at 582.  A further basis for Chief Goncalves' supervisory liability is that as the policymaker for the PPD, she had failed to create or maintain policies for supervisory oversight of investigations.  Members of the police department testified consistently at depositions that individual detectives had wide-ranging discretionary authority, with no review of their actions.  Thus, a detective such as Sue Cormier was seemingly entirely on her own in deciding what leads to pursue, what to disregard, how inclusive to be of facts in the warrant application, and how extensively she could ignore facts in her possession.  Chief Goncalves could be found accountable for the state of affairs that allowed for that autonomy.  Thus, the plaintiff has produced sufficient evidence to forestall summary judgment for Chief Goncalves and her Motion for Summary Judgment is DENIED on Counts I and II.

## B.  City of Pawtucket

Municipal liability for the lack of training must meet the standards of *Monell v. New York City Dept. of Soc. Services,* 436 U.S. 658 (1978).  A municipality can be found liable under 42 U.S.C. § 1983 "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989) (emphasis original).  There must be a direct causal link between a municipality's policy or custom and the alleged constitutional deprivation. *Id.*  That policy or custom can be a "failure to train," if that failure reflects a "'deliberate' or 'conscious' choice." *Id.* at 379.  It is the deliberateness of the choice that makes the

failure to train a "policy."  *Id.*  The municipality need not have made an actual decision not to train, and such a decision is not alleged here.  Instead, if the "inadequacy [is] so likely to result in the violation of constitutional rights," the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.   In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury."  *Id.* at 390.

Unlike the situation in, for example, *Seekamp v. Michaud,* 109 F.3d 802, 808 (1st Cir. 1997), where the police had received some training in high-speed chases, the evidence here could support a finding of no training by the PPD in DNA.  There is no dispute that the only training Pawtucket officers in general, and Det. Cormier in particular, had received in DNA was how to take a swab.  (ECF No. 50-2 at 31-32.)  In an era when DNA testing is an established tool of law enforcement investigations, and the PPD had been using DNA evidence since 2005, a jury could find that total failure grossly negligent.  Moreover, Mr. Monteiro has proffered the opinion of Sue Peters, a retained consultant in police protocols.  Ms. Peters' declaration offers the opinion that a detective investigating major crimes, as Det. Cormier did, could be expected to have received sufficient training to understand how DNA evidence worked before applying for a warrant and making an arrest.  (ECF No. 50-18.)  Ms. Peters' opinion is that training in Pawtucket fell "well below the standards of practice in law enforcement criminal investigations," (ECF No. 50-18 at 7) and that the

warrant affidavit included information "that was misrepresented, not factual, and unverified." *Id.*

PPD officers received no training in how to draft applications for warrants, what those applications should include, or how they should handle exculpatory evidence. There was no policy in place mandating inclusion of any exculpatory evidence in warrant applications, nor was there any policy in place requiring oversight by supervisors before warrants were sought. (ECF No. 50-2, 50-8 at 46-47.) In addition to the overall situation regarding training, Pawtucket as an entity had specific knowledge about Det. Cormier's alleged shortcomings, even if individual supervisors did not. She had received the lowest grade in the police training academy and supervisors had reported inadequate investigations after she made detective. In her early career, she was reprimanded for not properly investigating 40 cases, but was required to follow up with a supervisor for only a month. (ECF No. 50-50.)

The plaintiff has produced sufficient evidence to warrant a denial of Pawtucket's claim for summary judgment.

## C. Det. Susan Cormier and Det. Trevor Lefebvre

While Det. Cormier was clearly the lead detective responsible for the conduct of the investigation, Mr. Monteiro has produced evidence that Det. Lefebvre was sufficiently acting in concert with her to share whatever liability she may be found to have had concerning certain counts. Det. Cormier testified he provided general assistance to her, "work[ing] together." (ECF No. 50-2 at 42.) Although he did not participate in all aspects of the investigation, he conducted the interview of Mr.

