**Gerald J. Coyne**
**8 Newbrook Drive**
**Barrington, Rhode Island 02806**
**(401) 524-3602**
**gcoyne747@gmail.com**

September 22, 2022

Marc DeSisto, Esq.
DeSisto Law LLC
60 Ship Street
Providence, Rhode Island 02903

      Re:    Joao Monteiro v. Susan Cormier, et al.
                 United States District Court for the District of Rhode Island
                 Civil Action No. 1:21-cv-00046-MSM-LDA

Dear Mr. DeSisto:

Please accept my report regarding the above-referenced case. My opinions and conclusions are based upon my review of materials provided to me, as well as upon my experience as an attorney since 1983.

1. **Qualifications**

Between 1999 and 2019, I served as Deputy Attorney General of the State of Rhode Island. The Deputy Attorney General serves at the pleasure of Attorney General and is the highest ranking official in the office other than the elected Attorney General. The Deputy Attorney General is appointed by, and serves at the pleasure of the Attorney General. The Deputy Attorney General oversees the daily operations of the Office of Attorney General (the "Office"), including the Criminal Division, the Civil Division, the Administration and Finance Division, and the Bureau of Criminal Identification.

I graduated from Boston College in 1980, and from Suffolk University Law School in 1983. As a student at Suffolk University I participated in internships with the Rhode Island Attorney General's Criminal Division from May, 1982 through June, 1983. Following my graduation in 1983 I took the Rhode Island bar examination, and was sworn in as an attorney before the Rhode Island Supreme Court in October, 1983.

I entered active duty as a member of the United States Navy's Judge Advocate General's Corps in August, 1983. In December, 1983 I graduated from the Naval Justice School's Lawyers' Course, and was certified as a trial attorney under the Uniform Code of Military Justice. I reported to the Navel Legal Service Office in Pensacola, Florida in January 1983, and over the next twelve months

Marc DeSisto, Esq.
September 22, 2022

served as a Legal Assistance Attorney, Trial Counsel (Prosecutor), and Command Services Attorney.

In January, 1984, I reported to the Commander Naval Air Forces, U.S. Pacific Fleet as the Assistant Force Judge Advocate. In that capacity I provided legal advice on all matters, including military justice, to the Commander, whose command included aviation assets in the United States Pacific Fleet, including Naval Air Stations, Functional Wings, Aircraft Carriers, and aviation squadrons. During this assignment I also had the collateral duty of serving as the Staff Judge Advocate to the Commander of Carrier Group One. The Commander of Carrier Group One exercised operational and administrative command of a carrier battle group when deployed. In that role, I participated in deployments to the Indian Ocean and Western Pacific Ocean in 1985, 1986 and 1987.

In 1987, I reported to the Naval Justice School in Newport, Rhode Island as an instructor. I served in that capacity until April, 1988, when I left active duty and joined the Office of the Attorney General as a Special Assistant Attorney General in the Criminal Division. During my active duty service, I received several awards, including the Navy Commendation Medal, the Navy Achievement Medal, and the Sea Service Deployment ribbon.

My initial assignment in the Criminal Division was as a trial attorney assigned to the Providence County Superior Court, where I was assigned a variety of felony criminal cases for prosecution, up to and including the crime of murder. While serving in that capacity, I was assigned the additional responsibility of prosecuting all environmental crimes occurring within the State. In August, 1989 I was placed in charge of the Providence County Grand Jury unit, where I oversaw the presentation of several hundred cases before the Grand Jury. I was promoted to Assistant Attorney General in August of 1990, and in 1991 relinquished my assignment to the Grand Unit. At that time, I assumed responsibility for the investigation and prosecution of all cases related to organized crime within the State, in addition to environmental crime prosecution and other case assignments I received. From 1991 until 1994, I also served as the primary instructor for criminal law and procedure to recruits at the Rhode Island Municipal Police Training Academy, and also provided instruction at the Rhode Island State Police Training Academy.

In 1994 I resigned from the Office of Attorney General, and opened a law firm known as Bristow and Coyne. During that time, I focused on civil and criminal litigation before the state and federal courts, including the representation of indigent individuals when there was a conflict with the Office of the Public Defender. I also served as the legal counsel to the Majority Leader of the Rhode Island House of Representatives.