Monteiro with her and was present at the meeting when Det. Cormier went over the arrest warrant affidavit with prosecutors. At his deposition, he allowed that he probably read over the document before it was discussed. He was also present at the arrest. Therefore, at a minimum he would have been aware of the assertions in the affidavit creating the impression that Christine was last seen at Saint's Market and that Mr. Monteiro lived there *at that time* – assertions Mr. Monteiro contradicted when interviewed. *See e.g., Walczyk v. Rio,* 496 F.3d 139, 162 (2d Cir. 2007) (where affidavit stated suspect had access to his mother's home where firearms would be found, omission of the fact that he had not lived there for seven years gave rise to liability). Det. Lefebvre was also present at the interview with Anthony Soares. While there is no evidence that he was privy to the conversations between Det. Cormier and Ms. Wong about the DNA, he was sufficiently involved for a jury to find him accountable for the Affidavit's omissions.

### 1. Malicious prosecution (Counts I and VII)

The constitutional and common law torts of malicious prosecution share three elements: that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Hernandez-Cuevas v. Taylor,* 723 F.3d 91, 101 (1st Cir. 2013). The constitutional action is grounded in the Fourth Amendment, *Hernandez-Cuevas* 723 F.3d at 99, while Rhode Island maintains a common law basis for the state tort. *Henshaw v. Doherty,* 881 A.2d 909, 918 (R.I. 2005) (upholding grant of summary judgment on "common law malicious prosecution").

Rhode Island state law clearly requires a fourth element: "the existence of malice on defendant's part." *Id.* at 915. While the Rhode Island Supreme Court has implied that the elements of both the constitutional and tort actions may be the same, the claim of unconstitutional malicious prosecution seems not to require malice. In *Hernandez-Cuevas,* the Circuit compared several approaches to the civil rights claim and explicitly adopted what it termed "a purely constitutional approach." 723 F.3d at 101. It described *three* elements of the claim: "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminat[ed] in the plaintiff's favor." *Id.* It then explicitly declared there is "no principled reason why plaintiffs alleging a constitutional injury should be entitled to relief only if they can demonstrate that their claim meets all the elements of a common law claim." *Id.* Thus, the constitutional claim is made out on a showing that the police conduct was "objectively unreasonable," without the additional burden of showing "that the defendant officer acted with subjective malice." *Id.* at 99.

The vigorous dispute in this case is whether the arrest of Mr. Monteiro was undertaken with probable cause[14]. Probable cause is ordinarily a question for a jury. *B.C.R. Transp. Co., Inc. v. Fontaine,* 727 F.2d 7, 10 (1st Cir. 1984). Where, however, the arrest was authorized by a duly issued arrest warrant, it is presumptively supported by probable cause. Generally, "[a] search warrant executed by a judicial

---

[14] There is no dispute that Mr. Monteiro was arrested and, when the criminal proceedings were dismissed, they terminated in his favor. *Thompson v. Clark,* ___ U.S. ___, 142 S. Ct. 1332, 1335 (2022) (an ending without a conviction is favorable).

officer stands as an imposing impediment to [a Fourth Amendment] claim." *Jordan v. Town of Waldoboro,* 943 F.3d 532, 540 (1st Cir. 2019), *rev'd on other grounds.* The central question is whether the arrest warrant obtained by the Pawtucket Police may be relied upon in the face of evidence that the affidavit presented in support of its issuance was so replete with misleading information, and omitted so much exculpatory information, as to amount to falseness.

A warrant is void if it depends for probable cause on knowing or recklessly false statements made in the affidavit supporting it. *Franks v. Delaware,* 438 U.S. 154, 156 (1978). Statements that are false or misleading must be set aside and the remaining information must be assessed to determine whether it is sufficient to establish probable cause. "[T]he intentional or reckless omission of material exculpatory facts from information presented to a magistrate may also amount to a Fourth Amendment violation." *Burke v. Town of Walpole,* 405 F.3d 66, 81 (1st Cir. 2005). In the case of allegedly material omissions, "recklessness may be inferred where the omitted information was critical to the probable cause determination." *Id.* at 81-82 (quoting *Golino v. New Haven,* 950 F.2d 864, 871 (2d Cir.1991)). When the omitted information is "highly relevant," its nature supports an inference of reckless disregard. *United States v. Jacobs,* 986 F.2d 1231, 1234-35 (8th Cir. 1993) (where affidavit described a sniffing dog's "interest" in the package but failed to include the fact that the dog did not "alert," the omission occurred with "reckless disregard" because "[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know.") Any police officer who obtained a warrant using

materially false statements or misleading information may be held personally liable under 42 U.S.C. § 1983. *Jordan,* 943 F.3d at 540-41 (citing *Aponte Matos v. Toledo Dávila*, 135 F.3d 182, 187 (1st Cir. 1998). Liability may be predicated on omissions as well as material included. *Jordan,* 943 F.3d at 541.