Upon his election as Attorney General in November, 1998, Attorney-General Elect Sheldon Whitehouse offered me the position of Deputy Attorney General. I served as Deputy Attorney General for Attorney General Whitehouse during his tenure as Attorney General. Attorney General Whitehouse did not seek reelection, and was succeeded by Attorney General Patrick Lynch, who was elected in November, 2002 and who assumed office in January, 2003. Attorney General Lynch requested that I remain as Deputy Attorney General, and I served as his Deputy

Marc DeSisto, Esq.
September 22, 2022

Attorney General until he left office due to term limits in January 2011. Attorney General Lynch was succeeded by Attorney General Peter Kilmartin in January 2011, and Attorney General Kilmartin again requested that I continue to serve as Deputy Attorney General. I served as his Deputy Attorney General until he left office in January, 2019.

In 2010 I attended a program entitled, "Senior Executives in State and Local Government" at the Kennedy School of Government at Harvard University.

At the time I left office, I was familiar with the operations of attorneys general offices across the country, and served as an instructor for the National Attorneys General Training and Research Institute at numerous courses, including their "Career Prosecutor Course." I also served as a faculty member for orientation programs conducted for incoming attorneys general and deputy attorneys general from approximately 2006 to 2018.

In 2011, I received the Neil J. Houston, Jr. Award from Rhode Island Justice Assistance for, "Dedicated service and citizen contribution toward the criminal justice profession and the public interest. In 2011, I also received the Marvin Award (now known as the Senior Staff of the Year Award) from the National Association of Attorneys General for, "exceptional service to NAAG and the attorneys general through exemplary leadership, expertise, and achievement." At the time I left the Office of Attorney General, I had served as Deputy Attorney General longer than any of my colleagues across the country, with the exception of the Deputy Attorney General from Mississippi who had served for an identical period.

During my tenure, I became very familiar with the operation of other state attorneys general offices, and was selected to participate or lead in management reviews of other attorneys general offices on behalf of the National Association of Attorneys General on ten occasions.

Throughout my tenure as Deputy Attorney General, I met with the Chiefs of the Criminal Division on a daily basis to discuss matters occurring within that division. In addition, I personally prosecuted several cases, including homicides, environmental crimes, and police misconduct, and I directly oversaw the Office's investigation of officer-involved shootings throughout the state, including responding to the scene of shootings and being directly involved in the investigation of those incidents.

Since retiring from the Office of Attorney General, I have served as the Managing Director of State Marketing Services for Affiliated Monitors of Boston, Massachusetts.

**2.   Introduction**

I have been retained by DeSisto Law LLC to render an expert opinion and conclusions regarding the role of the prosecutor relative to arrest and charging of Joao Monteiro, who was charged with the murder of Christine Cole. Ms. Cole disappeared near her home in Pawtucket, Rhode Island on January 6, 1988, and her body was found on a beach in Warwick, Rhode Island approximately 54

Marc DeSisto, Esq.
September 22, 2022

days later.  There was no suspect charged in connection with Ms. Cole's disappearance or death until Mr. Monteiro was charged by the Pawtucket Police Department in July 2019.

My fees are $250 per hour for the revew of documentation and materials provided for review.  My professional unbiased opinion is provided in this report, and payment is not a factor in my rendering a favorable opinion.

I have not published any articles relevant to this topic in the past ten years, nor have I previously testified at trial or in a deposition as an expert witness within the past four years.

Pursuant to Rule 26 of the Federal Rules of Civil Procedure, I have reviewed the reports and materials provided to me by counsel referencing this case.  The facts and information I have considered in forming my opinions and the basis for those opinions are listed subsequently.

3. **Methodology**

My review is based upon my knowledge of the criminal justice system within the State of Rhode Island and my knowledge and experience of best practices in the area of criminal prosecution developed since 1983.

The opinions I have rendered are also the result of my study of the materials I have been provided. Other than those materials, I have no personal knowledge of the manner in which the decision to arrest and charge Mr. Monteiro was reached by either any individual named as a defendant in this case, or collectively by the Pawtucket Police or the Office of the Attorney General.

4. **Materials Reviewed**

   a) Deposition of Det. Susan Cormier (w/exhibits)
   b) Deposition of Major Daniel Mullen (w/exhibits)
   c) Deposition of Stephen Dambruch
   d) Deposition of Timothy Healey
   e) Deposition of Joao Moteiro
   f) Arrest Warrant for Joao Monteiro
   g) Draft affidavit in support of arrest warrant for Joao Monteiro
   h) Search Warrant for Joao Monteiro
   i) Background investigation of Joao Monteiro
   j) Text messages between Det. Cormier and Tamara Wong
   k) Investigation Summary (88-00837)
   l) Handwritten Cold Case Summary (one page)
   m) Police Reports of initial investigation (112 pages)
   n) Crime Scene photos (16 pages)
   o) Autopsy Report for Christine Cole