When facts in a warrant affidavit are false or misleading, a Court's function is to determine whether the untainted portion of the affidavit could, in a jury's opinion, amount to probable cause. In this case, the amount of information that was *not* false or misleading was limited. In addition, there was much information whose accuracy was severely undercut by the omission of exculpatory evidence. When the affidavits are stripped of tainted material, they lacked persuasive information that a crime had been committed, that Mr. Monteiro had a motive for committing it, or that he had the opportunity to do so. A jury could therefore find that the arrest lacked probable cause.

Under state law, malice means "hostility" and may be inferred simply from the lack of probable cause. *Nagy v. McBurney,* 392 A.2d 365, 367 (R.I. 1978). A showing that statements in an affidavit amounting to "deliberate falsehood or . . . reckless disregard for the truth" will inevitably satisfy the common law element of malice. *Hernandez-Cuevas,* 723 F.3d at 102 (finding "[t]his kind of reprehensible behavior "indistinguishable from the common law element of malice."). Malice may be inferred from egregious conduct that "violated substantive or procedural due process rights under the Fourteenth Amendment." *Senra v. Cunningham,* 9 F.3d 168, 173 (1st Cir.

1993). "'[A] distortion and corruption of the processes of law' such as 'falsification of evidence or some other egregious conduct'" may constitute malice. *Id.*[15]

A jury could find that the same conduct that underlies the plaintiff's challenge to the warrant implies a motivation by the Pawtucket officers characterized by ill will rather than a neutral desire to discern the facts. The omissions from the warrant affidavit could be found to have evidenced a determination to overstate the incriminating evidence against Mr. Monteiro and forestall any doubts about his guilt. That evidence, as well as other evidence of investigative options that the detectives chose not to pursue (such as a comparison of Pedro Ortiz' DNA, or an investigation of other males in the Monteiro/Jerson line), could support a finding of malice.

Therefore, Dets. Cormier and Lefebvre are denied summary judgment on Counts I and VII.

### 2. Counts II and VI (Unconstitutional and false arrest)

The analysis of probable cause that governs the denial of summary judgment as to malicious prosecution demands the same result regarding Counts II and IV. A false arrest or imprisonment claim requires a showing that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Beaudoin v. Levesque,* 697 A.2d 1065, 1067 (R.I. 1997). The existence of probable cause defeats the claim, as it does a claim of malicious

---

[15] *See* discussion by then-Circuit (now Chief) Judge Barron, concurring in *Pagán-González v. Moreno,* 919 F.3d 582, 602-03 (1st Cir. 2019), concerning the evolving nature of the malice requirement of a constitutional malicious prosecution claim.

prosecution.  *Horton v. Portsmouth Police Dept.,* 22 A.3d 1115, 1122 (R.I. 2011).  From the same deliberate omission of exculpatory facts — in a way that made the factual statements included arguably misleading and inaccurate — a jury could find the Pawtucket Detectives unable to rely on the arrest warrant to validate the arrest of Mr. Monteiro.  Mr. Monteiro is entitled to a jury determination of whether there was probable cause to support his arrest.  Therefore, Dets. Cormier and Lefebvre are denied summary judgment on Counts II and VI.

### D.  Tamara Wong – Counts I, II, VI, and VII.

Tamara Wong's liability is predicated on the theory that she supplied the PPD with information to obtain warrants that she knew or should have known was misinterpreted and misunderstood in a way that falsely portrayed and overstated his guilt.  Whether Ms. Wong's actions constituted a reckless disregard for Mr. Monteiro's rights is a jury question.  So too is whether her actions were so reckless as to deprive her of the defense that Rhode Island law gives DOH employees for "acting in good faith and without malice."[16]  R.I.G.L. 1956 § 23-1-32.  Ms. Wong herself was a state