Marc DeSisto, Esq.
September 22, 2022

- p) DNA Reports and messages (19 pages)
- q) News articles compiled by Pawtucket Police
- r) DNA messages (3 pages)
- s) Arrest Report for Joao Monteiro (19-1789)
- t) Incident Report reflecting arrest (18 pages)
- u) Combined screenshots of texts between Det. Cormier and AG's (27 pages)
- v) Screenshots between Det. Cormier and AAG Patrick Youngs (2 pages)
- w) Screenshots of texts between Det. Cormier and AG's (7 pages)

5. **Analysis**

Under Rhode Island law, the "Core function of the constitutionally established office of the Attorney General is the power and discretion to prosecute crimes." In re: House of Representatives (Special Prosecutor), 575 A.2d 176 (R.I. 1990).

In the State of Rhode Island, the Attorney General is an elected constitutional officer. The Attorney General is solely responsible for the prosecution of all felonies in the State. There are three states in which the Attorney General has this duty. Those states are Rhode Island Delaware and Alaska. In other states, this duty is generally carried out by District Attorneys (as in Massachusetts), or by State's Attorneys (as in Connecticut).

All attorneys within the Office are either Assistant Attorneys General or Special Assistant Attorneys General. The Attorney General may appoint up to 30 Assistant Attorney Generals. Attorneys entering the Office generally are hired as a Special Assistant Attorney General, and are promoted to the rank of Assistant Attorney General.

The Criminal Division of the Attorney General is headed by a Division Chief. Since 1999, the organization of the Criminal Division includes four Deputy Criminal Division Chiefs, whose responsibilities are generally set forth in an organization chart that is subject to revision based upon the direction of the Attorney General. Attorneys within the Criminal Division are assigned to a particular unit within the Criminal Division, each of which is supervised by a Unit Chief, who reports to the Chief of the Division through a particular Deputy Chief.

Generally, criminal cases against adults in Rhode Island are initiated in the District Court. The District Court has jurisdiction over all misdemeanors. Generally, all felonies in Rhode Island must be adjudicated in the Superior Court. In order for a criminal charge to be formally brought in Superior Court, the case must be charged either by grand jury indictment or by a criminal information which is signed by the Attorney General or a designee following review of

Marc DeSisto, Esq.
September 22, 2022

documentation prepared by the arresting law enforcement agency. In either case, there must be probable cause to bring a criminal charge to the Superior Court.

Article I, Section 7 of the Rhode Island Constitution memorializes the "Requirement of presentment or indictment" by stating:

*"Except in cases of impeachment, or in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger, no person shall be held to answer for any offense which is punishable by death or by imprisonment for life unless on presentment or indictment by a grand jury, and no person shall be held to answer for any other felony unless on presentment or indictment by a grand jury or on information in writing signed by the attorney-general or one of the attorney-general's designated assistants, as the general assembly may provide and in accordance with procedures enacted by the general assembly…"*

In Rhode Island, the crime of murder is punishable by imprisonment for life. See, §11-23-2. Therefore, no person shall be held to answer for the crime of murder unless first indicted by a grand jury.

Although the formal charging for the crime of murder in Superior Court must come through the return of an indictment by either a county or statewide grand jury, the decision whether the arrest an individual for crime is initially made by a police officer. It is well established that an arrest signifies the initial step towards the initiation of a prospective criminal prosecution.

Under Chapter 12-7 of the Rhode Island General Laws, a "peace officer" has the power to make a lawful arrest. As set forth in that section, an arrest may be made either with or without an arrest warrant. The term "peace officer" includes "any member of a municipal or local police department."

Crimes punishable by up to life imprisonment are referred to in Rhode Island as "capital offenses" despite the fact that the death penalty does not exist under Rhode Island law.

When an individual is arrested for a capital offense, including murder, that individual must be promptly presented to the court for an initial appearance. Although only the Superior Court has the jurisdiction to dispose of a felony charge, an individual who has been initially arrested is generally brought before the District Court for an initial appearance. (See, §12-3-2). Because the District Court does not have jurisdiction to dispose of the case, no plea is entered at the initial appearance of an individual charged with a felony. Rather, the court determines whether bail should be set, and if so, what the appropriate form and amount of that bail should be.