---

[16] Ms. Wong's reliance on § 23-1-32, entitled "Limitation on civil liability" raises several questions that need not be answered at this stage of litigation.  First among them is whether this limitation has any applicability to a federal cause of action brought under 42 U.S.C. § 1983, or whether it is operative only as to the state law false imprisonment claim.  Second, the statute says no employee of DOH shall be "personally liable for damages because of any act undertaken in the lawful performance of official duties."  Does that statute preclude a finding of her liability which would support damages against the state under *respondeat superior*, or does it merely mean that the state must indemnify her for any damages based on her personal liability?  Both appear to be open questions under Rhode Island law.  Third, the statute may simply be a description of the qualified immunity that is granted under federal law and conveyed by Rhode Island case law.  *See Hatch v. Town of*

actor.  And even a private person who is "a 'willful participant in joint activity with the State or its agents" can be liable under § 1983 for that police conduct.  *Ying Li v. City of New York,* 246 F. Supp. 3d 578, 597 (E.D.N.Y. 2017).  *Ying Li* is widely cited as persuasive in this area.  There, a private doctor was held liable for providing a "shaken baby" diagnosis that was unsupported by medical evidence or science and for ignoring inconsistent evidence of a metabolic bone disease.  *Id.* at 593, 615.  Her action in playing an active role in the decision to prosecute was tantamount to making herself a deputy of the police department.  *Id.*  at 645.  "A defendant could have initiated a prosecution 'by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.'"  *Id.* at 605.

Det. Cormier has insisted in evidence supplied by the plaintiff that Ms. Wong led her to believe that the DNA testing revealed a specific match ("a match that singled out John Monteiro as the person who matched that DNA"), much more than a consistency shared with hundreds of others.  (ECF No. 50-2 at 25.)  Det. Cormier testified at a deposition that Ms. Wong led her to believe that Ms. Wong was doing testing beyond what had been done in 2008 that could result in a specific match and that, therefore, when Ms. Wong texted her, "It's a match," Ms. Wong was signaling that she had achieved that degree of certainty.  Contrary to Ms. Wong's assertion that

---

*Middletown,* 311 F.3d 83, 90 (1st Cir. 2002) (concluding that Rhode Island law affords equivalent qualified immunity).

she merely sent one text, Det. Cormier maintains the scientist both called and texted her.  (ECF No. 50-2 at 25.)

Mr. Monteiro's theory is that Ms. Wong knew or should have known "It's a match" would be taken by a layperson as signaling an exclusive unique DNA match. That is how Det.  Cormier described her reaction, "That, to me, coming from a forensic scientist was telling me that what I submitted to her, that she had worked on all day was a confirmed match to the blood on the victim's pants."  (ECF No. 50-3 at 40.)

> I went by what she told me on the phone and what she told me on the text, that it was a match, and you know, having one request. When you're on the news for this, you know, make sure you mention the Department of Health. I'm not sure how else I should have taken all of this. I have a forensic scientist telling me, Congratulations, it's a match, nice work, make sure you name us on the news. That, to me, was her telling me time and again that we have the right person. That's what I believed in my heart 100 percent. *Id.* at 139.

Ms. Wong seeks summary judgment based on two propositions:  first, that her DNA analysis was accurate and, indeed, Mr. Monteiro agrees that it was.  (ECF No. 47, Part A.)  Second, she argues that her text statement that "It's a match" was of no consequence because it was not included in the warrant application.[17]  As to the first,

---

[17] Ms. Wong misconceives the relevance of the settled law that probable cause must ordinarily be gauged based on information within the four corners of the warrant affidavit.  *United States v. Christopher,* No. CR 20-491 (IM), 2021 WL 3910152, at * 1 (D.N.J. Sept. 1, 2021).  That precept governs the inquiry as to whether the affidavit presents *sufficient* information to support probable cause.  This case, however, involves false or misleading information presented to the magistrate outside the affidavit.  The issue is causation:  whether the "it's a match" conclusion influenced the issuance of the warrant and therefore whether Ms. Wong played a role in its issuance.  Moreover, the "four corners" rule is not absolute.  *United States v. Lucas,* 379 F. Supp. 3d 182, 192 (W.D.N.Y. 2019) (affidavit may be supplemented by sworn testimony).

the point is irrelevant to the plaintiff's allegation which is that she recklessly fostered a mistaken belief about the *meaning* of her analysis.  And as to the second, she intended her conclusion to be part of the probable cause submission, she knew that it would be communicated, and in fact it *was* communicated by Det. Cormier in a text conversation with the magistrate.  Thus there is ample causation between Ms. Wong's actions and the injury claimed.