Rhode Island law, however, permits individuals charged with capitol offenses to be held without bail at their initial appearance before the Court. Article I, Section 9 of the Rhode Island Constitution states that:

Marc DeSisto, Esq.
September 22, 2022

*"All persons imprisoned ought to be bailed by sufficient surety, unless for offenses punishable by imprisonment for life, or for offenses involving the use or threat of use of a dangerous weapon by one already convicted of such offense punishable by imprisonment for life, or for offenses involving the unlawful sale, distribution, manufacture, delivery, or possession with intent to manufacture, sell, distribute or deliver any controlled substance or by possession of a controlled substance punishable by imprisonment for ten (10) years or more, when the proof of guilt is evident or the presumption great."*

In the event that the State, or its representative, objects to the setting of bail at the initial appearance, this provision is enforced by the convening of a bail hearing, generally within 10 days of the individual's arrest. During the time between the initial appearance and the bail hearing, the individual is held without bail at the Adult Correctional Institution.

In order for the defendant to be held without bail at the conclusion of a bail hearing, the Court must find that the State has presented sufficient evidence, which would be admissible at trial, that, "proof of guilt is evident or the presumption great." Thus, the State, through the Attorney General, must present witnesses who can testify under oath, subject to cross-examination, in order to meet that burden of persuasion.

Until approximately 1990, the Rhode Island Attorney General generally utilized horizontal, rather than vertical prosecution practices. When a prosecutor prosecutes a case vertically, the same prosecutor handles every part of the trial process, from arraignment to sentencing. When a prosecutor prosecutes a case horizontally, a different prosecutor is in charge of each part of the process.

In the case of a homicide, different prosecutors could work on the same case at the investigatory stage, the initial appearance and bail hearing, the grand jury presentation, and trial. This was a very disjointed and inefficient system. Different prosecutors may have different theories of the underlying case; subsequent prosecutors could be bound by the legal and strategic decisions of previous prosecutors who often may be significantly less experienced, and the families of crime victims often had no single point of contact to whom questions could be directed.

In addition, decisions made by police during the investigatory stage without the benefit of legal advice could have significant impacts upon the admissibility of evidence in a subsequent trial.

Although the Rhode Island Attorney General has the statutory responsibility to prosecute all felonies, it cannot generally direct the police to take, or refrain from taking, any particular actions prior to the initiation of the prosecution process as triggered by an arrest. This authority differs from other jurisdictions. For example, in Massachusetts, the District Attorney has the overall statutory authority to "direct and control" the investigation of a homicide, under Title VI, Chapter 38, Section 4 of the Massachusetts General Laws, which states:

Marc DeSisto, Esq.
September 22, 2022

*"The district attorney or his law enforcement representative shall direct and control the investigation of the death and shall coordinate the investigation with the office of the chief medical examiner and the police department within whose jurisdiction the death occurred."*

In the absence of statutory authority, the Rhode Island Attorney General must rely largely upon the power of persuasion to convince the state's law enforcement agencies to implement certain policies. Implementation of vertical prosecution in homicide cases required the voluntarily cooperation of police departments. In order implement the policy of vertical prosecution, the policy was first implemented in the case of homicides, although vertical prosecution was used more widely in other jurisdictions, particularly in the area of sexual assaults.

In the area of a homicide, vertical prosecution requires the police department to notify the Attorney General whenever a potential homicide occurs, so that a prosecutor can be assigned with sufficient time to allow that prosecutor to respond to the scene of the crime. In the event such a notification is not made, or a prosecutor does not respond, a subsequently assigned prosecutor may not be able to obtain access to the crime scene, and certainly will have a far different perspective than he or she would have had if the scene had remained an active crime scene. In such a case, the prosecutor must rely upon photographs or other graphic evidence rather than personal observation, or upon the second hand impressions of those who were present.

Still, in the absence of a statutory mandate, law enforcement agencies do not have a universal practice of making a notification in every case. In some cases, the gravity of a victim's wounds may not be immediately apparent. In others, there is virtually no crime scene observe, if for instance, a victim was quickly transported to a medical facility from a public location.

The assigned prosecutor also can provide critical legal advice, often viewing the case prospectively in terms of what evidence will be admissible at a bail hearing or a trial. Although the legal standard for arrest one of is probable cause, which remains the standard for the formal filing of charges either through an indictment or a criminal information (in non-capital cases), the prosecutor must be mindful that a bail hearing requires legally admissible evidence to support the higher standard of "proof evident or presumption great," while to convict at trial the burden of proof rises to that of "beyond a reasonable doubt."

Thus, it is critical that while working with the police as a team, an experienced prosecutor must also function as a valuable check and balance. This "check and balance" role is inherent in the relationship of police and prosecutors. Prosecutors, as attorneys, have a duty to the fair and ethical administration of justice, and that obligation is not shared by police. In Rhode Island, prosecutors are bound by Rule 3.8 of the Rhode Island Rules of Professional Conduct entitled, "Special Responsibilities of a Prosecutor."