Ms. Wong's direct conduct in supplying misleading information in support of the warrant applications is sufficient to allow a jury to find her liable for an arrest without probable cause in violation of the Fourth Amendment and under Rhode Island state law.

A jury could also determine that she played a critical role in the initiation of the prosecution, such as to make her liable for malicious prosecution.  Her role was similar to the doctor's in *Ying Li v. City of New York.*  Her assertion that Mr. Monteiro's DNA was "a match" propelled what was only an investigation into an arrest.  Before she communicated the DNA results to Det. Cormier, the police had taken no steps to secure an arrest warrant.  Clearly, while many suspicions played in the minds of the detectives, Mr. Monteiro was perceived as a suspect and not "the perpetrator" until Ms. Wong declared his DNA a match.  Moreover, a jury could believe from this evidence that Ms. Wong knew very well that her communication – eagerly awaited by Det. Cormier – would cause the detectives to seek an arrest warrant.  This activity could warrant a finding that she played a role in the initiation of the prosecution.

Ms. Wong's Motion for Summary Judgment on Counts I, II, VI, and VII is therefore denied.

### E.  Conspiracy to Violate Civil Rights – Count IV

Liability for conspiracy to violate civil rights requires an agreement "to act in concert to inflict an unconstitutional injury," plus an overt act committed in furtherance of the conspiracy which causes damages.  *Williams v. City of Boston,* 771 F. Supp. 2d 190, 204 (D. Mass. 2011).  The agreement, which rarely is proven by direct evidence, can depend on circumstantial evidence.  *Id.* at 205, *Santiago,* 891 F.2d at 389.  The understanding between coconspirators may be tacit.  *United States v. Echeverri,* 982 F.2d 675, 679 (1st Cir. 1993).

The plaintiff claims three defendants participated in such a conspiracy:  Dets. Cormier and Lefebvre, and Ms. Wong.  There is no evidence produced by the plaintiff that Ms. Wong had agreed to act in concert with the detectives.  To the contrary, the evidence is manifest that they shared no meeting of the minds:  that there was a massive misunderstanding between the scientist and the detectives.  Ms. Wong may be potentially liable for creating the misunderstanding, but that does not mean she intended it.  Her Motion for Summary Judgment as to Count IV is GRANTED.

Dets. Cormier and Lefebvre, according to the plaintiff's evidence, conducted much if not most of the investigation together, they participated in the major events together, they were privy to the same information outside of Det. Cormier's communications with Ms. Wong about DNA.  They were privy to the same exculpatory evidence that was omitted from the affidavit, and the same information

that made many of the affidavit's statements misleading.  Although it was Det. Cormier who drafted the affidavit, Det. Lefebvre acknowledged he proofread it, and he acquiesced in it during the meeting with the Attorney General staff.  When officers act jointly, a jury can infer they were acting pursuant to an agreement.  *Williams,* 771 F. Supp. 2d at 205.  There, the officers responded to 911 calls together, were jointly involved in the investigation, and pursued false charges with fabricated evidence together.  *Id.  The* First Circuit concluded that these activities supported an inference of an agreement.  *Id.*  In this case, the joint activities of the two detectives were not much different, and the plaintiff is entitled to have a jury assess what inferences, if any, can be drawn.  Dets. Cormier and Lefebvre's Motions for Summary Judgment as to Count IV are DENIED.

### F.  Count V:  Failure to Intervene

Law enforcement officers have an affirmative duty to intervene to protect the constitutional rights of citizens from infringements occurring in their presence. *Terebesi v. Torreso,* 764 F.3d 217, 243 (2d Cir. 2014).  To be found liable, the officer must have had a "realistic opportunity" to intervene, "normally a question of fact for the jury."  *Id.* at 244.

The only individual against whom this claim is pursued is Det. Lefebvre.[18] Based on the evidence Mr. Monteiro has tendered, a jury could find that when Det.

---

[18] The parties have not addressed this point, but presumably if the case goes to trial, a jury would have to elect between Det. Lefebvre's liability for failure to intervene and his direct liability for the state and constitutional torts.  He cannot logically be liable both for acting and for failing to intervene to prevent his own actions.