In addition to the assignment of "vertical" prosecutors to homicides and other serious or complex cases, the Rhode Island Attorney General utilizes a practice of assigning liaisons between the Criminal Division and each law enforcement agency in the State. This practice was implemented

Marc DeSisto, Esq.
September 22, 2022

prior to my joining the office in 1988, and continues to this day. The liaison is expected to be available as a first line of contact with any member of that agency. This practice allows the agency to have access to prosecutors for legal advice in a variety of cases that may not warrant the utilization a vertical prosecution. In addition to the department liaisons, each weekend there are one or more prosecutors assigned to serve as "on duty prosecutors." These prosecutors fill the same role as department liaisons.

In addition, other specialized units develop working relationships with similarly assigned units within police departments, particularly in the areas that require specialized knowledge and experience, such as sexual assaults/child molestations ("Special Victims"), financial crimes, narcotics and juveniles.

Finally, over time, more senior prosecutors develop working relationships with individual investigators generally based upon past experiences, often developed over many years.

In sum, although the interaction of investigators and prosecutors cannot be mandated, there have been numerous practices that have developed in Rhode Island over the past forty years to ensure the availability of prosecutors to police officers.

In the present case, Assistant Attorney General Timothy Healy stated in his deposition that he first became "familiar" with the Christine Cole investigation when he was approached by a colleague, Assistant Attorney General Joseph McBurney, who he described as being in charge of the "Narcotics and Organized Crime Unit" within the Attorney General's Criminal Division. Although he was not aware of how Mr. McBurney became aware of the investigation, Mr. Healy did state that it was through Mr. McBurney's role as liaison to the Pawtucket Police Department, which was investigating this matter.

It is significant to note that what is not stated within Mr. Healy's deposition is his knowledge of whether there had been any other contact between the Pawtucket Police Department and the Office of the Attorney General prior to the contact to Mr. McBurney. It is noted that Ms. Cole disappeared in 1988, and that a very intensive investigation of her disappearance was conducted. It appears that the investigation of her disappearance continued to be active at least through 1996, when according to the Plaintiff's complaint at Paragraph 24, "unknown DNA analysis been conducted on that blood." (Referring to what the complaint refers to in Paragraph 23 as, "purportedly traces of blood found on her pants.")

The prior involvement of the Attorney General's office is documented in the "Investigation Summary" provided along with the materials in this case. Although it is undated, it is on Pawtucket Police Department letterhead bearing the name of "George L. Kelly, III – Chief of Police." Chief Kelly retired in 2010.

Detailing a number of investigative steps, the "Investigation Summary" concludes by stating, "In 1998 the investigation stalled due to change in personnel at the Attorney General's Office and the

Marc DeSisto, Esq.
September 22, 2022

lack of suitable scientific analysis techniques. In 2000 the Attorney General's office instructed the Pawtucket Police to return property seized from the Oulighan barn to Richard Graves, pursuant to his request to have the property returned."

Although the Complaint is silent regarding when the investigation was subsequently closed, at Paragraph 26 the Complaint asserts, "In August 2018 the Pawtucket [Police] reopened the investigation."

Given the high visibility of the underlying crime, and the lengthy period that the Pawtucket Police Department investigated this matter, it is reasonable to assume that there had been some contact between the Pawtucket Police Department and the Office of Attorney General prior to the time that Mr. McBurney spoke with Mr. Healy, although the nature and details of that contact were not known to Mr. Healy. Review of documentation provided disclosed that there was specific contact with Assistant Attorney General Randall White in March 2008, and with Assistant Attorney General Paul Daly in March 2010.

Detective Cormier stated in her deposition that she had spoken with several prosecutors since she reopened the case, and actually provided extensive documentation to Special Assistant Attorney General Lauren Iannelli. None of individuals previously consulted were among the group who responded to the Pawtucket Police Department prior to Mr. Monteiro's arrest.

In addition, Detective Cormier contacted Assistant Attorney General Patrick Youngs, among the most experienced of prosecutors in the Office, on June 13, 2019 so that he could review her draft affidavit in support of the search warrant for two buccal swabs from Mr. Monteiro.

One of the most critical components of the nature of assistance that the Office of the Attorney General provides to law enforcement agencies is the review of proposed affidavits. These affidavits can include affidavits in support of arrest warrants, search warrants, and warrants seeking permission to conduct electronic surveillance.