Lefebvre reviewed the warrant affidavit before it was submitted, and, when he attended the meeting at which Det. Cormier went over the affidavit with Attorney General staff, he had the opportunity to intervene to forestall the constitutional violation that Mr. Monteiro alleges. He knew of assertions in the affidavit that had been contradicted by Mr. Monteiro and that Mr. Monteiro's purported admission to living above Saint Market's at the time of Christine's disappearance was not accurate. He also knew of exculpatory explanations Mr. Monteiro had given at his interview that were not included in the affidavit, rendering the assertions about Mr. Monteiro's "covert" lifestyle arguably misleading. Finally, he was present at the Soares interview and had reason to know, therefore, that a major piece of potentially exculpatory information was omitted. *See gen'ly,* Deposition of Det. Lefebvre (ECF No. 50-6.) There is sufficient evidence to bring Count V to a jury and Det. Lefebvre's Motion for Summary Judgment is DENIED.

### G. Count VIII: Intentional infliction of emotional distress

Rhode Island recognizes a claim for intentional infliction of emotional distress.

> 'In order to impose liability on a defendant for intentional infliction of emotional distress: (1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be *extreme and outrageous*, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe.'

*Shannahan v. Moreau,* 202 A.3d 217, 230 (R.I. 2019) (quoting *Gross v. Pare,* 185 A.3d 1242, 1245-46 (R.I. 2018)) (emphasis original). But state law is also clear that to pursue that cause of action a plaintiff must suffer some physical manifestation of the emotional condition that a defendant's actions has allegedly caused. "Furthermore,

'this Court has required at least some proof of medically established physical symptomatology for both intentional and negligent infliction of mental distress.'" *Id.* at 230 (quoting *Gross*, 185 A.3d at 1246).

Mr. Monteiro has alleged no physical symptomatology in his Amended Complaint. "The existence of resulting physical symptomatology" must be pleaded. *Clift v. Narragansett Television L.P.,* 688 A.2d 805, 813 (R.I. 1996). It must then be supported by medical evidence. "[W]e require for recovery, however, along with the vast majority of judicial authority, that psychic as well as physical injury claims must be supported by competent expert medical opinion regarding origin, existence, and causation." *Vallinoto v. DiSandro,* 688 A.2d 830, 839 (R.I. 1997).

In the absence of physical symptomatology pleaded and supported, all defendants are entitled to summary judgment on Count VIII.

## H. Count IX: Slander

Slander or defamation, a state tort, consists of an unprivileged false and defamatory communication to a third party with fault amounting at least to negligence, and damages. *Kevorkian v. Glass,* 913 A.2d 1043, 1048 (R.I. 2007). A statement is defamatory if it is both false and "imput[es] conduct which injuriously affects a [person's] reputation, or which tends to degrade him [or her] in society or bring him [or her] into public hatred and contempt." *Alves v. Hometown Newspapers, Inc.,* 857 A.2d 743, 750 (R.I. 2004). If the communication is made in good faith, in the belief that the speaker has a legal, moral, or societal duty to speak in order to protect his own or a third party's interest, the law conveys a qualified privilege. *Id.* The

defendants' primary argument is that Mr. Monteiro has not specified the public statement he claims was both false and defamatory. To the contrary, his Complaint identifies that statement as the "public[] and false[] procla[mation] that there was a DNA match between the blood found in the girl's pants and Plaintiff." (ECF No. 1, ¶ 56.) Although the words are not quoted, the content of the allegedly false and defamatory statement is sufficiently described.

The statement does not fall into the realm of opinion, which enjoys some greater protection under Rhode Island law. *Burke v. Gregg,* 55 A.3d 212, 220 (R.I. 2012). It asserted a historical fact: that the DNA found on Christine's pants "matched" that of Mr. Monteiro. In the context of a press conference, it was also not pronounced as an interpretation of facts, but as an actual fact.