During the course of my service as either a line prosecutor or Deputy Attorney General, I reviewed over one hundred affidavits prior to their submission to a judge or magistrate. In each instance, the factual assertions contained in the affidavit must be those of the affiant. In fact, it is critical that the prosecutor ensure that their role is as a reviewer of the assertions of the affiant, and in that sense, reviewing a draft affidavit is an important, though not a required, "check and balance." The prosecutor also has the opportunity to challenge the sufficiency of any conclusions or inferences contained within the draft affidavit, as well as to identify any legal issues that the affidavit may pose.

Although a review by the Attorney General's office was not required, Detective Cormier's submission of her draft affidavit to prosecutors is consistent with best practice.

Marc DeSisto, Esq.
September 22, 2022

It is not unusual for an experienced prosecutor such as Mr. Healy to include a less experienced prosecutor such as Special Assistant Attorney General Jillian Dubois in the handling of a case of this nature. Including less experienced prosecutors in assignments of this nature provides invaluable on-the-job training. In addition, although less experienced, some prosecutors have specialized knowledge or experience that can be particularly helpful in certain instances.

Given the nature of this investigation, it appears that Mr. Healy notified the Chief of the Criminal Division, Stephen Dambruch. In his deposition, Mr. Healy stated that Mr. Dambruch accompanied he and Ms. Dubois to the Pawtucket Police Department when they met there with detectives on the evening that Mr. Healy become involved in the case. Given the workload of the Chief of the Criminal Division, it is not possible for the Chief to become directly involved in every investigation, or even every homicide investigation. Although it would be expected that Mr. Healy would keep Mr. Dambruch informed of significant developments in this case, the direct involvement of the Chief of the Criminal Division into the review of this investigation was therefore unusual and not reasonably foreseeable by the Police Department.

To the extent that the Attorney General has statewide prosecutorial responsibility, exercised through the Chief of the Criminal Division, the Chief's contacts within police departments generally occur at the executive and managerial level, and occasionally at the supervisory level. Direct interaction between the Chief and a line-level investigator is rare, and because of that, the lack of familiarity between Criminal Chief Dambruch and Detective Cormier would reduce the likelihood of the Attorney General's review of her draft affidavit being anything other than an "arms-length" review that would rise or fall on the merits of the draft.

I have reviewed a copy of Detective Cormier's draft affidavit in support of the arrest warrant she proposed seeking for Mr. Monteiro. The document provided contains hand written notes that supposedly reflect edits made my Mr. Dambruch, including notations in which he either made corrections or made notes seeking additional information.

Within the draft affidavit there is a statement that, "It appears that Monteiro lives his life in a very covert manner." There is no notation of any marks by Mr. Dambruch or any other person in the area of that statement. The draft also contains the statement that on July 16, 2019 Detective Cormier applied for a search warrant for two buccal swab samples to be used for DNA analysis, and that the search was issued on that day. The draft further states that at approximately 8:00 AM on July 17, 2019, Joao Monteiro was brought to the Pawtucket Police Department for the purpose of executing that search warrant, and that Mr. Monteiro cooperated with the detectives who obtained the samples from him. Following the seizure of the samples, Mr. Monteiro was advised of his Constitutional Rights, and agreed to be interviewed by Pawtucket Police. According to the draft, "Monteiro continued to deny knowing the victim or being responsible for her disappearance and death." Upon completion of the interview, Mr. Monteiro was transported to his home.

The buccal swabs were transported to the Rhode Island Department of Health, where they were analyzed by Forensic Scientist Tamara Wong. In the draft presented by Detective Cormier, the

Marc DeSisto, Esq.
September 22, 2022

following statement regarding that analysis was included: "Forensic Scientist Tamara Wong from the Rhode Island Department of Health contacted Detective Cormier at 5:50 PM on July 17, 2019 to notify her that the DNA reference was compared to the partial Y-STR profile obtained from the blood located on the inside crotch of the victim's pants and confirmed that it was a match." The words "a match" appear circled in blue ink on the draft, which Mr. Dambruch indicated were his edits. There is a line to the bottom of the page, where the following phrase in written: "Consistent with the known reference DNA profile for Joao Monteiro."

In his deposition, Mr. Dambruch explained that the word "match" is not a legal term, and the language he suggested was a more accurate legal description of the state of the evidence as he understood it to be.

I have reviewed the actual affidavit that Detective Cormier submitted in support of the arrest warrant she prepared for Mr. Monteiro, and noted that the language regarding the DNA analysis had been changed to include the language suggested by the Chief of the Criminal Division.