"[W]hether or not the meaning of a particular a statement is defamatory is one of law for the court" under Rhode Island law. *Gordon v. St. Joseph's Hosp.,* 496 A.2d 132, 136 (R.I. 1985). It is not a factual issue for a jury to determine. *Beattie v. Fleet Nat. Bank,* 746 A.2d 717, 721 (R.I. 2000), although a jury must determine whether the statement was false, whether it was communicated negligently, and whether it caused an injury. In this case, the Court finds the statement defamatory. Words are to be given their ordinary and plain meaning, *Swerdlick v. Koch,* 721 A.2d 849, 860 (R.I. 1998), and all the defendants have admitted that a layperson – which reporters and the public are – would interpret the word "match" as signifying a unique identification of a specific, singular individual. Thus, conveying to the public that the DNA on Christine's pants "matched" Mr. Monteiro was tantamount to proclaiming

36

he was with Christine at the time of her death; the near-compelling inference – and indeed the one the Pawtucket Police intended the public to draw – was that Mr. Monteiro killed her.  It cannot be seriously contested that such an accusation conveys a defamatory meaning.   A jury must decide whether the communication was made in a context that subjects the defendants to liability.

The Complaint asserts liability for defamation on the part of both Chief Goncalves and Det. Cormier, who conducted the press conference jointly. *See* Exhibit ZZ, ECF No. 50-53).  The defendants maintain that the plaintiff has failed to be specific enough about the falsity put forth at the press conference.  There is no transcript of the press conference, nor any deposition testimony about what was actually said.  However, the plaintiff has put forth a subsequent newspaper report alleging that Pawtucket claimed a "match" of Mr. Monteiro's DNA to blood on Christine's pants.  While Pawtucket disputed that assertion as "argumentative," it does not apparently dispute its accuracy.  (ECF No. 56, Pawtucket SDF ¶ 215.)  Pawtucket also asserted the DNA was "consistent" with Mr. Monteiro's, which was true, but according to the news report, Pawtucket had been more unequivocal about the "match" at the time of the news conference than it was six months later when the Attorney General declined to prosecute.  (ECF No. 56-19.)  In order to recover, the plaintiff will have to prove exactly what was said at the press conference, as well as its falsity, but what he has come forward with thus far is sufficient to present a jury issue concerning the falsity of statements made.

The issue of who might be liable, however, is less straightforward. A jury could find that based on what she knew, when Det. Cormier told Major Mullen the DNA sample from Mr. Monteiro was a "match" – the information that instigated the press conference and was announced there – she did so with knowing or reckless disregard for its accuracy. There is ample evidence in the record that Det. Cormier knew that the word "match" would be understood as meaning a unique identification of Mr. Monteiro as the perpetrator. There is no evidence, however, that Chief Goncalves knew or should have known anything other than what Det. Cormier told Major Mullen, which was that there was a "match." Nothing that the plaintiff has presented would warrant a juror in believing that Chief Goncalves displayed a reckless disregard for the accuracy of what she reported to the press or its outright falsity. Chief Goncalves, therefore, is entitled to summary judgment on Count IX, while Det. Cormier is not.

## VI. QUALIFIED IMMUNITY

The defendants posit that they are entitled to qualified immunity on all federal claims "because Detective Sue Cormier had probable cause to request an arrest warrant for Plaintiff, and her actions were reviewed and approved by prosecutors and a neutral magistrate." The defendants frame the inquiry wrongly. Qualified immunity protects government officials from damages resulting from their unconstitutional conduct. The doctrine has two elements: (a) that a constitutional violation was committed; (b) but without violating "clearly established statutory or constitutional rights of which a reasonable person would have known." *McDonald v.*

*City of Boston,* 334 F. Supp. 3d 429, 438 (D. Mass. 2018).   The application of qualified immunity thus presumes that a constitutional violation has occurred.   *Maldonado v. Fontanes,* 568 F.3d 263, 269 (1st Cir. 2009).   Thus, if Det. Cormier could rely on the existence of probable cause or approval of her application for an arrest warrant by a neutral and detached magistrate, she would be shielded by the lack of a constitutional violation, not by the application of qualified immunity.   *Wheeler v. City of Searcy, Ark.,* 14 F.4th 843, 852 (8th Cir. 2021) (the issuance of a warrant "is the clearest indication that the officers acted in an objectively reasonable manner or . . . in 'objective good faith'") (partially quoting *Messerschmidt v. Millender,* 565 U.S. 535, 546 (2012) (ellipse original).   But an affiant who has "recklessly or knowingly placed false information in the affidavit that misled the issuing judge" is not afforded that protection.   *Id.* at 852.