Based upon the information in the documents and materials provided, it appears that at some point on or before July 17, 2022 either Detective Cormier or another member of the Pawtucket Police Department contacted Assistant Attorney General Joseph McBurney. Based upon the review of the documents provided, it appears that the investigation had reached a critical point. The Police Department had obtained a search warrant seeking evidence for DNA analysis from an individual they considered a suspect.

Because the suspect had not yet been charged with any offense, upon learning that there was a "match" with respect to the DNA comparison, Detective Cormier had begun to prepare an affidavit in support of a warrant for the suspect's arrest. The Attorney General's response, with three prosecutors including the Chief of the Criminal Division, reflects the significance of the case. The Chief of the Criminal Division reviewed the draft, and made written suggestions, which were incorporated into the affidavit submitted to Magistrate J. Patrick O'Neill.

Once the suspect, Mr. Monteiro, was arrested, he was brought before the District Court, and in keeping with the typical procedure for defendants charged with murder, the State objected to the setting of bail, asking that he be held without bail.

The period of time between initial appearance and bail hearing gives the prosecutor an opportunity to review and assess the quality of the evidence that can be presented at the bail hearing.

An initial concern, particularly in a case that dates back approximately 30 years as this one did, is the availability of witnesses. Once the availability of witnesses is established, each witness must be interviewed in order to assess the value of their testimony.

For witnesses that are available, there are both legal and tactical decisions to be made at this point. On one hand, if a witness testifies subject to cross-examination, their testimony may be admissible

Marc DeSisto, Esq.
September 22, 2022

in a subsequent trial if that witness becomes unavailable to testify in person.  On the other hand, a witness who is not fully prepared to testify can offer testimony that is particularly useful for the defense attorney's cross examination at a later date.

In addition, the quality of evidence must be reviewed, including in this case, the quality of the DNA evidence.  Mr. Healy's deposition states that on the day of Mr. Monteiro's initial appearance, he contacted both Medical Examiner as well as the DNA forensic scientist regarding the evidence in the case.  It is clear that in the eyes of the police and the prosecutors, the DNA evidence provided the most critical connection between Mr. Monteiro and Ms. Cole.  Without that evidence, there was no other evidence specifically linking the two.

It was at that time that Mr. Healy, and subsequently Mr. Dambruch, stated that they learned the evidence did not provide the level of "match" they anticipated.  In his deposition, Mr. Healy stated, "At that time, it became clear that this wasn't a complete match, as I had believed, you know, the day before, rather that day."

Following his conversation with Ms. Wong, Mr. Healy described having a conversation with Detective Cormier in which he relayed to her that, "I have a lot of concerns about the vialbility of this case."  Because of that, they apparently reached the conclusion that there was insufficient evidence to meet the burden of proof that would be required to convince the District Court Judge to hold Mr. Monteiro without bail pending trial.

Later in the day of his appearance or the next day, Mr. Healy recalls reaching out to Mr. Monteiro's attorney and advising him that, "Based on this information that we have at this point…I'm prepared to go back into court….and request that the judge set bail in this case." Mr. Healy stated that he returned to court on the day following Mr. Monteiro's initial appearance, and asked that bail be set.  Bail was set in an amount agreed to between Mr. Healy and Mr. Monteiro's attorney.  Mr. Monteiro was released from the ACI on that day, a Friday, and subsequently appeared back in court the following Monday so that other bail conditions could be clarified.

Once bail was set, the charge against Mr. Monteiro was not immediately dismissed.  Rather, the prosecutors involved in the case gave suggestions to the Pawtucket Police regarding further steps they could take to develop additional evidence.  According to Mr. Healy no additional evidence was presented.

Based upon the documentation provided, the charge against Mr. Monteiro was dismissed by the Attorney General on January 31, 2020.

### 6. Opinion

Based upon the information I have received thus far regarding the matter of Monteiro v. Cormier, et al., the following section describes my professional opinions, conclusions and supporting

Marc DeSisto, Esq.
September 22, 2022

rationale.  If additional material becomes available, I reserve the right to amend my opinions and conclusions based upon any new or additional information.

In her affidavit in support of a search warrant for the seizure of two buccal swabs sufficient for DNA analysis from Mr. Monteiro, submitted to the District Court on July 16, 2019, Detective Cormier describes herself as having been a member of the Pawtucket Police Department for twenty-five years, and having been assigned to the Detective Division of that department for fourteen years.  As such, I believe that it is reasonable to assume that Detective Cormier was familiar with the process and legal standards of obtaining a search warrant and arrest warrant, including the requirements for an affidavit in support of a warrant.

In the same affidavit, Detective Cormier specifically states that she is "charged with the duty of investigating all violations of laws of the State of Rhode Island, including homicide."