The same reason, however, that precludes summary judgment on the malicious prosecution and false arrest claims stands as an obstacle to the court bestowing qualified immunity:   the review by the magistrate and resulting warrant were allegedly wholly contaminated by the misleading and false information contained in the affidavit.   If a jury were to find that the affidavit was, in material respect, full of misleading and false statements, as well as omissions of exculpatory information that should have been included, the warrant must be considered void for all purposes.[19]

---

[19] The Pawtucket Police defendants raise the approval of the Attorney General staff of the warrant application as a shield precluding liability on their part and as an affirmation that probable cause existed.   (ECF No. 45, at Part IV.)   The facts omitted from the warrant application, which arguably made the affidavit too misleading and inaccurate, were not conveyed to the Attorney General's staff either.   *See e.g.,*

The applicability of qualified immunity stumbles at the second prong as well. The law prohibiting false or misleading statements in support of a search warrant has been settled since at least *Franks v. Delaware,* in 1978.  438 U.S. at 156.  The First Circuit recognized in 2005 that the omission of material exculpatory information is of the same consequence as false information *Burke,* 405 F.3d at 81. The conduct alleged by the plaintiff here does not amount to mere "misjudgments," *Mejia v. Charette,* No. 12-cv-449, 2014 WL 576140, at \*2 (D.R.I. Feb. 12, 2014), but instead is alleged to have been intentional or reckless skewing of the facts in order to create a stronger appearance of Mr. Monteiro's guilt.  The reliance of the Pawtucket defendants on *Wynn v. City of Griffin,* No. 19-10479, 2021 WL 4848075, at \*1 (11th Cir. Oct. 18, 2021) is misplaced.  There, as in this case, the warrant affidavit was reviewed by local prosecutors and a warrant was issued by a magistrate.  In *Wynn,* however, even though the charges were dismissed against the plaintiff, there is no suggestion that the warrant affidavit was incomplete or false.  The essence of the claim here is that the affidavit reviewed by the Attorney General and magistrate were intentionally or recklessly misleading and false:  if that were true, the Pawtucket cannot rely on the "approval" of it by others who were oblivious of the facts.

---

Deposition of Timothy Healy, ECF No. 50-10).  That precludes reliance on their "approval" when they were given only a partial picture devoid of exculpatory information in a way that made the case against Mr. Monteiro seem much stronger than it was.  The same analysis that renders the warrant arguably void precludes reliance on the prosecutors' "approval." *Wynn* [*v. City of Griffin,* No. 19-10479, 2021 WL 4848075, at \*1 (11th Cir. Oct. 18, 2021)], is not "strikingly similar" as these defendants suggest; there is no indication in the opinion that the affidavit was in any way unreliable.  Here, the allegation is that certain Pawtucket defendants decided to demonstrate probable cause by deliberately omitting facts that undercut it.

## VII.  CONCLUSION

The Pawtucket defendants have presented no argument on the claim that the warrant affidavit contained false and misleading statements and omitted necessary material exculpatory information.   Their Memorandum in support of summary judgment (ECF No. 45) does not address those allegations, but argues simply that the contents of the affidavit demonstrated probable cause.  Their Reply Memorandum addresses only the slander claim.  (ECF No. 57.)  As to Defendant Wong, the plaintiff has presented sufficient evidence to entitle him to a jury determination of whether she was responsible for the inaccurate "version" of the DNA evidence upon which Det. Cormier relied in seeking the arrest warrant

For the reasons explained above, the Court partially grants and partially denies all the defendants' Motions for Summary Judgment as follows:

1.   Defendant Mullen's Motion for Summary Judgment (ECF No. 43) is GRANTED as to all counts.

2.   Defendant Goncalves' Motion for Summary Judgment (ECF No. 43) is GRANTED as to Counts VIII and IX and DENIED as to Counts I and II.

3.   Defendant Cormier's Motion for Summary Judgment (ECF No. 43) is GRANTED as to Count VIII and DENIED as to all other Counts.

4.   Defendant Lefebvre's Motion for Summary Judgment (ECF No. 43) is GRANTED as to Count VIII and DENIED as to all other Counts.

5.   Defendant Wong's Motion for Summary Judgment (ECF No. 47) is GRANTED as to Counts IV and VIII, and DENIED as to Counts I, II, VI, and VII.

6.    The City of Pawtucket's Motion for Summary Judgment (ECF No. 43) is DENIED.


IT IS SO ORDERED:

_____
Mary S. McElroy,
United States District Judge

September 28, 2023