As a detective with fourteen years of experience, I believe that it is reasonable to assume that in July, 2019, Detective Cormier was familiar with the role of the Rhode Island Attorney General's Criminal Division, and the assistance that could be provided to law enforcement agencies by the Division prior to an arrest.

Based upon her experience, I also believe that Detective Cormier would have been specifically familiar with the "vertical prosecution" model by which the Rhode Island Attorney General handled homicide cases, even if she was not familiar with the specific term "vertical prosecution."

I have reviewed the Plaintiff's Complaint, and specifically Paragraph 7, which states, "To get away with this misconduct, Defendants bypassed standard procedures by excluding representatives of the Rhode Island Attorney General's Office ("AGO") from the arrest process and by not seeking a grand jury indictment as the basis for an arrest."

Although the Rhode Island Attorney General's office has utilized a "vertical prosecution" model for the prosecution of homicide cases since approximately 1990, that model depends upon the police department initiating contact with he Attorney General's office, and there is no set timeline regarding the point at which such contact must be made.

In her deposition, Detective Cormier described having discussions with several prosecutors regarding this case prior to the time that she drafted the arrest warrant for Mr. Monteiro.

In this case, because the incident occurred in 1988, there was no crime scene for an assigned prosecutor to observe.  The Pawtucket Police apparently did reach out to their assigned liaison from the Attorney General's office on the morning of July 17, 2019, prior to an arrest being made.  Therefore, the Attorney General's office did have the opportunity to perform a preliminary review of the evidence that the Pawtucket Police believed supported an arrest.

Marc DeSisto, Esq.
September 22, 2022

The notification occurred with sufficient time for three prosecutors to respond to the Pawtucket Police Department, and to participate collectively in both the review of evidence, and the review of a proposed affidavit in support of an arrest warrant.

The personal involvement by the Chief of the Criminal Division, who responded to the Pawtucket Police Department, and his personal review of the arrest warrant affidavit demonstrated a higher level of review by the Criminal Division than occurs in most homicide cases when vertical prosecution is initiated.

Although the Attorney General was not notified until the day that the arrest warrant was sought, that notice did not prevent the Attorney General from having the opportunity to review the basis for this arrest.

Based upon my experience in the Attorney General's office, which dates to 1982, I am not familiar with any "standard procedure" that includes "seeking a grand jury indictment as the basis for an arrest."

It would be unusual for prosecutors to seek a grand jury indictment as the basis for an arrest in a homicide case. A grand jury is a secret proceeding in which witnesses testify under oath. At the conclusion of the testimony regarding a case, legal instruction regarding potential charges is presented by a prosecutor, who then leaves the room while the grand jury deliberates. In the event the grand jury votes to return an indictment, the indictment must then be drafted and returned to the grand jury so that members of the grand jury can sign the indictment. Once that process is completed, arrangements must be made with the Superior Court for the grand jury to appear in court, before a judge, and "return" the indictment to the court. Once the indictment is returned, the Attorney General may ask that the indictment be sealed, and that an arrest warrant be issued for the person indicted. If the Attorney General does not ask for an indictment to be sealed, the Court sets a date for the defendant's arraignment, and notice is sent to the defendant.

In my experience, utilizing a grand jury as the basis for an arrest is typically only done when the grand jury is necessary to compel testimony from an uncooperative witness, or when the Attorney General feels it is necessary in order to obtain sworn testimony from a witness or witnesses. It may also be used to form the basis of an arrest when the grand jury issues a subpoena duces tecum for the production of documents which are not otherwise available.

In this instance, with the execution of a search warrant on the morning of July 17, 2019, Mr. Monteiro became aware that he was a suspect in the murder of a child dating to 1988. With that notice, he had a motivation to flee the jurisdiction had he so chosen, or to begin to discuss the matter with others, potentially tainting their subsequent testimony. For that reason, once the buccal swabs were analyzed, I believe the proper decision was to seek an arrest warrant rather than initially seeking a grand jury indictment.

7. **<u>Conclusion</u>**

EXHIBIT 1

Marc DeSisto, Esq.
September 22, 2022


For the foregoing reasons, I believe that Detective Cormier and the Pawtucket Police Department complied with established procedures by notifying the Attorney General of this homicide investigation, seeking their counsel and advice, and providing the opportunity for the Attorney General to review the basis for an arrest before that arrest was made, including but not limited to the opportunity to edit the affidavit in support of that warrant.

Respectfully submitted,

*/S/   Gerald J. Coyne*

Gerald J. Coyne